# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

REVEREND DARCY ROAKE and ADRIAN VAN YOUNG, on behalf of themselves and on behalf of their minor children, A.V. and S.V.; REVEREND MAMIE BROADHURST and REVEREND RICHARD WILLIAMS, on behalf of themselves and on behalf of their minor child, N.W.; REVEREND JEFF SIMS, on behalf of himself and on behalf of his minor children, A.S., C.S. 1, and C.S. 2; JENNIFER HARDING and BENJAMIN OWENS, on behalf of themselves and on behalf of their minor child, A.O.; ERIN HAWLEY and DAVID HAWLEY, on behalf of themselves and on behalf of their minor children, A.H. and L.H.; DUSTIN MCCRORY, on behalf of himself and on behalf of his minor children, E.M., P.M., and L.M; GARY SERNOVITZ and MOLLY PULDA, on behalf of themselves and on behalf of their minor child, T.S.; CHRISTY ALKIRE, on behalf of herself and on behalf of her minor child, L.A.; JOSHUA HERLANDS, on behalf of himself and on behalf of his minor children, E.H. and J.H.,

        Plaintiffs,

        v.

CADE BRUMLEY, in his official capacity as the Louisiana State Superintendent of Education; CONRAD APPEL, in his official capacity as a member of the Louisiana State Board of Elementary and Secondary Education ("LSBESE"); JUDY ARMSTRONG, in her official capacity as a member of the LSBESE; KEVIN BERKEN, in his official capacity as a member of the LSBESE; PRESTON CASTILLE, in his official capacity as a member of the LSBESE; SIMONE CHAMPAGNE, in her official capacity as a member of the LSBESE; SHARON LATTEN-CLARK, in her official capacity as a member of the LSBESE; LANCE HARRIS, in his official capacity as a member of the LSBESE; PAUL HOLLIS, in his official capacity as a member of the LSBESE; SANDY HOLLOWAY, in her official capacity as a member of the LSBESE; STACEY

CIVIL ACTION NO. 3:24-cv-517

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MELERINE, in her official capacity as a member of
LSBESE; RONNIE MORRIS, in his official capacity
as a member of the LSBESE; EAST BATON ROUGE
PARISH SCHOOL BOARD; LIVINGSTON PARISH
SCHOOL BOARD; ORLEANS PARISH SCHOOL
BOARD; VERNON PARISH SCHOOL BOARD;
and ST. TAMMANY PARISH SCHOOL BOARD,

      Defendants.

## COMPLAINT

1.     Consistent with Louisiana law requiring parents to send their minor children to school, upwards of 680,000 students are enrolled in more than 1,300 public elementary and secondary schools across the state. These children and their families adhere to an array of faiths, and many do not practice any religion at all. Nevertheless, under House Bill No. 71, Act 676 ("H.B. 71" or the "Act"), which requires public schools to post a state-approved version of the Ten Commandments in every classroom, all of these students will be forcibly subjected to scriptural dictates, day in and day out, including: "I AM the LORD thy God"; "Thou shalt have no other gods before me"; "Thou shalt not take the Name of the Lord thy God in vain"; "Remember the Sabbath day, to keep it holy"; and "Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee." This simply cannot be reconciled with the fundamental religious-freedom principles that animated the founding of our nation.

2.     There is no longstanding tradition of permanently displaying the Ten Commandments in public-school classrooms in Louisiana or the United States more generally. Indeed, for nearly half a century, it has been well settled that the First Amendment forbids public schools from posting the Ten Commandments in this manner. *See Stone v. Graham*, 449 U.S. 39 (1980) (striking down Kentucky law requiring a version of the Ten Commandments to be posted

in public-school classrooms). Accordingly, no federal court has upheld any display of the Ten Commandments by a public school.

3.    H.B. 71 violates this binding precedent and the Establishment Clause and Free Exercise Clause of the First Amendment. Permanently posting the Ten Commandments in every Louisiana public-school classroom—rendering them unavoidable—unconstitutionally pressures students into religious observance, veneration, and adoption of the state's favored religious scripture. It also sends the harmful and religiously divisive message that students who do not subscribe to the Ten Commandments—or, more precisely, to the specific version of the Ten Commandments that H.B. 71 requires schools to display—do not belong in their own school community and should refrain from expressing any faith practices or beliefs that are not aligned with the state's religious preferences. And it substantially interferes with and burdens the right of parents to direct their children's religious education and upbringing.

4.    The state's main interest in passing H.B. 71 was to impose religious beliefs on public-school children, regardless of the harm to students and families. The law's primary sponsor and author, Representative Dodie Horton, proclaimed during debate over the bill that it "seeks to have a display of God's law in the classroom for children to see what He says is right and what He says is wrong."

5.    For these reasons, Plaintiffs seek a declaratory judgment that the Act is unconstitutional and preliminary and permanent injunctive relief to prevent Defendants from (i) implementing rules and regulations in accordance with the Act, (ii) otherwise seeking to enforce the Act, and (iii) displaying the Ten Commandments in any public-school classroom.

## JURISDICTION & VENUE

6.     This action arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331. In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3).

7.     The Court is authorized to award the declaratory and injunctive relief requested by Plaintiffs pursuant to 28 U.S.C. §§ 2201 and 2202.

8.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Middle District of Louisiana. Plaintiffs Reverend Mamie Broadhurst and Reverend Richard Williams, Jennifer Harding and Benjamin Owens, David and Erin Hawley, and Dustin McCrory reside in this district, and their minor children attend public schools in this district. Defendants Brumley, Appel, Armstrong, Berken, Castille, Champagne, Latten-Clark, Harris, Hollis, Holloway, Melerine, and Morris conduct their official duties in this district. La. R.S. § 17:3. In addition, defendants East Baton Rouge School Board and Livingston Parish School Board are in this district. Accordingly, the actions to administer, implement, and enforce the Act by the Defendants that give rise to the claims herein will necessarily occur in large part within this district.

## PARTIES

9.     Plaintiffs Reverend Darcy Roake and Adrian Van Young bring this suit on behalf of themselves and their minor children, A.V. and S.V.[1] S.V. is enrolled in a public elementary school in the NOLA Public School System. A.V. will attend an elementary school in the same

---

[1] In accordance with Federal Rule of Civil Procedure 5.2(3), all minor Plaintiffs are identified by their initials.

public-school system in 2025. Reverend Roake and Mr. Van Young are domiciled, and their children attend school, in Orleans Parish.

10.    Plaintiffs Reverend Mamie Broadhurst and Reverend Richard Williams bring this suit on behalf of themselves and their minor child, N.W., who is enrolled in a public school in the East Baton Rouge Parish School System. Reverend Broadhurst and Reverend Williams are domiciled, and their child attends school, in East Baton Rouge Parish.

11.    Reverend Jeff Sims brings this suit on behalf of himself and his minor children, A.S., C.S. 1, and C.S. 2. The children are enrolled in public schools in the St. Tammany Parish Public School System. Reverend Sims is domiciled, and his children attend school, in St. Tammany Parish.

12.    Plaintiffs Jennifer Harding and Benjamin Owens bring this suit on behalf of themselves and their minor child, A.O., who is enrolled in a public high school in the East Baton Rouge Parish School System. Ms. Harding and Mr. Owens are domiciled, and their child attends school, in East Baton Rouge Parish.

13.    Plaintiffs Erin and David Hawley bring this suit on behalf of themselves and their two minor children, A.H. and L.H., who are enrolled in a public elementary school in the East Baton Rouge Parish School System. The Hawleys are domiciled, and their children attend school, in East Baton Rouge Parish.

14.    Plaintiff Dustin McCrory brings this suit on behalf of himself and his minor children, E.M., P.M., and L.M., who are enrolled in a public elementary school in Livingston Parish Public Schools. Mr. McCrory is domiciled, and his children attend school, in Livingston Parish.

