**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

REVEREND DARCY ROAKE and ADRIAN
VAN YOUNG, on behalf of themselves and on
behalf of their minor children, A.V. and S.V., et
al.,

      Plaintiffs,

      v.

CADE BRUMLEY, in his official capacity as
the Louisiana State Superintendent of
Education, et al.,

      Defendants.

CIVIL ACTION NO.
3:24-cv-00517-JWD-SDJ

---

**<u>MEMORANDUM IN SUPPORT OF</u>**
**<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 2

ARGUMENT ............................................................................................................. 6

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
FIRST AMENDMENT CLAIMS ................................................................... 7

     A.    Permanently Displaying a Preferential Version of Scripture in Every
Public-School Classroom Violates the Establishment Clause. ...................... 7

          1.    The Supreme Court's binding precedent in *Stone v. Graham*
prohibits permanent displays of the Ten Commandments in public-
school classrooms. ................................................................................ 7

          2.    Displaying the Ten Commandments in public schools would
contradict the fundamental principles animating the Religion
Clauses. ................................................................................................. 8

          3.    H.B. 71 impermissibly takes sides on theological questions and
officially favors one religious denomination over others. .................. 11

          4.    Permanently displaying an official version of the Ten
Commandments in every public-school classroom is
unconstitutionally coercive. ............................................................... 16

     B.    Plaintiffs Are Likely To Succeed On The Merits Of Their Free Exercise
Clause Claim. ............................................................................................... 20

          1.    H.B. 71's permanent displays of the Ten Commandments are
unconstitutionally coercive under the Free Exercise Clause. ............. 20

          2.    H.B. 71 and its mandatory displays are not religiously neutral and
violate Plaintiffs' free-exercise rights because they do not satisfy
strict scrutiny ...................................................................................... 22

II.     THE REMAINING PRELIMINARY-INJUNCTION FACTORS WEIGH
HEAVILY IN PLAINTIFFS' FAVOR. ....................................................... 24

CONCLUSION ....................................................................................................... 25

**TABLE OF AUTHORITIES**

**Cases**

*ACLU of Ky. v. McCreary Cnty.*,
354 F.3d 438 (6th Cir. 2003) ....................................................... 8

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
878 F.2d 806 (5th Cir. 1989) ....................................................... 7

*Am. Humanist Ass'n v. McCarty*,
851 F.3d 521 (5th Cir. 2017) ..................................................... 18

*Baker v. Adams County/Ohio Valley Sch. Bd.*,
86 F. App'x 104 (6th Cir. 2004) ................................................. 8

*Carson v. Makin*,
596 U.S. 767 (2022)............................................................ 12, 21

*City of Elkhart v. Books*,
532 U.S. 1058 (2001)................................................................. 18

*Doe ex rel. Doe v. Elmbrook Sch. Dist.*,
687 F.3d 840 (7th Cir. 2012) (en banc) ............................... 17, 20

*Doe v. Duncanville Indep. Sch. Dist.*,
994 F.2d 160 (5th Cir. 1993) ..................................................... 24

*Doe v. Harlan Cnty. Sch. Dist.*,
96 F. Supp. 2d 667 (E.D. Ky. 2000) ...................................... 8, 15

*Edwards v. Aguillard*,
482 U.S. 578 (1987)..................................................................... 9

*Elrod v. Burns*,
427 U.S. 347 (1976)................................................................... 25

*Felix v. City of Bloomfield*,
841 F.3d 848 (10th Cir. 2016) ................................................... 13

*Freedom from Religion Found., Inc. v. Connellsville Area Sch. Dist.*,
127 F. Supp. 3d 283 (W.D. Pa. 2015)......................................... 8

*Freedom from Religion Found., Inc. v. New Kensington-Arnold Sch. Dist.*,
919 F. Supp. 2d 648 (W.D. Pa. 2013)......................................... 8

*Glassroth v. Moore*,
335 F.3d 1282 (11th Cir. 2003) ........................................... 14, 15

*Holloman ex rel. Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) ................................................. 24

*Ingebretsen v. Jackson Pub. Sch. Dist.*,
88 F.3d 274 (5th Cir. 1996) ................................................ 16, 25

*Jackson Women's Health Org. v. Currier,*
  760 F.3d 448 (5th Cir. 2014) ............................................................... 25

*Karen B. v. Treen,*
  653 F.2d 897 (5th Cir. 1981), *aff'd*, 455 U.S. 913 (1982) ....................... 24

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) ................................................................... passim

*Larson v. Valente,*
  456 U.S. 228 (1982) .............................................................. 11, 12, 15

*Lee v. Weisman,*
  505 U.S. 577 (1992) ................................................................... passim

*Marsh v. Chambers,*
  463 U.S. 783 (1983) .................................................................. 8, 9, 10

*McCreary Cnty. v. ACLU of Ky.,*
  545 U.S. 844 (2005) ................................................................... passim

*Mock v. Garland,*
  75 F.4th 563 (5th Cir. 2023) ................................................................ 7

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,*
  393 U.S. 440 (1969) ............................................................................ 12

*Sch. Dist. of Abington Twp. v. Schempp,*
  374 U.S. 203 (1963) .............................................................. 12, 17, 21, 24

*Stone v. Graham,*
  449 U.S. 39 (1980) .................................................................... passim

*Texas Monthly, Inc. v. Bullock,*
  489 U.S. 1 (1989) ............................................................................... 12

*Town of Greece v. Galloway,*
  572 U.S. 565 (2014) ................................................................... 9, 15, 16

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  582 U.S. 449 (2017) ........................................................................... 21

*Van Orden v. Perry,*
  545 U.S. 677 (2005) ................................................................... passim

*Wallace v. Jaffree,*
  472 U.S. 38 (1985) .......................................................................... 9, 18

*Wisconsin v. Yoder,*
  406 U.S. 205 (1972) ......................................................................... 22

*Zorach v. Clauson,*
  343 U.S. 306 (1952) ......................................................................... 16

## Statutes & Legislation

House Bill No. 71, Act No. 676 (2024) ........................................... passim

La. R.S. § 154.1(A)(1) ............................................................................................ 4

La. R.S. § 17:221 ................................................................................................... 4

La. R.S. § 17:233 ................................................................................................... 4

**Other Authorities**

Exodus, Chapter 20, *Books of the Bible*, U.S. CONF. OF CATHOLIC BISHOPS,
https://bible.usccb.org/bible/exodus/20 ........................................................ 14

James Madison, A Memorial and Remonstrance Against Religious Assessments (1785),
*reprinted in* SELECTED WRITINGS OF JAMES MADISON (Ralph Ketcham ed., 2006)................ 11

La. House Educ. Comm. (Apr. 4, 2024), https://house.louisiana.gov/H_Video/VideoArchive
Player?v=house/2024/apr/0404_24_ED. .................................................................. 2

La. House Reg. Sess. (Apr. 10, 2024),
https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/apr/0410_24_24
RS_Day16. Player?v=house/2024/apr/0404_24_ED.................................................... 2

La. Student Standards: Social Studies (May 11, 2023),
https://www.louisianabelieves.com/docs/default-source/academic-curriculum/k-12-
louisiana-student-standards-for-social-studies.pdf?sfvrsn=df396518_36. ........................ 23, 24

Official Facebook Page of Gov. Jeff Landry, FACEBOOK,
https://www.facebook.com/watch/?v=988049316321367&ref=sharing. ................................ 6

