# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DARCY ROAKE, et al., | |
| PLAINTIFFS, | |
| v. | Civil Action No. 3:24-cv-517 |
| CADE BRUMLEY, et al., | Judge: JWD - SDJ |
| DEFENDANTS. | |

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANTS' CONSOLIDATED MOTION TO DISMISS,
### OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, AND
### ALTERNATIVE MOTION FOR STAY PENDING APPEAL

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................ii

TABLE OF AUTHORITIES ...........................................................................................iii

INTRODUCTION ..............................................................................................................1

BACKGROUND ................................................................................................................3

LEGAL STANDARDS .......................................................................................................6

ARGUMENT .....................................................................................................................8

    I.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS UNDER RULE 12(B)(1) FOR
        LACK OF SUBJECT MATTER JURISDICTION. ..................................................................8

        A.    Plaintiffs' Claims Are Not Ripe. ..........................................................9

        B.    Plaintiffs Lack Article III Injury, Traceability, and Redressability.........................12

        C.    Defendants Brumley and Members of BESE Are Entitled to Sovereign Immunity..........17

    II.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS UNDER RULE 12(B)(6) FOR
        FAILURE TO STATE A CLAIM FOR RELIEF. ...................................................................20

        A.    Plaintiffs' Establishment Clause Claim Fails (Count I)...........................................21

        B.    Plaintiffs' Free Exercise Clause Claim Fails (Count II)..........................................41

    III.    THE COURT SHOULD DENY PLAINTIFFS' PRELIMINARY-INJUNCTION MOTION. .....................47

    IV.    IN THE ALTERNATIVE, THE COURT SHOULD STAY ANY INJUNCTION PENDING APPEAL. ......49

PRAYER FOR RELIEF .....................................................................................................50

# TABLE OF AUTHORITIES

**Cases**

*Agostini v. Felton,*
   521 U.S. 203 (1997) ................................................................................................39

*Allen v. Wright,*
   468 U.S. 737 (1984) ................................................................................................15

*Allied Marketing Group, Inc. v. CDL Marketing, Inc.,*
   878 F.2d 806(5th Cir. 1989) .....................................................................................8

*Am. Legion v. Am. Humanist Ass'n,*
   588 U.S. 29 (2019) ............................................................................... 13, 33, 36, 46

*Ams. United for Separation of Church & State, Inc.,*
   454 U.S. 464 (1982) ................................................................................................13

*Aronow v. United States,*
   432 F.2d 242 (9th Cir. 1970) ...................................................................................45

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..................................................................................................7

*Barber v. Bryant,*
   860 F.3d 345 (5th Cir. 2017) .......................................................................1, 13, 14, 20

*Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.,*
   27 F.4th 313 (5th Cir. 2022) ....................................................................................34

*Benfield v. Magee,*
   945 F.3d 333 (5th Cir. 2019) .....................................................................................7

*Bezet v. United States,*
   276 F. Supp. 3d 576 (E.D. La. 2017) .................................................................... 2, 47

*Bowen v. Roy,*
   476 U.S. 693 (1986) ..........................................................................................43, 44

*Braidwood Mgmt., Inc. v. EEOC,*
   70 F.4th 914 (5th Cir. 2023) ......................................................................................9

*California Parents for the Equalization of Educ. Materials v. Torlakson,*
   973 F.3d 1010 (9th Cir. 2020) .................................................................................45

*Carney v. Adams,*
   592 U.S. 53 (2020) ..................................................................................................12

*Carson v. Makin,*
   596 U.S. 767 (2022) ............................................................................................44

*Casillas v. Madison Ave. Assocs., Inc.,*
   926 F.3d 329 (7th Cir. 2019) ............................................................................16

*Choice Inc. of Tex. v. Greenstein,*
   691 F.3d 710 (5th Cir. 2012) ....................................................................8, 9, 11

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ............................................................................................43

*City of Alexandria v. FEMA,*
   781 F. Supp. 2d 340 (W.D. La. 2011) ..............................................................47

*City of Austin v. Paxton,*
   943 F.3d 993 (5th Cir. 2019) ................................................................17, 18, 20

*City of Ocala v. Rojas,*
   143 S. Ct. 764 (2023) ..........................................................................................13

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ............................................................................................15

*Croft v. Perry,*
   624 F.3d 157 (5th Cir. 2010) ..........................................................21, 23, 32, 45

*Crowley v. Smithsonian Inst.,*
   636 F.2d 738 (D.C. Cir. 1980) ..........................................................................45

*Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan,*
   938 F.3d 246 (5th Cir. 2019) ............................................................................39

*Doe v. Acton-Boxborough Reg'l Sch. Dist.,*
   8 N.E.3d 737 (Mass. 2014) ................................................................................45

*Doe v. Beaumont Indep. Sch. Dist.,*
   240 F.3d 462 (5th Cir. 2001) ......................................................................35, 44

*Doe v. Tangipahoa Par. Sch. Bd.,*
   494 F.3d 494 (5th Cir. 2007) ......................................................13, 14, 17, 20

*E.T. v. Paxton,*
   19 F.4th 760 (5th Cir. 2021) ......................................................................48, 49

*Emp't Div. v. Smith,*
   494 U.S. 872 (1990) ............................................................................................46

*Espinoza v. Montana Dep't of Revenue,*
  591 U.S. 464 (2020) ............................................................................ 37, 38

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ............................................................................ 15, 16

*Firewalker-Fields v. Lee,*
  58 F.4th 104 (4th Cir. 2023) ................................................................. 23

*Freedom From Religion Foundation v. Hanover School District,*
  626 F.3d 1 (1st Cir. 2010) ..................................................................... 45

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021) ............................................................................... 46

*Groff v. DeJoy,*
  600 U.S. 447 (2023) ............................................................................... 39

*Hamilton v. Dallas County,*
  79 F.4th 494 (5th Cir. 2023) ................................................................. 7

*Home Builders Ass'n of Miss., Inc. v. City of Madison,*
  143 F.3d 1006 (5th Cir. 1998) .............................................................. 6

*In re FEMA Trailer,*
  668 F.3d 281 (5th Cir. 2012) ................................................................. 6

*In re Great Lakes Dredge & Dock Co. LLC,*
  624 F.3d 201 (5th Cir. 2010) ................................................................. 7

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) ....................................... 13, 22, 23, 32, 34, 35, 36, 39, 44, 45

*Kling v. Hebert,*
  60 F.4th 281 (5th Cir. 2023) ................................................................. 6

*Labrador v. Poe,*
  144 S. Ct. 921 (2024) ............................................................................. 49

*Lemon v. Kurtzman,*
  403 U.S. 602 (1971) ...................................................... 13, 38, 39, 40

*Little v. KPMG LLP,*
  575 F.3d 533 (5th Cir. 2009) ................................................................. 6

*Lynch v. Donnelly,*
  465 U.S. 668 (1984) ............................................................................... 36

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
  584 U. S. 617 (2018).........................................................................................46

*Mayle v. United States*,
  891 F.3d 680 (7th Cir. 2018).............................................................................45

*McCreary County, Ky. v. ACLU of Ky.*,
  545 U.S. 844 (2005)................................................................................... 33, 40

*McLin v. Twenty-First Jud. Dist.*,
  79 F.4th 411 (5th Cir. 2023)................................................................................6

*McRorey v. Garland*,
  99 F.4th 831 (5th Cir. 2024)................................................................................7

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
  760 F.2d 618 (5th Cir. 1985)..............................................................................7

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024)..........................................................................21, 23, 41

*Munaf v. Geren*,
  553 U.S. 674 (2008)...................................................................................... 7, 47

*Murthy v. Missouri*,
  144 S. Ct. 1972 (2024)..........................................................12, 13, 14, 15, 16

*Myers v. Loudoun Cnty. Pub. Sch.*,
  418 F.3d 395 (4th Cir. 2005)............................................................................45

*New Doe Child #1 v. Congress of the United States*,
  891 F.3d 578 (6th Cir. 2018)............................................................................45

*New Doe Child #1 v. United States*,
  901 F.3d 1015 (8th Cir. 2018)..........................................................................45

*Newdow v. Lefevre*,
  598 F.3d 638 (9th Cir. 2010).............................................................................45

*Newdow v. Peterson*,
  753 F.3d 105 (2d Cir. 2014)..............................................................................45

*Newdow v. Rio Linda Union Sch. Dist.*,
  597 F.3d 1007 (9th Cir. 2010)..........................................................................45

*NiGen Biotech, L.L.C. v. Paxton*,
  804 F.3d 389 (5th Cir. 2015)........................................................................ 2, 18

*O'Hair v. Murray*,
  588 F.2d 1144 (5th Cir. 1979) ...................................................................................... 45

*Oliver v. Arnold*,
  3 F.4th 152 (5th Cir. 2021) ........................................................................................... 45

*Ramming v. United States*,
  281 F.3d 158 (5th Cir. 2001) .......................................................................................... 7

*Roho, Inc. v. Marquis*,
  902 F.2d 356 (5th Cir. 1990) .......................................................................................... 7

*Ruiz v. Estelle*,
  650 F.2d 555 (5th Cir. Unit A June 1981) ..................................................................... 8

*Sch. Dis. Of Abington Twp. v. Schempp*,
  374 U.S. 203 (1963) ...................................................................................................... 34

*Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*,
  980 F.2d 437 (7th Cir. 1992) ......................................................................................... 45

*Shurtleff v. Boston*,
  596 U.S. 243 (2022) .......................................................................................... 22, 32, 33

*Staley v. Harris County*,
  485 F.3d 305 (5th Cir. 2007) .......................................................................... 1, 9, 10, 11, 20

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ........................................................................................................ 17

*Stone v. Graham*,
  449 U.S. 39 (1980) .......................................................................... 2, 17, 36, 38, 39, 40, 41

*Texas All. for Retired Americans v. Scott*,
  28 F.4th 669 (5th Cir. 2022) ..................................................................................... 18, 19

*Town of Greece v. Galloway*,
  572 U.S. 565 (2014) .............................................................................................. 22, 38, 44

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ...................................................................................................... 16

*United States ex rel. Johnson v. Raytheon Co.*,
  93 F.4th 776 (5th Cir. 2024) ........................................................................................... 7

*Urb. Devs. LLC v. City of Jackson*,
  468 F.3d 281 (5th Cir. 2006) ........................................................................................... 6

*Van Orden v. Perry*,
    545 U.S. 677 (2005) ........................................................ 3, 4, 11, 25, 33, 35, 36, 38, 40, 41, 46

*Veasey v. Abbott*,
    870 F.3d 387 (5th Cir. 2017) ........................................................................................48

*W. Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ......................................................................................................45

*Whole Woman's Health v. Jackson*,
    595 U.S. 30 (2021) ........................................................................................................19

*Williamson v. Tucker*,
    645 F.2d 404 (5th Cir. May 1981) ..................................................................................7

**Statutes**

La. R.S. § 17:262 ........................................................................................................... 3, 20

La. R.S. § 17:2122 ............................................................................................... 4, 19, 23, 36

La. R.S. § 17:3351 ...............................................................................................................3

La. R.S. § 25:1281 ...............................................................................................................3

La. R.S. § 25:1283 ...............................................................................................................3

La. R.S. § 49.950 .................................................................................................................5