15.     Plaintiffs Gary Sernovitz and Molly Pulda bring this suit on behalf of themselves and their minor child, T.S., who is enrolled in a public elementary school in the NOLA Public School System. Mr. Sernovitz and Ms. Pulda are domiciled, and their child attends school, in Orleans Parish.

16.     Plaintiff Christy Alkire brings this suit on behalf of herself and her minor child, L.A., who is enrolled in a public high school in Vernon Parish School District and domiciled in Vernon Parish.

17.     Plaintiff Joshua Herlands brings this suit on behalf of himself and his minor children, E.H. and J.H., who are enrolled in a public elementary school in the NOLA Public School System. Mr. Herlands is domiciled, and his children attend school, in Orleans Parish.

18.     Defendant Cade Brumley is the Louisiana State Superintendent of Education.

19.     As the State Superintendent of Education, Defendant Brumley serves as the administrative head of the Louisiana State Department of Education and is statutorily responsible for administering and implementing all policies and programs adopted by the Louisiana State Board of Elementary and Secondary Education. La. R.S. § 17:21 *et seq*. All employees of the State Department of Education are under Defendant Brumley's direction and control. La. R.S. § 17:24.

20.     Per H.B. 71, the Louisiana State Department of Education, and therefore Defendant Brumley, are responsible for identifying appropriate resources to ensure that public elementary and secondary schools in Louisiana comply with the Act.

21.     Defendant Brumley is responsible for the implementation of all state laws that fall under the jurisdiction of the State Board of Elementary and Secondary Education, which includes H.B. 71. La. R.S. § 17:22. Such implementation of H.B. 71 violates the First Amendment to the United States Constitution.

22.    Defendant Brumley is sued here in his official capacity.

23.    Defendants Conrad Appel, Judy Armstrong, Kevin Berken, Preston Castille, Simone Champagne, Sharon Latten-Clark, Lance Harris, Paul Hollis, Sandy Holloway, Stacey Melerine, and Ronnie Morris are members of the Louisiana State Board of Elementary and Secondary Education ("LSBESE").

24.    LSBESE is responsible for the oversight and governance of all public elementary and secondary schools in Louisiana. La. Const. art. VIII, § 3; La. R.S. § 17:1 *et seq*. LBESE members have the statutory duty to enact policies and adopt regulations that govern the operations of public elementary and secondary schools in Louisiana. La. R.S. § 17:6(A)(10). In their official roles, LSBESE members exercise policymaking, budgetary, and related functions granted to them by the Louisiana State Legislature, providing board members with the authority to carry out their extensive responsibilities as detailed in Louisiana education law. *See generally* La. R.S. § 17:6.

25.    In H.B. 71, the Louisiana State Legislature has given LSBESE the authority to adopt rules and regulations to ensure the implementation of the Act.

26.    Defendants Appel, Armstrong, Berken, Castille, Champagne, Latten-Clark, Harris, Hollis, Holloway, Melerine, and Morris are each sued here in their official capacities as members of LSBESE.

27.    The East Baton Rouge Parish School Board ("EBR Parish School Board") is the governing authority for the East Baton Rouge Parish School System. *See* La. R.S. §§ 17:51, 17:58, 17:81, 17:1373. The EBR Parish School Board and its members must "serve in a policymaking capacity that is in the best interests of all students enrolled in schools under the board's jurisdiction." La. R.S. § 17:81(A)(1). Members exercise policymaking authority and are charged

with developing and maintaining a master plan for student discipline and a student code of conduct. La. R.S. §§ 17:252, 17:416.13.

28.     The Act requires the EBR Parish School Board, as a public-school governing authority, to "display the Ten Commandments in each classroom in each school under its jurisdiction."

29.     The Livingston Parish School Board is the governing authority for Livingston Parish Public Schools. *See* La. R.S. §§ 17:51, 17:81, 17:1373. The Livingston Parish School Board and its members must "serve in a policymaking capacity that is in the best interests of all students enrolled in schools under the board's jurisdiction." La. R.S. § 17:81. Members exercise policymaking authority and are charged with developing and maintaining a master plan for student discipline and a student code of conduct. La. R.S. §§ 17:252, 17:416.13.

30.     The Act requires the Livingston Parish School Board, as a public-school governing authority, to "display the Ten Commandments in each classroom in each school under its jurisdiction."

31.     The Orleans Parish School Board is the governing authority for NOLA Public Schools. *See* La. R.S. §§ 17:51, 17:81, 17:121, 17:1373. The Orleans Parish School Board and its members must "serve in a policymaking capacity that is in the best interests of all students enrolled in schools under the board's jurisdiction." La. R.S. § 17:81(A)(1). Members exercise policymaking authority and are charged with developing and maintaining a master plan for student discipline and a student code of conduct. La. R.S. §§ 17:252, 17:416.13.

32.     The Act requires the Orleans Parish School Board, as a public-school governing authority, to "display the Ten Commandments in each classroom in each school under its jurisdiction."

33.     The Vernon Parish School Board is the governing authority for the Vernon Parish School District. La. R.S. §§ 17:51, 17:81, 17:1371, 17:1373. The Vernon Parish School Board and its members must "serve in a policymaking capacity that is in the best interests of all students enrolled in schools under the board's jurisdiction." La. R.S. § 17:81. Members exercise policymaking authority and are charged with developing and maintaining a master plan for student discipline and a student code of conduct. La. R.S. §§ 17:252, 17:416.13.

34.     The Act requires the Vernon Parish School Board, as a public-school governing authority, to "display the Ten Commandments in each classroom in each school under its jurisdiction."

35.     The St. Tammany Parish School Board is the governing authority for the St. Tammany Parish Public School System. *See* La. R.S. §§ 17:51, 17:56.1, 17:81, 17:1373. The St. Tammany Parish School Board and its members must "serve in a policymaking capacity that is in the best interests of all students enrolled in schools under the board's jurisdiction." La. R.S. § 17:81. Members exercise policymaking authority and are charged with developing and maintaining a master plan for student discipline and a student code of conduct. La. R.S. §§ 17:252, 17:416.13.

36.     The Act requires the St. Tammany Parish School Board, as a public-school governing authority, to "display the Ten Commandments in each classroom in each school under its jurisdiction."

## FACTUAL ALLEGATIONS

37.     On June 19, 2024, Louisiana Governor Jeff Landry signed into law H.B. 71, an act "[r]equir[ing] the display of the Ten Commandments in schools." The Act became effective on June 19, 2024, upon receiving the Governor's signature.

38.    The Act requires each public-school governing authority in Louisiana to display the Ten Commandments in every classroom in every school under its jurisdiction. It applies to public elementary, secondary, charter, and post-secondary schools and educational institutions.

39.    As prescribed by the Act, the classroom display of the Ten Commandments must state:

"The Ten Commandments

I AM the LORD thy God.

Thou shalt have no other gods before me.

Thou shalt not make to thyself any graven images.

Thou shalt not take the Name of the Lord thy God in vain.

Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the land which the Lord

thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house.

Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's."

40.    The Act requires that the Ten Commandments be displayed on a poster or framed document that is at least eleven inches by fourteen inches. The text of the Ten Commandments must be the central focus of the poster or framed document and must be printed in a large, easily readable font.

41.    The Act also requires that the Ten Commandments "be displayed with a context statement" that purports to outline the "[h]istory of the Ten Commandments in American Public Education." The Act does not specify a size requirement for the statement and does not require that the statement be printed in a large, easily readable font.

42.    The Act includes false statements relating to a purported history and connection between the Ten Commandments and government and public education in the United States.

43.    For example, in Section 1(A)(4) of H.B. 71, the Act asserts that "James Madison, the fourth President of the United States of America, stated that '(w)e have staked the whole future of our new nation . . . upon the capacity of each of ourselves to govern ourselves according to the moral principles of the Ten Commandments.'"

44.    In fact, the quotation is fabricated. Madison never said this in any of his public or private writings or in any of his speeches.

45.    There is no longstanding tradition of permanently displaying the Ten Commandments in public-school classrooms in Louisiana or the United States more generally.