Official X Page of Gov. Jeff Landry, X.COM,
https://x.com/LAGovJeffLandry/status/1806339447648035096. .................................... 6

Patrick Wall, *Jeff Landry vows to defend 'Judeo-Christian values' after Ten Commandments
lawsuit*, TIMES-PICAYUNE (June 25, 2024), https://www.nola.com/news/politics/jeff-
landry-lawsuit-ten-commandments-judeo-christian/articl e_0555d6e6-3314-11ef-863e-
1b07594ff87c.html.................................................................................... 6

Paul Finkelman, *The Ten Commandments on the Courthouse Lawn and Elsewhere*,
73 FORDHAM L. REV. 1477 (2005).................................................................... passim

Press Release, Am. Humanist Ass'n, Humanists File Suit Against Ten Commandments
Display (May 23, 2018), https://americanhumanist.org/press-releases/humanists-file-suit-
ten-commandments-display/.......................................................................... 13

Robert S. Alley, *Public Education and the Public Good*,
4 WM. & MARY BILL RTS. J. 277 (1995) ............................................................ 11

Steven K. Green, *The Legal Ramifications of Christian Nationalism*,
26 ROGER WILLIAMS U. L. REV. 430 (2021) ........................................................ 10

*What are the Ten Commandments of God*, JEHOVAH'S WITNESS,
https://www.jw.org/en/bible-teachings/questions/10-commandments/#link.......................... 13

## INTRODUCTION

Nearly forty-five years ago, in *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), the U.S. Supreme Court held that the Establishment Clause of the First Amendment prohibits the government from permanently posting the Ten Commandments in public-school classrooms. Flouting this longstanding precedent, Louisiana lawmakers have enacted House Bill No. 71, Act No. 676 (2024) ("H.B. 71" or the "Act"), which not only requires *every* elementary, secondary, and postsecondary public school in the state to post the Ten Commandments in *every* classroom, but also mandates that these displays use an official version of the Ten Commandments that promotes Protestant beliefs and conflicts with versions used by Catholics and Jews.

When students across Louisiana, including the minor-child Plaintiffs, return to school this August, they will be subjected—as early as their first day of school and no later than the Act's January 1, 2025, compliance deadline—to unavoidable, permanently displayed religious directives such as "I AM the LORD thy God. Thou shalt have no other gods before me."; "Thou shalt not make thyself any graven images."; "Thou shalt not take the Name of the Lord thy God in vain."; Remember the Sabbath day, to keep it holy."; and "Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee." H.B. 71(B)(1), (2).

Because H.B. 71's religious displays simply cannot be reconciled with *Stone*'s binding precedent, this Court's constitutional analysis can begin and end there. However, H.B. 71 is also unconstitutional under other First Amendment jurisprudence, which makes clear that the Free Exercise Clause and Establishment Clause bar governmental favoritism and coercion in matters of faith. Accordingly, Plaintiffs are entitled to a preliminary injunction: They are likely to succeed on the merits of their First Amendment claims and all other factors supporting emergency relief weigh in their favor.

## FACTUAL BACKGROUND

On June 19, 2024, Louisiana Governor Jeff Landry signed H.B. 71, requiring each public-school governing authority in the state to display—no later than January 1, 2025—the Ten Commandments in every elementary, secondary, and post-secondary classroom under its jurisdiction. H.B. 71(B), (C).[1] The measure took effect immediately.[2]

During the House Education Committee debate on H.B. 71, its primary author and sponsor, Representative Dodie Horton, discussed the state's interest in enacting the bill: "It is so important that our children learn what God says is right and what He says is wrong and to allow [the Ten Commandments] to be displayed in our classrooms as a visual aid, I believe, especially in this day and time is so important." La. House Educ. Comm. (Apr. 4, 2024), at 5:08, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/apr/0404_24_ED.[3]

H.B. 71 co-author and co-sponsor Representative Sylvia Taylor, echoed this sentiment, explaining, "I believe that we are lacking in direction. A lot of people, their children, are not attending churches or whatever. . . . So what I'm saying is, we need to do something in the schools to bring people back to where they need to be." *Id.* at 15:15.

Under section B(2) of the Act, the mandatory classroom displays may use only the state's officially approved version of the commandments:

"The Ten Commandments

I AM the LORD thy God.

Thou shalt have no other gods before me.

---

[1] H.B. 71 provides that the law will be codified at La. R.S. 17:2122 & 3996(B)(82).

[2] H.B. 71(3) ("This Act shall become effective upon signature by the governor[.]").

[3] During the legislative debate, Horton also proclaimed that she is only "concerned with our children looking and seeing what God's law is." La. House Reg. Sess. (Apr. 10, 2024), at 47:42, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/apr/0410_24_24RS_Day16.

Thou shalt not make thyself any graven images.

Thou shalt not take the Name of the Lord thy God in vain.

Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy

God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house.

Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle,

nor anything that is thy neighbor's."

This version of the Ten Commandments, which is "identical" to the text of the monument at issue in *Van Orden v. Perry*, 545 U.S. 677 (2005), H.B. 71(A)(6), is principally associated with Protestant beliefs and denominations: It uses a numbering system derived from Lutheranism (a branch of Protestantism) and "a translation that comes from the Protestant King James version of the Bible." Paul Finkelman, *The Ten Commandments on the Courthouse Lawn and Elsewhere*, 73 FORDHAM L. REV. 1477, 1492 (2005). This numbering system and translation differ in meaningful ways from those used by other denominations and faiths that recognize the Ten Commandments as part of their theology, including Catholicism and Judaism. *See id.* at 1485–98; *infra*, pp.13–15. And for many religions, including "Hinduism, Buddhism, Taoism, and other non-western faiths," the Ten Commandments "have no place at all" in their theology. Finkelman, *supra* p. 3, at 1479; *infra* pp. 12-13.

3

The Act requires this Protestant version of the Ten Commandments to be displayed on a poster or framed document that is, at a minimum, eleven by fourteen inches; the text of the commandments must be the "central focus" of the document and printed in a "large, easily readable font." H.B. 71(B)(1). The displays are permanent and year-round; the Act does not provide for a time limit on them. *See generally* H.B. 71. The displays will be placed in every classroom, regardless of the subject matter taught: The Act does not require, for example, that schools post the Ten Commandments only in connection with potentially relevant, secular academic instruction (*e.g.*, social-studies or world-religions courses). *See generally id.*

The Act also requires that the commandments "be displayed with a context statement" that purports to outline the "[h]istory of the Ten Commandments in American Public Education." H.B. 71(B)(3). There is no minimum size requirement for the statement and no instruction that the statement be printed in the same large, easily readable font as the Ten Commandments. *See generally id.* Further, the Act permits, but does not require, the display "along with the Ten Commandments" of one or more additional documents: the Mayflower Compact, the Declaration of Independence and the Northwest Ordinance; the Act does not provide permission for the display of any other document. *See* H.B. 71(4)(a).

Louisiana law requires students from ages six to eighteen to attend school at least 177 days per year. La. R.S. § 154.1(A)(1). Louisiana parents, including the parent-Plaintiffs, who fail to send their children to school and "assure the attendance of the child in regularly assigned classes . . . shall be fined not more than two hundred and fifty dollars or imprisoned not more than thirty days, or both." *See id.* § 17:221. In addition, school officials must report students, including the minor-child Plaintiffs, who are "habitually absent from school" or tardy as "truant" to the juvenile or family court of the parish. *Id.* § 17:233.