**Other Authorities**

2018 La. Sess. Law Serv. Act 410 (S.B. 224) .....................................................................3

2023 La. Sess. Law Serv. Act 264 (H.B. 8) ........................................................................3

2006 La. Sess. Law Serv. Act 602 (S.B. 476) .....................................................................3

La. Admin. Code § 28:337(B)(41) ................................................................................. 3, 20

Amicus Br. of Prof. Charles L. Glenn in Supp. of Pet'rs,
    *Carson v. Makin*, 2021 WL 4173250 (U.S. Sept. 10, 2021) ........................................37

James W. Fraser, Between Church and State (2d ed.), https://tinyurl.com/3fmm48ev .....37

Encyclopedia Britannica, *The New-England Primer*, https://tinyurl.com/5682tuhy ............37

William Holmes McGuffey, *McGuffey's Fourth Eclectic Reader* (1920 rev. ed.) ................. 36, 37

**Rules**

Fed. R. App. P. 8(a)(1) ...................................................................................................8

Fed. R. Civ. P. 12(b)(1)...........................................................................................6, 8, 47

Fed. R. Civ. P. 12(b)(6).........................................................................................7, 20, 47

## INTRODUCTION

A few weeks ago, the Governor signed H.B. 71 into law. The law requires the display of the Ten Commandments, subject to certain minimum requirements and officials' discretion, in public school classrooms. Five days later, Plaintiffs in this case—a number of parents on behalf of themselves and their children—filed this lawsuit against various State officials and school boards. Plaintiffs allege that they "object to, and will be harmed by, the religious displays mandated by H.B. 71." ECF No. 1 (Compl.) at 17 (capitalization altered). Across more than 100 paragraphs of "Factual Allegations," however, the Complaint never mentions a single Defendant or a single H.B. 71 display. *See id.* ¶¶ 37–155. For good reason: No Plaintiff or their child has seen an H.B. 71 display. In fact, no one knows how any given school or official—including Defendants—will implement H.B. 71, what any given H.B. 71 display will look like, or whether any given H.B. 71 display will pose a potential constitutional issue. As a result, the most Plaintiffs can speculate is that, by "implementing H.B. 71," the named Defendants "*will*" violate Plaintiffs' constitutional rights. *Id.* ¶¶ 163, 170 (emphasis added).

That speculation requires dismissal for lack of subject matter jurisdiction. *First*, the Fifth Circuit has squarely held that any challenge to a "probable" display of the Ten Commandments "is not ripe because there are no facts before [the court] to determine whether such a []display might violate the Establishment Clause"—especially where "no decision has been made regarding any aspect of the future display." *Staley v. Harris County*, 485 F.3d 305, 309 (5th Cir. 2007) (en banc). Just so here. *Second*, the Fifth Circuit has squarely held that, "[i]n cases involving religious displays," "we have required an encounter with the offending item or action to confer standing." *Barber v. Bryant*, 860 F.3d 345, 353 (5th Cir. 2017). Because no Plaintiff or their child alleges an encounter with an H.B. 71 display, they lack Article III standing. And *third*, as to the State official Defendants covered by sovereign immunity, the Fifth Circuit has squarely held that a plaintiff may sidestep that immunity under the *Ex parte Young* doctrine only if (among other things) they identify an "ongoing violation of

federal law." *See NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015). By insisting that the named Defendants "will" violate Plaintiffs' constitutional rights, the Complaint admits that there is no ongoing violation of federal law, and thus the claims against the State officials must be dismissed. For these reasons, the Court should enter a brief dismissal order for lack of subject matter jurisdiction without prejudice to Plaintiffs or others filing a future lawsuit that is not jurisdictionally barred.

If the Court nonetheless were inclined to reach the merits, dismissal would remain in order because the Complaint fails to state a claim for relief. Plaintiffs' claims in this case are facial attacks on H.B. 71, which means that Plaintiffs must show that H.B. 71 cannot be constitutionally implemented under any circumstances. That is an impossible burden, as numerous illustrations demonstrate undisputedly constitutional implementation of H.B. 71. Plaintiffs claim that the Supreme Court's decision in *Stone v. Graham*, 449 U.S. 39 (1980), controls this case—but they omit that the Supreme Court overruled the doctrinal basis for *Stone*. And in all events, *Stone*—as narrowed by the Supreme Court itself—is easily distinguishable here. All this dooms Plaintiffs' Establishment Clause claim, as well as the Free Exercise Clause version of that claim.

Dismissal of the Complaint on any of the above grounds means the Court also should dismiss Plaintiffs' preliminary-injunction motion as moot. *See, e.g.*, *Bezet v. United States*, 276 F. Supp. 3d 576, 579 (E.D. La. 2017) ("Because the Court finds that the Government's motion to dismiss should be granted, the Court will deny as moot Plaintiff's motion for partial preliminary injunction."). In all events, the Court should deny the preliminary-injunction motion because Plaintiffs are, at the least, unlikely to succeed on the merits of their claims for all the reasons dismissal is warranted. Plaintiffs also will suffer no harm from the absence of an injunction because Plaintiffs themselves do not yet know how, if at all, they would be affected by a hypothetical H.B. 71 display. Finally, and in the alternative, the State respectfully asks that the Court stay any injunction order pending appeal.

To sum up: (I) The Court should dismiss the Complaint without prejudice for lack of subject matter jurisdiction. (II) If the Court reaches the merits, it should dismiss the Complaint for failure to state a claim for relief. (III) The Court should deny the preliminary-injunction motion either as moot or on the merits. (IV) In the alternative, the Court should stay any injunction order pending appeal.

## BACKGROUND

**A.** Over the past few decades, the Louisiana Legislature—and different Governors—have enacted laws addressing the role of religion in American and world history. For example, Governor Kathleen Blanco signed into law the "Religious History of America and of the State of Louisiana as Background of American and Louisiana Law." *See* 2006 La. Sess. Law Serv. Act 602 (S.B. 476). That law came on the heels of the Supreme Court's decision upholding a display of the Ten Commandments in *Van Orden v. Perry*, 545 U.S. 677 (2005). Since then, Louisiana has permitted public displays of the Ten Commandments in courthouses and other State and local buildings to acknowledge the role of religion in our history and culture. La. R.S. § 25:1281 *et seq.* Such displays are accompanied by contextualizing language. *Id.* § 25:1283.

Similarly, the Legislature and Governor John Bel Edwards enacted a law requiring all schools to display the national motto "In God We Trust" in public school buildings. *See* 2018 La. Sess. Law Serv. Act 410 (S.B. 224) (codified at La. R.S. § 17:262 (2018)). And last summer, Governor Edwards signed into law a requirement to more prominently display the "In God We Trust" motto on a poster "at least eleven inches by fourteen inches" in "large, easily readable font" in every public school classroom. *See* 2023 La. Sess. Law Serv. Act 264 (H.B. 8) (codified at La. R.S. §§ 17:262 & 17:3351(O)). Eight months later, on February 20, 2024, the Louisiana State Board of Elementary and Secondary Education (BESE) updated the Louisiana Handbook for School Administrators to require each local education agency to "have policies and procedures" to address the "display of the national motto in each classroom in each school under its jurisdiction." La. Admin. Code § 28:337(B)(41).

3

**B.** During the 2024 session, the Legislature and Governor Jeff Landry enacted another such law, H.B 71. As with the "In God We Trust" national motto, H.B. 71 requires schools to display the Ten Commandments in "large, easily readable font" on "a poster or framed document that is at least eleven inches by fourteen inches"—slightly larger than this page—where the Ten Commandments is "the central focus." La. R.S. § 17:2122(B)(1). The text of the Ten Commandments is "identical" to the text found on the monument upheld in *Van Orden. Id.* § 17:2122(A)(6). The display itself must include a specific context statement explaining the history of the Ten Commandments in American public education. *Id.* § 17:2122(B)(3). Alongside the Ten Commandments, schools may also display other notable documents such as the Mayflower Compact, the Declaration of Independence, and the Northwest Ordinance. *Id.* § 17:2122(B)(4)(a). No school governing board is required to "spend its funds to purchase displays," which may be donated or funded exclusively by private donations. *Id.* § 17:2122(B)(5). Beyond these provisions, H.B. 71 leaves "[t]he nature of the display [to] be determined by each governing authority." *Id.* § 17:2122(B)(1).

The law requires schools to comply by January 1, 2025. *Id.* The law also requires BESE to "adopt rules and regulations in accordance with the Administrative Procedure Act to ensure the proper implementation of this Section." *Id.* § 17:2122(B)(6)(a). Finally, it requires the Department of Education to "identify appropriate [compliance] resources" that "are free of charge" and "list [them] on the department's internet website." *Id.* § 17:2122(B)(6)(b).

**C.** Plaintiffs—a group of Louisiana parents, on behalf of themselves and their minor children enrolled in public schools—filed this lawsuit five days after the Governor signed H.B. 71. *See* Compl. The named Defendants in this suit are Louisiana State Superintendent of Education Cade Brumley, the members of BESE in their official capacities, and five parish school boards (East Baton Rouge, Vernon, Livingston, St. Tammany, and Orleans). The Complaint asserts two claims for relief: a violation of the First Amendment's Establishment Clause (Count I) and a violation of the First

Amendment's Free Exercise Clause (Count II). Compl. at 38–41. Across both claims, Plaintiffs allege that they "object to, and will be harmed by, the religious displays mandated by H.B. 71." *Id.* at 17 (capitalization altered). They thus generally ask the Court to enjoin Superintendent Brumley, the BESE members, the parish school boards, and several unnamed people and entities not before the Court from (1) "adopting rules or regulations in accordance with, or otherwise enforcing," H.B. 71, (2) "requiring that the Ten Commandments be displayed in every public-school classroom," and (3) "displaying the Ten Commandments in any public-school classroom." *Id.* at 41.

Two weeks later, Plaintiffs filed a preliminary-injunction motion. ECF Nos. 20 (PI Mot.), 20-1 (PI Mem.). That motion seeks injunctive relief along the same lines, as well as "an order directing Defendants Brumley and the members of [BESE] to provide a copy of any preliminary injunction granted to all Louisiana public elementary, secondary, and charter schools, and all public post-secondary education institutions." PI Mot. at 3.

**D.** Absent from the Complaint—and critical for present purposes—is any allegation that a Plaintiff or their child has seen any H.B. 71 display, especially one traceable to any named Defendant. That is unsurprising given that Plaintiffs sued a matter of hours after the Governor signed H.B. 71, weeks before Plaintiffs' children would go to school and well before any Defendant could come up with a plan for creating a H.B. 71 display.

Indeed, Defendants have thus far taken no steps to implement H.B. 71. BESE, for example, has not even held a regular meeting since the Governor signed H.B. 71. Ex. B (Morris Decl.) ¶ 8. And even if BESE were to promulgate a rule, that process would take around half a year to complete. *See* La. R.S. § 49.950 *et seq.* Similarly, none of the Defendant school boards has taken steps to implement the law. There are no H.B. 71 displays on their walls. *See* Ex. C (Smith Decl.) ¶ 8; Ex. D (Hart Decl.) ¶ 8; Ex. E (Travis Decl.) ¶ 8; Ex. F (Link Decl.) ¶ 8; They have not accepted donated funds or posters. Ex. C ¶ 9; Ex. D ¶ 9; Ex. E ¶ 9; Ex. F ¶ 9. They have not considered any potential displays. Ex. C

¶ 10; Ex. D ¶ 10; Ex. E ¶ 10; Ex. F ¶ 10. In fact, the most they can represent as of today is that (a) they will likely not post any "stand-alone copy of the Ten Commandments," (b) they "will likely prioritize the consideration of displays that preeminently celebrate [Louisiana, American, or world] history," and (c) they will "consider allowing different classrooms to post different versions of the display." Ex. C ¶¶ 13–14; Ex. D ¶¶ 13–14; Ex. E ¶¶ 13–14; Ex. F ¶¶ 13–14.