46.    Under the Act, a school may—but is not required to—display three additional documents "along with the Ten Commandments": the Mayflower Compact, the Declaration of Independence, and the Northwest Ordinance. The Act does not specify a size requirement for these documents and does not require that they be printed in a large, easily readable font.

47.    The Act does not provide permission for the display of any other document with the Ten Commandments.

48.    The Act requires public schools to acquire the Ten Commandments displays either by (1) accepting donated displays, or (2) accepting donated funds to purchase compliant displays.

49.    LSBESE is responsible for "adopt[ing] rules and regulations in accordance with the Administrative Procedure Act to ensure the proper implementation" of the Act.

50.    The Act also requires the Louisiana Department of Education to "identify appropriate resources to comply with" the Act "that are free of charge." The Department of Education is required to list these resources on its webpage.

51.    Under the Act, which is now effective, every public school must post the state-approved version of the Ten Commandments in every classroom no later than January 1, 2025.

52.    The displays will be permanent and year-round; the Act does not provide for a time limit on the displays.

53.    The Act requires the displays to be placed in every classroom, regardless of the subject matter taught. For example, the Act requires the state-approved version of the Ten Commandments to be posted in math and science classrooms.

54.    The Act requires that the Ten Commandments displays be posted in classrooms without regard to the grade level and literary comprehension of students. For example, the Act requires the Ten Commandments displays to be hung in both kindergarten and university classrooms.

55.    As evinced by the nature of the mandatory displays themselves, the history of H.B. 71, and comments made by various lawmakers, the state's main interest in enacting and implementing H.B. 71 is the imposition of religious beliefs on public-school children.

**The Act Officially Approves and Prescribes One Particular Version of the Ten Commandments, to Which Many People Do Not Subscribe.**

56.     H.B. 71 is not neutral with respect to religion. By design, it expressly requires the display of religious scripture—the Ten Commandments—in every public-school classroom, and it requires a specific, state-approved version of that scripture to be posted, taking sides on theological questions regarding the correct content and meaning of the Decalogue.

57.     Numerous Louisianans do not subscribe to the specific text of H.B. 71's version of the Ten Commandments.

58.     Many people in Louisiana are non-religious and do not adhere to the religious tenets set forth in any version of the Ten Commandments, including the one mandated by H.B. 71.

59.     There are many faith traditions that do not teach, recognize, or reference the Ten Commandments at all. For example, followers of Hinduism, Buddhism, and Taoism generally do not consider the commandments to be part of their belief system.

60.     Some Christians, including Jehovah's Witnesses, reject the proposition that the Ten Commandments are authoritative or binding.

61.     Some faith traditions that do consider the Ten Commandments to be part of their theology and authoritative do not believe in elevating the commandments set forth in H.B. 71 over other biblical commandments or teachings.

62.     Even for faith traditions that view the Ten Commandments to be authoritative and important, there are many different versions, depending on religious denomination or biblical translation.

63.     Among those who may believe in some version of the Ten Commandments, the particular text that they follow can differ by religious denomination or tradition. For instance,

Catholics, Jews, and many Protestants differ in the way that they number, organize, and translate the commandments from Hebrew to English.

64.     The version of the Ten Commandments mandated in H.B. 71 is similar to a version that many Protestants use.

65.     The version of the Ten Commandments mandated in H.B. 71 does not match any version or translation found in the Jewish tradition.

66.     The version of the Ten Commandments mandated in H.B. 71 omits key language and context that is included in the version set forth in the Torah. For example, it is missing the important message in the Jewish story about God bringing the Israelites out of Egyptian slavery to freedom. It also summarizes other commandments instead of including the text as found in the Torah in its entirety.

67.     The version of the Ten Commandments mandated in H.B. 71 does not match the version followed by most Catholics. For example, the Catholic version does not include the language prohibiting "graven images." Indeed, given how common iconography, sculpture, and other artwork is in the Catholic faith, many Catholics would be offended by this prohibition.

68.     H.B. 71 and its mandatory, religiously preferential displays do not further a compelling governmental interest and, even if they did, they are not narrowly tailored to any such interest.

**The Displays Mandated By H.B. 71 Will Coerce Students, Including the Minor Plaintiffs, into Religious Observance, Veneration, and Adoption of the State's Official Religious Scripture.**

69.     Louisiana law requires parents to send their minor children to school and to "assure the attendance of the child in regularly assigned classes during regular school hours." La. R.S. § 17:221(A)(1)(c).

70.     Under Louisiana law, students from age six to eighteen must attend school at least 177 days per year. La. R.S. § 154.1(A)(1).

71.     Consistent with these statutory mandates, more than 680,000 children are enrolled in Louisiana's public schools across the state.[2]

72.     These children and their families practice a wide array of faiths. And within these faith systems, students and families adhere to a variety of denominations, branches, and sects.

73.     Many public-school children and families in Louisiana do not adhere to any faith and cherish their right to be non-religious to the same extent that people of faith cherish their right to religious belief and exercise.

74.     Given the religious diversity present in Louisiana's public schools, many students and families, including some of the Plaintiffs, do not subscribe to the Ten Commandments at all. *See generally infra* ¶¶ 82-155.

75.     Many other public-school students and their families who believe in their faith's version of the Ten Commandments, including some of the Plaintiffs, do not subscribe to the specific state-selected version set forth in H.B. 71. *See generally infra* ¶¶ 82-155.

---

[2]     *Student Attributes: Public Enrollment 2023-2024*, LA. DEP'T OF EDUC., https://louisianabelieves.com/resources/library/student-attributes (last visited June 23, 2024) (February 2024 statistics spreadsheet, accessible on the webpage).

76.    Under H.B. 71, each of these children will be forcibly subjected to the state's official version of the Ten Commandments for nearly every hour that they are in school.

77.    Cumulatively, for students entering the Louisiana public-school system at age six, H.B. 71 will subject them to the state's preferred religious dogma for at least 2,124 days—the minimum number of school days students must attend school from age six to eighteen. *See* La. R.S. § 17:221.

78.    The Act not only requires that public schools post the displays in every classroom— with no exceptions—but, as noted above, it also requires that the Ten Commandments be the "central focus" of a poster or framed document, which must be at least eleven inches by fourteen inches in size. And the text of the commandments must be printed in a "large, easily readable font."

79.    These requirements are intended to, and will, ensure that students are more likely to observe, absorb, accept, and follow the Ten Commandments. For example, during the House Education Committee's debate, Representative Horton, the primary author and sponsor of the bill, explained: "It is so important that our children learn what God says is right and what He says is wrong, and to allow [the Ten Commandments] to be displayed in our classrooms as a visual aid, I believe, especially in this day and time is so important." Horton later told a reporter that she is only "concerned with our children looking and seeing what God's law is." Representative Sylvia Taylor, Horton's co-author and co-sponsor of H.B. 71, similarly stated: "I really believe that we are lacking in direction. A lot of people, their children, are not attending churches or whatever . . . So what I'm saying is, we need to do something in the schools to bring people back to where they need to be." And Representative Roger Wilder, another co-author and co-sponsor of H.B. 71, expressed his support for the law by claiming that those who oppose it are waging an "attack on Christianity" and suggesting that it would provide a religious counterbalance to students' secular

education: "My wife is a Christian and if she was a teacher she would be asked to teach evolution which is in complete contradiction with the theory of creation that we believe out of the Bible. . . . I am a parent and am asking for this [bill]."

80.     As a result of the displays mandated by H.B. 71, students who do not subscribe to the state's official version of the Ten Commandments—including minor-child Plaintiffs—will be pressured into religious observance, veneration, and adoption of this religious scripture.

81.     As a result of the displays, mandated by H.B. 71, students who do not subscribe to the state's official version of the Ten Commandments—including minor-child Plaintiffs—will feel pressure to avoid fully expressing or practicing their own faiths and religious beliefs or non-religious beliefs in view of their peers, teachers and other school staff.