Challenging the state's use of these compulsory school-attendance laws to subject children to mandatory, denominationally preferential religious displays in every public-school classroom, Plaintiffs—who are Christian, Jewish, Unitarian Universalist, and nonreligious—filed a Complaint on June 24, 2024. ECF No. 1. The Complaint asserts that H.B. 71 and its required displays violate both the Establishment Clause and the Free Exercise Clause of the First Amendment. *Id.* ¶¶ 156–70. Suing on behalf of themselves and their combined sixteen minor children enrolled or soon-to-be enrolled in Louisiana's public schools, Compl. ¶¶ 9–17, the fourteen parent-Plaintiffs have asserted a variety of objections to H.B. 71 and have identified numerous harms that they and their children will suffer as a result of the statute. Specifically, as set forth in the Plaintiffs' declarations accompanying this motion, the displays will: (1) substantially burden the parent-Plaintiffs' religious exercise by usurping their parental authority to direct their children's religious upbringing and education,[4] (2) forcibly subject their children to religious doctrine and beliefs in a manner that conflicts with the families' own religious beliefs and practices,[5] (3) send a message to their children that they do not belong in their own school community because they do not subscribe to the state's preferred religious text,[6] and (4) religiously coerce their children by pressuring them to observe, meditate on, venerate, and follow the state's favored religious text,[7] and by pressuring them to

---

[4] *See, e.g.*, Rev. Roake Decl. ¶¶ 6, 8–15; Van Young Decl. ¶¶ 6, 8–14; Erin Hawley Decl. ¶¶ 6, 10–14; David Hawley Decl. ¶¶ 6, 10–14; Rev. Broadhurst Decl. ¶¶ 6–9, 14; Rev. Williams Decl. ¶¶ 6–9, 14; Sernovitz Decl. ¶¶ 5–8, 11-14; Pulda Decl. ¶¶ 5–8, 11–14; Herlands Decl. ¶¶ 6, 12–15; Rev. Sims Decl. ¶¶ 5–8, 12; Alkire Decl. ¶¶ 3–6; Harding Decl. ¶¶ 2–5; Owens Decl. ¶¶ 2–5; McCrory Decl. ¶¶ 2–5.

[5] *See, e.g.*, Rev. Roake Decl. ¶¶ 5, 13–15; Van Young Decl. ¶¶ 5, 12–14; Erin Hawley Decl. ¶¶ 5, 13–15; David Hawley Decl. ¶¶ 5, 13–15; Rev. Broadhurst Decl. ¶¶ 5, 9–12; Rev. Williams Decl. ¶¶ 5, 9–12; Sernovitz Decl. ¶¶ 7–12, 14; Pulda Decl. ¶¶ 7–12, 14; Herlands Decl. ¶¶ 5, 7–14; Rev. Sims Decl. ¶¶ 5, 8–12; Alkire Decl. ¶¶ 6–8; Harding Decl. ¶¶ 3, 4–7; Owens Decl. ¶¶ 3, 4–7; McCrory Decl. ¶¶ 3, 5–7.

[6] *See, e.g.*, Rev. Roake Decl. ¶¶ 14–17; Van Young Decl. ¶¶ 13–16; Erin Hawley Decl. ¶¶ 15–16; David Hawley Decl. ¶¶ 15–16; Rev. Broadhurst Decl. ¶¶ 12–15; Rev. Williams Decl. ¶¶ 12–14; Sernovitz Decl. ¶¶ 14–16; Pulda Decl. ¶¶ 14–16; Herlands Decl. ¶¶ 13–15; Rev. Sims Decl. ¶¶ 10–13; Alkire Decl. ¶¶ 5–8; Harding Decl. ¶¶ 5–7; Owens Decl. ¶¶ 5–7; McCrory Decl. ¶¶ 2–4, 7.

[7] *See, e.g.*, Rev. Roake Decl. ¶¶ 15–17; Van Young Decl. ¶¶ 14–17; Erin Hawley Decl. ¶¶ 15–16; David Hawley Decl. ¶¶ 15–16; Rev. Broadhurst Decl. ¶¶ 12–15; Rev. Williams Decl. ¶¶ 12–14; Sernovitz Decl. ¶¶ 14–16;

suppress expression of their own religious beliefs and backgrounds at school.[8]

Defendants—twelve state education officials (sued in their official capacities) and five local school boards—are responsible for overseeing, administering, and implementing H.B. 71. Compl., ¶¶ 19-36. Plaintiffs' Complaint seeks preliminary and permanent injunctive relief that prevents Defendants from carrying out any of these actions and an order declaring H.B. 71 unconstitutional. *Id.* at pp. 41–42.

After Plaintiffs filed their lawsuit, Governor Landry posted about H.B. 71 on his official social media pages, declaring, "Since when did the Ten Commandments become a bad way to live your life?!"[9] And in a fundraising email noting the lawsuit, Landry exhorted his supporters to help him "ADVANCE [] the Judeo-Christian values that this nation was built upon." Patrick Wall, *Jeff Landry vows to defend 'Judeo-Christian values' after Ten Commandments lawsuit*, TIMES-PICAYUNE (June 25, 2024), https://www.nola.com/news/politics/jeff-landry-lawsuit-ten-commandments-judeo-christian/articl e_0555d6e6-3314-11ef-863e-1b07594ff87c.html.

## ARGUMENT

In deciding whether to grant a preliminary injunction, a district court must weigh whether a movant has established: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878

---

Pulda Decl. ¶¶ 14–16; Herlands Decl. ¶¶ 13–15; Rev. Sims Decl. ¶¶ 10–13; Alkire Decl. ¶¶ 6–8; Harding Decl. ¶¶ 5–7; Owens Decl. ¶¶ 5–7; McCrory Decl. ¶¶ 5–7.

[8] *See, e.g.*, Rev. Roake Decl. ¶¶ 14–17; Van Young Decl. ¶¶ 13–17; Erin Hawley Decl. ¶¶ 14–16; David Hawley Decl. ¶¶ 14–16; Rev. Broadhurst Decl. ¶¶ 13–15; Rev. Williams Decl. ¶¶ 13–14; Sernovitz Decl. ¶¶ 14–16; Pulda Decl. ¶¶ 14–16; Herlands Decl. ¶¶ 13–15; Rev. Sims Decl. ¶¶ 10–13; Alkire Decl. ¶¶ 7–8; Harding Decl. ¶¶ 5–7; Owens Decl. ¶¶ 5–7; McCrory Decl. ¶¶ 5–7.

[9] Official Facebook Page of Gov. Jeff Landry, FACEBOOK (June 27, 2024, 10:55 AM), https://www.facebook.com/watch/?v=988049316321367&ref=sharing; Official X Page of Gov. Jeff Landry, X.COM (June 27, 2024, 10:50 AM), https://x.com/LAGovJeffLandry/status/1806339447648035096.

F.2d 806, 809 (5th Cir. 1989). "[N]one of the . . . [preliminary-injunction] prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (internal citation and quotation marks omitted). Here, all four factors weigh decisively in favor of Plaintiffs.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIMS.

### A.    Permanently Displaying a Preferential Version of Scripture in Every Public-School Classroom Violates the Establishment Clause.