With respect to the Department of Education, H.B. 71 requires the Department only to identify and list free compliance resources—but the Department has not yet taken any such steps. Ex. A (Townsend Decl.) ¶¶ 9–10. The Department has reviewed a number of illustratives referenced below and it "will likely consider some" of them "or variations of them." Ex. A ¶ 12. But the Department "will likely also consider other illustratives with different themes, content, formats, layouts, graphics, typography, color schemes, sizes, styles, interactive elements, spacing, borders, and headings." Ex. A ¶ 13. And all Defendants almost certainly will consider stakeholder input from parents, students, staff, and community members before deciding on a course of action. Ex. A ¶ 14.

As of today, no Defendant has published an H.B. 71 display (or a related rule) or has any imminent plans to do so.

## LEGAL STANDARDS

**Dismissal for Lack of Jurisdiction.** Rule 12(b)(1) permits a party to raise fatal jurisdictional defects early. *See* Fed. R. Civ. P. 12(b)(1); *see, e.g.*, *In re FEMA Trailer*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)). And when "a Rule 12(b)(1) motion is filed," "the court first considers its jurisdiction." *McLin v. Twenty-First Jud. Dist.*, 79 F.4th 411, 415 (5th Cir. 2023). Ripeness, standing, and sovereign immunity are all jurisdictional questions to be considered first when raised in a Rule 12(b)(1) motion. *See Urb. Devs. LLC v. City of Jackson*, 468 F.3d 281, 292 (5th Cir. 2006) (ripeness); *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) (standing); *Kling v. Hebert*, 60 F.4th 281, 284 (5th Cir. 2023) (sovereign immunity).

6

Plaintiffs, as "the part[ies] asserting jurisdiction," "constantly bear[] the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *see, e.g.*, *United States ex rel. Johnson v. Raytheon Co.*, 93 F.4th 776, 783 (5th Cir. 2024). On a factual attack under Rule 12(b)(1), as here, "no presumptive truthfulness attaches to the [] allegations." *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. May 1981).

**Dismissal for Failure to State a Claim.** Dismissal also is proper where a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hamilton v. Dallas County*, 79 F.4th 494, 499 (5th Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plaintiffs' "conclusory allegations, unwarranted factual inferences, or legal conclusions" are "not accept[ed] as true"—only "well-pleaded facts" receive that presumption. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (internal citations and quotations omitted). Once the complaint is stripped to its "well-pleaded facts," those alone "must make relief plausible, not merely possible." *Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019).

**Preliminary Injunction.** "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal citations and quotations omitted); *see Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (calling it "the exception rather than the rule"). The preliminary-injunction elements are well-treaded: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest." *McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024); *see Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir. 1990) (failure to prove just one can be dispositive). Plaintiffs, as movants, must "clearly carr[y] the burden

of persuasion with respect to all four factors." *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

**Stay Pending Appeal.** Courts consider four factors in determining whether to grant a stay pending appeal: "(1) whether the movant has made a showing of likelihood of success on the merits, (2) whether the movant has made a showing of irreparable injury if the stay is not granted, (3) whether the granting of the stay would substantially harm the other parties, and (4) whether the granting of the stay would serve the public interest." *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. Unit A June 1981); *see* Fed. R. App. P. 8(a)(1).

## ARGUMENT

The Court need do no more than dismiss Plaintiffs' Complaint, without prejudice, for lack of subject matter jurisdiction. The Complaint is directly foreclosed by Fifth Circuit precedent governing ripeness, standing, and sovereign-immunity. Accordingly, the Court should issue a brief dismissal order beginning and ending with subject matter jurisdiction. If the Court were inclined to reach the merits, however, dismissal would remain warranted because Plaintiffs fail to state a claim for relief.

Dismissal of the Complaint would warrant summary denial of Plaintiffs' preliminary-injunction motion as moot. If the Court were inclined not to dismiss the lawsuit, however, the Court should deny the preliminary-injunction motion because Plaintiffs are, at the least, unlikely to succeed on the merits; they will not suffer irreparable harm; and the equities and the public interest cut in Defendants' favor. Alternatively, and for the same reasons, Defendants respectfully request that the Court stay any injunction pending appeal.

**I.    The Court Should Dismiss Plaintiffs' Claims under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction.**

Fifth Circuit precedent requires the dismissal of Plaintiffs' Complaint for lack of subject matter jurisdiction. *See, e.g.*, *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714–15 (5th Cir. 2012) ("Article III of the United States Constitution provides that federal courts have the power to decide only actual

8

cases or controversies."). The most straightforward basis to do so is on ripeness grounds, although the same considerations equally demonstrate the lack of Article III injury, traceability, and redressability. Separately, Defendants Brumley and members of BESE are entitled to sovereign immunity, which independently warrants dismissal of the claims against them. Whichever route the Court chooses, its analysis should begin and end with the lack of subject matter jurisdiction.

### A. Plaintiffs' Claims Are Not Ripe.

The clearest dismissal ground is lack of ripeness. The ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id.* at 715 (citation omitted). "[A] court must look at two factors to determine ripeness: (1) 'the fitness of the issues for judicial decision' and (2) 'the hardship to the parties of withholding court consideration.'" *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 930 (5th Cir. 2023). The claims in this case are not fit for judicial decision. And in all events, dismissal on ripeness grounds would pose no hardship on the parties.

**1.** Plaintiffs' claims are not fit for judicial decision. "[A] claim is 'fit for judicial decision' if it presents a pure question of law that needs no further factual development." *Id.* But, "if a claim is 'contingent [on] future events that may not occur as anticipated, or indeed may not occur at all,' the claim is not ripe." *Id.* Plaintiffs' claims do not satisfy this standard, for reasons the Fifth Circuit has explained on materially identical facts.

In *Staley*, the en banc Fifth Circuit confronted the question whether Establishment Clause litigation over a Ten Commandments display that was, in fact, "no longer displayed" was moot. 485 F.3d at 308. The Fifth Circuit said yes and dismissed the case. In doing so, the court emphasized that "the Supreme Court has made clear that 'under the Establishment Clause detail is key.'" *Id.* The court underscored that point by recounting "[t]he importance of facts and context" in the Supreme Court's Ten Commandments cases. *Id.* The court thus concluded that the case was moot: "Out of sight," the

Ten Commandments display "no longer raises the potential Establishment Clause violations that offended [the plaintiff]." *Id.* at 309.

Key here, the court further emphasized that "any dispute over a probable *redisplay* of the [Ten Commandments] is not ripe because there are no facts before us to determine whether such a redisplay might violate the Establishment Clause." *Id.* (emphasis added). The problem, the court added, was that "no decision has been made regarding any aspect of the future display of the [Ten Commandments]," and "[i]n the absence of this evidence, we are unable to conduct the fact-intensive and context-specific analysis required by [the Supreme Court]." *Id.* As a result, "any claim that the Establishment Clause may be violated" in the future "is not ripe for review." *Id.*

That is Plaintiffs' problem here. Because the Governor signed H.B. 71 into law only a few weeks ago—and because schools need not comply until January 2025—Plaintiffs can challenge only some unspecified display that they *presume* may violate their constitutional rights at some unspecified future time. They do not allege that either they or their children have viewed an H.B. 71 display on a classroom wall. Nor could they: Defendants have not taken any steps to carry out H.B. 71, and they do not, in fact, know how they will comply with the statute. *See supra* 5–6. And so critical questions are currently unanswered: What would any display viewed by Plaintiffs' children actually look like? Would that display place the Ten Commandments in a certain context, and if so, what context? Where would the display be located in the classroom—by a teacher, on a side wall, on a back wall? How big would the display be? What would be included as part of the display? Would the same display appear in multiple classrooms, or would different classrooms have different versions? Will any particular school actually receive donated posters that a school opts to use? And these critical questions are compounded by the fact that there are countless ways a Defendant might comply with H.B. 71, including, for example, the various illustrations referenced below. *See infra* Section II.A.

Applying *Staley*, Plaintiffs' case is unquestionably not ripe. The "importan[t] … facts and context" essential to the First Amendment analysis are nowhere to be found because no Plaintiff has yet seen an H.B. 71 display. *Staley*, 485 F.3d at 308; *see Van Orden*, 545 U.S. at 701 (Breyer, J., concurring) (emphasizing that "focusing on the text of the Commandments alone cannot conclusively resolve [a] case"); *infra* Section II.A (illustrating the unsuitability of this case as a facial challenge). Moreover, "no decision has been made regarding any aspect of [a] future display." *Staley*, 485 F.3d at 309. In fact, the facts here are even worse for Plaintiffs: Unlike in *Staley* where the plaintiff at least had previously seen the challenged display, Plaintiffs and their children do not allege that they have ever seen an H.B. 71 display on their classroom walls. Accordingly, with "no facts before [this Court] to determine whether such a [future] []display might violate the Establishment Clause," this Court and the parties are "unable to conduct the fact-intensive and context-specific analysis required by" the Supreme Court. *Id.* The upshot here, as it was in *Staley*, is that "any dispute over a probable []display of the [Ten Commandments] is not ripe." *Id.* Dismissal is thus in order.

**2.** Even if Plaintiffs could overcome the first ripeness factor, dismissal would remain in order because they face no hardship from dismissal. *See Choice Inc.*, 691 F.3d at 715 ("even where an issue presents purely legal questions," there must be a "hardship to the parties of withholding court consideration" (citation omitted)). "The Supreme Court has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being forced to modify one's behavior in order to avoid future adverse consequences." *Id.* (cleaned up).

None of these potential hardships would flow from dismissal here. H.B. 71 undisputedly does not create any legal rights or obligations as to Plaintiffs. Nor is any Plaintiff or Plaintiff's child currently or imminently subject to any H.B. 71 display; indeed, Defendants themselves do not yet know how they will comply with H.B. 71. Nor is there any practical impediment to Plaintiffs filing suit if and

when their children actually view an H.B. 71 display that they believe violates their constitutional rights. Accordingly, even on the hardship prong, dismissal remains warranted without prejudice to a filing by a future plaintiff, in a future case, with a future H.B. 71 display in hand.

**B. Plaintiffs Lack Article III Injury, Traceability, and Redressability.**

The same considerations tee up Plaintiffs' lack of Article III standing. Plaintiffs "bear[] the burden of establishing standing as of the time [they] brought th[e] lawsuit and maintaining it thereafter." *Carney v. Adams*, 592 U.S. 53, 59 (2020). Thus, as of June 24 (the date of the Complaint), each Plaintiff "must show that [they] [have] suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024). Plaintiffs, however, do not satisfy any of these three requirements.