### Plaintiffs Object to, and Will Be Harmed by, the Religious Displays Mandated by H.B. 71.

#### *Reverend Darcy Roake, Adrian Van Young, and their minor children*

82.     Plaintiff Reverend Darcy Roake is an ordained minister in the Unitarian Universalist ("UU") Church, and Plaintiff Adrian Van Young is Reform Jewish. They are parents to two minor children, A.V. and S.V. Reverend Roake, Mr. Van Young, and their children are members of a local synagogue, and the children also have been welcomed into the UU Church in dedication ceremonies.

83.     On behalf of themselves and on behalf of their children, Reverend Roake and Mr. Van Young object to, and are offended by, H.B. 71 because the overtly religious classroom displays mandated by the law will promote, and forcibly subject their children to, religious scripture in a manner that violates the family's religious beliefs and practices. In so doing, the displays will religiously coerce the children and usurp Reverend Roake's and Mr. Van Young's

parental roles in directing their children's religious education, religious values, and religious upbringing.

84.     Reverend Roake's Unitarian Universalist religion counsels her to value everyone's experience and religious background, and to avoid elevating some religions over others. Her faith does not endorse specific scripture or dogma, although it does affirm seven principles that help guide one's ethical and moral decision-making. While all these principles are important to Reverend Roake, the fourth UU principle supporting the right to a "free and responsible search for truth and meaning" is especially significant to her, and she believes that this spiritual inquiry cannot happen when the government imposes religious doctrine on someone. Indeed, Reverend Roake's Unitarian Universalist faith teaches, and she believes, that forcing religious beliefs on individuals causes them significant spiritual, psychological, and emotional harm. She also believes that forcing religious beliefs on others conflicts with her commitment to religious tolerance and acceptance, which is fundamental to her practice as a Unitarian Universalist and minister. Mr. Van Young's Jewish beliefs similarly oppose evangelizing and likewise consider religious tolerance to be paramount as a spiritual matter.

85.     As part of an interfaith household, Reverend Roake and Mr. Van Young navigate a complex and careful path in guiding the spiritual development of their children, who are being raised in both the Unitarian Universalist and Jewish traditions. For example, S.V. previously attended Unitarian Universalist Sunday school and currently attends Jewish youth religious education classes (Chavurah) at the family's synagogue. Even in teaching their children about Jewish and Unitarian Universalist tenets and traditions, however, they recognize and emphasize to their children that it is ultimately the children's right to undertake a free and responsible search for truth and meaning and to decide, when they are old enough, what faith system, if any, they will

follow. To help facilitate that spiritual journey, Reverend Roake and Mr. Van Young have enrolled the children in public school to ensure that they receive a secular, religiously unbiased education and have the ability to interact with and get to know peers from a variety of cultural and faith traditions.

86.    The ability to direct and guide their children in matters of faith and protect their children's ability to undertake a free and responsible search for truth and meaning is an essential aspect of Reverend Roake's and Mr. Van Young's religious exercise. H.B. 71 will significantly interfere with and burden their ability to carry out this religious exercise. This burden is substantial.

87.    Specifically, the law's mandatory religious displays will conflict with their spiritual beliefs and the spiritual values that they seek to instill in their children. Reverend Roake and Mr. Van Young believe that the mandated displays will not comport with the Jewish traditions being imparted to S.V. in Chavurah because the displays misappropriate and alter the text of the Ten Commandments set out in the Torah and present the commandments without their vital Jewish context. Nor will the displays provide the necessary context that would be provided through a Unitarian Universalist reading of the text.

88.    For example, Reverend Roake and Mr. Van Young believe that the text of H.B. 71's commandment ordering, "Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's," wrongly centers a heterosexual male perspective and treats women and other individuals ("manservant[s]" and "maidservant[s]") as property. They further believe that, by posting this text without its Jewish context and history— which would include an acknowledgement of Judaism's commitment to equality for all people— and without otherwise acknowledging and disputing the text's discriminatory language, the state

will send the message to their children that the religious text should be taken literally, which would violate core spiritual values that Reverend Roake and Mr. Van Young teach their children.

89.     Moreover, because H.B. 71 requires that the commandments be permanently posted in every classroom, rendering them unavoidable, and does not require the displays to be connected to the subject matter being taught, Reverend Roake and Mr. Van Young believe that the religious displays will send the message, in conflict with their religious beliefs, not only that the posted text is the "correct" or superior version of religious doctrine, but also that the Ten Commandments, as set forth in the display, constitute official rules that must be followed by A.V., S.V., and their peers. And relatedly, Reverend Roake and Mr. Van Young believe that H.B. 71 and its religious displays send a message of religious intolerance, also in conflict with the family's spiritual beliefs, that anyone who does not believe in the state's official religious scripture is an outsider and not fully part of the school community.

90.     As a result of these messages, Reverend Roake and Mr. Van Young believe that their children will be pressured to observe, venerate, and adopt the state's preferred religious doctrine and to suppress expression of their own religious backgrounds and views at school. This religious coercion will harm their children spiritually and substantially interfere with, impede, and burden their children's ability to conduct a free and responsible inquiry for truth and meaning and to decide, for themselves, what to believe when it comes to matters of faith.

*Reverend Mamie Broadhurst, Reverend Richard Wright, and their minor child*

91.     Plaintiffs Reverend Mamie Broadhurst and Reverend Richard Williams are ordained ministers in the Presbyterian Church (U.S.A). They are raising their minor child, N.W., in the Presbyterian denomination of the Christian tradition. On behalf of themselves and N.W., they object to, and are offended by, H.B. 71 because it will forcibly subject N.W. to school displays

of the Ten Commandments in a manner that violates the family's religious beliefs and practices and will usurp their parental roles in directing N.W.'s religious education, religious values, and religious upbringing.

92.     The ability to direct and guide their child's spiritual development is an essential aspect of Reverend Broadhurst's and Reverend Williams's religious exercise. For the reasons discussed below, H.B. 71 will significantly interfere with and burden their ability to carry out this religious exercise. This burden is substantial.

93.     Reverend Broadhurst and Reverend Williams strongly believe that scriptural matters and questions, including which version of scripture is correct and what it means, are far too sacred to place in the hands of government officials. They believe that these are issues that must be reserved for faith communities. This belief is rooted in the Presbyterian understanding that civil magistrates should not interfere with the administration of God's Word or misappropriate God's authority. Yet, that is exactly what the state has done here by placing its stamp of approval on one particular version of the Ten Commandments and mandating that this version be posted in every public-school classroom. In so doing, H.B. 71 and the displays it requires will send a message to all students, including N.W., that the government holds religious authority.

94.     Reverend Broadhurst and Reverend Williams believe that the reservation of theological matters to faith communities is especially important when it comes to youth religious education, including for their own child. Receiving and navigating scripture, such as the Ten Commandments, within the context of their faith is critical to ensuring that N.W.'s understanding of the commandments aligns with Presbyterian teachings and values. For example, as pastors trained in biblical study and interpretation, Reverend Broadhurst and Reverend Williams look to the faith tradition out of which scripture was born, and the version of the Ten Commandments

21

mandated by H.B. 71 effectively erases that critical context by disregarding and dismissing text that is central to its Jewish origin.

95.     In addition, the family's Presbyterian faith strongly teaches that all people are equal in the eyes of God and should be treated as such. However, the text of the Ten Commandments mandated by H.B. 71 includes language that, on its face, is contrary to this value—effectively treating women and others ("maidservant[s]" and "manservant[s]") as property. To avoid this harmful message, the language must be introduced to N.W. by her parents and church within the broader framework of Presbyterian religious doctrine and belief.

96.     Moreover, the state's decision to mandate the display of a specific version of the Ten Commandments in public schools sends the message to N.W. and other students that those who do not believe in this official version are not as worthy as those who do, contrary to the family's religious principles, which value a multicultural and diverse society and do not base the worthiness of people on their faith or lack thereof.