1.    *The Supreme Court's binding precedent in* Stone v. Graham *prohibits permanent displays of the Ten Commandments in public-school classrooms.*

H.B. 71 is constitutionally forbidden under directly applicable, binding Supreme Court precedent. *Stone* considered whether a Kentucky law that required the display of "a durable, permanent copy" of the Ten Commandments "on the wall of each public classroom in the State" was permissible under the Establishment Clause. 449 U.S. at 39–40 n.1. Like H.B. 71, the Kentucky statute required that a context statement be posted with the display: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* at 40 n.1. In striking down the statute, the Court held that "posting the Ten Commandments on schoolroom walls is plainly religious in nature" and serves "no educational function." *Id.* at 41–42. Rather, the mandatory displays would unconstitutionally "induce . . . schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Id.* at 42.

*Stone* has been the law of the land for nearly half a century. Even in the one Establishment Clause case where the Supreme Court upheld a governmental display of the Ten Commandments, the Court emphasized that the public-school context in *Stone* set it apart from a passive relic placed among other monuments on the Texas Capitol grounds: "There are, of course, limits to the display

of religious messages or symbols. For example, we held unconstitutional a Kentucky statute requiring the posting of the Ten Commandments in every public schoolroom. . . . [*Stone*] stands as an example of the fact that we have been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Van Orden v. Perry*, 545 U.S. 677, 690–91 (2005) (plurality opinion) (internal citations and quotation marks omitted).[10]

H.B. 71 is very similar to the statute overturned in *Stone.* Indeed, H.B. 71 is more constitutionally egregious than the Kentucky law because, unlike in *Stone*, Louisiana lawmakers took it upon themselves to select and approve an official version of the Ten Commandments—one aligned with Protestant beliefs—and then mandate that this specific text be posted in every classroom. As *Stone* is binding law, the Court need look no further in its analysis.[11]

2.    *Displaying the Ten Commandments in public schools would contradict the fundamental principles animating the Religion Clauses.*

Even if the Court were to examine H.B. 71 under other Supreme Court jurisprudence, such as the "original meaning and history" test, *Kennedy v. Bremerton School District*, 597 U.S. 507, 536 (2022), the Act still would not pass constitutional muster. In *Marsh v. Chambers*, the Supreme Court upheld the practice of opening legislative sessions with prayer, pointing to an "unambiguous

---

[10] In his controlling concurrence, Justice Breyer similarly explained that "[t]he display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state." *Van Orden*, 545 U.S. at 703 (Breyer, J., concurring) (citing *Stone* and *Lee v. Weisman*, 505 U.S. 577, 592 (1992)).

[11] Since *Stone*, no federal court has upheld a public school's Ten Commandments display, regardless of the context. *See, e.g.*, *Baker v. Adams County/Ohio Valley Sch. Bd.*, 86 F. App'x 104 (6th Cir. 2004) (school display of the Ten Commandments alongside the Constitution, Declaration of Independence, and the Magna Carta was unconstitutional); *ACLU of Ky. v. McCreary Cnty.*, 354 F.3d 438 (6th Cir. 2003) (preliminarily enjoining school's display of the Ten Commandments alongside "historical documents"); *Freedom from Religion Found., Inc. v. Connellsville Area Sch. Dist.*, 127 F. Supp. 3d 283, 318 (W.D. Pa. 2015) (Ten Commandments monument on outdoor grounds of junior high school violated the Establishment Clause); *Doe v. Harlan Cnty. Sch. Dist.*, 96 F. Supp. 2d 667, 675, 679 (E.D. Ky. 2000) (granting preliminary injunction against school's display of the Ten Commandments alongside other documents because the "overriding theme of each individual document as presented in the displays and of the displays as a whole is one of religion and more specifically of Christianity"); *cf. Freedom from Religion Found., Inc. v. New Kensington-Arnold Sch. Dist.*, 919 F. Supp. 2d 648, 661 (W.D. Pa. 2013) (denying motion to dismiss in challenge to Ten Commandments monument at front entrance of high school).

and unbroken history" of such prayers dating back to the First Congress and reasoning that the prayers had, over those 200 years, "become part of the fabric of our society." 463 U.S. 783, 792 (1983); *accord Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014) ("*Marsh* stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the *specific practice* is permitted." (emphasis added)). Relying on *Marsh* and its progeny, the Court held more recently in *Kennedy* that "the Establishment Clause must be interpreted by reference to historical practices and understandings." 597 U.S. at 535.

The legislative invocations at issue in *Marsh* had a "unique history," 463 U.S. at 791, which few religious practices today share. Here, the state cannot proffer evidence of an equivalent longstanding or widespread historical practice or tradition of permanently displaying the Ten Commandments in public schools because there is none. In the "context statement" set to accompany the displays, Louisiana asserts that "[t]he Ten Commandments were a prominent part of American public education for almost three centuries." H.B. 71(B)(3). But the only evidence the state points to is three examples of early textbooks that purportedly included references to the Ten Commandments. Putting aside that the American public-education system as we know it today was not in existence in the 1600s or even in the early 1800s,[12] discrete passages in privately written textbooks are nowhere close to state-mandated, permanent displays in every classroom of a state-approved, official version of the Ten Commandments.

Furthermore, even if the state could demonstrate that some public schools have, at one point or another, permanently posted the Ten Commandments in classrooms, such displays have been expressly *prohibited* under the law for almost half a century. *See Stone*, 449 U.S. at 42–43.

---

[12] The context statement in H.B. 71 dates two of these textbooks to those eras. However, as the Supreme Court has acknowledged, "free public education was virtually nonexistent at the time the Constitution was adopted." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987); *accord Wallace v. Jaffree*, 472 U.S. 38, 80 (1985) (Powell, J., concurring) ("The simple truth is that free public education was virtually nonexistent in the late 18th century.").

Thus, any prior or current sporadic practice involving such displays would certainly not constitute the widespread, "unambiguous and unbroken" history necessary to justify H.B. 71 under the *Marsh-Kennedy* standard. *See Marsh*, 463 U.S. at 792.

Nor would such sporadic displays overcome *Kennedy*'s admonition that, under the "original meaning and history" test, the "line . . . between the permissible and the impermissible has to accor[d] with history and faithfully reflec[t] the understanding of the Founding Fathers." 597 U.S. at 535–36 (alterations in original) (internal quotation marks omitted). H.B. 71's preamble suggests that the law merely "[r]ecogniz[es] the historical role of the Ten Commandments" in "our nation's history" and "faithfully reflects the understanding of the founders of our nation with respect to the necessity of civic morality to a functional self-government." H.B. 71(A)(4). Not so.

There is no evidence that the Framers of the Constitution considered the Ten Commandments to be a basis for either American law or government:

> [A]s best can be determined, no person or persons of influence asserted that the Commandments served as the foundation of American law or government . . . . Significantly, the debates of the Constitutional Convention contained in Madison's *Notes* are devoid of any claims of the authority of the Ten Commandments or the Bible generally. In the wide-ranging debates . . . the Founders mentioned Roman law, European Continental law, British law, and various other legal systems, but as can best be determined, no delegate ever mentioned the Ten Commandments or the Bible. Similarly, neither the "Bible" nor "Scripture" nor the "Ten Commandments" appears in the index of the Federalist Papers, which are generally considered to contain the most important discussions of the meaning of the United States Constitution at the time of ratification. The claim that the Ten Commandments have profoundly influenced the formation of Western legal thought and the formation of our country is not supported by history and is a legal fiction.