**1.** They fail at the first step: a concrete, particularized, actual or imminent injury-in-fact. By the Complaint's filing on June 24—and by the Complaint's own telling, Compl. ¶ 37—all that had happened was the Legislature had passed H.B. 71, and the Governor had signed it on June 19. Plaintiffs do not allege that they or their children have ever seen an H.B. 71 display. As explained below, *see infra* Section II, this means that Plaintiffs' claims in this case can only be facial attacks on H.B. 71, as opposed to as-applied challenges involving specific H.B. 71 displays. That is important for standing purposes because "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy*, 144 S. Ct. at 1988. Here, Plaintiffs fail to identify any Article III injury regardless of how their claims are construed.

*First*, despite their facial attack, Plaintiffs notably do not base their claims on alleged harm solely from the face of H.B. 71—*i.e.*, the statutory text—itself. *See, e.g.*, Compl. ¶¶ 83, 91, 101, 108, 115, 125, 131, 140, 147 (alleging instead that Plaintiffs are offended by H.B. 71 "*because the overtly religious displays* mandated by the law will" violate their constitutional rights (emphasis added)). Rightly so: The

Fifth Circuit has foreclosed any such theory in Establishment Clause cases. Specifically, "[t]he religious-display cases do not provide a basis for standing to challenge the endorsement of beliefs that exist only in the text of a statute." *Barber*, 860 F.3d at 354. Indeed, "[a]llowing standing on that basis would be indistinguishable from allowing standing based on a 'generalized interest of all citizens in' the government's complying with the Establishment Clause without an injury-in-fact," which is itself foreclosed by the Supreme Court. *Id.* (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 483 (1982)). Since Plaintiffs' claims are facial attacks on H.B. 71, therefore, they have no standing under *Barber*—and that effectively ends the standing analysis since Plaintiffs have no standing "for [the] claim[s] that they press." *Murthy*, 144 S. Ct. at 1988.

*Second*, and in all events, Plaintiffs' theory of harm (as of the June 24 Complaint date) is that they "will" be "offended by" some unspecified future H.B. 71 display that violates their constitutional rights. *See, e.g.*, Compl. ¶¶ 83, 91, 101, 108, 115, 125, 131, 140, 147. That theory invokes so-called "offended observer standing"[1]—but Plaintiffs do not even have offended observer standing. As the en banc Fifth Circuit has held, "[t]he question" for offended observer standing is whether the plaintiffs "were exposed to, and may thus claim to have been injured by, [the challenged action]." *Doe v. Tangipahoa Par. Sch. Bd.*, 494 F.3d 494, 497 (5th Cir. 2007) (en banc). Indeed, "[i]n cases involving religious displays," the Fifth Circuit "require[s] an encounter with the offending item or action to confer standing." *Barber*, 860 F.3d at 353. This makes sense: To be an offended *observer*, one must have *observed* something. And that requirement "represent[s] the outer limit[] of where we can find these otherwise elusive Establishment Clause injuries." *Id.*

---

[1] Because the doctrinal basis for offended observer standing has now been overruled by the Supreme Court, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534–35 (2022) (overruling *Lemon v. Kurtzman*, 403 U.S. 602 (1971), Defendants preserve for appellate review the threshold question whether offended observer standing itself remains a viable doctrine. *See, e.g., Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 79 (2019) (Gorsuch, J., concurring); *City of Ocala v. Rojas*, 143 S. Ct. 764 (2023) (Gorsuch, J., respecting the denial of certiorari).

Here, however, Plaintiffs do not allege that they or their children "were exposed to" or had "an encounter with" an H.B. 71 display that allegedly violates their constitutional rights. In fact, the Complaint's repeated use of the auxiliary verb "will"—*e.g.*, Plaintiffs' children "will be unconstitutionally coerced," Compl. ¶ 160—admits that no such exposure or encounter has occurred. Again, that is not surprising given that the Governor's June 19 signature on H.B. 71 was hardly dry when Plaintiffs filed this lawsuit on June 24. And that is fatal under *Doe* and *Barber*. *See Doe*, 494 F.3d at 497–99 (ordering dismissal for lack of standing because there was no evidence that the plaintiffs were exposed to the challenged prayers at school board meetings); *Barber*, 860 F.3d at 354 (ordering dismissal for lack of standing in challenge to statute because the plaintiffs "cannot confront statutory text").

This deficiency, moreover, leads to at least two other independently fatal injury-in-fact problems. *One*, the Complaint does not carry Plaintiffs' burden to establish a "*concrete*, *particularized*, and *actual or imminent*" injury. *Murthy*, 144 S. Ct. at 1986 (emphasis added). The reason the Complaint generally claims "the displays will violate our rights" is that Plaintiffs cannot speak in specifics, because they have never seen an H.B. 71 display and thus do not know how (if at all) their rights might be violated. Indeed, as several illustrations below suggest, it is easy to see that no Plaintiff or their child will likely ever experience harm, much less a violation of his or her rights. But for present purposes, Plaintiffs' inability to identify a concrete, particularized, and imminent injury from an H.B. 71 display is independently fatal. *See Doe*, 494 F.3d at 499 ("Without the requisite specifics, this court would be speculating upon the facts. This is something we cannot do …."). *Two*, Plaintiffs' theory of harm boils down to a claim that they will be offended by any H.B. 71 display, in any form, in any location, at any time. But that is just a theory of alleged harm from H.B. 71's "alleged endorsement of specific beliefs"—and it is foreclosed by *Barber*'s specific distinction between (a) standing for attacks on a statute or policy and (b) standing for attacks on a religious display. *See* 860 F.3d at 354 ("The religious-

display cases do not provide a basis for standing to challenge the endorsement of beliefs that exist only in the text of a statute."); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[C]itizens [may not] sue merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a government action.").[2]

In sum, however the Court construes Plaintiffs' alleged harm, Plaintiffs allege no cognizable injury-in-fact.

**2.** Plaintiffs' failure to allege an injury-in-fact means that Plaintiffs also have failed to show "any concrete link between their injuries and the [D]efendants' conduct." *Murthy*, 144 S. Ct. at 1997; *see FDA*, 602 U.S. at 383 (plaintiffs must show a "line of causation between the illegal conduct and injury" (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)). That link "must not be too speculative or too attenuated." *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). That determination is often "heavily fact-dependent." *Id.* at 384.

Here, too, the mismatch between Plaintiffs' facial attack on H.B. 71 and their speculative injuries from hypothetical future H.B. 71 displays distorts the Article III analysis. Although Plaintiffs ultimately attack H.B. 71 itself, they correctly do not suggest that Defendants—schools boards and State officials uninvolved in the passage of legislation—somehow "caused" H.B. 71. Instead, they shift to alleged harms from unspecified future H.B. 71 displays. But the Complaint does not link those alleged harms to Defendants. Indeed, one of the most striking aspects of the Complaint is that its over 100 paragraphs of "Factual Allegations" never mention a single Defendant. *See* Compl. ¶¶ 37–155. In fact, all but two paragraphs in Counts I and II likewise fail to mention a single Defendant. *Id.* ¶¶ 156–70. Again, all this is unsurprising because no Defendant took any compliance steps in the four days

---

[2] All the above defects likewise dispose of the Complaint's suggestions that the Plaintiff parents suffer harm in their own right from H.B. 71's alleged interference with their children's upbringings. *E.g.*, Compl. ¶¶ 120, 140. That "one-step-removed" harm theory, *Murthy*, 144 S. Ct. at 1986, depends on cognizable harm to the children themselves, which, as demonstrated here, does not exist. Accordingly, the Plaintiff parents have no freestanding theory of harm that survives these basic defects.

between the Governor's signature on H.B. 71 and the filing of this lawsuit. And that remains true today as no Defendant yet knows how it will comply with H.B. 71. *See supra* 5–6 (collecting declarations).

The most Plaintiffs offer to link any Defendant to their alleged harms from actual (but as of yet unknown) H.B. 71 displays is the following allegation: "By implementing H.B. 71, Defendants … will unavoidably violate Plaintiffs' rights." Compl. ¶ 163; *id.* ¶ 170 (same). Setting aside the merits of that claim, *see infra* Section II, for standing purposes this allegation commits the exact error identified in *Murthy*: It "treat[s] the defendants[ and] plaintiffs … as a unified whole," even though the Supreme Court's "decisions make clear that 'standing is not dispensed in gross.'" 144 S. Ct. at 1988; *see also id.* ("That is, 'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'"). More fundamentally, Plaintiffs cannot actually draw that link between any particular Plaintiff and any particular Defendant because, again, the Complaint alleges no ongoing or intended conduct by any Defendant. Plaintiffs' allegation that Defendants "will unavoidably violate [their] rights," Compl. ¶ 163, therefore, "is too speculative or otherwise too attenuated to establish standing." *FDA*, 602 U.S. at 390. It is also simply wrong—as the illustrations below show, *see infra* Section II.A, Defendants can easily avoid violating Plaintiffs' rights.

**3.** So, too, for redressability. *See id.* at 380 ("The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'"). "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021) (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 332 (7th Cir. 2019)). When a defendant has not harmed the plaintiff, "there is no injury for a federal court to redress." *Casillas*, 926 F.3d at 332. And that is the case here. The Complaint fails to allege an Article III injury-in-fact, let alone an injury

16

traceable to a particular Defendant. Accordingly, "there is no injury for [this] federal court to redress." *Id.*

**4.** One final note bears mentioning. In their pleadings and briefing, Plaintiffs have attempted to shroud their case in *Stone v. Graham*. That strategy is misplaced on the merits for reasons expressed below. *See infra* Section II. But, if Plaintiffs were inclined to argue that *Stone* likewise permits them to bypass the ripeness and standing problems identified above, the en banc Fifth Circuit has squarely foreclosed that argument. In *Doe*, the dissent argued that "lower courts can infer standing from the Supreme Court's decision in similar Establishment Clause cases where the issue was not ruled on by the Court." 494 F.3d at 498. "This proposition is incorrect," the en banc majority said. *Id.* That is because, "[g]oing back to Chief Justice Marshall, the [Supreme] Court has consistently held that it 'is not bound by a prior exercise of jurisdiction in a case where [jurisdiction] was not question and it was passed sub silentio.'" *Id.* (collecting cases). And indeed, the Supreme Court itself has long emphasized that such "drive-by jurisdictional rulings"—*i.e.*, where justiciability is "assumed without discussion by the Court"—"have no precedential effect." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998). *Stone*, of course, contains no discussion of justiciability and thus does not save Plaintiffs' Complaint from dismissal for lack of subject matter jurisdiction.

## C.  Defendants Brumley and Members of BESE Are Entitled to Sovereign Immunity.

**1.** Finally, the claims against Defendants Brumley and BESE members must be dismissed because they are entitled to sovereign immunity. "In most cases, Eleventh Amendment sovereign immunity bars private suits against nonconsenting states in federal court." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (noting also that sovereign immunity presents a jurisdictional determination). That bar extends to "suits against state officials or agencies that are effectively suits against a state," including official-capacity claims. *Id.* Thus, "unless the state has waived sovereign immunity or Congress has expressly abrogated it, the Eleventh Amendment bars the suit." *Id.*

Sovereign immunity bars this suit against Defendant Brumley and BESE members. Each such Defendant is a State official sued only in his or her "official capacity." Compl. ¶¶ 22 (Brumley), 26 (BESE members). Accordingly, the claims against these Defendants "are effectively suits against a state," which are barred under the Eleventh Amendment. *City of Austin*, 943 F.3d at 997.

**2.** Plaintiffs could avoid that bar only by invoking the *Ex parte Young* equitable exception, which "permits plaintiffs to sue a state officer in his official capacity for an injunction to stop ongoing violations of federal law." *Texas All. for Retired Americans v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022). But they cannot satisfy that exception for at least two independent reasons.