97.     This message of inequality, like the others discussed above, will be virtually inescapable for N.W., as the displays will be posted permanently in every classroom throughout the rest of N.W.'s public-school education.

98.     Indeed, as a former public high-school teacher, Reverend Broadhurst is well aware that posting anything on the walls of a classroom is done with great intentionality and for the purpose of intensifying students' focus on the subject matter and conveying its importance. This is especially true where the subject matter of the display stands out because it is unrelated to the academic subject being taught, as with the Ten Commandments, which underscores the power of the government to mandate the presence of the commandments and portrays the state as a religious actor.

99. The Ten Commandments displays posted in N.W's classrooms will not only interfere with and undermine Reverend Broadhurst's and Reverend Williams's ability to guide N.W.'s religious education, but they will also create pressure for N.W. to accept and believe—contrary to the family's Presbyterian faith—the overtly religious messages conveyed by them, including that the state has authority on theological or scriptural questions and that students who do not subscribe to the state's official version of the Ten Commandments are lesser in status. This also will create pressure for N.W. to suppress expression, especially in school, of N.W's own religious beliefs on these issues and other religious questions or concerns raised by the religious displays.

100. Finally, as ministers in the community, Revered Broadhurst and Reverend Williams work ecumenically and in interfaith contexts. In favoring one set of religious language and beliefs over others, H.B. 71 will help create a climate in Baton Rouge—and, indeed, across Louisiana—that is hostile to, or dismissive of, people of minority faiths, interfering with the exercise of these pastoral responsibilities.

### _Reverend Jeff Sims and his minor children_

101. Plaintiff Reverend Jeff Sims is an ordained minister in the Presbyterian Church (U.S.A). He is the parent of three minor children, A.S., C.S. 1, and C.S. 2, whom he is raising in the Presbyterian Christian tradition. On behalf of himself and on behalf of his children, Reverend Sims objects to, and is offended by, H.B. 71 because it promotes, and will forcibly subject the children to, religious displays in a manner that violates the family's religious beliefs and practices. It will also usurp Reverend Sims's parental role in directing his children's religious education, religious values, and religious upbringing.

102.    The ability to direct and guide his children's spiritual development is an essential aspect of Reverend Sims's religious exercise. For the reasons discussed below, H.B. 71 will significantly interfere with and burden his ability to carry out this religious exercise. This burden is substantial.

103.    As a minister and parent, Reverend Sims believes that scripture, including the Ten Commandments, is best understood—especially by children—when presented within the context of the family's church and particular faith tradition. This ensures that a child's introduction to the religious text and comprehension of it aligns with the family's religious beliefs.

104.    The family's Presbyterian beliefs strongly value the equality of all people, including women and people of color. Reverend Sims believes that scripture, such as the Ten Commandments, must be navigated through the lens of this core religious principle. However, the text of the Ten Commandments mandated by H.B. 71, even though Christian-centric, presents language that runs counter to this important Presbyterian value. As just one example, Reverend Sims believes that the state's approved version of the Ten Commandments treats some people as chattel. Thus, as a spiritual matter, it is critical that this text be presented to his children by him or through the family's church, to avoid his children receiving this harmful message. Instead, H.B. 71 will impose this version of the Ten Commandments on his children every day, in every classroom.

105.    Relatedly, Reverend Sims also believes that H.B. 71's stamp of approval for a particular version of the Ten Commandments and its mandate that this scripture be displayed in his children's classrooms improperly sends the message to him, his children, and the community that people of some religious denominations or faith systems are superior to others and that there is an official religious hierarchy featuring the state's officially favored "in" group and the state's

officially disfavored "out" group. This religious favoritism violates the family's Presbyterian beliefs, which prioritize inclusiveness and the dignity of all people, honor God's gift of diversity, and are firmly opposed to the notion that there is any pecking order of faithful or non-faithful people.

106.    Further, H.B. 71 represents an intrusion of civil authority into matters of faith, sending the message to Reverend Sims, his children, and the community that the public-school system and the government more generally not only possess religious authority, but that this authority is greater than God's, in direct contradiction of the Presbyterian tradition. Presbyterianism was strongly influenced by the beliefs and writing of theologian John Calvin, who posited that civil authority exists only as a result of God's divine law of love and that civil magistrates should not interfere with the administration of God's Word, co-opt the Word for their own purposes, or otherwise arrogate to themselves God's authority. Reverend Sims believes that H.B. 71 does all three.

107.    The Ten Commandments displays posted in the his children's classrooms will not only interfere with and undermine Reverend Sims's ability to guide their spiritual development, but they will also pressure the children to accept and believe—contrary to the family's Presbyterian faith—the overtly religious messages conveyed by the displays, including that the state has authority over theological questions and scripture and that authority is greater than God's, that one denomination or faith system is preferable to others, and that those who do not adhere to it are lesser in worth and status. And the children will further be pressured to suppress expression, especially in school, of their own religious beliefs on these issues and other religious questions or concerns raised by the religious displays.

*Jennifer Harding, Benjamin Owens, and their minor child*

108.    Plaintiffs Jennifer Harding and Benjamin Owens, on their own behalf and on behalf of their minor child, A.O., object to, and are offended by, H.B. 71 because the displays it mandates will promote, and forcibly subject their child to, religious scripture to which they and their child do not subscribe. In so doing, the displays will also usurp Ms. Harding's and Mr. Owens's parental role in directing their child's non-religious upbringing.

109.    Ms. Harding and Mr. Owens are nonreligious, and A.O. is an atheist. They value their right to adopt no religious beliefs as much as others surely value their right to follow a particular faith. Ms. Harding and Mr. Owens are raising A.O. in a nonreligious household and tradition and seek to provide A.O. space and autonomy to develop A.O.'s own beliefs and views about religion.

110.    Ms. Harding, Mr. Owens, and A.O. do not subscribe to the religious dictates of the Ten Commandments generally or the specific version that H.B. 71 mandates.

111.    Ms. Harding and Mr. Owens believe that H.B. 71 and the required Ten Commandments displays directly interfere with and substantially burden and undermine their ability to raise A.O. in a nonreligious tradition by subjecting A.O. to displays of religious doctrine in every classroom. Specifically, Ms. Harding and Mr. Owens believe that H.B. 71's Ten Commandments displays will impose on A.O. one set of religious values and beliefs over their family's values, which are not based in religion. Ms. Harding and Mr. Owens do not want the government to push religious morality on A.O.

112.    Ms. Harding and Mr. Owens further believe that the Ten Commandments displays required under H.B. 71 will create a structure for teachers and school administrators to inject other religious beliefs into the classroom. Ms. Harding, Mr. Owens, and A.O. also believe that the

displays will signal that some are in the "in group" and some are in "out group" in A.O.'s classes, leading to peer-to-peer harassment of A.O., who has been open about being an atheist.

113.    Moreover, even as open and unapologetic as A.O. has been about being an atheist, Ms. Harding, Mr. Owens, and A.O. believe that the religious displays mandated by H.B. 71 will increase the pressure on A.O. to suppress expression of A.O.'s own nonreligious background and atheist views at school as well as pressure A.O. to observe, venerate, and adopt the state's preferred religious doctrine.

### *Erin and David Hawley and their minor children*

114.    Plaintiffs Erin and David Hawley and their minor children, A.H. and L.H., are attenders and members of a Unitarian Universalist church, where Mr. Hawley was previously the church president. They were married in the church, and their children were welcomed into the church through its child-dedication ceremony.

115.    On behalf of themselves and on behalf of their minor children, the Hawleys object to, and are offended by, H.B. 71 because the displays mandated by the law will promote, and forcibly subject their children to, religious scripture to which they and their children do not subscribe, in a manner that violates their religious belief and practice. In so doing, the displays will religiously coerce the children and usurp the Hawleys' parental role in directing their children's religious education, religious values, and religious upbringing.