Steven K. Green, *The Legal Ramifications of Christian Nationalism*, 26 Roger Williams U. L. Rev. 430, 492–93 (2021) (internal citations and quotation marks omitted). Moreover, the Act's preamble quotation attributed to James Madison, which extolls the purported role of the Ten Commandments in the nation's founding, H.B. 71(A)(4), is fabricated. As the editors of the Papers

of James Madison explained almost two decades ago, nothing that Madison wrote or said, publicly or privately, was "remotely like the sentiment expressed" in the manufactured quotation. In fact, the false quote is "inconsistent with everything we know about Madison's views on religion and government." Robert S. Alley, *Public Education and the Public Good*, 4 WM. & MARY BILL RTS. J. 277, 317 (1995).

It follows that there is likewise no historical evidence that—had the American public-education system as we know it today existed back then—Madison or any of the other Framers would have supported the "specific practice" of displaying a state-approved version of the Ten Commandments in classrooms. Quite the opposite. Even before he drafted the First Amendment, Madison vehemently opposed state support of any particular religious teachings and famously railed against a bill that would have provided taxpayer funds for "teachers of the Christian religion." *See* James Madison, A Memorial and Remonstrance Against Religious Assessments ¶ 7 (1785), *reprinted in* SELECTED WRITINGS OF JAMES MADISON (Ralph Ketcham ed., 2006).[13]

3.    *H.B. 71 impermissibly takes sides on theological questions and officially favors one religious denomination over others.*

The Establishment Clause was intended "not only to protect the integrity of individual conscience in religious matters, . . . but to guard against the civic divisiveness that follows when the government weighs in on one side of religious debate[.]" *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 876 (2005). Indeed, "nothing does a better job of roiling society, a point that needed no explanation to the descendants of English Puritans and Cavaliers (or Massachusetts Puritans and Baptists)." *Id.* Accordingly, "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S.

---

[13] Although H.B. 71 asserts that it does not impose an "unfunded mandate on any public[-]school governing authority" and requires schools to either accept donated posters or raise funds to purchase them, H.B. 71(A)(11), B(5), schools will still be required to use administrative resources and school property to implement the law.

228, 244 (1982). It is thus unsurprising that there is no longstanding history or tradition of governmental displays of the Ten Commandments in public schools, as the government's selection and explicit approval of one particular version of scripture "raise[s] serious concerns about state entanglement with religion and denominational favoritism." *Carson v. Makin*, 596 U.S. 767, 787 (2022) (citing *Larson*).

To that end, the Supreme Court has repeatedly warned against government action that takes sides in "controversies over religious doctrine and practice." *See Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188–89 (2012) (noting that the Establishment Clause "prohibits government involvement in . . . ecclesiastical decisions"); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 243 (1963) (Douglas, J., concurring) (First Amendment requires "on the part of all organs of government a strict neutrality toward theological questions")*.* As the Court has explained:

> There exists an overriding interest in keeping the government—whether it be the legislature or the courts—out of the business of evaluating the relative merits of differing religious claims. The risk that governmental approval of some and disapproval of others will be perceived as favoring one religion over another is an important risk the Establishment Clause was designed to preclude.

*Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 20 (1989) (plurality opinion) (internal quotation marks and alterations omitted) (holding state tax-exemption law unconstitutional, in part, because it increased prospect of state "embroilment in controversies over religious doctrine").

Here, in violation of these fundamental, longstanding principles, Louisiana has chosen sides on religious controversies of the utmost importance, announcing an official position on perhaps the greatest theological question of all: Which religion (and which religious texts) should Louisianan public-school students and families believe in and follow? The state's explicit preference for biblical scripture rules out any number of faiths in which the Ten Commandments

are generally not recognized as part of the religious tradition, including Buddhism, Hinduism, Taoism, Jainism, Sikhism, certain Native American religions, Paganism, Wicca, and Humanism.[14] Similarly excluded are religious denominations, such as Jehovah's Witnesses,[15] that reject the proposition that any version of the Ten Commandments is authoritative or binding.

But legislators did not stop there. By hand-picking the specific text of the Ten Commandments, and mandating its display in public-school classrooms statewide, they dove even deeper into core theological questions and controversies surrounding the correct content and meaning of the Ten Commandments for those who do consider the commandments important or binding. Louisiana's official version of the Ten Commandments is Protestant in structure and translation. *See supra* p. 3. It does not match translations found in the Jewish tradition, altering or omitting key language and context that is included in the Torah. For example, accepted Jewish translations of the commandments typically begin by recounting God's delivery of the Jewish people from slavery: "I the LORD am your God *who brought you out of the land of Egypt, the house of bondage*." *See* Finkelman, *supra* p. 3, at 1486 (emphasis added); *see also* Sernovitz Decl. ¶ 10; Pulda Decl. ¶ 10; Herlands Decl. ¶ 11. This is "a statement of faith that in itself is a Commandment." Finkelman, *supra* p. 3, at 1486. But Louisiana's official version of the Ten Commandments erases this Jewish aspect of the text, rendering it Christian-centric.

---

[14] *See, e.g.*, Finkelman, *supra* p. 3, at 1479, 1481, 1489; *Felix v. City of Bloomfield*, 841 F.3d 848, 854 & n.2 (10th Cir. 2016) (noting that "Plaintiffs are polytheistic Wiccans" and that the first commandment to "have no other gods before me" is "a particularly disconcerting command for polytheists"); Rev. Roake Decl. ¶¶ 7–10, 12; Erin Hawley Decl. ¶¶ 7–9, 12–14; David Hawley Decl. ¶¶ 7–9, 12–14; Press Release, Am. Humanist Ass'n, Humanists File Suit Against Ten Commandments Display (May 23, 2018), https://americanhumanist.org/press-releases/humanists-file-suit-ten-commandments-display/. The displays also, of course, reject the beliefs of atheists and other nonreligious people. *See, e.g.*, Alkire Decl. ¶¶ 2–5; Harding Decl. ¶¶ 2–5; Owens Decl. ¶¶ 2–5; McCrory Decl. ¶¶ 2–5.

[15] *See, e.g.*, *What are the Ten Commandments of God*, JEHOVAH'S WITNESS (last visited July 7, 2024), https://www.jw.org/en/bible-teachings/questions/10-commandments/#link1 (explaining that "God gave his Law, including the Ten Commandments, specifically to the ancient nation of Israel" and that this law "is not binding on Christians").

Louisiana's official version of the Ten Commandments is also inconsistent with Jewish theology when it comes to the specific language mandated by H.B. 71. For instance, "the Hebrew translation of the Sixth Commandment prohibits only murder, not all killings as the King James Version does." *Glassroth v. Moore*, 335 F.3d 1282, 1299 n.3 (11th Cir. 2003). The text set forth in H.B. 71, however, instructs students to avoid the latter. This "difference in translation is significant" and represents a continuing controversy between faith systems. *See* Finkelman, *supra* p. 3, at 1495 ("There is a clear legal difference between to kill and to murder, and this difference has had, and continues to have, important theological implications."); *see also Glassroth*, 335 F.3d at 1299 n.3 ("In some cases the differences among . . . [versions of the Ten Commandments] might seem trivial or semantic, but lurking behind the disparate accounts are deep theological disputes." (internal quotation marks omitted)).