*First*, for all the reasons explained above, Plaintiffs do not allege an "ongoing violation[] of federal law," *id.*—and that is fatal. *See NiGen Biotech*, 804 F.3d at 394 ("It is true that a complaint must allege that the defendant *is violating* federal law …." (emphasis in original)). Indeed, Plaintiffs' repeated claim that Defendants "*will* unavoidably violate Plaintiffs' rights," Compl. ¶¶ 163, 170 (emphasis added), effectively admits that there is no *ongoing* violation of federal law right now. That independently forecloses any invocation of *Ex parte Young* here. *See NiGen Biotech*, 804 F.3d at 394 n.5 (distinguishing the "similar but not identical" Article III standing requirement that a plaintiff show "ongoing harm *or* a threat of imminent harm" (emphasis added)).

*Second*, Plaintiffs do not allege that Defendant Brumley or the Defendant BESE members have the requisite authority to enforce H.B. 71. To invoke *Ex parte Young*, a plaintiff must allege that "[t]he officer sued [has] '*some* connection with the enforcement of the [challenged] act.'" *Scott*, 28 F.4th at 672. Although the Fifth Circuit's conception of "[h]ow much of a 'connection' has been hard to pin down," "some guideposts have emerged": (1) "an official must have more than 'the general duty to see that the laws of the state are implemented'"; (2) "the official must have 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty'"; and (3) "enforcement means compulsion or constraint." *Id.* As to the last requirement, "[i]f the official

does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Id.* The Complaint fails under each of these guideposts.

Beginning with Defendant Brumley, the Complaint emphasizes that he is the State Superintendent of Education, is responsible for overseeing the Department of Education and BESE, and is "responsible for the implementation of all state laws that fall under the jurisdiction of [BESE], which includes H.B. 71." Compl. ¶¶ 19–21. But these are just allegations that Defendant Brumley has a "general duty to see that the laws of the state are implemented," which is insufficient in the Fifth Circuit. *Scott*, 28 F.4th at 672. In addition, Plaintiffs notably do not allege that Defendant Brumley has a "particular duty to enforce [H.B. 71]" through "compulsion or constraint," *id.*, nor could they: H.B. 71 simply requires the Department of Education to "identify," and "list," "free [compliance] resources on the department's internet website." La. R.S. § 17:2122(B)(6)(b). Compulsion and constraint that is not, which means Defendant Brumley "is not a proper defendant under *Ex parte Young*" and the claims against him must be dismissed. *Scott*, 28 F.4th at 672.

So, too, with Defendant BESE members. The Complaint emphasizes BESE's "responsib[ility] for the oversight and governance of all public elementary and secondary schools in Louisiana." Compl. ¶ 24. But again, such allegations of a "general duty to see that the laws of the state are implemented" are insufficient. *Scott*, 28 F.4th at 672. The Complaint also alleges that, "[i]n H.B. 71, the Louisiana State Legislature has given LSBESE the authority to adopt rules and regulations to ensure the implementation of the Act." Compl. ¶ 25. But that allegation does not help Plaintiffs. For one thing, they do not (and cannot) challenge any such BESE rule or regulation, and that BESE "might in the future promulgate" a rule is insufficient for *Ex parte Young* purposes. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021). For another thing, Plaintiffs do not allege that any BESE regulation would require implementation of H.B. 71 through "compulsion or constraint." *Scott*, 28 F.4th at 672. In fact, BESE's regulation regarding implementation of the "In God We Trust" motto simply tells schools to

develop "policies and procedures that address … display of the national motto in each classroom in each school under its jurisdiction in accordance with R.S. 17:262." La. Admin. Code § 28:337(B)(41). That is a far cry from ordinary examples of compulsion and constraint such as "prohibiting payment of claims under [an] abortion statute," "rate-setting," "sending letters threatening formal enforcement," or a "threat of criminal prosecution." *City of Austin*, 943 F.3d at 1001–02 (collecting cases). And that only underscores that *Ex parte Young* does not save Plaintiffs' claims against the BESE members.

*     *     *

The Court lacks jurisdiction. As the Fifth Circuit has noted when identifying the same problem in other cases, "a future plaintiff" may well be able to overcome these jurisdictional obstacles, "but the federal courts must withhold judgment unless and until that plaintiff comes forward." *Barber*, 860 F.3d at 358. And indeed, given the high-profile nature of H.B. 71, "it is not hard to conceive that a more concrete controversy may arise in the future," *i.e.*, when an H.B. 71 display actually appears on a classroom wall. *Doe*, 494 F.3d at 499. For now, however, dismissal is warranted, as in *Barber*, *Staley*, and *Doe*. It "poses [no] inconvenience for the parties," and "it spares this court from issuing a largely hypothetically-based ruling on issues of broad importance …." *Id.* The Court should dismiss for lack of jurisdiction and proceed no further.

## II.     The Court Should Dismiss Plaintiffs' Claims under Rule 12(b)(6) for Failure to State a Claim for Relief.

If the Court proceeds to the merits, however, dismissal remains warranted because Plaintiffs have failed to state a claim for relief under either the Establishment Clause (Count I) or Free Exercise Clause (Count II).

20

### A. Plaintiffs' Establishment Clause Claim Fails (Count I).

#### 1. Plaintiffs cannot show that there is no set of circumstances under which H.B. 71 may be constitutionally implemented.

Beginning with Plaintiffs' Establishment Clause claim, the first critical step is to identify the nature of the claim: It is a facial attack on H.B. 71—that is, an attack on the statute itself rather than a particular application of H.B. 71. *See Croft v. Perry*, 624 F.3d 157, 164 (5th Cir. 2010) ("Because a distinction exists between facial and as-applied Establishment Clause challenges, we must consider where the plaintiffs' claims belong."). In fact, this can *only* be a facial attack on H.B. 71 since the Complaint does not, and could not, challenge any particular display implementing H.B. 71. And the scope of requested relief—*i.e.*, a declaration that H.B. 71 itself is unconstitutional and an injunction against its implementation—confirms as much. *Compare* Compl. at 41, *with Croft*, 624 F.3d 157 ("Our conclusion that the challenges are facial attacks is confirmed by the relief sought by the plaintiffs: that the pledge be invalidated in its entirety ….").

"[T]hat matters" because "facial challenges are disfavored." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2408–09 (2024). All nine Justices recently emphasized this point. *See id.* at 2409 (Barrett, J., concurring) (emphasizing "the dangers of bringing a facial challenge"); *id.* at 2411 (Jackson, J., concurring in part and concurring in the judgment) ("[A]s all Members of the Court acknowledge, plaintiffs bringing a facial challenge must clear a high bar."); *id.* at 2428 (Alito, J., concurring in the judgment) ("Such challenges are strongly disfavored."). A plaintiff's choice "to litigate [his] case[] as [a] facial 'challenge'" thus "comes at a cost" because the Supreme Court "has … made facial challenges hard to win." *Id.* at 2397 (maj. op.).

That difficulty is key here. To "successfully mount a facial challenge" under Fifth Circuit precedent, Plaintiffs must plausibly allege "that there is no set of circumstances under which [the implementation of H.B. 71] is constitutional." *Croft*, 624 F.3d at 164. Put otherwise, Plaintiffs must "show [H.B. 71] to be unconstitutional in every application." *Id.* As discussed below, that standard is

fatal to Plaintiffs' claims because there are countless ways a school may constitutionally implement H.B. 71—in fact, so many that, even if the high bar were lowered, Plaintiffs' Complaint still does not meet it.

> **2. H.B. 71 is constitutional because it plainly may be implemented in countless ways that do not implicate *Kennedy*'s "hallmarks of religious establishments."**

**a.** Although Plaintiffs' Complaint never mentions the decision, the Supreme Court recently established the proper framework for an Establishment Clause analysis. Specifically, courts must interpret "the Establishment Clause … by 'reference to historical practices and understandings.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). And the Court specifically directs courts to look at the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* at 537 & n.5 (citing *Shurtleff v. Boston*, 596 U.S. 243, 285–86 (2022) (Gorsuch, J., concurring) (collecting the hallmarks)). There are six:

1. "[T]he government exerted control over the doctrine and personnel of the established church."

2. "[T]he government mandated attendance in the established church and punished people for failing to participate."

3. "[T]he government punished dissenting churches and individuals for their religious exercise."

4. "[T]he government restricted political participation by dissenters."

5. "[T]he government provided financial support for the established church, often in a way that preferred the established denomination over other churches."

6. "[T]he government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function."

*Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring). Among those hallmarks, most "reflect forms of 'coerc[ion]' regarding 'religion or its exercise.'" *Id.* As the Supreme Court has noted, "[g]overnment 'may not coerce anyone to attend church,' nor may it force citizens to engage in 'a formal religious

exercise.'" *Kennedy*, 597 U.S. at 537 (citations omitted); *see also id.* ("[n]o doubt … coercion along these lines was among the foremost hallmarks"). At the same time, however, the Establishment Clause does not "compel the government to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious." *Id.* at 535 (cleaned up).

Therefore, Plaintiffs' burden here is to plausibly allege that *every* potential display implementing H.B. 71 will violate the Establishment Clause because it falls within one of these historical hallmarks of religious establishments. *See Croft*, 624 F.3d at 164.[3] They have not done so, and cannot do so.

**b.** Plaintiffs' problem begins with the scope of H.B. 71. *See Moody*, 144 S. Ct. at 2398 ("The first step in the proper facial analysis is to assess the state laws' scope."). By its own terms, H.B. 71 sets only a floor—"a minimum requirement"—for an H.B. 71 display, otherwise leaving "[t]he nature of the display [to] be determined by each governing authority." *See* La. R.S. § 17:2122(B)(1), (C)(1). That means the universe of potential H.B. 71 displays is infinite. A few illustrations bear this out.

For example, a school, teacher, or civic non-profit looking to donate displays could simply have a poster that explains the historical role that the Ten Commandments have played in American history, both in education and in law:

---

[3] Plaintiffs suggest (*e.g.*, PI Mot. at 9) that *Defendants* bear this burden. That is incorrect. *See, e.g., Firewalker-Fields v. Lee*, 58 F.4th 104, 122 & n.7 (4th Cir. 2023) ("*Kennedy*) makes clear that, under the Establishment Clause, historical analysis is 'the rule rather than some exception.' So, in Establishment Clause cases, the plaintiff has the burden of proving a set of facts that would have historically been understood as an establishment of religion." (citations omitted)).



*Illustration 1*[4]



*Illustration 2*

---

[4] For reading ease, full-page copies of the illustrations are attached as exhibits to the declaration of Ashley Townsend. *See* Ex. A-1.