116.    As Unitarian Universalists, the Hawleys' religion counsels them to value everyone's experience and religious background, and to avoid elevating some religions over others. Their faith does not endorse specific scripture or dogma, although it affirms seven principles that guide many members, including the family. In particular, the Hawleys place significant value on the first UU principle, which states that every person has "inherent worth and

dignity," and the fourth UU principle, which supports the ability to conduct a "free and responsible search for truth and meaning."

117.    In the spirit of those principles, Unitarian Universalism teaches, and the Hawleys believe, that there is no "correct" religious doctrine and—recognizing that some people have been injured by religion—that individuals should not be forcibly subjected to religious belief or practice. Furthermore, as a spiritual matter, they believe that morality imposed or enforced only through a fear of God or the negative concepts of sin and guilt harms individuals and can impede individuals' spiritual ability to undertake a free and responsible search for truth and meaning.

118.    The Hawleys are raising their children as Unitarian Universalists and instilling in them these same values and beliefs. They ultimately intend to give their children the freedom to choose which faith, if any, they follow—without pressure or undue influence from authority figures.

119.    The ability to direct and guide their children in matters of faith and protect their children's ability to undertake a free and responsible search for truth and meaning is an essential aspect of the Hawleys' religious exercise. H.B. 71 will significantly interfere with and burden their ability to carry out this religious exercise. This burden is substantial.

120.    As part of this religious exercise, and in accordance with their spiritual beliefs, the Hawleys do not follow or impose on their children the religious dictates of the Ten Commandments generally or as set forth in H.B. 71's state-prescribed version (for example, H.B. 71's scriptural directives to "have no other gods before me"; "not make to thyself any graven images"; "not take the Name of the Lord thy God in vain"; and "[r]emember the Sabbath day, to keep it holy").

121.    Moreover, their Unitarian Universalist beliefs value the equality of all people, and they object to the specific language of the state's approved version of the Ten Commandments

because it advances a heterocentric worldview, objectifies women, and treats women and other individuals as property.

122.    In addition, the Hawleys believe that the Ten Commandments, as a whole, present morality in a negative, guilt-based framework that will harm their children and impede the children's free and responsible search for truth and meaning. Their spiritual approach to instilling moral and ethical values in their children is instead rooted in positive concepts, such as love and caring for others. In direct contradiction to this, however, H.B. 71 will impose the Ten Commandments on their children, A.H. and L.H., on a daily and hourly basis, undermining and interfering with the Hawleys' ability to instill those beliefs and values in their children.

123.    The Hawleys believe that the state's posting of these religious displays in every public-school classroom, untethered to any academic lesson, confers on the Ten Commandments the highest level of legitimacy—an official stamp of approval that will send the message to their children that the state-selected version of the Ten Commandments is the "correct" or superior religious doctrine, contrary to the family's UU beliefs and practices. They also believe that, as a result of this message and the sheer ubiquity of the displays mandated by H.B. 71, their children will be pressured into religious observance, veneration, and adoption of this scripture, violating the family's faith tenets and interfering with, deterring, or preventing a free and responsible search for truth and meaning by their children.

124.    The Hawleys further believe that H.B. 71 and the displays it mandates send a harmful message to them and their children that they are outsiders and not fully part of the school community because they do not believe in the state's official religious scripture. They believe that, because of this message, their children will be pressured to avoid or truncate their search for spiritual meaning and to suppress expression of their own spiritual beliefs and views at school.

_Dustin McCrory and his minor children_

125.   Plaintiff Dustin McCrory, on his own behalf and on behalf of his minor children, E.M., P.M., and L.M., objects to, and is offended by, H.B. 71 because the displays it mandates will promote, and forcibly subject his children to, religious scripture to which he and his children do not subscribe. In so doing, the displays will also usurp Mr. McCrory's parental role in directing his children's nonreligious upbringing.

126.   Mr. McCrory is an agnostic atheist. He is raising E.M., P.M., and L.M. in a nonreligious household. Mr. McCrory values his family's right to adopt no religious beliefs as much as others surely value their right to follow a particular faith. Mr. McCrory and his children do not subscribe to the religious dictates of the Ten Commandments generally or the specific version that H.B. 71 mandates.  Mr. McCrory seeks to allow his children to independently develop their own decisions on religious matters and does not want their public school to interfere with this decision.

127.   Mr. McCrory believes that H.B. 71 and the required Ten Commandments displays will directly interfere with and substantially burden and undermine his ability to raise E.M., P.M., and L.M. in a nonreligious tradition by subjecting his children to displays of religious doctrine in every classroom. Specifically, Mr. McCrory objects to the display of the first four commandments mandated by H.B. 71 in his children's classrooms. Mr. McCrory views these as religious obligations that are contrary to his own views and beliefs and those of E.M., P.M., and L.M.

128.   Mr. McCrory will have to undertake additional burdens because of H.B. 71 and the displays that will be posted in his children's classrooms. Mr. McCrory will feel compelled to discuss the Ten Commandments with E.M., P.M., and L.M. if the displays will be put in their classrooms. He does not wish to be forced to have this sensitive conversation with E.M., P.M., and

L.M. about the Ten Commandments given their young age. He also opposes posting the mandated language of H.B. 71 because he believes that it addresses age-inappropriate religious content. For example, Mr. McCrory does not wish for his elementary-age children to be instructed by their school about the biblical conception of adultery.

129.    Mr. McCrory believes that the religious displays mandated by H.B. 71 will increase the pressure on E.M., P.M., and L.M. to suppress expression of their own nonreligious background and nonreligious views at school as well as pressure them to observe, venerate, and adopt the state's preferred religious doctrine.

### *Gary Sernovitz, Molly Pulda, and their minor child.*

130.    Plaintiffs Gary Sernovitz and Molly Pulda are Jewish and are intentionally and actively raising their minor child, T.S., in the Reform Jewish tradition. The family regularly attends synagogue, where Mr. Sernovitz is a member of the board, and Ms. Pulda is on the board of the local Jewish community center. Mr. Sernovitz and Ms. Pulda have chosen to educate T.S. in the public-school system because of their strong belief in separating T.S.'s secular education from T.S.'s religious education and their desire to oversee the latter and ensure that it is consistent with their Jewish belief and practice. To that end, T.S. attends weekly (and, in the coming academic year, twice-weekly) religious education at the family's synagogue, and T.S. has attended overnight Jewish summer camp in furtherance of T.S.'s religious education.

131.    On behalf of themselves and on behalf of their minor child, T.S., Mr. Sernovitz and Ms. Pulda object to, and are offended by, H.B. 71 because, among other reasons, it forcibly imposes on T.S. overtly religious classroom displays that are, in many ways, contrary to the family's Jewish faith. Specifically, they believe that H.B. 71 (1) misappropriates a Jewish text, ripping it from its Jewish context, (2) selectively edits that text by altering its meaning and

obscuring or erasing its Jewish significance, and (3) then mandates the display of the altered text to non-Jews, in violation of core Jewish tenets that oppose proselytizing. In so doing, the displays are likely to result in religious coercion of T.S. and usurp Mr. Sernovitz's and Ms. Pulda's parental roles in directing T.S.'s religious education, religious values, and religious upbringing.

132.    The official version of the Ten Commandments set forth in H.B. 71 and the display of this state-selected religious scripture are religiously offensive to Mr. Sernovitz and Ms. Pulda and do not comport with their view and understanding of the Ten Commandments. H.B. 71's characterization of the Ten Commandments as merely a "historically significant document" that reflects nothing more than the "function of civic morality to the functioning of self-government" improperly denies the sacred significance of the Ten Commandments to the Jewish faith. Indeed, Mr. Sernovitz and Ms. Pulda believe that this official version of the Ten Commandments obscures, and conflicts with, the Reform Jewish tradition on the history and meaning of the commandments.