Nor does the state's official version of the Ten Commandments conform to the version followed by many Catholics. For example, some Catholic translations do not use the phrase "graven images," instead barring adherents from "'carv[ing] idols for yourselves in the shape of anything in the sky above or on the earth below or in the waters beneath the earth.'" Finkelman*, supra* p. 3, at 1493–94 (quoting the Catholic New American Bible); *see also* Exodus, Chapter 20, *Books of the Bible*, U.S. CONF. OF CATHOLIC BISHOPS, https://bible.usccb.org/bible/exodus/20 (last visited July 7, 2024). This religious directive to "not carve idols" is "substantively different" from the Protestant King James Bible's command not to make "any graven images," which is mandated by H.B. 71. Finkelman, *supra* p. 3, at 1494. ("These differences are of course theological.").

These are just a few ways in which the principally Protestant version of scripture approved by H.B. 71 differs from and rejects translations and faith tenets associated with Judaism and

Catholicism, among other denominations.[16] Even if some displays of the Ten Commandments on government property could pass muster under the *Marsh-Kennedy* test,[17] Louisiana's decision to adopt, by statute, this particular version of the Ten Commandments and promulgate it via mandatory displays in public-school classrooms cannot be reconciled with the Establishment Clause's requirement that the government maintain "a strict neutrality toward theological questions," or its command that "one religious denomination cannot be preferred over another." *See supra* pp. 12–13. Indeed, Justice Scalia, joined by Justices Rehnquist and Thomas, recognized as much in his *McCreary* dissent, acknowledging that some displays of the Ten Commandments could be impermissible: "The Establishment Clause would prohibit, for example, governmental endorsement of a particular version of the Decalogue as authoritative." *McCreary Cnty.*, 545 U.S at 894 n.4.

Because H.B. 71 violates the Establishment Clause's prohibition on denominational preferences, it "must be invalidated unless it is justified by a compelling governmental interest . . . and unless it is closely fitted to further that interest." *See Larson*, 456 U.S. at 247. As

---

[16] H.B. 71's orders to "have no other gods before me" and "not take the name of the Lord thy God in vain" derive directly from the King James Version of the Bible. *See* Finkelman, *supra* p. 3, at 1495. Jewish and Catholic translations use different language, highlighting "important theological" disputes. *Id.*

[17] In upholding the *Van Orden* monument, from which H.B. 71 drew the text of the Ten Commandments, *supra* p. 3, the Supreme Court did not give states *carte blanche* to adopt the same text in official form. The Fraternal Order of Eagles (FOE) donated the monument at issue in *Van Orden* to Texas in 1961. 545 U.S. 677 at 712. The monument was not erected due to any law requiring such displays, and the *FOE*, on its own volition, selected the text and particular version of the commandments inscribed on the monument—*not* the state. *Id.* at 712-13. Here, by contrast, the state went out of its way to require public-school displays of the commandments and to select, vote on, and officially approve the specific text to be used. Intentionally choosing, in this manner, "which version of the Ten Commandments to display" communicates religious favoritism. *See Glassroth*, 335 F.3d at 1299 n.3; *see also Harlan Cnty. Sch. Dist.*, 96 F. Supp. at 677 ("Notably, the defendants did not post a Hebrew version of the Ten Commandments and in selecting a version of the Ten Commandments had to choose among several differing translations, some favored by particular Christian sects over others."); *cf. Town of Greece*, 572 U.S. at 581 ("Our Government is prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief or code of moral behavior.").

discussed below, Defendants do not come close to meeting either prong of this standard. *See infra* pp. 21–24.

4.    *Permanently displaying an official version of the Ten Commandments in every public-school classroom is unconstitutionally coercive.*

i.    The public-school context presents unique coercion concerns.

Under the Establishment Clause, the "government may not coerce anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). "It may not thrust any sect on any person. It may not make a religious observance compulsory. It may not coerce anyone to attend church, to observe a religious holiday, or to take religious instruction." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952), *quoted in Kennedy*, 597 U.S. at 536–37. These constitutional prohibitions are at the forefront in the public-school context because "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure[.]" *Lee,* 505 U.S. at 592. Thus, as the plurality and Justice Breyer affirmed in *Van Orden*, the Supreme Court has been especially attentive to monitoring compliance with the Establishment Clause in this setting. *Supra* pp. 7–8.

These special concerns stem in part from the fact that "students [are] a captive audience that cannot leave without being punished by the state or School Board for truancy or excessive absences." *See Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 279–80 (5th Cir. 1996); *supra* p. 4. Once students are at school, staff control their movements and often their expression, further compounding the inherently coercive nature of the environment. Students are not able to move around freely to avoid official religious indoctrination or to contest it beyond certain limits. *Cf. Town of Greece*, 572 U.S. at 590 (plurality opinion) (legislative prayers at town council meeting were not religiously coercive where "[n]othing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer, arriving late, or . . . making a later

protest"). And, as the Supreme Court has repeatedly recognized, children are particularly susceptible to "religious indoctrination or peer pressure," *see id.*, the latter of which is especially abundant in school, where students—who are confined to classrooms for most of the day—are captive not only to the state's messages delivered therein but also to the immediate impressions and judgments of their classmates. *See Lee*, 505 U.S. at 593.

The Supreme Court recently reaffirmed that it remains "problematically coercive" for public schools to promote religious messages to students who are part of a captive audience. *Kennedy*, 597 U.S. at 541.[18] As one federal court of appeals has explained, "[o]nce a school district creates a captive audience, the coercive potential . . . can operate." *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 855 (7th Cir. 2012) (en banc).

    ii.    <u>H.B. 71's mandatory displays pressure students into observance, meditation on, veneration, and adoption of the Ten Commandments.</u>

Viewed through the lens of this special concern for captive-audience public-school students, H.B. 71's mandatory displays of the Ten Commandments will be unconstitutionally coercive. The state has selected and approved an official version of biblical scripture and has directed that it be permanently posted in every public-school classroom in a manner that harnesses three things—(1) the state's authority to require children to be in those classrooms, (2) the otherwise coercive nature of that environment, and (3) the vulnerability and impressionability of children—to pressure students, both directly and indirectly, to read scripture, meditate on it, venerate it, and follow it. *See, e.g.*, *Schempp*, 374 U.S. 203, 210, 225 (holding that school-directed reading of Bible passages constitutes "religious exercise" where, as here, it is not "presented

---

[18] In *Kennedy*, the Court upheld the right of a public-school football coach to engage in a quiet and private act of prayer after games, noting that the prayers looked "very different" from those at issue in *Lee*. *Kennedy*, 597 U.S. at 541. The coach's prayers did not involve students and were not imposed on a captive audience. *Id.* at 525, 542.

objectively as part of a secular program of education").[19] "Coercion along these lines was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 597 U.S. at 537. *Cf. Am. Humanist Ass'n v. McCarty*, 851 F.3d 521, 525-26 & n.12 (5th Cir. 2017).