An elementary school or teacher might use the Commandments as an illustration of rules before laying out the class rules:



*Illustration 3*

Or a school, teacher, or civic non-profit looking to donate displays might draw inspiration from the Supreme Court's own description of its building, *see, e.g.*, *Van Orden*, 545 U.S. at 688 (plurality op.), and develop a poster describing Moses's place at the Court:



*Illustration 4*

Similarly, a school, teacher, or civic non-profit looking to donate displays might draw inspiration from the incredible architecture and artwork in the U.S. House of Representatives' chamber, adding that one of Louisiana's own congressmen serves as Speaker and looks directly at Moses when presiding from the dais:



*Illustration 5*

Along the same lines, a school, teacher, or civic non-profit looking to donate displays may turn to Charlton Heston's historic portrayal of Moses in *The Ten Commandments* and one of the clever songs from Lin-Manuel Miranda's *Hamilton* for their fine art classrooms:



*Illustration 6*

For history classrooms, a school, teacher, or civic non-profit looking to donate displays might consider looking to the late Justice Ruth Bader Ginsburg, who wrote in *My Own Words*:



*Illustration 7*

27

A school, teacher, or civic non-profit looking to donate displays also may wish to highlight historic civil rights leaders—for example, Martin Luther King Jr., who famously required Birmingham campaign volunteers to sign "ten commandments of non-violence," or Thurgood Marshall, whom the New York Times memorably described as "brandishing" the Constitution as Moses brandished the Ten Commandments:



*Illustration 8*



*Illustration 9*

A school, teacher, or civic non-profit looking to donate displays might choose a humor-inspired poster for computer classes:



*Illustration 10*

For schools and teachers focused on rhetoric, debate, or the study of speech-language pathology, they might use this opportunity to reinforce strategies for overcoming stuttering in their speech classes:



*Illustration 11*

29

A school, teacher, or civic non-profit looking to donate displays also could explain the impact of non-profit organizations on legislative and litigation processes in a government class:



*Illustration 12*

Or, using many of the same headlines, a school, teacher, or civic non-profit may similarly highlight the impact of ligation on our governance while alluding to pop culture by invoking Internet memes:



*Illustration 13*

A school, teacher, or civic non-profit looking to donate displays also could educate students on particular Supreme Court decisions, or speak more broadly to how different Supreme Court decisions have addressed the Ten Commandments in a government or elective class:



*Illustration 14*



*Illustration 15*

As these few examples demonstrate, there are quite literally innumerable ways to comply with H.B. 71. From different topics, to different content, to different fonts, to different colors, to different

31

sizes, to different orientations—the possibilities are endless. *See* Ex. A ¶ 13 (in addition to considering these illustrations, the Department of Education "will likely also consider other illustratives with different themes, content, formats, layouts, graphics, typography, color schemes, sizes, styles, interactive elements, spacing, borders, and headings"). And that sets aside a whole host of other questions about where schools and teachers actually place the posters, what size the posters are, whether each classroom may have a different poster, and so on.

**c.** Against this infinite universe of potential H.B. 71 displays, Plaintiffs must show that every single display reflects one of the six "historical hallmarks of an established religion." *Kennedy*, 597 U.S. at 537 & n.5 (citing *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring)); *Croft*, 624 F.3d at 164. They have not done so, and cannot do so—to the contrary, every illustration above is constitutional, underscoring the breadth of constitutional H.B. 71 displays.

Just take as an example *The Supreme Court & the Lawgivers* illustration:



*Illustration 4*

Much like the Court's own public recognition of Moses's pervasive presence throughout the Court building, this poster explains the unique friezes that line the Courtroom and highlights three of the most well-known lawgivers and their most notable works. *See Am. Legion v. Am. Humanist Ass'n*, 588

U.S. 29, 53 (2019) ("In *Van Orden* and *McCreary*, no Member of the Court thought that these depictions [in the Supreme Court's frieze] are unconstitutional."). That illustration is not remotely (1) the exertion of control over church doctrine and personnel, (2) mandated church attendance and corresponding punishment for failure to participate, (3) punishment for religious exercise, (4) restricted political participation, (5) financial support for a church, or (6) using a church to carry out civil functions. *See Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring).

So, too, with (to take another example) the *Legal Non-Profits In Action* illustration:



*Illustration 12*

That illustration plainly teaches the reader about two well-known non-profit organizations, explains the potential roles that such organizations can play, and—using a real-world example—demonstrates the clash of titans that often unfolds in high-profile adversarial litigation. Again, this is not remotely (1) the exertion of control over church doctrine and personnel, (2) mandated church attendance and corresponding punishment for failure to participate, (3) punishment for religious exercise, (4) restricted political participation, (5) financial support for a church, or (6) using a church to carry out civil functions. *See Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring).

33

All this is true of every illustration above, which, again, only scratches the surface of potential H.B. 71 displays.

**d.** Plaintiffs' contrary allegations and arguments are unavailing. *First*, a prominent theme in Plaintiffs' papers is that H.B. 71 displays "will [] unconstitutionally coerce[] [Plaintiffs and their children] into religious observance, veneration, and adoption of the state's favored religious scripture." *E.g.*, Compl. ¶ 160; PI Mem. at 16–20. Respectfully, that is an entirely implausible allegation when compared to the illustrations above: No reasonable observer would feel coerced to venerate the Ten Commandments if, for example, they happen to see Justice Ginsburg's take on important foundational documents, an explanation of the House chamber, or strategies for stuttering. *See, e.g.*, *Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 320 (5th Cir. 2022) ("Determining whether a claim is plausible 'requires the reviewing court to draw on its judicial experience and common sense.'"). And that is especially so when measured against the forms of coercion identified in *Kennedy*. *See* 597 U.S. at 537 ("Government 'may not coerce anyone to attend church,' nor may it force citizens to engage in 'a formal religious exercise.'" (citations omitted)). Plaintiffs' children are not required to do anything, nor does H.B. 71 require displays to be read, discussed, or even placed in an especially visible part of the classroom; they are simply passive displays. This case thus "looks very different from those in which [the Supreme] Court has found prayer" and devotional Bible reading "involving public school students to be problematically coercive." *Kennedy*, 597 U.S. at 541; *see Sch. Dis. Of Abington Twp. v. Schempp*, 374 U.S. 203, 206–07, 225 (1963) (holding unconstitutional vocal, school-directed prayer and Bible reading at the beginning of each day).

That disposes of Plaintiffs' suggestion (PI Mem. at 16) that truancy laws should alter this analysis because offended students cannot absent themselves without incurring punishment, which is coercion in Plaintiffs' view. The coercion question for Establishment Clause purposes is whether Plaintiffs' children are forced to participate in religious activity. But there is no religious activity

34

occurring and nothing is required of Plaintiffs' children. The most Plaintiffs can say is that they presumably will be offended if and when they see an H.B. 71 display. The Supreme Court has made clear, however, that "offense does not equate to coercion." *Kennedy*, 597 U.S. at 539 (cleaned up); *see also Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462, 470 (5th Cir. 2001) (en banc) ("If no religious *activity* is at issue, any speculation as to whether students might feel pressured to participate is irrelevant." (emphasis added)).

*Second*, another prominent theme in Plaintiffs' papers is that H.B. 71 displays will "adopt[] an official position on religious matters" and "tak[e] sides in questions over theological doctrine," namely the correct version of the Commandments. Compl. ¶ 161; *see also* PI Mem. at 13–15. Again, respectfully, that is an entirely implausible allegation when assessed against, for example, education about the parallels that Martin Luther King Jr. and the *New York Times* have drawn to the Ten Commandments. In fact, Plaintiffs' charge is simply wrong, as possible posters like the *Important Supreme Court Cases* illustration demonstrate. Although that poster's discussion of *Van Orden* would be constitutional standing alone, the addition of the "NOTE" renders that fact beyond dispute: "This was the version upheld in *Van Orden*, but different faith traditions adopt different versions of the Commandments' text. For example, the Catholic version omits 'graven images.' And the Torah uses the phrase 'I am the Lord your God who brought you out of the land of Egypt, out of the house of bondage.'" Ex. A-1 at 14. If adopted by a school or teacher, therefore, this illustration would necessarily neutralize the heart of Plaintiffs' Complaint.

At bottom, Plaintiffs' Establishment Clause claim must be dismissed because Plaintiffs have not met—and cannot meet—the high standard for facial claims given the endless possibilities of H.B. 71 displays that may be implemented.

### 3. H.B. 71 is independently constitutional given the history of Ten Commandments in public education.

Although the Court need not proceed past Plaintiffs' inability to identify even one of the *Kennedy* hallmarks for every potential H.B. 71 display, it bears noting that H.B. 71 is especially constitutional given the historical role of the Ten Commandments not only in America, but also in American public education. The *Van Orden* plurality emphasized that (and catalogued how) the Ten Commandments are part of "the rich American tradition of religious acknowledgments." 545 U.S. at 689–92 (plurality op.). More recently, the Supreme Court emphasized that the Ten Commandments "have historical significance as one of the foundations of our legal system." *Am. Legion*, 588 U.S. at 53. As to public education (and as discussed below), moreover, *Stone* itself and the principal *Van Orden* dissent expressly acknowledged that the Ten Commandments constitutionally may be integrated into school curriculum. *See Stone*, 449 U.S. at 42; *Van Orden*, 545 U.S. at 742 (Souter, J., dissenting).

This historical backdrop matters because, where "*categories* of monuments, symbols, and practices with a longstanding history follow in" our Nation's "tradition, they are likewise constitutional." *Am. Legion*, 588 U.S. at 63 (plurality op.) (emphasis added); *accord id.* at 86–87 (Gorsuch, J., concurring) ("[W]hat matters" "isn't" a display's "age but its compliance with ageless principles"). Ten Commandments displays, as a category, therefore are presumptively constitutional because of their long historical pedigree. *See Van Orden*, 545 U.S. at 686, 688 (plurality) ("[T]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789," including "acknowledgments of the role played by the Ten Commandments in our Nation's heritage." (quoting *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984))).

That historical backdrop alone justifies H.B. 71 displays; however, there is even more historical justification here. As H.B. 71 explains, the Ten Commandments were featured in textbooks widely used before and after the advent of public schools. La. R.S. § 17:2122(B)(3) (citing, *inter alia*, *The New England Primer* and the *McGuffey Readers*); *see* Encyclopedia Brittanica, *The New-England Primer*,

36

https://tinyurl.com/5682tuhy ("the principal textbook for millions of colonists and early Americans"); James W. Fraser, Between Church and State (2d ed.), https://tinyurl.com/3fmm48ev, at 35 ("omnipresent McGuffey's Readers" were "[p]erhaps the most consistent element in the nineteenth-century common school classroom"). Indeed, in the "public common schools" that arose *after* disestablishment, not only these textbooks but "religious instruction" more generally was "pervasive," "permeat[ing]" "every subject." Amicus Br. of Prof. Charles L. Glenn in Supp. of Pet'rs, *Carson v. Makin*, 2021 WL 4173250, at *5–10 (U.S. Sept. 10, 2021) (Glenn Br.).

One example (of many) of how the Ten Commandments were used in public education is a story called *The Young Witness*, which appeared in *McGuffey's Readers*. William Holmes McGuffey, *McGuffey's Fourth Eclectic Reader* 207–210 (1920 rev. ed.) (available at https://tinyurl.com/5n64bcsu). That story described a nine-year-old girl who was called to testify at a criminal trial. The defendant's counsel sought to disqualify her on the ground that she "does not understand the nature of an oath." So, the judge asked her if she knew what the Bible was (she did) and whether she knew what would happen if she lied after placing her hand on the Bible and swearing to tell the truth. She replied that she would be sent to prison and she would never go to Heaven. "How do you know this," the judge asked. She took the Bible from him, turned to the Commandments, and explained, "Thou shalt not bear false witness against thy neighbor." So, the judge—moved by the sincerity of her belief and the seriousness with which she took her oath—found her competent to testify.