133.    Specifically, Mr. Sernovitz and Ms. Pulda do not believe that the Ten Commandments are a universal benign ethical guide. The language of H.B. 71 omits key biblical text after the first commandment that, they believe, makes this clear: In the book of Exodus, chapter 20, in the Torah, the words "I am the Lord Your God" are followed by "who brought you out of the land of Egypt, out of the house of bondage." This clause is an important part of their Jewish understanding of the origins and purpose of the Ten Commandments, and omission of this text denies the commandments' specific meaning in their Jewish faith. This omission is, for Mr. Sernovitz and Ms. Pulda, tantamount to an official, governmental erasure of the Jewish significance of the Ten Commandments.

134.    As Reform Jews, Mr. Sernovitz and Ms. Pulda also believe that introducing the Ten Commandments to T.S., and any action that could be construed as attempting to convey their

proper religious meaning and interpretation, must occur in the context of the broader Reform Jewish tradition. Indeed, in the modern Jewish tradition, the Ten Commandments would rarely, if ever, be displayed on the walls of a *religious* classroom, as the commandments must be interpreted and reconciled with many other parts of the Torah and the interpretative body of work that has emerged over millennia to understand the Torah. In mandating such displays in the secular classroom, H.B. 71 interferes with Mr. Sernovitz's and Ms. Pulda's ability and right to address this religious doctrine with T.S. in a manner that complies with their faith.

135.    For example, the official text mandated by H.B. 71 states: "Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's." Torn from its Jewish context and presented to students like T.S. in the manner required under H.B. 71, this language endorses a point of view of God's commandments that specifically addresses property-owning men and implicitly denigrates women as equal adults.  In fact, as Reform Jews, the equality of men and women is a fundamental faith tenet for Mr. Sernovitz and Ms. Pulda and a principle that is central to how they teach T.S. to read, abide by, and criticize Jewish texts and traditions. H.B. 71's required displays undermine their ability to do so.

136.    The ability to direct and guide their child in matters of faith is an essential aspect of Mr. Sernovitz's and Ms. Pulda's religious exercise. H.B. 71 will significantly interfere with and burden their ability to carry out this religious exercise. This burden is substantial.

137.    Specifically, for the reasons discussed above, Mr. Sernovitz and Ms. Pulda believe that forcibly subjecting T.S. to the displays mandated by H.B. 71 will undermine and interfere with their ability to instill in T.S. what it means to be specifically Jewish and their ability to introduce and teach the Ten Commandments to T.S. in a manner that comports with other important Jewish tenets. Mr. Sernovitz and Ms. Pulda also believe that the displays will create confusion for T.S. by

wrongly suggesting that the state-selected version of the Ten Commandments is the "correct" or authoritative version of scripture—even though it conflicts with their Jewish teachings—and will pressure T.S. to observe, venerate, and adopt the state's preferred religious beliefs and practices.

138.    They also believe that, because of the displays, T.S.—who was, on information and belief, just one of a few Jewish students in T.S.'s class last year—will likely face situations in which T.S. feels pressured to suppress expression of T.S.'s own Jewish background and beliefs, including the fundamental Jewish belief in tolerating and supporting the expression of all faiths.

139.    Finally, Mr. Sernovitz and Ms. Pulda strongly object to H.B. 71's religious displays because they would violate Jewish tenets that oppose proselytizing. In text and tradition, their Jewish faith teaches that proselytizing their religion to people of other faiths, trying to convert people to Judaism, or pressuring them to accept Jewish beliefs is wrong. These are religious values that they instill in T.S. School displays of the Ten Commandments will interfere with their ability to do so and may place T.S., as one of the few Jewish students in T.S.'s class, in the position of being questioned by T.S.'s peers and being asked to defend or condemn this sacrilegious proselytizing.

### *Christy Alkire and her minor child*

140.    Plaintiff Christy Alkire, on her own behalf and on behalf of her minor child, L.A., objects to, and is offended by, H.B. 71 because the displays it mandates will promote and forcibly subject her child to, religious scripture to which she and her child do not subscribe. In so doing, the displays will also usurp Ms. Alkire's parental role in directing her child's nonreligious upbringing.

141.    Ms. Alkire and L.A. are nonreligious.  They value their right to adopt no religious beliefs as much as others surely value their right to follow a particular faith. Ms. Alkire is raising

L.A. in a nonreligious family. Ms. Alkire and L.A. do not subscribe to the religious dictates of the Ten Commandments generally or the specific version that H.B. 71 mandates.

142.    L.A. believes that the Ten Commandments displays required under H.B. 71 elevate Christianity over other religious beliefs and L.A.'s non-belief. Ms. Alkire and L.A. view H.B. 71 and the mandatory displays as setting a religious precedent for how kids are supposed to behave. They perceive the required displays as signifying that the posted Ten Commandments take precedence over their family's own personal nonreligious beliefs.

143.    Ms. Alkire further believes that H.B. 71 and the required Ten Commandments displays directly interfere with and substantially burden and undermine her ability to raise L.A. in a nonreligious tradition by subjecting L.A. to displays of religious doctrine in every classroom.

144.    Ms. Alkire and L.A. are concerned that the Ten Commandments displays will embolden and empower Christian students to harass L.A. and other students who do not conform to traditional Christian norms.

145.    L.A. has already felt some pressure in school to be careful about exposing L.A.'s nonbelief to other students. L.A. believes that the religious displays mandated by H.B. 71 will increase the pressure on L.A. to suppress expression of L.A.'s own nonreligious background and nonreligious views at school as well as pressure L.A. to observe, venerate, and adopt the state's preferred religious doctrine.

### *Joshua Herlands and his minor children*

146.    Plaintiff Joshua Herlands is Jewish and is raising his minor children, E.H. and J.H., within the Jewish tradition. E.H. attends Hebrew school at a local synagogue, and the family attends synagogue on certain Jewish holidays and takes part in various community-engagement events sponsored by the synagogue.

147.    On behalf of himself and on behalf of his minor children, Mr. Herlands objects to, and is offended by, H.B. 71 because the overtly religious classroom displays mandated by the law will promote, and forcibly subject his children to, religious scripture in a manner that violates the family's religious beliefs and practices. In so doing, the displays will religiously coerce his minor children and usurp his parental role in directing their religious education, religious values, and religious upbringing.

148.    Mr. Herlands objects to H.B. 71's mandatory religious displays, in part, because he believes that they violate a key tenet of Judaism: the prohibition against missionizing. Tolerance is at the heart of the family's practice of Judaism, and, like many Jewish people, Mr. Herlands believes that evangelizing and trying to force religious teachings on others is inherently antithetical to this Jewish value.

149.    Mr. Herlands further objects to H.B. 71's religious displays, in part, because the commandments are presented without the broader context provided by the Hebrew Bible and Jewish doctrine more generally, thus obscuring important principles that apply to interpretation of the commandments. For example, it is offensive to Mr. Herlands that the name of "G[-]d" is spelled out in the mandated Ten Commandments text.[3] In his practice of Judaism, he typically does not write out the name of G-d because he, like many other Jewish people, views it as a violation of the commandment that prohibits taking G-d's name in vain.

150.    As another example, H.B. 71's final commandment, "Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's," is explicitly from a man's point of view, giving the impression, Mr. Herlands believes,

---

[3] In accordance with Mr. Herlands's religious beliefs, "G-d" is used in this section (Compl. ¶¶ 146-155).

that the commandment should apply based on gender. In addition, the commandment's discussion of "manservant[s]" and "maidservant[s]" suggests that it endorses personal servitude. However, it is fundamental to Mr. Herlands's practice of Judaism that all people are created equal, that any rule or law or obligation such as this would apply to all people equally—not just to one gender— and that any support for human slavery or servitude is immoral, wrong, and against G-d's will. Mr. Herlands believes that this context and modern Jewish interpretive principles are vital so as not to imply that Judaism endorses or supports gender discrimination or any form of servitude.