The Ten Commandments are undeniably biblical scripture with overtly religious dictates that "do not confine themselves to arguably secular matters." *Stone*, 449 U.S. at 40. "[T]he first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day." *Id.* at 41–42 (citing Exodus 20:1-11; Deuteronomy 5:6-15); *accord McCreary Cnty.*, 545 U.S. at 869 ("[T]he original text viewed in its entirely is an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction."). H.B. 71's mandatory displays of this religious scripture will serve "no educational function." *See Stone*, 449 U.S. at 42. The displays will not, for example, be "integrated into the school curriculum . . . in an appropriate study of history, civilization, ethics, comparative religion, or the like." *See id.* On the contrary, they will be hung in every classroom without regard to the subject being taught. The only possible function served by such permanent and pervasive displays is "to induce . . . schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Id.* Many years after *Stone*, Justice Rehnquist acknowledged this, even as he criticized the Court's denial of certiorari in a challenge to a forty-year-old Ten Commandments monument on the lawn of a city's municipal building. *City of Elkhart v. Books*, 532 U.S. 1058, 1061 (2001) (Rehnquist, C.J., dissenting from denial of certiorari). With Justices Scalia and Thomas joining, Justice Rehnquist distinguished

---

[19] The constitutional prohibition against state coercion of religious exercise includes vocal and silent activities. *See Stone*, 449 U.S. at 42 ("Nor is it significant that the Bible verses involved in this case are merely posted on the wall, rather than read aloud as in *Schempp* and *Engel*[.]"); *Wallace*, 472 U.S at 60–61 (holding that state could not encourage students to engage in silent prayer).

*Stone* from the facts at bar, writing: "In *Stone*, the posting effectively induced schoolchildren to meditate upon the Commandments during the school-day." *Id.*

H.B. 71 capitalizes on the direct and indirect coercive pressures unique to the public-school context to force students to engage in religious exercise. First, the state has mandated the *permanent* display of the Ten Commandments in *every* classroom, rendering them unavoidable by students. The displays are, therefore, not comparable to religious displays outside of the school context. *Cf. Van Orden,* 545 U.S. at 691 (plurality opinion) ("The placement of the Ten Commandments monument on the Texas State Capitol grounds is a far more passive use of those texts than was the case in *Stone*, where the text confronted elementary school students every day."). Second, the state has required that these displays be no smaller than eleven by fourteen inches, present the Ten Commandments as the "central focus" of the document, and be printed in "a large, easily readable font"—ensuring that students' attention will be drawn to the commandments and that students will perceive them as authoritative rules that must be followed. *Supra* p. 4. Third, in selecting and approving an official version of the Ten Commandments that does not reflect the religious beliefs of tens of thousands,[20] if not more, Louisiana students, the state will engender a classroom environment that is unwelcoming and potentially hostile toward those students, including the minor-child Plaintiffs, *supra* nn. 6-8, increasing the pressure on them to conform to the state's preferred scripture. "This pressure, though subtle and indirect, can be as real as any

---

[20] It is "impossible to have a theologically neutral version" of the Ten Commandments. Finkelman, *supra* p. 3, at 1492. Where, as here, the state selects, approves, and mandates the specific text of the commandments, "[i]n addition to being religious in the most obvious sense of the term, any display . . . will inevitably favor one faith or one denomination over all others . . . because any ordering of the Commandments or translation of the original Hebrew text will reflect the position of one or more faiths and exclude that of other faiths." *Id.* at 1478, 1483. But even if it were possible to adopt a religiously neutral version of the Ten Commandments, it would not negate the coercive effect of those displays in the school context. *See Lee*, 505. U.S. at 594 ("That the intrusion was in the course of promulgating religion that sought to be civic or nonsectarian rather than pertaining to one sect does not lessen the offense or isolation to the objectors. At best it narrows their number, at worst increases their sense of isolation and affront.").

overt compulsion." *Lee*, 505 U.S. at 593. As the Seventh Circuit has observed, "[d]isplaying religious iconography . . . may do more than provide public school students with knowledge of Christian tenets"; it "tend[s] to promote religious beliefs," and "students might feel pressure to adopt them"—a concern that "was front and center in *Stone*." *Elmbrook*, 687 F.3d at 851.[21]

The extent of the coercion under H.B. 71 does not end there. Public-school students are obliged to attend school under penalty of truancy. *Supra* p. 4s Thus, H.B. 71's requirement that students submit to the state's religiously indoctrinating displays is backed by the threat of civil and criminal sanction, a form of direct religious coercion that strikes at the heart of the Establishment Clause. *See, e.g.*, *Lee*, 505 U.S. at 640, 643 (Scalia, J., dissenting) ("The coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy . . . by force of law and threat of penalty. . . . [W]e have made clear our understanding that school prayer occurs within a framework in which legal coercion to attend school (*i.e.*, coercion under threat of penalty) provides the ultimate backdrop."). Lawmakers have effectively conceded that the design and implementation of H.B. 71 will produce this coercive end, characterizing the displays, for example, as "visual aid[s]" that will persuade children to follow "what God says is right and what He says is wrong." *See supra* p. 2, 6.

**B.    Plaintiffs Are Likely To Succeed On The Merits Of Their Free Exercise Clause Claim.**

1.    *H.B. 71's permanent displays of the Ten Commandments are unconstitutionally coercive under the Free Exercise Clause.*

H.B. 71 likewise strikes at the heart of the Free Exercise Clause, which "embrace[s] a

---

[21] H.B. 71's context statement asserting that the permanent religious displays illustrate the role of the Ten Commandments in American public education, *supra* pp. 4, 9–10, does not ameliorate the displays' coercive effect on children. As in *Stone*, the context statement is nothing more than an "implausible disclaimer." *See McCreary Cnty.*, 545 U.S. at 869 (discussing *Stone*). Nor does H.B. 71's provision authorizing the display of the Northwest Ordinance, Mayflower Compact, or Declaration of Independence lessen the coercion students will experience. On the contrary, that the state identifies these documents as historically significant, but nevertheless declines to require their display, highlights that the state's main interest is imposing the Ten Commandments' religious dictates on schoolchildren.

freedom of conscience and worship." *Lee*, 505 U.S. at 591. The Clause protects the "right of every person to freely choose his own course [in matters of faith] . . . free of any compulsion from the state." *Schempp*, 374 U.S. at 222. And it prohibits both direct and indirect coercion. *See Carson*, 596 U.S. at 778. As discussed above, H.B. 71's mandatory displays will religiously coerce students, who will be subjected to the Ten Commandments for nearly every hour they are in school, in every classroom, with no exceptions and without regard to the subject matter being taught. In short, the state's official religious doctrine will be unavoidable. *See supra* pp. 17-20.

By subjecting students, including minor-child Plaintiffs, to prominent, pervasive Ten Commandments displays, H.B. 71 pressures them to observe, meditate on, venerate, and adopt or obey the state's preferred religious doctrine. *See supra* n.7. In addition, students, including minor-child Plaintiffs, will be pressured to suppress their own religious or non-religious backgrounds and beliefs at school to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers. *See supra* n.8.

Standing alone, these coercive pressures violate the minor-child Plaintiffs' free-exercise rights. Louisiana may not condition students' attendance of its public schools on families' surrender of their religious freedom: "[It] is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017). What is more, as discussed above, the coercion is direct here: Plaintiffs' refusal to submit to the state's religiously indoctrinating displays would render the minor-child Plaintiffs truant and subject to being reported to the juvenile courts, while the parent-Plaintiffs would be under threat of fine or imprisonment. *See supra* pp. 4–5, 20–21.

21

2.   *H.B. 71 and its mandatory displays are not religiously neutral and violate Plaintiffs' free-exercise rights because they do not satisfy strict scrutiny.*

"[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Kennedy*, 597 U.S. at 525 (internal citations and quotation marks omitted). Where a plaintiff makes this showing, courts must "find a First Amendment violation unless the government can satisfy strict scrutiny by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.*

H.B. 71 is not neutral with respect to religion. By design, and on its face, the statute mandates the display of expressly religious scripture, the Ten Commandments, in every public-school classroom. H.B. 71 also requires that a specific version of that scripture be used, one that is associated with Protestantism and is exclusionary of other faiths. *See supra*, pp. 3, 12–15. "The government may not favor one religion over another, or religion over irreligion, religious choice being the prerogative of individuals under the Free Exercise Clause." *McCreary Cnty.*, 545 U.S. at 875–76. H.B. 71 runs roughshod over both neutrality requirements.