To be sure, much of the 19th-century curricula were (lamentably) non-ecumenical, and they were criticized by, for example, Catholics for reflecting a "least-common-denominator Protestantism." *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 503 (2020) (Alito, J., concurring). As the Nation became more religiously diverse, accommodations were demanded and made. *See* Glenn Br. at *8–10 (recounting public school system that "screen[ed] out content disparaging Catholicism" from common-school textbooks, to the "praise[]" of the "common-school movement's leading light").

37

More importantly, the 19th-century debates were about whether *more* or *different* religious instruction should be supported by the state, *Espinoza*, 591 U.S. at 502–06 (Alito, J., concurring)—not whether religious materials in schools could "coexis[t] with the principles of disestablishment," *Town of Greece*, 572 U.S. at 578.

So schools today act comfortably within historical norms when they take one aspect of the religious material long presented in schools—one that has "an undeniable historical meaning," *Van Orden*, 545 U.S. at 690 (plurality op.)—and display it passively and with context: not in textbooks, but on the wall; not to be read and tested on, but merely available to be viewed (with bemusement or admiration) as an aspect of legal, civic, and educational history.

### 4. *Stone* is dead and inapposite.

One final note about Plaintiffs' Complaint and their preliminary-injunction motion. They rely at length on the Supreme Court's 1980 *per curiam* decision in *Stone*, suggesting that *Stone* begins and ends this case in their favor. That reliance is puzzling given that (a) *Stone* is no longer good law and (b) *Stone*'s own language and the Supreme Court's subsequent narrowing constructions of *Stone* render that decision easily distinguishable from the myriad ways H.B. 71 may be implemented.

**a.** To start, *Stone* is not good law. From top to bottom, that *per curiam* decision applied—and rested on—the three-part test previously announced by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). In fact, the *Stone* Court took only the first part of the test (the so-called "secular legislative purpose" part) and decided the case on that ground alone. *See* 449 U.S. at 41 ("We conclude that Kentucky's statute requiring the posting of the Ten Commandments in public schoolrooms had no secular legislative purpose, and is therefore unconstitutional."); *see also id.* at 42–43 ("We conclude that [the Kentucky statute] violates the first part of the *Lemon v. Kurtzman* [] test[] and thus the Establishment Clause of the Constitution.").

38

The problem for Plaintiffs is the Supreme Court has now rejected the *Lemon* test in its entirety. In *Kennedy*, it criticized *Lemon* as an "ambitiou[s], abstract, and ahistorical approach to the Establishment Clause," and it "abandoned *Lemon* and its endorsement test offshoot." 597 U.S. at 534; *see also id.* at 546 (Sotomayor, J., dissenting) ("The Court overrules *Lemon* ...."); *Groff v. DeJoy*, 600 U.S. 447, 460 (2023) (describing *Lemon* as "now abrogated"). That overruling of the doctrinal foundation for *Stone*, in turn, means at least one of two things for *Stone*'s relevance here.

*First*, and if nothing else, Fifth Circuit precedent prohibits any "exten[sion]" of *Stone* "to the facts of this case" because *Stone* "was built upon a [doctrine] that the Supreme Court appears to have walked back from." *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 257–59 & n.11 (5th Cir. 2019); *see infra* 39–41 (noting distinctions between this case and *Stone*). In fact, the Supreme Court has outright thrown *Lemon* away.

*Second*, the Supreme Court's own precedent all but holds that this Court should treat *Stone* as bad law altogether. To be sure, under *Agostini v. Felton*, 521 U.S. 203 (1997)—another Establishment Clause case—the ordinary rule is that lower courts must leave the overruling of Supreme Court decisions to the Supreme Court itself. *See id.* at 237. But *Agostini* likewise suggests that the situation would be different if "the general principles we use to evaluate whether [something] violates the Establishment Clause have [] changed" since the decision in question—drawing precisely on the then-unchanged nature of *Lemon* itself. *Id.* at 222; *see also id.* at 223 (noting that "the nature of [the *Lemon*] inquiry has remained largely unchanged"). That is exactly what has happened here: By overruling *Lemon*, the Supreme Court has uprooted the very analytical foundation of *Stone* and the analytical framework for Establishment Clause claims. Without that foundation, *Stone* is nothing. The Court should say as much, which disposes of Plaintiffs' reliance on *Stone*.

**b.** Even if the Court wished to assess *Stone*'s relevance on its own terms, Plaintiffs' reliance on that decision would remain misplaced because *Stone* is easily distinguishable. *Stone* emphasized that the

required display in that case had a "plainly religious" purpose. 449 U.S. at 41. But the *Stone* Court went out of its way to emphasize that "[t]his is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." *Id.* at 42. By that Court's telling, *Stone* involved only the "[p]osting of religious texts on the wall [that] serves no [] educational function." *Id.*

In subsequent decisions, the Supreme Court expressly narrowed *Stone* in this way, even under the now-defunct *Lemon* test. For example, in *McCreary County, Ky. v. ACLU of Ky.*, 545 U.S. 844 (2005), the Court said that the *Stone* Ten Commandments "stood alone"—and their "*isolated* exhibition did not leave room even for an argument that secular education explained their being there." *Id.* at 867–68 (emphasis added). "But," the Court continued, "*Stone* did not purport to decide the constitutionality of every possible way the Commandments might be set out by the government, and under the Establishment Clause detail is key." *Id.* at 867. And "[t]he display in *Stone* had no context that might have indicated an object beyond the religious character of the text." *Id.* at 868. Similarly, in the contemporaneous *Van Orden* decision, the plurality emphasized that nothing "suggest[s] that *Stone* would extend to displays of the Ten Commandments that lack a 'plainly religious,' 'pre-eminent purpose.'" *Van Orden*, 545 U.S. at 691 n.11 (plurality op.). And the principal dissent by Justices Souter, Stevens, and Ginsburg agreed that "the Decalogue, as *Stone* suggested, [could] be integrated constitutionally into a course of study in public schools." *Id.* at 742 (Souter, J., dissenting); *see, e.g.*, *ACLU of Ky. v. Mercer County*, 432 F.3d 624, 634 (6th Cir. 2005) ("Whatever is left of *Stone* is limited to circumstances involving public displays of the Ten Commandments in isolation.").

The preceding discussion and illustrations vividly demonstrate that the potential H.B. 71 displays are worlds away from the standalone displays addressed in *Stone*. Every illustration above clearly lacks a religious purpose (much less a preeminently religious one) and clearly has a context— including a lengthy required context statement that was lacking in *Stone*—that indicates an educational

or other non-religious objective. That means the Supreme Court itself would distinguish the displays and uphold them even if *Stone* remained good law. H.B. 71 simply does nothing more than "constitutionally" integrate the Ten Commandments "into a course of study in public schools," which even the *Van Orden* dissenters readily acknowledged is permissible. *Id.*

*    *    *

In sum, Plaintiffs cannot show that there is "no set of circumstances" under which H.B. 71 may be constitutionally implemented. *Croft*, 624 F.3d at 164. To be clear, if the analysis feels speculative, abstract, and uncertain, that is because Plaintiffs elected to bring a facial challenge long before H.B. 71 was even implemented. That underscores the lack of ripeness and Plaintiffs' lack of standing, *see supra* Section I—and at the very least, it underscores that Plaintiffs cannot "clear [the] high bar" presented by a facial challenge at this motion-to-dismiss stage. *Moody*, 144 S. Ct. at 2411 (Jackson, J., concurring in part and concurring in the judgment). That is the "cost" of bringing a claim that the Supreme Court intentionally has "made … hard to win." *Id.* at 2397 (maj. op.). The Court should dismiss the Establishment Clause claim in Count I.

### B.  Plaintiffs' Free Exercise Clause Claim Fails (Count II).

The foregoing analysis also resolves Plaintiffs' Free Exercise claim, which receives comparatively little time in Plaintiffs' papers. The Complaint alleges that each H.B. 71 display "will substantially burden the religious exercise of minor-child Plaintiffs and other children who do not subscribe to the state-sanctioned version of the Ten Commandments by pressuring them to suppress or limit express of their religious or nonreligious backgrounds, beliefs, or practices," while also "pressuring them into observance, veneration, and adoption of the state's favored religious scripture." Compl. ¶¶ 168, 169. These allegations are implausible for at least three independent reasons.

**1.** At the outset, it defies common sense to say that a student would feel this alleged pressure if they happen to view, say, *Legal Non-Profits In Action*, *Memes & Law*, or *Ten (Duel) Commandments*:



*Illustration 12*



*Illustration 13*



*Illustration 6*

The ACLU's long-running fight against the Ten Commandments—whether presented as part of a lesson about non-profits or as part of a Regina George joke—is precisely the position Plaintiffs and their children advance here. How could that pressure them to change or suppress their religion? So, too, seeing Lin-Manuel Miranda's clever spin on the Ten Commandments may prompt an observer to watch *Hamilton*, but it would not burden their religion or force them to change it any more than it would coerce a student to duel.

**2.** More fundamentally, the Free Exercise Clause is not implicated here. As its name suggests, the Free Exercise Clause protects only religious *exercise*—believing, professing, and engaging in "conduct motivated by religious belief." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). And nothing in the Free Exercise Clause obligates the State to "comport with the religious beliefs of particular citizens," or "demand[s] that the Government join in [their] chosen religious practices." *Bowen v. Roy*, 476 U.S. 693, 699–700 (1986).

43

Those baseline principles matter here because several Plaintiffs claim they are not exercising religion at all, Compl. ¶¶ 108–13, 125–29, 140–45,[5] so their Free Exercise claims fail from the jump. Others allege that they "object to," and are "offended" by H.B. 71, Compl. ¶¶ 83, 91, 101, 108, 115, 125, 131–32, 140, 147, 149, but taking religious offense does not curtail one's own religious *exercise*. *See Kennedy*, 597 U.S. at 539. And still others suggest that H.B. 71 contains a "wrong[]" or "sacrilegious" version of the Ten Commandments that "promote[s]" "religious scripture" or "religious displays" and "send[s] a message" with which they disagree. Compl. at ¶¶ 83, 88, 89, 91, 95–97, 101, 104–07, 115, 123–25, 137, 139, 147, 154. But the Free Exercise Clause does not compel government to affirm Plaintiffs' chosen religious practices. *Bowen*, 476 U.S. at 699.

In reality, Plaintiffs' Free Exercise claim boils down to a redux of their Establishment Clause coercion theory—but this time characterized as a substantial burden on their religious exercise. To be sure, the Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson v. Makin*, 596 U.S. 767, 778 (2022) (citation omitted). But the government "do[es] not engage in impermissible coercion merely by *exposing* constituents to [something] they would rather not hear and in which they need not participate." *Town of Greece*, 572 U.S. at 590 (emphasis added). Nor does "[o]ffense … equate to coercion." *Kennedy*, 597 U.S. at 539 (quoting *Town of Greece*, 572 U.S. at 589). That is no less true in classrooms where, "[i]f no religious *activity* is at issue, any speculation as to whether students might feel pressured to participate is irrelevant." *Beaumont Indep. Sch. Dist.*, 240 F.3d at 470 (emphasis added).

The case law illustrates that line well. Consider religious students objecting to the Pledge of Allegiance. It is canonical now that public schools cannot force a religiously objecting student to recite the pledge or stand for the ceremony. *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 629, 642

---

[5] As far as Defendants can tell, the non-religious plaintiffs are Harding, Owens, A.O., McCrory, E.M., P.M., L.M., Alkire, and L.A.