151.    Mr. Herlands additionally objects to H.B. 71 because the state-mandated version of the Ten Commandments is different than the version in the Hebrew Bible (*i.e.*, the Torah), omitting text that Mr. Herlands believes is religiously significant and thereby imposing a distorted version of the Decalogue. For example, in the Hebrew Bible, one of the commandments prohibits any graven images of G-d, as well as any *likeness* of G-d, which is why one typically does not see any images of G-d in a synagogue. But the version set forth in H.B. 71 mentions only the prohibition on "graven images." By eliminating the Hebrew Bible's important prohibition on likenesses of G-d, Mr. Herlands believes, H.B. 71's official version ensures that popular Christian iconography of G-d (*e.g.*, images of Christ) is not in violation of the commandment, erasing the commandment's Jewish significance and rendering the display of the state's approved Ten Commandments Christian-centric.

152.    As another example, in the Hebrew Bible, the first commandment discusses G-d being the one who delivered the Jewish people from Egypt, where they were slaves. For Mr. Herlands, this is a key piece of the Ten Commandments and of the Jewish story, which is commemorated each year by the Passover holiday, one of the holiest Jewish holidays. The version

of this commandment in H.B. 71, however, eliminates this language and thus omits a key piece of the cultural and religious history of the Jewish people.

153.    The ability to direct and guide his children in matters of faith is an essential aspect of Mr. Herlands's religious exercise. H.B. 71 will significantly interfere with and burden his ability to carry out this religious exercise. This burden is substantial.

154.    Specifically, by forcibly imposing on his children a distorted version of the Ten Commandments, detached from its Jewish context, H.B. 71 will significantly undermine and conflict with Mr. Herlands's ability to teach them about their religion in a manner that comports with the family's faith. Given that the displays will be unconnected to any specific academic lesson and the children will be forced to observe the displays day in and day out, in every classroom—where they are subject to teachings by people in positions of authority—Mr. Herlands believes that the displays will convey to his children the false messages that (1) there is a single set of religious laws that one should preference above others, (2) the posted version is authoritative in that regard, and (3) forcing this religious doctrine on people who may not believe in it is acceptable.

155.    He further believes that, given the nature of the religious displays, the children are likely to be put under pressure to view the state's distorted, Christian-centric version of the Ten Commandments as the one true version of the religious text that all people must follow, in direct conflict with the family's religious beliefs.

## CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

156.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

157.    The Establishment Clause of the First Amendment to the United States Constitution guarantees that "Congress shall make no law respecting an establishment of religion."

158.    In *Stone v. Graham*, the Supreme Court struck down a statute similar to H.B. 71, holding that posting the Ten Commandments in public-school classrooms violates the Establishment Clause of the First Amendment. 449 U.S. at 41-42. *Stone* remains binding precedent, and H.B. 71 is, therefore, unconstitutional.

159.    By mandating that this state-sanctioned version of the Ten Commandments be displayed in every public-school classroom in Louisiana, H.B. 71 impermissibly prefers and imposes a set of distinct religious norms on Louisiana's public-school children, including the minor-child Plaintiffs.

160.    As a result of the Ten Commandments displays mandated by H.B. 71, Louisiana students—including minor-child Plaintiffs—will be unconstitutionally coerced into religious observance, veneration, and adoption of the state's favored religious scripture, and they will be pressured to suppress their personal religious beliefs and practices, especially in school, to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers.

161.    In addition, by mandating that one version of the Ten Commandments be displayed in public educational institutions and prescribing an official religious text for schoolchildren to venerate, H.B. 71 adopts an official position on religious matters, violating the Establishment Clause's prohibition against taking sides in questions over theological doctrine and violating the "clearest command" of the Establishment Clause that "one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

162.    There is no longstanding historical practice or tradition of prominently and permanently displaying any version of the Ten Commandments in American public-school

classrooms. On the contrary, the Supreme Court unambiguously held in *Stone* that such a practice is proscribed by the Constitution.

163.    By implementing H.B. 71, Defendants, under the color of state law, will unavoidably violate Plaintiffs' rights under the Establishment Clause of the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, and 42 U.S.C. § 1983.

## COUNT II

## VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

164.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

165.    The Free Exercise Clause of the First Amendment to the United States Constitution guarantees that "Congress shall make no law . . . prohibiting the free exercise [of religion]."

166.    H.B. 71 and the religious displays it requires are not neutral with respect to religion. By design, H.B. 71 mandates the display of expressly religious scripture, the Ten Commandments, in every public-school classroom and, moreover, requires that a specific version of that scripture be used.

167.    The religiously discriminatory displays mandated by H.B. 71 will substantially burden the religious exercise of the Plaintiff parents and other parents who do not subscribe to the state-sanctioned version of the Ten Commandments by interfering with, conflicting with, and usurping their ability to direct their children's religious education and religious upbringing.

168.    The displays mandated by H.B. 71 will substantially burden the religious exercise of minor-child Plaintiffs and other children who do not subscribe to the state-sanctioned version of the Ten Commandments by pressuring them to suppress or limit expression of their religious or

nonreligious backgrounds, beliefs, or practices while in school to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers.

169.    The displays mandated by H.B. 71 will substantially burden the religious exercise of minor-child Plaintiffs and other children who do not subscribe to the state-sanctioned version of the Ten Commandments by pressuring them into observance, veneration, and adoption of the state's favored religious scripture in violation of their own religious or non-religious beliefs.

170.    By administering and implementing H.B. 71, Defendants, under the color of state law, will unavoidably violate Plaintiffs' rights under the Free Exercise Clause of the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, and 42 U.S.C. § 1983.

## **REQUEST FOR RELIEF**

The plaintiffs respectfully request the following relief:

A.    An order declaring H.B. 71 to be in violation of the Establishment Clause and Free Exercise Clause of the First Amendment to the United States Constitution;

B.    An order preliminarily and, thereafter, permanently enjoining the Defendants and their officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other persons or entities in active concert or privity or participation with them, from adopting rules or regulations in accordance with, or otherwise enforcing, the Act, and from requiring that the Ten Commandments be displayed in every public-school classroom in Louisiana;

C.    An order preliminarily and, thereafter, permanently enjoining the School Board Defendants and their officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other persons or entities in active concert or privity or participation with them from displaying the Ten Commandments in any public-school classroom;

D.     An order directing Defendants to provide a copy of the written injunction to all Louisiana public elementary, secondary, and charter schools, and all public post-secondary education institutions;

E.     An award, from Defendants to Plaintiffs, of reasonable attorneys' fees and costs incurred in connection with this action, pursuant to 42 U.S.C. § 1988;

F.     An order retaining this Court's jurisdiction of this matter to enforce the terms of the Court's order; and

G.     Such other relief as the Court deems just and proper.


DATED: June 24, 2024

> Respectfully submitted,
>
> By: *s/ Charles Andrew Perry*
> Charles Andrew Perry
> AMERICAN CIVIL LIBERTIES UNION
> FOUNDATION OF LOUISIANA
> Charles Andrew Perry
> La. Bar No. 40906
> PO Box 56157
> New Orleans, LA 70156
> (504) 522-0628
> aperry@laaclu.org
>
> AMERICAN CIVIL LIBERTIES UNION
> FOUNDATION
> Daniel Mach*
> Heather L. Weaver*
> 915 15th Street, NW, Suite 600
> Washington, DC 20005
> (202) 675-2330
> dmach@aclu.org
> hweaver@aclu.org

AMERICANS UNITED FOR
SEPARATION OF CHURCH & STATE
Alex J. Luchenitser*
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
luchenitser@au.org

FREEDOM FROM RELIGION
FOUNDATION
Patrick C. Elliott*
Samuel T. Grover*
PO Box 750
Madison, WI 53701
(608) 256-8900
Patrick@ffrf.org
sgrover@ffrf.org

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood*
Janet A. Gochman*
Nicholas J. Prendergast*
Jordan T. Krieger*
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
Nicholas.Prendergast@stblaw.com
Jordan.Krieger@stblaw.com

* Motion for *Pro Hac Vice* Admission
Forthcoming

*Counsel for Plaintiffs*