In so doing, it will burden Plaintiffs' exercise of their sincere religious or nonreligious beliefs in substantial ways. The displays will interfere with and usurp the fundamental rights of the parent-Plaintiffs "as contrasted with that of the State, to guide the religious future . . . of their children." *See Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). *See supra* n.4. They will send an exclusionary and spiritually burdensome message to the Plaintiffs—who do not subscribe to the state-approved version of the Ten Commandments and disagree with the manner in which the state has co-opted scripture for use in the displays—that they are outsiders who do not belong in their own school community. *See supra* n.6. And the displays will pressure the minor-child Plaintiffs

into religious observance, meditation on, veneration, and adoption of the state's favored religious scripture, and into suppressing expression, while at school, of their own religious or non-religious backgrounds and beliefs. *See supra* nn. 7–8.

These impositions on Plaintiffs' religious beliefs and practices cannot be sustained under the Free Exercise Clause's strict-scrutiny standard. It is the government's burden to demonstrate that its attacks on Plaintiffs' "protected rights serve a compelling interest and are narrowly tailored to that end." *See Kennedy*, 597 U.S. at 532. Defendants cannot meet this burden.

The state's mandate that public schools post an official state-approved version of the Ten Commandments in every classroom does not further any compelling governmental interest. It "serves no . . . educational function." *Stone*, 449 U.S. at 42. And the reasons proffered by the state for H.B. 71 in the statute's preamble are not supported by the historical record. *See supra* pp. 9–11. Moreover, the state's own curricular standards governing social studies and world history do not consider the Ten Commandments important enough to mention even once,[22] which further belies any argument that H.B. 71's displays are necessary to educate students regarding the commandments' purported role in American history and American public education.[23]

Even if the state were to somehow meet its heavy burden under the first prong of the strict-scrutiny standard, it would nevertheless fail the "narrowly tailored" prong. There are many ways in which students could be taught any relevant history of the Ten Commandments without the state

---

[22] *See generally* La. Student Standards: Social Studies (hereinafter, "Social Studies Standards") (updated May 11, 2023), https://www.louisianabelieves.com/docs/default-source/academic-curriculum/k-12-louisiana-student-standards-for-social-studies.pdf?sfvrsn=df396518_36.

[23] In any event, if it were true (though it is not) that the Ten Commandments had played an important role in American public education or had formed the foundation for the American legal system, singling out this one religious text over every other historical or foundational text for mandatory, permanent display does not serve a compelling interest. Nor does selecting, approving, and mandating the display of one particular, denominational version of the commandments. *Cf. McCreary Cnty.*, 545 U.S at 894 n.4 (Scalia, J., dissenting) (state's adoption of "a particular version of the Decalogue as authoritative" is not permissible).

approving an official version of scripture and then subjecting students to it in every classroom on a permanent, daily basis. Most obviously, the matter could be broached "objectively as part of a secular program of education," *Schempp*, 374 U.S. at 225, through "an appropriate study of history, civilization, ethics, comparative religion, or the like." *Stone*, 449 U.S. at 42. In fact, Louisiana's current social-studies standards already provide for multiple opportunities to learn about religion.[24] To the extent that the state has any legitimate interest in teaching about the Ten Commandments, such instruction could be integrated into any of these lessons, provided it is undertaken in an objective, secular manner.[25]

## II.    THE REMAINING PRELIMINARY-INJUNCTION FACTORS WEIGH HEAVILY IN PLAINTIFFS' FAVOR.

Plaintiffs are highly likely to succeed on the merits of their First Amendment claims for the reasons discussed above. As a general matter, where First Amendment plaintiffs have demonstrated that they are likely to succeed on the merits of their claim, the remaining preliminary-injunction factors are typically presumed to weigh in their favor as well. *See, e.g.*, *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166 (5th Cir. 1993). This proves true here.

Plaintiffs are likely to suffer irreparable harm because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

---

[24] Students in the fourth and fifth grades will study the "origin and spread of major world religions as they developed throughout history." Social Studies Standards, *supra* n.22, at 18, 22. Sixth-graders will learn about the "importance of the founding and development of the Plymouth settlement, including the "practice of self-government established by the Mayflower Compact . . . [and] religious freedom," and they will "[a]nalyze the historical and religious factors that influenced the development of government in the United States, including those from ancient Greece; the Roman Republic; the Judeo-Christian tradition; English rule of law and the Magna Carta; Enlightenment philosophies; and the Great Awakening." *Id.* at 26–27. High-school students studying world history will examine "how various religious philosophies have influenced government institutions and policies from 1300 to 2010." *Id.* at 55.

[25] H.B. 71 is also not narrowly tailored to any state-asserted interest in instilling ethical or moral values in students. The government "cannot employ a religious means to serve otherwise legitimate secular interests." *Karen B. v. Treen*, 653 F.2d 897, 901 (5th Cir. 1981), *aff'd*, 455 U.S. 913 (1982); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1283 (11th Cir. 2004) (rejecting teacher's claim that in-class prayer was a permissible way to teach compassion in connection with character-education instruction because religious exercise "is not within the range of tools among which teachers are empowered to select in furtherance of their pedagogical duties").

*Ingebretsen*, 88 F.3d at 280 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Moreover, the public interest and balance of potential harms to the parties also weigh in Plaintiffs' favor. There is no harm to the public interest, or to Defendants specifically, because a preliminary injunction will merely maintain the status quo pending this litigation's outcome. On the contrary, the public interest would be well served by an injunction because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 (5th Cir. 2014).

## CONCLUSION

For the reasons set forth above, this Court should issue the requested preliminary injunction, as outlined in Plaintiffs' Motion for Preliminary Injunction.

Date: July 8, 2024                    Respectfully submitted,

                              By: */s/ Charles Andrew Perry*
                                   Charles Andrew Perry
                                   AMERICAN CIVIL LIBERTIES UNION
                                   FOUNDATION OF LOUISIANA
                                   Charles Andrew Perry
                                   La. Bar No. 40906
                                   PO Box 56157
                                   New Orleans, LA 70156
                                   (504) 522-0628
                                   aperry@laaclu.org

                                   AMERICAN CIVIL LIBERTIES UNION
                                   FOUNDATION
                                   Daniel Mach*
                                   Heather L. Weaver*
                                   915 15th Street, NW, Suite 600
                                   Washington, DC 20005
                                   (202) 675-2330
                                   dmach@aclu.org
                                   hweaver@aclu.org

AMERICANS UNITED FOR
SEPARATION OF CHURCH & STATE
Alex J. Luchenitser*
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
luchenitser@au.org

FREEDOM FROM RELIGION
FOUNDATION
Patrick C. Elliott*
Samuel T. Grover*
PO Box 750
Madison, WI 53701
(608) 256-8900
Patrick@ffrf.org
sgrover@ffrf.org

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood*
Janet A. Gochman*
Nicholas J. Prendergast*
Jordan T. Krieger*
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
Nicholas.Prendergast@stblaw.com
Jordan.Krieger@stblaw.com

* Admitted *Pro Hac* Vice

*Counsel for Plaintiffs*