(1943); *see, e.g.*, *Oliver v. Arnold*, 3 F.4th 152, 163 (5th Cir. 2021). Yet the Pledge of Allegiance recitation ceremony creates no Free Exercise problem in schools despite exposing objectors to the ceremony. *See, e.g.*, *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 440 (7th Cir. 1992); *Croft*, 624 F.3d at 170.[6] So too with the United States' motto "In God We Trust." Whether on a coin, bill, or even a classroom wall (as in Louisiana), it does not "compel citizens to engage in a religious observance" nor do its actions "amount to coerced participation in a religious practice." *New Doe Child #1 v. United States*, 901 F.3d 1015, 1019, 1023 (8th Cir. 2018); *see, e.g.*, *O'Hair v. Murray*, 588 F.2d 1144 (5th Cir. 1979).[7]

At bottom, forcing religious objectors to participate in religious exercise is forbidden of course, but non-participatory exposure is not. Otherwise, creationist students could demand that the concept of evolution be edited out of textbooks or educational museum exhibits. *See Crowley v. Smithsonian Inst.*, 636 F.2d 738 (D.C. Cir. 1980). Or, Hindu students could ask for history book revisions because they offend their religious beliefs about who settled India and when. *See California Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020). As with the Pledge of Allegiance, while students may have a right to opt out of participating in specific lessons, activities, or observances that cause them to violate their faith, they do not have a right to remove content from the curriculum (or the classroom wall) because the presence allegedly offends them. As a result, H.B. 71 displays—in whatever form they may ultimately appear—do not infringe Plaintiffs' Free Exercise rights.

**3.** In all events, Plaintiffs' Free Exercise claim independently fails because they cannot show that H.B. 71 is "not neutral or generally applicable." *Kennedy*, 597 U.S. at 525. "Government fails to

---

[6] *See also, e.g.*, *Myers v. Loudoun Cnty. Pub. Sch.*, 418 F.3d 395, 398 & n.1 (4th Cir. 2005); *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1036 (9th Cir. 2010); *Freedom From Religion Foundation v. Hanover School District,* 626 F.3d 1 (1st Cir. 2010); *Doe v. Acton-Boxborough Reg'l Sch. Dist.*, 8 N.E.3d 737 (Mass. 2014).

[7] *See also, e.g.*, *Aronow v. United States*, 432 F.2d 242, 243 (9th Cir. 1970); *Newdow v. Lefevre*, 598 F.3d 638, 644 (9th Cir. 2010); *Newdow v. Peterson*, 753 F.3d 105, 109 (2d Cir. 2014); *New Doe Child #1 v. Congress of the United States*, 891 F.3d 578, 589 (6th Cir. 2018); *Mayle v. United States*, 891 F.3d 680, 684–86 (7th Cir. 2018).

act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (citing *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U. S. 617, 636–40 (2018); and *Lukumi*, 508 U.S. at 533). Here, H.B. 71 plainly does not "restrict[] practices because of their religious nature," *id.*—it does not restrict anything, in fact. H.B. 71 also is not "intolerant of religious beliefs." *Id.* If anything, it is exceedingly *tolerant* of beliefs across faith traditions that espouse the Ten Commandments, by urging education about the role of the Ten Commandments in Louisiana, American, and world history.

To the extent Plaintiffs suggest that the Legislature's selection of the Ten Commandments (or a particular version of the Ten Commandments) demonstrates intolerance of other faiths, that argument would make a hash of the Court's Establishment Clause cases. The Latin cross upheld in *American Legion* would be unlawfully intolerant of other faiths and thus subject to strict scrutiny under the Free Exercise Clause. The same would be true of the Ten Commandments monument—reflecting the exact same text at issue here—upheld in *Van Orden*: subject to strict scrutiny under the Free Exercise Clause. That is nonsense. Moreover, Plaintiffs overlook that the text at issue here resulted from "consultation with a committee composed of members of several faiths" in an effort to "find a nonsectarian text." *Van Orden*, 545 U.S. at 701–02 (plurality op.). There is no serious claim that H.B. 71 is not neutral as defined by the Supreme Court.

Nor is there any serious claim that H.B. 71 is not generally applicable, which is likely why Plaintiffs do not press that claim. Under Supreme Court precedent, a "law is not generally applicable if it 'invites' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (quoting *Emp't Div. v. Smith*, 494 U.S. 872, 884 (1990)) (cleaned up). "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* This test illustrates the problem with Plaintiffs' attempt to shoehorn an Establishment

Clause claim into the Free Exercise Clause—this test doesn't make sense as applied here. H.B. 71 does not prohibit any conduct at all, much less prohibit religious conduct while excusing similar secular conduct. And for the same reason, H.B. 71 does not maintain an exemption scheme for a non-existent prohibition, which in the ordinary Free Exercise case would illustrate unlawful targeting of religion.

The Court should dismiss the Free Exercise claim in Count II.

## III. The Court Should Deny Plaintiffs' Preliminary-Injunction Motion.

If the Court dismisses Plaintiffs' Complaint (on any ground), the most efficient path forward is to deny Plaintiffs' preliminary-injunction motion as moot. *See, e.g., Bezet*, 276 F. Supp. 3d at 579 ("Because the Court finds that the Government's motion to dismiss should be granted, the Court will deny as moot Plaintiff's motion for partial preliminary injunction."); *see also City of Alexandria v. FEMA*, 781 F. Supp. 2d 340, 342 n.1 (W.D. La. 2011) (ordering that a pending Rule 12(b)(6) motion and preliminary-injunction motion be "denied as moot" upon dismissing for lack of subject matter jurisdiction under Rule 12(b)(1)). Accordingly, the Court should deny the motion as moot.

If the Court addresses the preliminary-injunction motion on the merits, it should deny the motion on the merits because Plaintiffs do not satisfy the ordinary factors warranting "extraordinary" relief. *Munaf*, 553 U.S. at 689–90. *First*, for all the reasons expressed above and incorporated by reference here, Plaintiffs are not likely to succeed on the merits of their claims. Specifically, this Court lacks subject matter jurisdiction for various reasons ranging from ripeness, to lack of standing, to sovereign immunity. *See supra* Section I. Even if the Court reached the merits, dismissal would be warranted because Plaintiffs have failed to state a claim for relief. *See supra* Section II. Assuming *arguendo*, however, that Plaintiffs could avoid dismissal, they are—*at the very least*—unlikely to succeed on the merits of their claims, particularly given the clear jurisdictional problems and the disfavored nature of Plaintiffs' facial challenge.

47

*Second*, Plaintiffs will not suffer any irreparable harm from the absence of an injunction. Plaintiffs' motion dedicates only one sentence to the issue—and that sentence simply invokes the merits. *See* PI Mem. at 24 ("Plaintiffs are likely to suffer irreparable harm because '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"). For the same reasons this case is not ripe, Plaintiffs lack standing, and Plaintiffs fail to state a claim, therefore, they also have not identified imminent irreparable harm. And to be specific: Plaintiffs do not yet know how H.B. 71 will be implemented, and thus do not yet know whether any particular display plausibly could give rise to their constitutional concerns. Although this is a key fatal defect in the jurisdictional analyses, it likewise underscores Plaintiffs' inability to show imminent irreparable harm.

*Third*, and for similar reasons, the equities and the public interest cut against an injunction. As just explained, Plaintiffs face no imminent irreparable harm. On the other side of the ledger, both the State of Louisiana and the public would suffer from an injunction, particularly one that affects the implementation of H.B. 71. *See, e.g., E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." (quoting *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (alteration omitted))). An injunction, moreover, would be inequitable as to Defendants themselves, who must determine for themselves how they will comply with H.B. 71 in advance of the January 2025 deadline for schools—a determination that would be complicated by an injunction. For these reasons, the equities and the public interest plainly cut against an injunction.

*Finally*, as to Plaintiffs' request that the Court issue "an order directing Defendants Brumley and the members of [BESE] to provide a copy of any preliminary injunction granted to all Louisiana public elementary, secondary, and charter schools, and all public post-secondary education institutions," PI Mot. at 3, the Court should reject that request out of hand. Nothing prevents Plaintiffs

themselves from sending their proposed mailing. There is no valid reason to coopt State officials for that purpose. Moreover, because Defendants recognize that this Court cannot enjoin non-parties from implementing H.B. 71, it appears that the only purpose behind Plaintiffs' demand that *Defendants Brumley and members of BESE themselves* send a copy of any injunction is to create an in terrorem effect, a *de facto* injunction, on all non-parties throughout the State—even though Plaintiffs chose to sue only a small number of Defendants. That is exceedingly improper and should be rejected, including because that relief is unnecessary to redress Plaintiffs' alleged harm and extends to schools that their children do not attend. *See Labrador v. Poe*, 144 S. Ct. 921, 921 (2024) (Gorsuch, J., concurring) (agreeing with the Supreme Court's partial stay of a district court's injunction and explaining that injunctions generally "may go no further than necessary to provide interim relief to the parties").

The Court should deny the preliminary-injunction as moot or on the merits.

## IV.    In the Alternative, the Court Should Stay Any Injunction Pending Appeal.

If the Court is inclined (a) not to dismiss the Complaint and (b) to grant an injunction, Defendants respectfully ask that the Court stay the order pending appeal. Such a stay would be proper for essentially all of the reasons dismissal of the Complaint and denial of the preliminary-injunction motion are proper. *First*, if nothing else, Defendants would be likely to succeed on the merits of their appeal because, for example, this case is jurisdictionally barred under Fifth Circuit precedent. *See supra* Sections I, II, II. *Second*, the equities and the public interest would favor a stay because, among other things, the State and the public have an interest in the enforcement of Louisiana law. *See E.T.*, 19 F.4th at 770. By contrast, Plaintiffs identify no ongoing harm or any imminent harm, which confirms that a stay would be proper.

## PRAYER FOR RELIEF

Defendants respectfully request that this Court grant Defendants' motion to dismiss and dismiss Counts I and II of Plaintiffs' Complaint. The Court also should deny Plaintiffs' motion for a preliminary injunction, but if it enters an injunction, it should stay the order pending appeal.

Dated: August 5, 2024

Respectfully submitted,

  /s/ J. Benjamin Aguiñaga
J. BENJAMIN AGUIÑAGA*
  Solicitor General

  /s/ Zachary Faircloth
ZACHARY FAIRCLOTH (La #39875)
  Principal Deputy Solicitor General
MORGAN BRUNGARD (La #40298)
  Deputy Solicitor General
OFFICE OF THE LOUISIANA ATTORNEY GENERAL
1885 North Third Street
Baton Rouge, LA 70804
Telephone: (225) 326-6766
Facsimile:   (225) 326-6795
aguinagab@ag.louisiana.gov
fairclothz@ag.louisiana.gov
brungardm@ag.louisiana.gov

*Counsel for Defendants Cade Brumley, Conrad Appel, Judy Armstrong, Kevin Berken, Preston Castille, Simone Champagne, Sharon Latten-Clark, Lance Harris, Paul Hollis, Sandy Holloway, Stacey Melerine, Ronnie Morris, East Baton Rouge Parish School Board, Livingston Parish School Board, Vernon Parish School Board, and St. Tammany Parish School Board*

*pro hac vice granted*

51