# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| REVEREND DARCY ROAKE and ADRIAN VAN YOUNG, on behalf of themselves and on behalf of their minor children, A.V. and S.V., et al., | CIVIL ACTION NO. 3:24-cv-00517-JWD-SDJ |
| Plaintiffs, |  |
| v. |  |
| CADE BRUMLEY, in his official capacity as the Louisiana State Superintendent of Education, et al., |  |
| Defendants. |  |

## PLAINTIFFS' COMBINED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION .................................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 2

ARGUMENT .......................................................................................................... 4

I.    THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER
PLAINTIFFS' FIRST AMENDMENT CLAIMS. ................................................ 4

    A.    Plaintiffs meet all three prongs of the Article III standing inquiry. ............. 7

        1.    Plaintiffs' asserted injuries are sufficient to confer standing. .......... 7

            a.    Plaintiffs' injuries are concrete and particularized. ............ 7

            b.    Plaintiffs' future injuries are "certainly impending." ......... 9

        2.    Plaintiffs' injuries are fairly traceable to Defendants. ................... 11

        3.    Plaintiffs' injuries will be redressed by injunctive and
declaratory relief. ......................................................................... 15

    B.    Plaintiffs' Claims Are Ripe. ...................................................................... 16

        1.    This case is fit for judicial decision. ............................................. 16

        2.    The hardship to Plaintiffs in withholding a decision is
significant. .................................................................................... 18

    C.    The State Defendants Are Not Entitled to Sovereign Immunity. ............... 18

II.    DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS SHOULD BE
DENIED. .............................................................................................................. 21

    A.    Plaintiffs Have Adequately Alleged Facts Supporting Their Facial
Challenge. ................................................................................................. 22

    B.    Plaintiffs' Allegations Support a Plausible Establishment Clause
Claim. ....................................................................................................... 24

        1.    *Stone* is not "dead" and is directly applicable, binding law. ......... 24

        2.    Permanently displaying the Ten Commandments in every
public-school classroom is not permissible under *Kennedy*'s
"original meaning and history" test. ............................................. 28

            a.    The First Amendment was animated by the Founders'
concerns about government promotion of religion
and coercion. ................................................................... 29

            b.    The Ten Commandments do not form the basis of the
U.S. legal system or government. ..................................... 30

   c. The historical record demonstrates that there is no longstanding, widespread tradition of permanently displaying the Ten Commandments in public-school classrooms. .......................................................... 31

  3. Defendants concede that the Act's mandated version of the Ten Commandments is denominational. ........................................ 33

  4. The displays mandated by H.B. 71 are religiously coercive. ......... 34

 C. Plaintiffs' Allegations Support a Plausible Free Exercise Clause Claim. ................................................................................................... 37

  1. The Free Exercise Clause prohibits all forms of religious coercion. ................................................................................... 37

  2. The Act is not religiously neutral, and Defendants have not met their burden under strict scrutiny. ......................................... 40

   a. The Act and its mandatory displays are not religiously neutral. ................................................ 41

   b. The Act fails strict scrutiny. ............................................ 42

III. THIS COURT SHOULD GRANT A PRELIMINARY INJUNCTION. ............. 43

IV. DEFENDANTS' STAY MOTION IS PREMATURE AND SHOULD BE DENIED. ........................................................................................................ 44

CONCLUSION ................................................................................................................ 45

## TABLE OF AUTHORITIES

**Cases**

*Agostini v. Felton*,
   521 U.S. 203 (1997) ........................................................................... 25, 26

*Am. Legion v. Am. Humanist Ass'n*,
   588 U.S. 29 (2019) ............................................................................ 28, 33

*Aronow v. United States*,
   32 F.2d 242 (9th Cir. 1970) ................................................................... 39

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................ 21, 22

*Barber v. Bryant*,
   860 F.3d 345 (5th Cir. 2017) ................................................................. 8, 9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................. 22

*Bennett v. Spear*,
   520 U.S.154 (1997) .................................................................................. 15

*Block v. Canepa*,
   74 F.4th 400 (6th Cir. 2023) ................................................................... 21

*Book People, Inc. v. Wong*,
   91 F.4th 318 (5th Cir. 2024) ................................................. 17, 19, 20, 44

*Bosse v. Oklahoma*,
   580 U.S. 1 (2016) ..................................................................................... 24

*Bourque v. Nat'l Flood Ins. Program*,
   480 F. Supp. 3d 733 (M.D. La. 2018) ...................................................... 6

*Bowen v. Kendrick*,
   487 U.S. 589 (1988) ................................................................................. 22

*Braidwood Mgmt. v. EEOC*,
   70 F.4th 914 (5th Cir. 2023) ................................................................... 18

*Carson v. Makin*,
   596 U.S. 767 (2022) ................................................................................. 37

*Chamber of Com. of U.S. v. U.S. Sec. & Exch. Comm'n*,
   85 F.4th 760 (5th Cir. 2023) ................................................................... 24

*Chavez v. Plan Benefit Servs., Inc.*,
 108 F.4th 297(5th Cir. 2024) ................................................................. 9

*Citizens for Clean Air v. U.S. Dep't of Transp.*,
 98 F.4th 178 (5th Cir. 2024) ................................................................. 10

*City of Elkhart v. Books*,
 532 U.S. 1058 (2001) ........................................................................... 39

*Cochran v. U.S. Sec. & Exch. Comm'n*,
 20 F.4th 194 (5th Cir. 2021), *aff'd and remanded sub nom.*
 *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023) .............. 21

*Collins v. Yellen*,
 594 U.S. 220 (2021) ............................................................................... 7

*Comm. for Pub. Educ. & Religious Liberty v. Nyquist*,
 413 U.S. 756 (1973) ............................................................................. 29

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
 91 F.4th 342 (5th Cir. 2024) ................................................................. 24

*Crawford v. Hinds Cnty. Bd. of Supervisors*,
 1 F.4th 371 (5th Cir. 2021) ................................................................... 11

*Croft v. Perry*,
 624 F.3d 157 (5th Cir. 2010) ................................................................. 22

*Dep't of Com. v. New York*,
 588 U.S. 752 (2019) ............................................................................. 10

*Doe v. City of Albuquerque*,
 667 F.3d 1111 (10th Cir. 2012) ....................................................... 22, 23

*Doe ex rel. Doe v. Elmbrook Sch. Dist.*,
 687 F.3d 840 (7th Cir. 2012) (en banc) ................................................ 37

*Doe v. Santa Fe Indep. Sch. District*,
 168 F.3d 806 (5th Cir.1999) ................................................................. 22

*Doe v. Sch. Bd. of Ouachita Par.*,
 274 F.3d 289 (5th Cir. 2001) .................................................................. 8

*Doe v. Tangipahoa Par. Sch. Bd.*,
 494 F.3d 494 (5th Cir. 2007) ............................................................. 9, 10

*E.T. v. Paxton*,
 19 F.4th 760 (5th Cir. 2021) ................................................................. 43

iv

*Edwards v. Aguillard,*
    482 U.S. 578 (1987) ........................................................................................ 22

*Electronic Frontier Found. v. Off. of Dir. of Nat'l Intel.,*
    No. C 08-01023 JSW, 2009 WL 3297195 (N.D. Cal. Oct. 13, 2009) ...................... 44

*Elrod v. Burns,*
    427 U.S. 347 (1976) ........................................................................................ 18

*Engel v. Vitale,*
    370 U.S. 421 (1962) ................................................................................. 26, 29

*Everson v. Bd. of Educ.,*
    330 U.S. 1 (1947) ............................................................................................ 29

*Frame v. City of Arlington,*
    657 F.3d 215 (5th Cir. 2011) ........................................................................... 10

*Frye v. Anadarko Petroleum Corp.,*
    953 F.3d 285 (5th Cir. 2019) ........................................................................... 21

*Gregory v. Baucum,*
    No. 7:16-CV-00103-BP, 2018 WL 10096597 (N.D. Tex. Feb. 23, 2018) .............. 44

*Hohn v. United States,*
    524 U.S. 236 (1998) ........................................................................................ 24

*Ingebretsen v. Jackson Pub. Sch. Dist.,*
    88 F.3d 274 (5th Cir. 1996) ...................................................................... passim

*Jackson v. Wright,*
    82 F.4th 362 (5th Cir. 2023) ........................................................................... 11

*JMCB, LLC v. Bd. of Com. & Indus.,*
    336 F. Supp. 3d 620 (M.D. La. 2018) .............................................................. 40

*Johnson v. Lumpkin,*
    74 F.4th 334 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 829 (2024) .................... 24

*Jusino v. Fed'n of Catholic Teachers, Inc.,*
    54 F.4th 95 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 1056 (2023) .................... 26

*K.P. v. LeBlanc,*
    627 F.3d 115 (5th Cir. 2010) ........................................................................... 11

*Karen B. v. Treen,*
    653 F.2d 897 (5th Cir. 1981), *aff'd*, 455 U.S. 913 (1982) ........................... 6, 17

*Kennedy v. Bremerton School District,*
    597 U.S. 507 (2022) ................................................................................................ passim

*La. State Conf. of NAACP v. Louisiana,*
    490 F. Supp. 3d 982 (M.D. La. 2020), *aff'd sub nom. Allen v. Louisiana,*
    14 F.4th 366 (5th Cir. 2021) ......................................................................................... 6

*Larson v. Valente,*
    456 U.S. 228 (1982) .......................................................................................... 2, 29, 34

*Leal v. McHugh,*
    731 F.3d 405 (5th Cir. 2013) ...................................................................................... 21

*Lee v. Weisman,*
    505 U.S. 577 (1992) ................................................................................... 2, 35, 38, 40

*Lefebure v. D'Aquilla,*
    15 F.4th 650 (5th Cir. 2021) ....................................................................................... 24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) .................................................................................................... 11

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021) ....................................................................................... 45

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...................................................................................................... 7

*Lynch v. Donnelly,*
    465 U.S. 668 (1984) .................................................................................................... 39

*Mallory v. Norfolk S. Ry. Co.,*
    600 U.S. 122 (2023) .................................................................................................... 25

*Marsh v. Chambers,*
    463 U.S. 783 (1983) .............................................................................................. 29, 31

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n,*
    584 U.S. 617 (2018) .................................................................................................... 41

*McCreary Cnty. v. ACLU of Ky.,*
    545 U.S. 844 (2005) .................................................................................................... 29

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,*
    518 F. Supp. 2d 1197 (C.D. Cal. 2007)...................................................................... 44

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) .................................................................................................... 21

*Murray v. City of Austin*,
   947 F.2d 147 (5th Cir. 1991) ............................................................................ 7

*Murthy v. Missouri*,
   144 S. Ct. 1972 (2024) ................................................................................... 12

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) ........................................................................................... 28

*Nat'l Coal. for Men v. Selective Serv. Sys.*,
   969 F.3d 546 (5th Cir. 2020) .......................................................................... 24

*NiGen Biotech, L.L.C. v. Paxton*,
   804 F.3d 389 (5th Cir. 2015) .......................................................................... 21

*Nikon, Inc. v. Ikon Corp.*
   No. 89 Civ. 6044, 1992 WL 398440 (S.D.N.Y. Dec. 18, 1992) .......................... 44

*NLRB v. Catholic Bishop of Chicago*,
   440 U.S. 490 (1979) ....................................................................................... 26

*Oliver v. Arnold*,
   3 F.4th 152 (5th Cir. 2021) ............................................................................. 38

*Omega Hosp., LLC v. United Healthcare Servs., Inc.*,
   345 F. Supp. 3d 712 (M.D. La. 2018) ............................................................... 6

*Opulent Life Church v. City of Holly Springs*,
   697 F.3d 279 (5th Cir. 2012) .......................................................................... 43

*Patton v. Air Prods. & Chems. Inc.*,
   No. CV 22-00392-BAJ-RLB, 2024 WL 131362 (M.D. La. Jan. 11, 2024) ............ 40

*Plaquemines Par. v. Chevron USA, Inc.*,
   84 F.4th 362 (5th Cir. 2023) ........................................................................... 45

*Prentis v. Atl. Coast Line Co.*,
   211 U.S. 210 (1908) ....................................................................................... 21

*Ramming v. United States*,
   281 F.3d 158 (5th Cir. 2001) ........................................................................... 6

*Ramos v. Louisiana*,
   590 U.S. 83 (2020) ......................................................................................... 25

*Reynolds v. United States*,
   98 U.S. 145 (1878) ......................................................................................... 29

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.,*
  490 U.S. 477 (1989) ............................................................................ 25

*Sanchez v. R.G.L.,*
  761 F.3d 495 (5th Cir. 2014) .............................................................. 15

*Santa Fe Indep. Sch. Dist. v. Doe,*
  530 U.S. 290 (2000) ..................................................................... 22, 35

*Sch. Dist. of Abington Twp. v. Schempp,*
  374 U.S. 203 (1963) ................................................................... passim

*Shurtleff v. Boston,*
  596 U.S. 243 (2022) ............................................................................ 28

*Sonnier v. Crain,*
  613 F.3d 436 (5th Cir. 2010), *op. withdrawn in part on reh'g,*
  634 F.3d 778 (5th Cir. 2011) .............................................................. 22

*Staley v. Harris Cnty.,*
  485 F.3d 305 (5th Cir. 2007) (en banc) ............................................ 17

*State Oil Co. v. Khan,*
  522 U.S. 3 (1997) ................................................................................ 25

*Steffel v. Thompson,*
  415 U.S. 452 (1974) ............................................................................ 15

*Stone v. Graham,*
  449 U.S. 39 (1980) ..................................................................... passim

*Summit Med. Assocs., P.C. v. Pryor,*
  180 F.3d 1326 (11th Cir. 1999) .......................................................... 21

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ..................................................................... 10, 11

*Tenet v. Doe,*
  544 U.S. 1 (2005) ................................................................................ 24

*Tex. Democratic Party v. Abbott,*
  961 F.3d 389 (5th Cir. 2020) .............................................................. 14

*Tex. Democratic Party v. Hughs,*
  997 F.3d 288 (5th Cir. 2021) .............................................................. 18

*Texas v. United States,*
  497 F.3d 491 (5th Cir. 2007) .............................................................. 16

*Thomas v. Union Carbide Agr. Prods. Co.*,
  473 U.S. 568 (1985) ................................................................................ 16

*Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*,
  460 U.S. 533 (1983) ................................................................................ 24

*Town of Greece v. Galloway*,
  572 U.S. 565 (2014) ........................................................................ 29, 38

*Turner v. Pleasant*,
  663 F.3d 770 (5th Cir. 2011) ................................................................ 21

*U.S. v. Abbott*,
  85 F.4th 328 (5th Cir. 2023) ................................................................ 21

*United States v. Coil*,
  442 F.3d 912 (5th Cir. 2006) ................................................................ 24

*United States v. Coto-Mendoza*,
  986 F.3d 583 (5th Cir. 2021) ................................................................ 24

*United States v. Salerno*,
  481 U.S. 739 (1987) ................................................................................ 22

*Van Orden v. Perry*,
  545 U.S. 677 (2005) ...................................................................... 8, 26, 39

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ................................................................................ 38

*Wallace v. Jaffree*,
  472 U.S. 38 (1985) ................................................................................ 36

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ................................................................................ 22

*Waste Mgmt. Holdings, Inc. v. Gilmore*,
  252 F.3d 316 (4th Cir. 2001) ................................................................ 21

*Whole Woman's Health v. Jackson*,
  595 U.S. 30 (2021) ................................................................................ 21

*Williamson v. Tucker*,
  645 F.2d 404 (5th Cir. 1981) .................................................................. 6

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ................................................................................ 40

## Statutes & Regulations

La. Admin. Code tit. 28, § 1301 ................................................................ 19

La. House Bill No. 71, Act No. 676 (2024) ........................................... passim

La. R.S. §§ 17:1 *et seq.* ........................................................................... 12

La. R.S. § 17:6 ........................................................................................ 12

La. R.S. §§ 17:21 *et seq.* ................................................................... 12, 19

La. R.S. § 17:22 ...................................................................................... 12

La. R.S. § 154.1(A)(I) ................................................................................. 2

La. R.S. § 17:221 ....................................................................................... 2

La. R.S. § 17:233 ....................................................................................... 2

La. R.S. § 17:3992(C) ............................................................................... 13

## Constitutional Provisions

La. Const. art. VIII, § 3 ........................................................................... 12

U.S. Const. & amends. .............................................................................. 30

## Other Authorities

11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE &
PROCEDURE
  § 2948.1 (3d ed. 2022) (updated June 2024) ......................................... 43

La. 2024-2025 Comprehensive Reporting Calendar BESE-Authorized Charter Schools, Dep't of
Educ.,
  https://www.louisianabelieves.com/docs/default-source/school
  -choice/2023-2024-charter-school-reporting-calendar-(1)-(1).pdf?sfvrsn=8b0f6018_4 ......... 14

La. House Reg. Sess. (Apr. 10, 2024),
  https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=
  house/2024/apr/0410_24_24RS_Day16 ............................................. 41, 42

Letter from Jefferson to S. Miller, Jan. 23, 1808,
  *available at* FOUNDERS ONLINE, https://founders.archives.gov/
  documents/Jefferson/99-01-02-7257 ................................................... 30

## INTRODUCTION

Defendants' motion to dismiss and opposition to Plaintiffs' preliminary-injunction motion are premised on a fundamentally flawed understanding of what is at issue in this case. This case is not about the content of any individual display posted under House Bill No. 71, Act No. 676 ("H.B. 71" or "the Act"). Whether public schools decide to hang displays of the Ten Commandments standing alone or, for instance, comparing the commandments to the musical Hamilton, has no bearing on Plaintiffs' facial challenge under the First Amendment. Rather, Plaintiffs' claims strike at the heart of the Act's statutory regime. Regardless of variations in content, the minimum requirements of the Act demand permanent displays that all feature one unavoidable constant as their focus: a state-adopted, Protestant version of the Ten Commandments.

Students may switch classrooms between courses, progress from elementary to middle to high school, or even transfer school districts, but so long as they attend a Louisiana public school, they will not be able to escape the specific biblical scripture adopted and prescribed by the State. No matter the details of any one display, the Act's broad scheme to impose on students—for nearly every hour they are in school, day in and day out, for the duration of their public-school education—an official, denominational version of the Ten Commandments will injure the minor-child Plaintiffs and their parents. That harm is more than sufficient to support Article III standing, and it is imminent: As the Attorney General has repeatedly affirmed, all schools are expected to comply with the statute's January 1, 2025, deadline.

The issue before this Court then becomes whether the state may constitutionally mandate that the Ten Commandments be permanently displayed in every public-school classroom consistent with the requirements of the Act. *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), plainly precludes it under the Establishment Clause. *Stone* remains good law, binding on this Court, unless and until the Supreme Court overrules it. And even if *Stone* were no longer binding,

the Act not only violates the Free Exercise Clause but is also unconstitutional under the Establishment Clause tests set forth in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), *Larson v. Valente*, 456 U.S. 228 (1982), and *Lee v. Weisman*, 505 U.S. 577 (1992). As with the question of Plaintiffs' standing, the analysis does not depend on the content of any individual display. It is the state's relentless imposition of a religiously preferential version of the Ten Commandments on public-school students that runs afoul of each test. By its very nature, this statutory scheme is unconstitutional on its face and cannot be applied without violating Plaintiffs' First Amendment rights. It is, thus, no surprise that Defendants seek to distance themselves from it by diverting attention to their panoply of "illustrations." But they can no more avoid the Act's constitutional infirmities than can Louisiana students avoid the Ten Commandments if Defendants are permitted to implement the law. Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss and grant Plaintiffs' preliminary-injunction motion.

## **FACTUAL BACKGROUND**

On June 19, 2024, Governor Jeff Landry signed into law H.B. 71,[1] which mandates the display of a state-approved version of the Ten Commandments in every classroom of every public elementary, secondary, and postsecondary school. The Act took effect immediately. H.B. 71(3). Plaintiffs filed their Complaint (ECF No. 1) on June 24, 2024, and their Motion for Preliminary Injunction (ECF No. 20) on July 8, 2024.

Suing on behalf of themselves and their combined sixteen minor children enrolled or soon-to-be enrolled in Louisiana's public schools, Compl. ¶¶ 9–17,[2] the fourteen parent-Plaintiffs have identified numerous harms that they and their minor children will inevitably suffer as a direct result

---

[1] H.B. 71 will be codified at La. R.S. §§ 17:2122 and 3996(B)(82).
[2] Louisiana's compulsory-education laws require the parent-Plaintiffs to send their children to school or face civil and criminal penalties for truancy. La. R.S. §§ 17:221, 17:233. These laws mandate that students ages six to eighteen attend school at least 177 days per year. La. R.S. § 154.1(A)(I).

of the Act. Specifically, as set forth in the Complaint and Plaintiffs' declarations, the Ten Commandments displays required by the Act will: (1) substantially burden the parent-Plaintiffs' religious exercise by usurping their parental authority to direct their children's religious upbringing and education;[3] (2) forcibly subject their children to religious doctrine and beliefs in a manner that conflicts with the families' own religious beliefs and practices;[4] (3) send a message to their children that they do not belong in their own school community because they do not subscribe to the state's preferred religious doctrine;[5] and (4) religiously coerce their children by pressuring them to observe, meditate on, venerate, and follow the state's favored religious text,[6] and by pressuring them to suppress expression of their own religious beliefs and backgrounds at school.[7]

Under the Act, "[n]o later than January 1, 2025, each public[-]school governing authority shall display the Ten Commandments in each classroom in each school under its jurisdiction." H.B. 71(B)(1). There are no exceptions. *See generally* H.B. 71. The displays will be permanent; the Act does not set or contemplate a time limit on them. *See generally id.* Further, the Act sets

---

[3] *See* Compl. ¶¶ 82–169; *see also* Rev. Roake Decl. (ECF No. 20-2) ¶¶ 6, 8–15; Van Young Decl. (ECF No. 20-3) ¶¶ 6, 8–14; Erin Hawley Decl. (ECF No. 20-9) ¶¶ 6, 10–14; David Hawley Decl. (ECF No. 20-10) ¶¶ 6, 10–14; Rev. Broadhurst Decl. (ECF No. 20-4) ¶¶ 6–9, 14; Rev. Williams Decl. (ECF No. 20-5) ¶¶ 6–9, 14; Sernovitz Decl. (ECF No. 20-12) ¶¶ 5– 8, 11-14; Pulda Decl. (ECF No. 20-13) ¶¶ 5–8, 11–14; Herlands Decl. (ECF No. 20-15) ¶¶ 6, 12–15; Rev. Sims Decl. (ECF No. 20-6) ¶¶ 5–8, 12; Alkire Decl. (ECF No. 20-14) ¶¶ 3–6; Harding Decl. (ECF No. 20-7) ¶¶ 2–5; Owens Decl. (ECF No. 20-8) ¶¶ 2–5; McCrory Decl. (ECF No. 20-11) ¶¶ 2–5.

[4] *See* Compl. ¶¶ 69–169; *see also* Rev. Roake Decl. ¶¶ 5, 13–15; Van Young Decl. ¶¶ 5, 12–14; Erin Hawley Decl. ¶¶ 5, 13–15; David Hawley Decl. ¶¶ 5, 13–15; Rev. Broadhurst Decl. ¶¶ 5, 9–12; Rev. Williams Decl. ¶¶ 5, 9–12; Sernovitz Decl. ¶¶ 7–12, 14; Pulda Decl. ¶¶ 7–12, 14; Herlands Decl. ¶¶ 5, 7–14; Rev. Sims Decl. ¶¶ 5, 8–12; Alkire Decl. ¶¶ 6–8; Harding Decl. ¶¶ 3, 4–7; Owens Decl. ¶¶ 3, 4–7; McCrory Decl. ¶¶ 3, 5–7.

[5] *See* Compl. ¶¶ 89–169; *see also* Rev. Roake Decl. ¶¶ 14–17; Van Young Decl. ¶¶ 13–16; Erin Hawley Decl. ¶¶ 15–16; David Hawley Decl. ¶¶ 15–16; Rev. Broadhurst Decl. ¶¶ 12–15; Rev. Williams Decl. ¶¶ 12–14; Sernovitz Decl. ¶¶ 14–16; Pulda Decl. ¶¶ 14–16; Herlands Decl. ¶¶ 13–15; Rev. Sims Decl. ¶¶ 10–13; Alkire Decl. ¶¶ 5–8; Harding Decl. ¶¶ 5– 7; Owens Decl. ¶¶ 5–7; McCrory Decl. ¶¶ 2–4, 7.

[6] *See* Compl. ¶¶ 83–169; *see also* Rev. Roake Decl. ¶¶ 15–17; Van Young Decl. ¶¶ 14–17; Erin Hawley Decl. ¶¶ 15–16; David Hawley Decl. ¶¶ 15–16; Rev. Broadhurst Decl. ¶¶ 12–15; Rev. Williams Decl. ¶¶ 12–14; Sernovitz Decl. ¶¶ 14–16; Pulda Decl. ¶¶ 14–16; Herlands Decl. ¶¶ 13–15; Rev. Sims Decl. ¶¶ 10–13; Alkire Decl. ¶¶ 6–8; Harding Decl. ¶¶ 5– 7; Owens Decl. ¶¶ 5–7; McCrory Decl. ¶¶ 5–7.

[7] *See* Compl. ¶¶ 90–169; *see also* Rev. Roake Decl. ¶¶ 14–17; Van Young Decl. ¶¶ 13–17; Erin Hawley Decl. ¶¶ 14–16; David Hawley Decl. ¶¶ 14–16; Rev. Broadhurst Decl. ¶¶ 13–15; Rev. Williams Decl. ¶¶ 13–14; Sernovitz Decl. ¶¶ 14–16; Pulda Decl. ¶¶ 14–16; Herlands Decl. ¶¶ 13–15; Rev. Sims Decl. ¶¶ 10–13; Alkire Decl. ¶¶ 7–8; Harding Decl. ¶¶ 5– 7; Owens Decl. ¶¶ 5–7; McCrory Decl. ¶¶ 5–7.

specific visual requirements for the displays, including "a minimum requirement that the Ten Commandments shall be displayed on a poster or framed document that is at least eleven inches by fourteen inches." H.B. 71(B)(1). And "[t]he text of the Ten Commandments shall be the central focus of the poster or framed document and shall be printed in a large, easily readable font." *Id.* The Act specifies the exact, state-approved version of the Ten Commandments that public schools must use—a Protestant rendition of scripture. Compl. ¶¶ 39, 64.

After Plaintiffs filed their preliminary-injunction motion, the parties notified the Court on July 19, 2024, of their agreement that Defendants would not take steps to implement the statute before November 15, 2024. Notice of Date of Implementation of Statute (ECF No. 32).[8] The same day, Attorney General Liz Murrill announced on her official X.com (formerly Twitter) and Facebook accounts that the "Ten Commandments law is not 'paused,' 'blocked,' or 'halted'" and that "[t]he compliance date of January 2025 has not changed (and lawyers have no authority to change it)." Declaration of Chloe L.M. Slater ("Slater Decl.") Exs. 1–2. On July 24, 2024, Attorney General Murrill further posted on her Facebook account that "Louisiana's Ten Commandments law . . . will be implemented in classrooms statewide by January!" Slater Decl. Ex. 3.

## **ARGUMENT**

## I.    **THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' FIRST AMENDMENT CLAIMS.**

Defendants' 12(b)(1) motion boils down, for the most part, to two main points: no Ten Commandments displays have been imposed on the minor-child Plaintiffs to date, and Plaintiffs cannot assert harm based on any future displays because the complete content of each display is uncertain and has not been decided. Neither contention obviates subject-matter jurisdiction here.

---

[8] This Court subsequently entered an order directing: "No defendant will post the Ten Commandments in any public-school classroom before 11/15/2024. Defendants will not, before 11/15/2024, promulgate advice, rules, or regulations regarding proper implementation of the challenged statute." July 22, 2024, Order (ECF No. 33).

Once signed into law, the Act authorized any of the Defendants to take action immediately to implement it and provided that—in all events—implementation *must* occur no later than January 1, 2025. *Supra* pp. 3–4. It is only because of this lawsuit that Defendants have agreed not to implement the act before November 15, 2024. *Supra* p. 4. Without intervention by this Court, there's nothing stopping Defendants from doing so on November 16, 2024, or at any time between then and January 1. And again, they *must* implement the Act by January 1, as the Attorney General has repeatedly stated.

Once the Act is implemented, the minor-child Plaintiffs will be subjected to permanent displays of the Ten Commandments in every classroom, every day, for the duration of their public-school education. Defendants do not dispute this. Instead, they argue that Plaintiffs cannot show an injury sufficient for Article III standing because no one knows what the individual displays themselves will entail. But Plaintiffs do not need to know the exact parameters of every individual display that will be imposed on them to demonstrate injury. They know and allege the following indisputable facts: (1) the Act requires that the Ten Commandments be placed in every public-school classroom no later than January 1, 2025; (2) the Act does not limit the duration of the displays; they will be permanent and year-round; (3) the Act requires that a state-approved, denominational version of the Ten Commandments be used in each display; (4) the Act requires that this version of the Ten Commandments be "displayed on a poster or framed document that is at least eleven inches by fourteen inches"; (5) the Act requires that the state's approved version of the Ten Commandments be the "central focus" of this poster or framed document; (6) the Act requires that the Ten Commandments be printed in a "large easily readable font"; and (7) because the Act has no exceptions, the displays will be placed in every public-school classroom, regardless of the instructional topics covered in that classroom. Compl. ¶¶ 37–55.

These "minimum requirement[s]," Def. Br. at 23,[9] drawn from the face of the statute, are unambiguous and apply to *all* displays posted under the Act. Schools have no discretion as to whether to comply with these provisions. Regardless of the content or parameters of any one display, the minimum statutory requirements, operating together, will injure the minor-child Plaintiffs and their parents in the myriad ways set forth in the Complaint and Plaintiffs' declarations. *Supra* pp. 2–3. These injuries will commence as soon as the Act is implemented and displays of the Ten Commandments are put up in the minor-Plaintiffs' school. Plaintiffs are not required to suffer those harms before this Court may exercise jurisdiction over their claims. *See Ingebretsen v. Jackson Pub. Sch. Dist.,* 88 F.3d 274, 278 (5th Cir. 1996) ("There is no need . . . to wait for actual implementation of the statute and actual violations of [Plaintiffs'] rights under the First Amendment where the statute 'makes inappropriate government involvement in religious affairs inevitable.'" (quoting *Karen B. v. Treen*, 653 F.2d 897, 902 (5th Cir. 1981), *aff'd*, 455 U.S. 913 (1982))).

"'[A] motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief.'" *La. State Conf. of NAACP v. Louisiana,* 490 F. Supp. 3d 982, 997 (M.D. La. 2020) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)), *aff'd sub nom. Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021). Plaintiffs easily overcome this threshold.[10]

---

[9] Defs. Mem. of Law in Support of Defs. Consolidated Mot. to Dismiss, Opp. to Pls.' Mot. for Preliminary Injunction, and Alternative Mot. to Stay Pending Appeal (ECF No. 39-1) (hereinafter "Def. Br.").

[10] In ruling on "a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), the Court may consider evidence outside the Complaint." *Bourque v. Nat'l Flood Ins. Program*, 480 F. Supp. 3d 733, 736 (M.D. La. 2018); *see also Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). Where, as here, Defendants' motion is accompanied by supporting evidence external to the Complaint, it is appropriate for Plaintiffs to submit their own evidence in opposing the motion. *See, e.g.*, *Omega Hosp., LLC v. United Healthcare Servs., Inc.*, 345 F. Supp. 3d 712, 722 (M.D. La. 2018).

A.    **Plaintiffs meet all three prongs of the Article III standing inquiry.**

"To establish Article III standing, a plaintiff must show that it has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" *Collins v. Yellen*, 594 U.S. 220, 242 (2021) (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–561 (1992)). Plaintiffs meet all three requirements.

1.    *Plaintiffs' asserted injuries are sufficient to confer standing.*

Defendants' contention that that Plaintiffs have failed to allege an injury adequate for Article III standing cannot be reconciled with the Supreme Court's ruling in *School District of Abington Township v. Schempp,* 374 U.S. 203 (1963). Here, as in *Schempp*, the Plaintiffs "are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed." *Id.* at 224 n.9. And here, as there, "[t]hese interests surely suffice to give the parties standing to complain." *Id.* Indeed, Plaintiffs have evinced various ways that they will be directly affected and harmed by displays posted in accordance with the Act. *Supra* pp. 2–3.

a.    Plaintiffs' injuries are concrete and particularized.

Defendants incorrectly surmise that Plaintiffs have asserted only "offended observer standing." Def. Br. at 13. To be sure, spiritual offense resulting from direct, unwelcome contact with, or exposure to, a governmental religious display or practice is a sufficient basis for standing,[11] but the injuries alleged by Plaintiffs go far beyond that. As stated in the Complaint, the minor-child Plaintiffs will be subjected to a state-mandated, religiously preferential version of the Ten Commandments in every classroom, for at least 177 days every school year, for the entire remainder of their elementary and secondary public-school education. Compl. ¶¶ 70–77. Plaintiffs

---

[11] *See, e.g.*, *Murray v. City of Austin*, 947 F.2d 147, 151–52 (5th Cir. 1991) (recognizing that "allegations of direct, personal contact" with city insignia satisfied Article III injury requirement).

further allege that Defendants' imposition of this scripture will injure them by, among other harms, (1) promoting and forcibly subjecting the minor-child Plaintiffs to religious doctrine in a manner that violates and contradicts their families' religious or non-religious beliefs and practices, (2) pressuring the minor-child Plaintiffs to observe, meditate on, venerate, and adopt the state's preferred religious doctrine and to suppress expression of their own religious backgrounds and views at school, and (3) interfering and conflicting with the ability of the parent-Plaintiffs to direct their children's religious education and upbringing. *Supra* pp. 2–3.

This case is, therefore, nothing like *Barber v. Bryant*, 860 F.3d 345, 353 (5th Cir. 2017), Def. Br. at 13, where the plaintiffs asserted a "stigmatic injury" based on a statute's endorsement of (what the plaintiffs contended) were religious beliefs about gender and marriage. The statute had no effect on the *Barber* plaintiffs beyond the fact that they knew about the alleged endorsement. *See id.* at 354–55. The statute did not require them, for example, to be personally confronted by religious displays or religious exercise, and it did not injure them through its "legal effect." *Id.* at 354–55. Here, by contrast, the Act unquestionably requires the minor-child Plaintiffs to be personally confronted with religious displays. *See Van Orden v. Perry*, 545 U.S. 677, 691 (2005) (plurality opinion) ("The placement of the Ten Commandments monument on the Texas State Capitol grounds is a far more passive use of those texts than was the case in *Stone*, where the text confronted elementary school students every day."). The displays must accord with the minimum requirements of the Act and will, as a result, religiously coerce the children and interfere with their parents' right to direct their religious education. Furthermore, the Act has an obvious legal effect on Plaintiffs: It conditions their access to Louisiana's public schools on their acquiescence to unavoidable, state-mandated displays of scripture. *See Doe v. Sch. Bd. of Ouachita Par.*, 274 F.3d 289, 292 (5th Cir. 2001) ("The case for standing is made stronger when the plaintiffs

are students and parents of students attending public schools, who enjoy a cluster of rights vis-a-vis their schools, and thus are not merely 'concerned bystanders.' . . . [T]he Supreme Court has repeatedly recognized the right of children and their parents to receive public education that is compliant with the Establishment Clause."); Pl. Br. at 21.[12]

This is the very sort of "concrete applicability" and "particularized" injury demanded by the Fifth Circuit in *Barber*, 860 F.3d at 353, and recognized by the Supreme Court in *Schempp*. *Accord Chavez v. Plan Benefit Servs., Inc.*, 108 F.4th 297, 307 (5th Cir. 2024) (noting that "a concrete injury is one that is real, and not abstract" and that a "particularized" injury "must affect the plaintiff in a personal and individual way" (internal quotation marks omitted)). Defendants' reliance on *Doe v. Tangipahoa Par. Sch. Bd*. 494 F.3d 494 (5th Cir. 2007) (en banc), Def. Br. at 13–14, is misplaced. There, the challenged practice (school-board invocations) was ongoing but there was no evidence in the record that the plaintiff had ever personally and directly been subjected to it, effectively reducing his alleged injury to "mere abstract knowledge that invocations were said." *Id.* at 497. Here, as Defendants note, the Act has not yet been implemented, and there is no ongoing practice *yet*. That indisputably will all change on or before January 1, 2025, however, and there is no question that the minor-child Plaintiffs will come into direct contact with the Act's displays. *Infra* p. 15.

        b.        Plaintiffs' future injuries are "certainly impending."

Defendants repeatedly note that Plaintiffs "do not allege that either they or their children have viewed an H.B. 71 display on a classroom wall" because the Defendants have not yet implemented the Act. Def. Br. at 10.[13] The Fifth Circuit has already made clear, however, that

---

[12] Mem. in Support of Pls.' Mot. for Preliminary Injunction (ECF No. 20-1) (July 8, 2024) (hereinafter, "Pl. Br.").

[13] *See also* Def. Br. at 11 ("Nor is any Plaintiff or Plaintiff's child currently or imminently subject to any H.B. 71 display."); *id.* at 14 ("The Complaint's repeated use of the auxiliary verb 'will' . . . admits that no such exposure or encounter has occurred.").

Article III standing does not require Plaintiffs to *actually* suffer injury before they may access judicial relief. In *Ingebretsen*, the plaintiffs challenged a Mississippi statute that would have allowed official, student-initiated prayer at school events. 88 F.3d at 277. The State argued that the plaintiffs did "not have standing to challenge the School Prayer Statute because the statute has not yet been implemented." *Id.* at 278. The court disagreed: Noting that the plaintiffs had "alleged real and substantial injury which would result from the implementation" of the statute, the court held that there was "no need . . . to wait for actual implementation of the statute and actual violations of [the plaintiffs'] rights." *Id.*

Contrary to Defendants' position, "[a]n allegation of future injury" is adequate for purposes of Article III standing if the "threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *see also Dep't of Com. v. New York*, 588 U.S. 752, 766–67 (2019) (holding that states had standing to challenge the inclusion of a citizenship question in the decennial census in light of alleged "future injuries"). Thus, the Fifth Circuit has opined that a plaintiff under the Americans with Disabilities Act "may seek injunctive relief with respect to a soon-to-be-built sidewalk, as long as the plaintiff shows a sufficiently high degree of likelihood that he will be denied the benefits of that sidewalk once it is built." *Frame v. City of Arlington*, 657 F.3d 215, 235 (5th Cir. 2011) (rejecting city's argument "that the plaintiffs lack standing with respect to inaccessible sidewalks they have not personally encountered"). Similarly, the court found standing for plaintiffs in an environmental challenge to "construction [that] has yet to break ground." *Citizens for Clean Air v. U.S. Dep't of Transp.*, 98 F.4th 178, 187 (5th Cir. 2024). The court acknowledged that "[i]t may not appear that Petitioners' alleged injuries are actual or imminent" but explained that "the Supreme Court has expressly held that a threatened injury will satisfy the 'injury in fact' requirement for standing."

*Id.* (internal quotation marks omitted). And in *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021), the court held that a plaintiff had standing to assert disability-access claims at a courthouse based only on a "substantial risk of being called for jury duty again."

Defendants point to their "illustrations" to support their argument that "no Plaintiff or their child will likely ever experience harm, much less a violation of his or her rights." Def. Br. at 14. But, as discussed above, Plaintiffs' injuries are not dependent on the content of any individual display; the threatened harms to Plaintiffs will occur as a result of Defendants' implementation of the Act's minimum requirements alone. Here, given that the Act's January 1 compliance deadline looms, Plaintiffs' alleged injuries are "certainly impending." *Driehaus*, 573 U.S. at 158. Defendants do not posit that the minor-child Plaintiffs will not attend school, that they will not implement the Act, *infra* p. 15, or that, once the Act, is implemented, the displays will not be posted in the minor-child Plaintiffs' classrooms. The Act provides no exception to any of the statute's minimum requirements, including its mandate that the State's preferred version of the Ten Commandments be posted in "each classroom" by January 1. H.B. 71(B)(1). Plus, the minor-child Plaintiffs are legally required to attend school (while their parents are required to ensure that they do) under the threat of criminal or civil penalty, per Louisiana's truancy laws. *Supra* n.2

### 2. *Plaintiffs' injuries are fairly traceable to Defendants.*

Defendants appear to mistake Article III's traceability prong for a proximate-cause requirement. *See* Def. Br. at 15. But "[t]racing an injury is not the same as seeking its proximate cause." *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010). "Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014); *see also Jackson v. Wright*, 82 F.4th 362, 369 (5th Cir. 2023) (citing *Lexmark*). For each defendant, there need be only "one plaintiff with standing to seek an injunction." *Murthy*

*v. Missouri*, 144 S. Ct. 1972, 1988 (2024). Plaintiffs' threatened injuries here are fairly traceable to each subset of defendants.

First, as alleged in the Complaint, members of the Louisiana Board of Elementary and Secondary Education ("BESE") are required by law to assist in implementing H.B. 71.[14] Board members are responsible for the oversight and governance of all public elementary and secondary schools in Louisiana. La. Const. art. VIII, § 3; La. R.S. § 17:1 *et seq.*; La. R.S. § 17:6(A)(10); La. R.S. § 17:6; Compl. ¶ 24. To that end, the Act explicitly directs: "The State Board of Elementary and Secondary Education shall adopt rules and regulations in accordance with the Administrative Procedure Act to ensure the proper implementation of this Section." H.B. 71(B)(6)(a); Compl. ¶¶ 25, 49.

Second, as alleged in the Complaint, because he is the State Superintendent of Education, Defendant Cade Brumley is statutorily responsible for administering and implementing all policies and programs adopted by BESE. La. R.S. § 17:21 *et seq.*; Compl. ¶ 19. He is thus responsible for the implementation of all rules and regulations that BESE adopts in relation to the Act. Compl. ¶ 21.

Finally, as alleged in the Complaint, each School Board Defendant is a "public-school governing authority." Compl. ¶¶ 27–36. Under the Act, "[n]o later than January 1, 2025, each public[-]school governing authority shall display the Ten Commandments in each classroom in each school under its jurisdiction." H.B. 71(B)(1); Compl. ¶ 38. Thus, each School Board Defendant must comply with the Act by end of this year. Furthermore, each School Board Defendant has jurisdiction over at least one school attended by at least one of the minor-child

---

[14] The Complaint identifies the individual members of BESE, who are: Conrad Appel, Judy Armstrong, Kevin Berken, Preston Castille, Simone Champagne, Sharon Latten-Clark, Lance Harris, Paul Hollis, Sandy Holloway, Stacey Melerine, and Ronnie Morris. Compl. ¶ 23.

Plaintiffs.[15] The minor children of Plaintiffs Reverend Mamie Broadhurst and Reverend Richard Williams,[16] Jennifer Harding and Benjamin Owens,[17] and David and Erin Hawley,[18] are enrolled in public schools in the East Baton Rouge Parish School System. The East Baton Rouge Parish School Board is the governing authority for the East Baton Rouge Parish School System. Compl. ¶ 27. The minor children of Plaintiff Dustin McCrory are enrolled in a public school in the Livingston Parish Public Schools System.[19] The Livingston Parish School Board is the governing authority for the Livingston Parish School System. *Id.* ¶ 29. The minor child of Plaintiff Christy Alkire is enrolled in a public school in the Vernon Parish School System.[20] The Vernon Parish School Board is the governing authority for the Vernon Parish School System. *Id.* ¶ 33. And the minor children of Plaintiff Reverend Jeff Sims attend public schools in the St. Tammany Parish Public School System.[21] The St. Tammany Parish School Board is the governing authority for the St. Tammany Parish School System. *Id.* ¶ 35.[22]

---

[15] The Article III standing of Plaintiffs Joshua Herlands, Molly Pulda, and Gary Sernovitz, and their children is addressed in a separate brief responding to a separate motion to dismiss (ECF No. 38) filed by Defendant Orleans Parish School Board.

[16] Rev. Broadhurst Decl. ¶¶ 1–3; Rev. Williams Decl. ¶¶ 1–3; Compl. ¶ 10.

[17] Harding Decl. ¶ 1; Owens Decl. ¶ 1; Compl. ¶ 12.

[18] Erin Hawley Decl. ¶¶ 1–2; David Hawley Decl. ¶¶ 1–2; Compl. ¶ 13.

[19] McCrory Decl. ¶ 1; Compl. ¶ 14.

[20] Alkire Decl. ¶ 1; Compl. ¶ 16.

[21] Sims Decl. ¶¶ 1–2; Compl. ¶ 11.

[22] In addition, the child of Plaintiffs Reverend Darcy Roake and Adrian Van Young attend a school in the NOLA Public School System. Roake Decl. ¶ 2; Van Young Decl. ¶ 2; Compl. ¶ 9. The school is a "Type 2" charter school authorized by BESE. Mem. in Support of Rule 12(B)(1) Mot. to Dismiss and Opp. to Mot. for Preliminary Injunction on Behalf of Def. Orleans Par. Sch. Bd. (ECF No. 38-1), at 3. BESE (named in the Complaint through its individual members) is thus the public-school governing authority for the school and has the legal authority and obligation to ensure that the school complies with all laws, including the Act. *See, e.g.*, La. R.S. § 17:3992(C) ("A school charter may be revoked by the authority that approved its charter upon a determination by an affirmative vote of . . . a majority of the members of the State Board of Elementary and Secondary Education . . . that the charter school or its officers or employees . . . [v]iolated any provision of law applicable to a charter school[.]"). To that end, the Department of Education annually requires BESE-authorized charter schools to certify compliance with a host of applicable statutes and regulations. *See* Slater Decl. Ex. 5 at 3–6; *see also* 2024-2025 Comprehensive Reporting Calendar BESE-Authorized Charter Schools, Dep't of Educ., 3, https://www.louisianabelieves.com/docs/default-source/school-choice/2023-2024-charter-school-reporting-calendar-(1)-(1).pdf?sfvrsn=8b0f6018_4 (noting that "[t]he 2023-2024 Charter School Assurances template is available in the Charter School Library" and that the "Charter Board Chair shall submit the signed assurances document" to the state by July 31, 2024).

Because the Act requires the display of the Ten Commandments in every public school in the state, including the schools attended by the minor-child Plaintiffs, these allegations demonstrate that Plaintiffs' injuries are fairly traceable to the BESE Defendants and Superintendent Brumley, whose implementation responsibilities under the Act are statewide. *See, e.g.*, *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 399 (5th Cir. 2020) (holding that the plaintiffs' injury relating to statewide restriction on voting by mail was traceable to, and redressable by, the secretary of state, whose statutory duties included preparing "detailed and comprehensive written directives and instructions" relating to the challenged statutes). Similarly, because each School Board Defendant is required, under the Act, to display the Ten Commandments, Plaintiffs' injuries are fairly traceable to each Board that is the public-school governing authority for each of the minor-child Plaintiffs' schools.

In their traceability argument, Defendants once again incorrectly suggest that future harm is inadequate under Article III, asserting that Plaintiffs cannot draw a "link between any particular Plaintiff and any particular Defendant because . . . the Complaint alleges no ongoing or intended conduct by any Defendant." *See* Def. Br. at 16. The Complaint makes clear, however, that this link will occur once Defendants take "actions to administer, implement, and enforce the Act." Compl. ¶ 8 (Defendants' enforcement actions "*will necessarily occur* in large part within this district" (emphasis added)); *id.* ¶ 163 ("By implementing H.B. 71, Defendants . . . will unavoidably violate Plaintiffs' rights under the Establishment Clause[.]"); *id.* ¶ 170 ("By administering and implementing H.B. 71, Defendants . . . will unavoidably violate Plaintiffs' rights under the Free Exercise Clause[.]"). As the Complaint alleges, Defendants are legally required to comply with the provisions of the Act, which assigns each of them a role in implementation and enforcement.

They do not contend that they will fail to carry out these duties. Quite the opposite. Defendants' declarations affirm that they have every intention of complying with the law.[23]

> ### 3.    *Plaintiffs' injuries will be redressed by injunctive and declaratory relief.*

Defendants do not offer any redressability argument beyond reiterating their injury-in-fact and traceability claims. Def. Br. at 16–17. The redressability prong for Article III standing is satisfied if it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S.154, 167 (1997). "When establishing redressability, [a plaintiff] need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm." *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (alteration in original) (internal quotation marks omitted).

Here, Plaintiffs' injuries would be redressed by both an injunction and declaratory judgment. An injunction blocking implementation of the law by the State Defendants and the Defendant School Boards will ensure that the minor-child Plaintiffs are not subjected to the unavoidable displays of the Ten Commandments mandated by the Act, preventing the religious coercion that they would otherwise experience and shielding them from an officially sponsored religious message that they are lesser in the eyes of the State because of their own religious or non-religious beliefs. It will also preserve the ability of the parent-Plaintiffs to direct their children's religious education and upbringing. An order declaring that the Act violates the Establishment Clause and Free Exercise Clause of the First Amendment will further alleviate Plaintiffs' injuries. *See Steffel v. Thompson*, 415 U.S. 452, 466–71 (1974) (noting that declaratory relief is "valuable to the plaintiff" as it has "the force and effect of a final judgment" (internal quotation marks omitted)).

---

[23] *See, e.g.*, Townsend Decl. (ECF No. 39-2) ¶¶ 12–14; Smith Decl. (ECF No. 39-4) ¶¶ 13–14; Hart Decl. (ECF No. 39-5) ¶¶ 13–14; Travis Decl. (ECF No. 39-6) ¶¶ 13–14; Link Decl. (ECF No. 39-7) ¶¶ 13–14.

**B.    Plaintiffs' Claims Are Ripe.**

Ripeness is a question of timing, with courts seeking to avoid "premature adjudication" of "abstract disagreements." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580 (1985). "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Id.* at 581 (internal quotation marks omitted). The two-prong ripeness analysis examines and balances "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007). Both ripeness factors weigh in Plaintiffs' favor here, and this Court may appropriately rule on this case.

1.    *This case is fit for judicial decision.*

This case is fit for judicial decision for several reasons. First, Plaintiffs will suffer serious—indeed, irreparable—injuries once the Act is implemented. *See id.* at 496 (recognizing that the standing and ripeness "often overlap in practice, particularly in an examination of whether a plaintiff has suffered a concrete injury"); *supra* pp. 7–11; *infra* pp. 43–44. Second, that harm is not hypothetical in the slightest. Defendants are required to comply with the Act by January 1, 2025, and they have affirmed that they will do so. No Defendant has suggested that they will not adhere to the minimum requirements of the Act. *Supra* p. 15. Nor could they in light of the Act's obligatory nature.

Finally, notwithstanding Defendants' mistaken view that Plaintiffs' injuries and claims are dependent on the content of individual displays, this case presents a "pure question of law that needs no further factual development": Does the imposition of the Ten Commandments on the minor-child Plaintiffs, in accordance with the minimum statutory dictates of the Act, violate the First Amendment? *See Book People, Inc. v. Wong*,  91 F.4th 318, 333 (5th Cir. 2024) (holding that booksellers' First Amendment challenge to a state-mandated book-rating system was fit for

16

judicial determination even though state had not enforced law against sellers or even fully implemented the statute); *Karen B.*, 653 F.2d at 899, 902 (holding that Louisiana school-prayer statute and "derivative Jefferson Parish School Board regulations which establish guidelines for student participation in prayer at school" were facially unconstitutional, despite acknowledging that "[t]he Jefferson Parish program has yet to be put into effect" and "the nature and extent of state involvement in religious activity is in some measure speculative at this time").

*Staley v. Harris County*, 485 F.3d 305 (5th Cir. 2007) (en banc), does not counsel otherwise. Defendants incorrectly assert that *Staley* involved "materially identical facts" to this case. Def. Br. at 9. Not so. As an initial matter, *Staley* did not involve a "Ten Commandments display," as Defendants state. *Id.* The challenged monument, which was placed on the grounds of the Harris County courthouse in the 1950s, featured a Bible. *Staley*, 485 F.3d at 306–07. Between the panel's initial decision and the en banc ruling, the courthouse was closed for "a few years" for renovations and the monument placed in storage. *Id.* at 307. Although the County said that it would display the monument after completing renovations, it stressed that "no decision ha[d] been made regarding when, where, or under what circumstances the monument will be displayed again in the future." *Id.* at 307–08. Based on that information, the court ruled that any dispute "over a probable redisplay . . . is not ripe because . . . no decision has been made regarding any aspect of the future display of the monument." *Id.* at 309.

This case is a far cry from *Staley*. Here, the legislature has already made a number of decisions regarding the Act's mandatory, permanent displays, including where they will be posted (in every classroom in every public school, without exception); when they will be posted (no later than January 1, 2025); what the "central focus" will be (the state's preferred, denominational version of the Ten Commandments); their size (no smaller than eleven by fourteen inches); and

even how legible the commandments must be (printed in a "large, easily readable font"). *See generally* H.B. 71. Displays posted in accordance with this statutory scheme will harm Plaintiffs and violate their rights.

2.    *The hardship to Plaintiffs in withholding a decision is significant.*

The analysis of hardship under ripeness doctrine "principally tracks the Article III injury analysis." *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 931 (5th Cir. 2023). Plaintiffs will suffer a significant hardship if a judicial decision is withheld because the "[l]oss of First Amendment freedoms, even for minimal periods of time, constitute irreparable injury." *Ingebretsen,* 88 F.3d at 280 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *infra* pp. 43–44. And because the displays will be permanent and present in every classroom, the injuries incurred by Plaintiffs will last far longer than a "minimal" period of time, casting a shadow over every hour and every day they are in school.

**C.    The State Defendants Are Not Entitled to Sovereign Immunity.**

"*Ex parte Young* allows a federal court to enjoin a state official from enforcing state laws that conflict with federal law. To be sued under *Ex parte Young*, the state official must have some connection to the state law's enforcement and threaten to exercise that authority." *Tex. Democratic Party v. Hughs*, 997 F.3d 288, 290–91 (5th Cir. 2021) (internal quotation marks omitted). Here, the Act *specifically names* BESE and states that BESE "*shall* adopt rules and regulations in accordance with the Administrative Procedure Act to ensure the proper implementation of this Section." H.B. 71A(4) (emphasis added); *see* Compl. ¶¶ 24–25. Those rules and regulations, in BESE's own words, "have the force and effect of law."[24] Furthermore, as the Superintendent of

---

[24] *See* Slater Decl. Ex. 5. On its official website, BESE states that it has the "constitutional and statutory authority to make policy decisions that govern the public education system of the state." *Id.* Further, "[a]cting in its capacity as a quasi-legislative body, *the Board adopts policies and regulatory rules which have the force and effect of law.*" *Id.* (emphasis added). This admission tracks with the education chapter of Louisiana's Administrative Code, which provides that "[a]ll regulatory policies and procedures adopted in response to state statutory requirements, most

Education, Defendant Brumley is statutorily "responsible for administering and implementing all policies and programs adopted by [BESE]." Compl. ¶ 19 (citing La. R.S. § 17:21 *et seq.*). Accordingly, BESE's and Brumley's "connection with the enforcement" of the Act goes well beyond a "general duty to see that the laws of the state are implemented" and is based on far more than the required "scintilla" of legal obligation required under *Ex Parte Young. See Jackson*, 82 F.4th at 367 (internal quotation marks omitted).

Defendants have "demonstrated willingness to exercise th[eir] duty." *See Book People*, 91 F.4th at 335. They make no suggestion that they will not carry out their mandatory enforcement obligations under the Act. *Supra* p. 15. As the Attorney General has publicly clarified, "[n]o posters are going up before November 15 because certain legal actions take time, specifically publishing rules through BESE[.]" Slater Decl. Exs. 1–2. And BESE President, Ronnie Morris, has acknowledged the Board's statutory duty under the Act to "adopt rules and regulations that will govern the proper implementation of the law." Morris Decl. (ECF No. 39-3) ¶ 6.

Defendants' upcoming exercise of their statutory duty to adopt and administer "rules and regulations . . . to ensure the proper implementation" of the statute by school boards will necessarily result in the constraint or compulsion, Def. Br. at 15–16, of Plaintiffs. The minor-child Plaintiffs will be forced to attend school and submit to unwanted and unconstitutionally coercive religious displays, and the parent-Plaintiffs will be forced to acquiesce to schools' usurpation of their right to direct their children's religious education. For example, in *Book People*, the Fifth Circuit held that the Texas Education Agency commissioner, who had been sued by book vendors, had a sufficient enforcement connection to a state law prohibiting school districts from buying books from vendors that failed to put sexual-content ratings on library materials. 91 F.4th at 334–

---

noticeably Louisiana Revised Statutes, Title 17, . . . must be adopted by BESE as Rules through the rulemaking process . . . [and] [o]nce adopted, rules have the force and effect of law." La. Admin. Code tit. 28, § 1301.

35. Texas insisted that the commissioner's "only enforcement authority is over school districts and, if [the plaintiff book vendors] are compelled to or constrained from doing anything, it is by school districts, not the State," but the court rejected that argument, explaining:

> True, the enforcement here "is not the same type of direct enforcement found in *Ex Parte Young*, for instance, where the attorney general threatened civil and criminal prosecution." But "such enforcement is not required." Plaintiffs have identified specific actions that this court can enjoin. . . .

> We agree with Plaintiffs that these acts "compel[] them to submit ratings with which they disagree," and "constrain[] them from continuing to do business with school districts if they fail to submit the required ratings or decline to acquiesce in the State's revised ratings." That Commissioner Morath enforces the law through the school districts doesn't change our analysis.

*Id.* at 335–36 (alterations in original) (internal citations omitted). Here, as Plaintiffs have requested, the Court can enjoin the state Defendants from carrying out their statutory duties to adopt and administer rules and regulations to ensure proper implementation of the law by school boards, thereby reducing the injuries Plaintiffs are likely to suffer. *See supra* pp. 11–16.

Echoing their injury-in-fact argument, *supra* pp. 7–11, Defendants erroneously argue that *Ex Parte Young* does not apply here because Plaintiffs do not allege an "*ongoing* violation of federal law *right now*." Def. Br. at 18 (emphasis added). That misconstrues the law. *Ex Parte Young* plainly authorizes suit based on imminent future harm. Indeed, *Ex Parte Young* was itself a facial challenge to a state law, made prior to the law's implementation and based on the plaintiffs' alleged future injuries. *See* 209 U.S. 123, 144 (1908) ("[T]he question really to be determined under this objection is whether the acts of the legislature and the orders of the railroad commission, *if enforced*, would take property without due process of law." (emphasis added)). The "ongoing and continuous" requirement cited by Defendants "merely distinguishes between cases where the relief sought is prospective in nature, *i.e.*, designed to prevent injury that will occur in the future, and cases where relief is retrospective." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338

(11th Cir. 1999). It does not require that "enforcement of the allegedly unconstitutional state statute actually must be in progress against the particular plaintiffs initiating suit." *Id.* Instead, "where there is a threat of future enforcement that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied." *Id*.[25] Defendants' reasoning would foreclose the relief granted by the Supreme Court to the *Ex Parte Young* plaintiffs and preclude any pre-enforcement challenges to state laws.[26] Because courts have routinely recognized that the exception to sovereign immunity applies in pre-enforcement challenges,[27] Defendants' position must be rejected.

## II.    DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS SHOULD BE DENIED.

"[A] motion to dismiss under [Rule] 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013) (quoting *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011)). When evaluating a Rule 12(b)(6) motion, "the court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff[s]." *Frye v. Anadarko Petroleum Corp*., 953 F.3d 285, 290–91 (5th Cir. 2019).

To survive Defendants' motion, Plaintiffs need only plead "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible where the pleading contains factual allegations sufficient to "allow[] the court to draw the reasonable

---

[25] *Accord Block v. Canepa*, 74 F.4th 400, 411 (6th Cir. 2023); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001).

[26] *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389 (5th Cir. 2015), Def. Br. at 18, does not support Plaintiffs' argument. There, the court found ongoing harm, disagreeing with the State that the plaintiff had only alleged past harm in the complaint. *Id.* at 394–95. At no point was the court presented with the question of whether a plaintiff must allege ongoing harm as opposed to imminent future harm.

[27] *See, e.g.*, *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49–50 (2021); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992); *Prentis v. Atl. Coast Line Co.*, 211 U.S. 210, 230 (1908); *U.S. v. Abbott*, 85 F.4th 328, 335–36 (5th Cir. 2023); *cf. Cochran v. U.S. Sec. & Exch. Comm'n*, 20 F.4th 194, 210 (5th Cir. 2021), *aff'd and remanded sub nom. Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023) (recognizing that "the threat of irreparable harm may justify pre-enforcement judicial review under [*Ex Parte Young*'s] principles of equity").

21

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. Plaintiffs' Complaint plainly meets this standard.

A.    **Plaintiffs Have Adequately Alleged Facts Supporting Their Facial Challenge.**

Defendants make much of the fact that Plaintiffs' lawsuit mounts a facial challenge to the Act, arguing that Plaintiffs must "plausibly allege 'that there is no set of circumstances under which [the implementation of H.B. 71] is constitutional.'" Def. Br. at 21 (quoting *Croft v. Perry*, 624 F.3d 157, 164 (5th Cir. 2010)).[28] In fact, the Supreme Court has never applied that standard to facial challenges under the Establishment Clause or the Free Exercise Clause.[29] Nor, with the exception of *Croft*, has the Fifth Circuit.[30] Although Plaintiffs do not concede that the "no set of circumstances" standard applies here, they nevertheless satisfy it.

Despite acknowledging that Plaintiffs have asserted a facial challenge, Defendants do not address the constitutionality of the Act's overarching statutory scheme, demanding instead that the Court evaluate Plaintiffs' claims by assessing the content and constitutionality of hypothetical "illustrations"—separate and apart from the rest of the statute's provisions. That is not how statutory interpretation or facial challenges work. As one of court of appeals has explained, the

---

[28] While *Croft* does not directly cite *United States v. Salerno*, 481 U.S. 739, 745 (1987), the Supreme Court held there that a plaintiff asserting a facial challenge "must establish that no set of circumstances exists under which the Act would be valid." *But see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) ("While some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a plainly legitimate sweep." (internal quotation marks omitted)).

[29] *See, e.g.*, *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301, 313–16 (2000); *Bowen v. Kendrick*, 487 U.S. 589, 593, 602 (1988); *id.* at 627 n.1 (Blackmun, J., dissenting) (noting with approval that the Court had rejected application of *Salerno*'s "rigid analysis" to Establishment Clause cases); *Edwards v. Aguillard*, 482 U.S. 578, 580–83 (1987).

[30] *See, e.g.*, *Doe v. Santa Fe Indep. Sch. District*, 168 F.3d 806 (5th Cir.1999); *Ingebretsen*, 88 F.3d at 274; *Sonnier v. Crain*, 613 F.3d 436, 464 (5th Cir. 2010), *op. withdrawn in part on reh'g*, 634 F.3d 778 (5th Cir. 2011) (Dennis, J., concurring) (listing Supreme Court and Fifth Circuit cases adjudicating "facial challenges by relying on substantive constitutional doctrines that were incompatible with the 'no set of circumstances' test"); *cf. Doe v. City of Albuquerque*, 667 F.3d 1111, 1124–26 (10th Cir. 2012) ("The idea that the Supreme Court applies the 'no set of circumstances' test to every facial challenge is simply a fiction. . . . Following *Salerno*, the Court has repeatedly considered facial challenges simply by applying the relevant constitutional test to the challenged statute without attempting to conjure up whether or not there is a hypothetical situation in which application of the statute might be valid.").

analysis involves "an examination of whether the terms of the statute itself measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, contain[] a constitutional infirmity that invalidates the statute in its entirety." *City of Albuquerque,* 667 F.3d at 1127 (alteration in original) (internal quotation marks omitted).

Here, operating together, the terms of the statute (*i.e.*, its minimum requirements) comprise an unconstitutional statutory scheme, and displays of the Ten Commandments posted pursuant to, and in compliance with, that scheme will infringe Plaintiffs' First Amendment rights—no matter the content of any individual display. Whatever else may be included in any individual display, lawmakers have written the statute to ensure that, across the board, the Ten Commandments are the displays' defining feature and that students' attention will be drawn to them. Subjecting the minor-child Plaintiffs to permanent displays of a state-mandated, denominational version of the Ten Commandments in every classroom for the duration of their public-school education is, in and of itself, patently unconstitutional under *Stone* and any applicable First Amendment test. *See* Pl. Br. at 7–20; *infra* pp. 24–37. Accordingly, Plaintiffs' allegations plausibly show that the Act is unconstitutional in all applications; and the allegations further demonstrate that Plaintiffs are likely to succeed on their claims, as necessary for this Court to issue a preliminary injunction.

Defendants presume, without any evidence or discussion, that their "illustrations" would comply with the Act and would be constitutionally permissible on an individual basis. Plaintiffs do not agree and do not concede either assumption. But as explained above, for purposes of Plaintiffs' facial challenge, Defendants' illustrations are beside the point. Plaintiffs have not brought this challenge to contest whether a public school could, for instance, constitutionally hang a temporary Ten Commandments poster in one classroom as an "illustration" in connection with a particular lesson. The fact that any given poster may be constitutionally permissible within a

separate program of instruction is irrelevant when no single implementation of the Act can be separated from its unconstitutional statutory scheme as a whole.

### B.    Plaintiffs' Allegations Support a Plausible Establishment Clause Claim.

Defendants are wrong in asserting that *Stone* is "dead and inapposite." *See* Def. Br. at 38. *Stone* remains binding Supreme Court precedent, and it is dispositive in this case. "[O]nly the Supreme Court may overrule its precedents even where subsequent decisions or factual developments may appear to have significantly undermined the rationale for the earlier holding." *Nat'l Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 549–50 (5th Cir. 2020) (alteration and internal quotation marks omitted). Defendants offer no persuasive reason for this Court to depart from this ironclad rule. *Stone* should end the Court's inquiry, but even if Defendants' assessment of *Stone* were correct, the Act does not pass constitutional muster under any applicable First Amendment test.

### 1.    Stone *is not "dead" and is directly applicable, binding law.*

The Supreme Court has repeatedly held that it is the "Court's prerogative alone to overrule one of its precedents." *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016).[31] Lower courts must follow that precedent and "cannot ignore a decision from the Supreme Court unless directed to do so by the Court itself." *Nat'l Coal. for Men*, 969 F.3d at 549.[32] This is true even where a party believes that subsequent Supreme Court jurisprudence has called into question the continuing validity of a prior ruling: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons

---

[31] *See also, e.g.*, *Tenet v. Doe*, 544 U.S. 1, 10–11 (2005); *Hohn v. United States,* 524 U.S. 236, 252–53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); *Thurston Motor Lines, Inc. v. Jordan K. Rand*, *Ltd.*, 460 U.S. 533, 535 (1983) ("[O]nly this Court may overrule one of its precedents.").

[32] The Fifth Circuit has routinely recognized and applied this principle. *See, e.g.*, *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 346, 355–56 (5th Cir. 2024); *Johnson v. Lumpkin*, 74 F.4th 334, 339 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 829 (2024); *Chamber of Com. of U.S. v. U.S. Sec. & Exch. Comm'n*, 85 F.4th 760, 769 n.4 (5th Cir. 2023); *Lefebure v. D'Aquilla*, 15 F.4th 650, 660 (5th Cir. 2021); *United States v. Coto-Mendoza*, 986 F.3d 583, 586 (5th Cir. 2021); *United States v. Coil*, 442 F.3d 912, 916 (5th Cir. 2006) (collecting additional cases).

rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 489 (1989); *see also Agostini v. Felton*, 521 U.S. 203, 237–38 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent.").[33]

Defendants assert that *Agostini* affirmed this rule only because the *Lemon* test remained good law in that case. This is incorrect and ignores the unusual procedural posture of *Agostini*, in which the Petitioners sought relief from a permanent injunction pursuant to Federal Rule of Civil Procedure 60(b)(5). *See* 521 U.S. at 215, 238–39 ("[O]ur decision today is intimately tied to the context in which it arose. This litigation involves a party's request under Rule 60(b)(5) to vacate a continuing injunction entered some years ago in light of a *bona fide*, significant change in subsequent law."). The Court's recognition that it applied the same "general principles" under *Lemon* as in previous cases was merely the baseline against which the Court assessed whether its jurisprudence had, in fact, changed enough for purposes of satisfying Rule 60(b)(5). *Agostini*, 521 U.S. at 237 (announcing that "our Establishment Clause law has significantly changed" and "[w]e are only left to decide whether this change in law entitles petitioners to relief under Rule 60(b)(5)") (first set of alterations in original) (alterations and internal quotation marks omitted). Even *after* holding that there had been a significant change in law, the Court went on to reaffirm that lower courts may not decide for themselves that a particular ruling is no longer good law: "The trial court acted within its discretion in entertaining the motion with supporting allegations, but it was also

---

[33] *Accord Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (precedent remains binding even if "the lower court thinks the precedent is in tension with some other line of decisions.") (internal quotation marks omitted); *State Oil Co. v. Khan*, 522 U.S. 3, 20-22 (1997) (holding that appellate court properly applied binding precedent even though subsequent Supreme Court rulings had "gravely weakened" the precedent's "conceptual foundations," leaving little "to salvage"); *Ramos v. Louisiana*, 590 U.S. 83, 124 (2020) (Kavanaugh, J., concurring) ("[V]ertical stare decisis is absolute . . . [lower] courts have a constitutional obligation to follow a precedent of this Court unless and until it is overruled by this Court.") (internal citation and quotation marks omitted).

correct to recognize that the motion had to be denied unless and until this Court reinterpreted the binding precedent." *Id.* at 238.

The U.S. Court of Appeals for the Second Circuit has already rejected Defendants' suggestion that all Supreme Court rulings based on *Lemon* are no longer binding. *See Jusino v. Fed'n of Catholic Teachers, Inc.*, 54 F.4th 95, 102 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 1056 (2023). In *Jusino*, the Second Circuit held that the Supreme Court's ruling in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), "remains good law notwithstanding its reliance . . . on *Lemon*[.]" Noting that *Kennedy* "indisputably did not . . . overrule – or even mention – *Catholic Bishop*," the court held that "unless and until the Supreme Court sees fit to overrule *Catholic Bishop* directly, it remains binding on this Court." *Jusino*, 54 F.4th at 102.

Likewise, although *Kennedy* confirmed that the *Lemon* test had been abandoned, 597 U.S. at 23, the Court did not mention *Stone*, let alone overrule it. And, importantly, *Stone* relies on precedent other than *Lemon*—most prominently, *Schempp*, which is rooted in the very "historical practices and understandings" that are central to the *Kennedy* test.[34] *See infra* pp. 28–29; *Van Orden*, 545 U.S. at 690–91 (plurality opinion) ("As evidenced  by *Stone's* almost exclusive reliance upon two of our school  prayer cases, . . .  it stands as an example of the fact that we have been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." (internal quotation marks omitted) (citing *Schempp* and *Engel v. Vitale*, 370 U.S. 421 (1962))). Thus, *Stone* is still binding law. *Id.*

Defendants' position that *Stone* does not apply here is not supported by a comparison of the two statutes. As in *Stone*, 449 U.S. at 39, Plaintiffs assert a facial Establishment Clause

---

[34] In *Schempp*, the Court looked to European and colonial history and the leading Founders' views for guidance on the Establishment Clause's meaning and determined, among other conclusions, that the Clause requires the government to remain neutral as to religion. 374 U.S. at 214-25.

challenge to a state law mandating permanent displays of the Ten Commandments in every classroom. Neither statute expressly requires that the commandments be displayed standing alone. *See generally id.* Additionally, as in *Stone*, 449 U.S. at 41 & n.1, the statute challenged here imposes a minimum size requirement on the displays and mandates that they be accompanied by a context statement setting out the purported historical relevance of the Ten Commandments.[35]

Finally, as in *Stone*, the state's purpose here is plainly religious, with the principal author and sponsor of the Act explaining: "It is so important that our children learn what God says is right and what He says is wrong, and to allow [the Ten Commandments] to be displayed in our classrooms as a visual aid, I believe, especially in this day and time is so important." Compl. ¶ 79. The statutory scheme further belies Defendants' claim that the displays mandated by the Act have a "non-religious objective." Def. Br. at 41. The Act does not tie the displays to any existing, possibly relevant curriculum, such as world history or world religions, or to any curriculum at all. Pl. Br. at 23–24. It mandates the display of only one (purportedly) historical document, regardless of instructional context: the Ten Commandments. Even the Declaration of Independence, one of the most consequential documents in U.S history, does not get this special treatment. And the other core Founding documents, the Constitution and Bill of Rights,[36] are nowhere to be found in the Act. That's because lawmakers had one aim: to impose the Ten Commandments on students in an effort to induce them to believe in and live by the state's preferred religious doctrine. *See* Pl. Br. at 6 (Governor Landry defending the Act by questioning, "[s]ince when did the Ten Commandments become a bad way to live your life?!").

---

[35] Defendants incorrectly state that no context statement was required in *Stone*. Def. Br. at 40.
[36] *See* Declaration of Steven K. Green, J.D., Ph.D. Ex. 1 (Expert Report of Steven K. Green, J.D., Ph.D., hereinafter, "Green Rep."), ¶ 29.

Given the direct parallels between the Kentucky and Louisiana statutes, *Stone* is apposite and determinative here. Indeed, the Act is more constitutionally egregious than the Kentucky statute because it adopts and prescribes a specific, denominational version of the Ten Commandments. Pl. Br. at 11–16, 22–25; *infra* pp. 33–34, 41–42.

2.    *Permanently displaying the Ten Commandments in every public-school classroom is not permissible under* Kennedy*'s "original meaning and history" test.*

Defendants assert that there are six—no more, no less—"hallmarks of religious establishments" that the Framers of the Constitution "sought to prohibit when they adopted the First Amendment." Def. Br. at 22 (quoting *Kennedy*, 597 U.S. at 537 & n.5). According to Defendants, Plaintiffs must "plausibly allege that *every* potential display implementing [the Act] . . . falls within one of [those six] historical hallmarks." Def. Br. at 23. This is not the law.

Defendants' position grossly oversimplifies the Establishment Clause analysis outlined in *Kennedy* and distorts Plaintiffs' burden at this stage of the litigation.[37] What Defendants refer to as the "*Kennedy* hallmarks," Def. Br. at 36, are plucked not from the Court's majority opinion in that case, but from Justice Gorsuch's *concurrence* in *Shurtleff v. Boston*, 596 U.S. 243, 285–86 (2022) (Gorsuch, J., concurring).[38] The Court has never held that a government act must neatly invoke one of these six "hallmarks" to violate the Establishment Clause. On the contrary, the *Kennedy* Court's Establishment Clause approach was not so circumscribed, commanding only that

---

[37] Defendants assert, based on a footnote from an out-of-circuit case, Def. Br. at 23 n.3, that the burden of proof falls on Plaintiffs under *Kennedy*. Plaintiffs do not agree. Neither the Supreme Court nor the Fifth Circuit has offered clear guidance on the question. *Cf. N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022) (explaining that requirement for government to produce historical evidence to justify Second Amendment restriction "accords with how we protect other constitutional rights" and asserting, in following paragraph, that "our focus on history also comports with how we assess many other constitutional claims" while citing *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 60 (2019)). Even if Defendants are correct, however, Plaintiffs have surpassed any burden here.

[38] *Kennedy*'s majority opinion cites Justice Gorsuch's *Shurtleff* concurrence, along with other sources, in a footnote supporting the majority's unremarkable observation that some forms of coercion were "*among* the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." 597 U.S. at 537 & n.5 (emphasis added). But the Court in no way suggests that the list in the *Shurtleff* concurrence is definitive, exhaustive, or exclusive.

"the Establishment Clause must be interpreted by reference to historical practices and understandings." 597 U.S. at 535; *see also, e.g.*, *Marsh v. Chambers*, 463 U.S. 783, 792 (1983) (citing an "unambiguous and unbroken history" of legislative prayer as the reason for finding against an Establishment Clause violation); *Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014) (reiterating that it is "*not* necessary to define the precise boundary of the Establishment Clause where history shows that the *specific practice* is permitted" (emphases added)).

a.   <u>The First Amendment was animated by the Founders' concerns about government promotion of religion and coercion.</u>

Under *Kennedy*, courts should "focus[] on [the] original meaning and history" of the First Amendment, drawing "the line . . . between the permissible and the impermissible . . . [to] faithfully reflect[] the understanding of the Founding Fathers." 597 U.S. at 536–37 (internal quotation marks omitted). And it is "the views of [James] Madison and [Thomas] Jefferson," among other Founders, on which the Supreme Court has focused in construing the Establishment Clause. *See Schempp*, 374 U.S. at 214.[39]

Problematically for Defendants, the Framers to which this Court should look for guidance would have objected to the State's attempt to memorialize a government-prescribed version of the Ten Commandments in furtherance of a statutory scheme that imposes religious teachings on its citizenry. *See* Pl. Br. at 8–11; Green Rep. ¶¶ 13–32. The Act violates the fundamental principles undergirding the First Amendment, including that "[g]overnment should not take a position on any religious doctrine or promote any denomination or denominational belief or practice as favored or preferred" and that "[g]overnment should not coerce or promote religious fealty or any religious belief." Green Rep. ¶ 20; *see also* Pl. Br. at 10–11. Indeed, on the latter point, the Founders had a

---

[39] *See also, e.g.*, *Reynolds v. United States*, 98 U.S. 145, 162-63 (1878); *Everson v. Bd. of Educ.*, 330 U.S. 1, 11-13 (1947); *Engel*, 370 U.S. at 425, 436; *Larson*, 456 U.S. at 245; *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 770 n.28 (1973); *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 878 (2005).

29

broad view of what constitutes impermissible religious coercion by the government. As Jefferson noted in 1808, he was concerned not only with religious coercion enforced by "fine & imprisonment," but also with governmental action that could result in "some degree of proscription perhaps in public opinion." Letter from Jefferson to S. Miller, Jan. 23, 1808.[40] In his view, a "mere governmental 'recommendation' of religious practice, even without the backing of legal force, was no "less a law of conduct for those to whom it is directed." Green Rep. ¶ 21 (quoting letter to Miller). Madison believed the same. *Id.* Despite the substantial influence that Madison, in particular,[41] had on the First Amendment, Defendants do not mention him in their brief and, consequently, ignore critical evidence of the "original meaning and history" of the Establishment Clause.

        b.    <u>The Ten Commandments do not form the basis of the U.S. legal system or government.</u>

As Plaintiffs explained in their opening brief, "[t]here is no evidence that the Framers of the Constitution considered the Ten Commandments to be a basis for either American law or government." Pl. Br. at 10. Consistent with the leading Founders' general reproach toward government support for, or interference with, religion, neither the Constitution nor the Bill of Rights—the core foundational documents for the American legal system and government— mentions God, the Bible, or any commandment. *See generally* U.S. Const. & amends.; Green Rep. ¶ 29. In addition, "neither the Ten Commandments nor the Bible more generally received any explicit mention in the debates [about the Constitution] and publications surrounding the founding documents." Green Rep. ¶ 30; Pl. Br. at 10. For example, he *Federalist Papers*, "which are generally considered to set forth the most important discussions of the meaning of the Constitution

---

[40] *Available at* FOUNDERS ONLINE, https://founders.archives.gov/documents/Jefferson/99-01-02-7257.
[41] *See* Pl. Br. at 10–11; Green Rep. ¶¶ 17–19.

at the time of ratification," did not mention the Ten Commandments (or "Bible," or "scripture"). Green Rep. ¶ 31; Pl. Br. at 10. In the opinion of Dr. Steven K. Green, Plaintiffs' expert in this case, "the American government and legal system are not premised on, or rooted in, the Ten Commandments," and "[t]here is no historical basis for singling out the Ten Commandments as seminal in the foundation of American law and government." Green Rep. ¶ 33; *see also* Pl. Br. at 8–11. With the exception of a few generic quotes from Supreme Court opinions, Defendants fail to offer any evidence demonstrating any influence of the Ten Commandments on the American legal system and government at the Founding.

c.   <u>The historical record demonstrates that there is no longstanding, widespread tradition of permanently displaying the Ten Commandments in public-school classrooms.</u>

The historical record is devoid of any meaningful indication of a longstanding, widespread, "unambiguous and unbroken" history of permanently posting the Ten Commandments in American public schools. *See* Pl. Br. at 9–10 (*citing Marsh*, 463 U.S. at 792). This conclusion is bolstered by Dr. Green's report, which affirms that "the evidence for a longstanding historical practice and acceptance of widespread and permanent displays of the Ten Commandments in public-school classrooms does not exist." Green Rep. ¶ 39.

In his report, Dr. Green notes that the *New England Primer*, cited as historical evidence in the Act and relied on by Defendants, Def. Br. at 36-37, "was used chiefly, if not exclusively, in *religiously* run schools" and "fell into disuse during the early decades of the nineteenth century, before the rise of public education." Green Rep. ¶ 34. Even so, "there is a lack of evidence that these schools permanently displayed the Ten Commandments on classroom walls." *Id.*

The *McGuffey Readers*, also cited as historical evidence in the Act and relied on by Defendants, Def. Br. at 37, were used by some public schools. Green Rep. ¶ 43. While some editions included a lesson setting forth the Ten Commandments in their entirety or lessons that

sporadically referred to particular commandments, other editions did not explicitly reference any commandment at all. *Id.* Notably, "the Ten Commandments, even when used or referred to . . . were not a significant aspect of the texts, and the extent to which common-school teachers may have relied on those particular readings and spelling lessons, as opposed to the dozens of others available in the same book, cannot be verified"; "references to the commandments were largely eliminated in later versions of the *Readers*"; and, "while the *Readers* were used in many common schools from their initial publication through the early twentieth century, reliance on them tapered as public schools turned to myriad other available options." *Id.*[42] This limited history does not support the Act's expansive claim in the context statement that "[t]he Ten Commandments were a prominent part of American public education for almost three centuries," H.B. 71(B)(3), and the use of privately written textbooks with discrete passages referring to the commandments most certainly does not prove a longstanding, "unambiguous and unbroken" history of permanently displaying the Ten Commandment in public-school classrooms. *See* Pl. Br. at 8–10.

Other evidence supports Dr. Green's conclusion. For example, "[r]eflect[ions] [of] any specific, routine practice of displaying the Ten Commandments in classrooms or otherwise using them in classroom instruction" are conspicuously absent from late-1800s surveys administered by the U.S. Commissioner of Education. Green Rep. ¶¶ 45–47 (discussing other "available data and research"). Simply put, there is no "evidence of a longstanding, let alone unbroken, historical acceptance and practice of widespread, permanent displays of the Ten Commandments in public schools." *Id.* ¶ 48.

---

[42] The Act also cites Noah Webster's *The American Spelling Book*, H.B. 71(B)(3), though Defendants do not mention it. According to Dr. Green, references to any commandment in various editions of the speller were sparse, and the words "commandment" or "commandments" do not appear in the book's 1795, 1808, 1822, 1843, 1848, 1857, 1866, 1880, and 1908 editions. Green Rep. ¶ 42.

Tellingly, Defendants do not point to a single piece of historical evidence specifically involving the Ten Commandments and schools, other than the use of the *New England Primer* and *McGuffey Readers*. Instead, they resort to generic quotes about the recognition of religion's role in American life, pulled from the Supreme Court's *Van Orden* and *American Legion* plurality opinions—neither of which had anything to do with public schools. Going a step further, Defendants, without any substantiation, falsely assert that "Ten Commandments displays, as a category, therefore are presumptively constitutional." Def. Br. at 36. The Supreme Court has never held that. Not in *American Legion*;[43] not in *Van Orden*; not in *McCreary*, where the Court affirmed an injunction against a courthouse display featuring the Ten Commandments, 545 U.S. at 881; and, of course, not in *Stone*.

3.    *Defendants concede that the Act's mandated version of the Ten Commandments is denominational.*

Defendants do not dispute Plaintiffs' allegations that the Act adopts and mandates one particular version of the Ten Commandments or that this version is Protestant. *See* Compl. ¶¶ 64–67; *see also* Pl. Br. at 11–20; Green Rep. ¶¶ 49–56. On the contrary, they concede that the version of the Ten Commandments mandated by statute does not comport with the Catholic or Jewish faiths. Def. Br. at 35 (quoting Ex. A-1 at 14).

Nonetheless, retreating to one of their "illustrations," Defendants *do* dispute as "implausible," Def. Br. at 35, Plaintiffs' allegation that, "by mandating that one version of the Ten Commandments be displayed in public educational institutions and prescribing an official religious text for schoolchildren to venerate, [the Act] adopts an official position on religious

---

[43] *American Legion*, involved a challenge to a display on government property of a Latin cross statue commemorating lives lost in World War I. 588 U.S. at 37. The cross and the land were acquired by a government commission in 1961. *Id.* at 45. In upholding the display, the plurality explained that "[t]he passage of time gives rise to a strong presumption of constitutionality" but noted that "retaining established, religiously expressive monuments, symbols, and practices is quite different from erecting or adopting new ones." *Id.* at 57.

matters, . . . [and] tak[es] sides in questions over theological doctrine." Compl. ¶ 161. According to Defendants, because their sample poster acknowledges that "different faith traditions adopt different versions of the Commandments' text," it dispels any suggestion of denominational preference. *See* Def. Br. at 35. Putting aside that Defendants' quoted hypothetical "illustration" does not cure any constitutional concerns even on an individual basis, it is, as discussed above, irrelevant to Plaintiffs' facial challenge. Plaintiffs take issue with the statutory regime in its entirety. The Act's facial adoption of a Protestant version of the Ten Commandments, and its mandate that this version—and only this version—be posted in thousands of classrooms across the state violate "[t]he clearest command of the Establishment Clause" under *Larson*, which held that "one religious denomination cannot be officially preferred over another." 456 U.S at 244; *see also* PI Br. at 11–16. Defendants do not address *Larson* or either prong of the strict-scrutiny test that they must satisfy under *Larson* and have waived any argument that the Act serves a compelling state interest or is narrowly tailored to that interest. *See infra* pp. 37–40.

4.      *The displays mandated by H.B. 71 are religiously coercive.*

Defendants' coercion argument suffers from the same fatal flaw as their other arguments: Defendants wrongly assume that the coercion analysis depends on the specific content of individual displays. *See* Def. Br. at 34 (asserting that Plaintiffs' coercion allegations are "entirely implausible" when considered in light of Defendants' "illustrations"). Again, the legal analysis here does not depend on the content of specific displays. Rather, the Court must consider whether students will be religiously coerced under the mandatory provisions of the statutory scheme, which will subject students, including the minor-child Plaintiffs, to a state-approved, Protestant version of the Ten Commandments in every classroom for every day of their public-school education.

Defendants proclaim that "Plaintiffs' children are not required to do anything" in response to the displays, Def. Br. at 34, but that neglects the inherently coercive nature of the school

environment. The Supreme Court has repeatedly recognized that children are particularly susceptible to religious indoctrination at school, both because they are captive audiences to the state's religious messages and because they are vulnerable to the immediate impressions and judgments of their teachers and classmates if they do not fall in line with the state's preferred religious beliefs. *See Lee,* 505 U.S. at 593; *see also Santa Fe*, 590 U.S. at 311–12; Pl. Br. at 16–17. Under *Lee*, consistent with the Founders' concerns about religious coercion of any degree, *supra* pp. 29–33, the Establishment Clause forbids any coercion arising from the "subtle coercive pressure[s]" intrinsic to the school context. *Lee*, 505 U.S. at 592; *see also Santa Fe*, 530 U.S. at 312.

Although *Lee* is the seminal and binding Supreme Court precedent pertaining to religious coercion of students, Defendants do not contend with it in the slightest, failing to cite it even once in their brief. Nor do they ever acknowledge, even in passing, that students in public-school classrooms are a quintessentially captive audience. *See Ingebretsen*, 88 F.3d at 279–80 (striking down state law that would authorize prayers at public-school events where "attendance is compulsory" because "students will be a captive audience that cannot leave without being punished by the state or School Board for truancy or excessive absences"); Pl. Br. 16–17. In light of *Lee* and notwithstanding the content of any particular display beyond the text of the Ten Commandments, it is certainly not *implausible* to allege that the minor-child Plaintiffs will feel pressured to observe, meditate on, venerate, and adopt or obey the state's preferred religious doctrine. Pl. Br. at 17–20.

Defendants' "illustrations," even if they were not irrelevant to Plaintiffs' facial challenge, would merely put a finer point on the matter, demonstrating that the State is deeply and bizarrely obsessed with imposing the commandments on students and will do whatever it can to shoehorn

its preferred version of that religious doctrine into any number of displays. Whether schools decide to display one or more of Defendants' hypothetical posters, or use posters featuring other content,[44] the common denominator, from classroom to classroom and school to school, will be the State's mandatory version of the Ten Commandments. Students will be acutely aware of the lengths to which the State has gone in ensuring that they encounter these displays in every classroom for nearly every minute of their school day, and students will reasonably feel religiously coerced by the State's desperate insistence that they take heed of the commandments. The Supreme Court effectively recognized this in *Stone*, holding that the only function served by such permanent and pervasive displays is "to induce . . . schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." 442 U.S. at 42.

Defendants contrast the Act's classroom displays of the Ten Commandments with "the vocal, school-directed prayer and Bible reading at the beginning of each day" in *Schempp* and argue that the Act is not coercive because "there is no religious activity" at issue. Def. Br. at 34. The Supreme Court has rejected that claim: In *Schempp*, the Court recognized that daily scriptural readings constituted "religious exercise," 374 U.S. at 224–25; and in *Stone*, the Court held that it is not "significant that the Bible verses involved in this case are merely posted on the wall, rather than read aloud as in *Schempp* and *Engel*." 449 U.S. at 42. School-promoted religious activity is no less unconstitutional merely because it is silent. *See Wallace v. Jaffree*, 472 U.S. 38, 60–61 (1985) (holding that state law improperly encouraged students to engage in silent prayer); Pl. Br. at 18. As the Seventh Circuit has observed, "[d]isplaying religious iconography . . . may do more than provide public school students with *knowledge* of Christian tenets"; it "tend[s] to promote

---

[44] To be sure, the content of an individual display may compound the religiously coercive pressures already faced by students as a result of the Act's minimum requirements. For instance, Defendants' "illustration" describing the Ten Commandments as "Statements About How You Behave," Def. Br. at 25, would no doubt further induce children to view the state's version of the Ten Commandments as authoritative rules that they must follow.

religious beliefs, and students might feel pressure to adopt them"—a concern that "was front and center in *Stone*." *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 851 (7th Cir. 2012) (en banc).

**C.**    **Plaintiffs' Allegations Support a Plausible Free Exercise Clause Claim.**

Like their other arguments, Defendants' objections to Plaintiffs' claims under the Free Exercise Clause fail to grapple with the problematic nature of the Act's statutory regime. Based on the Act's minimum requirements alone, the minor-child Plaintiffs will be subjected to permanent, pervasive, and unavoidable displays of the state's preferred version of scripture throughout the entire school day, for the duration of their public-school education. Thus, it simply does not matter whether the displays reference a popular musical, movie, online meme, or any other subject. Defendants' "illustrations" remain a red herring that prove nothing other than the extraordinary efforts that public schools might make to infuse scripture into their classrooms, draw students' attention to it, and pressure them into observing, meditating on, venerating, and living by its faith tenets.

1.    *The Free Exercise Clause prohibits all forms of religious coercion.*

The Free Exercise Clause broadly secures the "right of every person to freely choose his own course [in matters of faith] . . . free of any compulsion from the state." *Schempp*, 374 U.S. at 222. As Defendants concede, Def. Br. at 44, the Clause bars direct and "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson v. Makin*, 596 U.S. 767, 778 (2022). Yet, even as they admit that "forcing religious objectors to participate in religious exercise is forbidden," Def. Br. at 44, Defendants dismiss the displays mandated by the Act as nothing more than "non-participatory exposure," Def. Br. at 45, to unwanted content. That characterization does not reflect the wide-ranging, all-pervading nature of the statutory regime, which capitalizes on the State's compulsory-education laws, *supra* n.2, and the coercive school

context, *supra* pp. 34–37, to impose on students constant and unavoidable displays of the Ten Commandments—the State's preferred version, no less—that will follow them throughout their educational journeys.

In their effort to downplay the Act's unremitting assault on students' conscience as mere "offense," Defendants' turn to the Supreme Court's ruling in *Town of Greece*. Def. Br. at 44. But the Court's assessment of coercion there was premised wholly on the fact that the objectors were "mature adults" who voluntarily attended government meetings and were "free to enter and leave with little comment and for any number of reasons." *Town of Greece*, 572 U.S. at 590 (quoting *Lee*, 505 U.S. at 597). The minor-child Plaintiffs, by contrast, are students who are compelled by law to attend school and are under the thumb of State control while there—a distinction recognized by the Court itself in *Town of Greece. Id.* at 590–91 (citing *Lee*, 505 U.S. at 597). According to the Court, "[s]hould nonbelievers choose to exit the room during a prayer they find distasteful, their absence will not stand out as disrespectful or even noteworthy[,]" and "should they remain, their quiet acquiescence will not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed." *Id.* at 590. It is an entirely different story for children, who are "readily susceptible to religious indoctrination or peer pressure." *See id.* (internal quotation marks omitted).

Defendants' reliance on Pledge of Allegiance cases, Def. Br. at 44, is also ineffectual and fails to account for the nature of those challenges. Those cases largely involved students asserting religious objections to what the courts have deemed to be secular conduct. This is far afield from students being confronted with religious, rather than secular, practices by school authorities, especially because students may opt out of the short recitation of the Pledge. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 644 (1943); *Oliver v. Arnold*, 3 F.4th 152, 155 (5th Cir. 2021). There is no way for students here to opt out of the Act's coercive scheme because the

commandments will be posted in every single classroom. The free-exercise concerns present in the Pledge cases, then, are simply different those asserted by Plaintiffs here.[45]

Similarly, a student's hypothetical free-exercise challenge to evolution lessons or to coursework relating to world affairs, Def. Br. at 45, contests *secular* instruction, not the unyielding inculcation of (the State's approved version of) *religious* scripture. The latter directly implicates the core principles of the Free Exercise Clause. While students who object to "specific lessons, activities, or observances that cause them to violate their faith" may have the right to opt out of them*, Def. Br. at 45, students who object to the religious displays posted under the Act have no way to avoid them. The Act's minimum requirements make sure of that. In any event, Plaintiffs do not seek a change to any curriculum: The State's curriculum does not even mention the Ten Commandments, Pl. Br. at 23 & n.22, and the Act does not tie the displays to, or serve, any curricular function. *See Stone*, 449 U.S. at 42 (posting the Ten Commandments in every classroom "serves no . . . educational function").

In sum, the Act cannot be constitutionally implemented because its mandatory, permanent displays of the Ten Commandments in every classroom will "effectively induce [] schoolchildren to meditate upon the Commandments during the school-day." *See City of Elkhart v. Books*, 532 U.S. 1058, 1061 (2001) (Rehnquist, C.J., dissenting from denial of certiorari); *see also Van Orden*, 545 U.S. at 690–91 (plurality opinion). The Act provides no path for objectors to opt out, and the permanent, ubiquitous nature of the displays offers no relief from them. As a result, students will

---

[45] Challenges to the national motto also have a different character. *See* Def. Br. at 45. Courts have found that the motto, like the Pledge, is a form of ceremonial deism, holding that "its use is of a patriotic or ceremonial character and bears no true resemblance to a governmental sponsorship of a religious exercise." *Aronow v. United States*, 432 F.2d 242, 243 (9th Cir. 1970); *see also Lynch v. Donnelly*, 465 U.S. 668, 716 (1984) (Brennan, J., dissenting) ("I would suggest that such practices as the designation of 'In God We Trust' as our national motto, or the references to God contained in the Pledge of Allegiance can best be understood . . . as a form a "ceremonial deism," protected from Establishment Clause scrutiny chiefly because they have lost through rote repetition any significant religious content."). The same cannot be said for the Ten Commandments, an entire scriptural passage excerpted from the Bible.

be coercively indoctrinated in the State's favored religious beliefs and concomitantly pressured to suppress their own religious beliefs and practices at school. That is anathema to the "freedom of conscience and worship" that the Free Exercise Clause embraces. *See Lee*, 505 U.S. at 591; Pl. Br. at 20–22.

2.    *The Act is not religiously neutral, and Defendants have not met their burden under strict scrutiny.*

"[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened [their] sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Kennedy*, 597 U.S. at 525 (internal quotation marks omitted). Plaintiffs here have adequately pleaded and shown substantial burdens on their religious practice, *supra* pp. 2–3, 7–11, including but not limited to the coercive effect the Act's displays will have on the minor-Plaintiffs 'expression and practice at school, and the Act's interference with the parent-Plaintiffs' right to direct the religious education and upbringing of their children. *See Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) (affirming the right of parents "as contrasted with that of the State, to guide the religious future . . . of their children"). Further, Plaintiffs have demonstrated that the Act is not religiously neutral. This court should, therefore, "find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 597 U.S. at 525. Because Defendants fail to address either prong of this standard, they have waived any argument that they can overcome strict scrutiny.[46]

---

[46] *See, e.g.*, *Patton v. Air Prods. & Chems., Inc.*, No. CV 22-00392-BAJ-RLB, 2024 WL 131362, at *5 (M.D. La. Jan. 11, 2024) (noting that the "failure to brief an argument in the district court waives that argument in that court" (quoting *JMCB, LLC v. Bd. of Com. & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018)).

a.    <u>The Act and its mandatory displays are not religiously neutral.</u>

The Free Exercise Clause bars "even subtle departures from neutrality on matters of religion." *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 638 (2018) (internal quotation marks omitted). Factors relevant to the assessment of governmental neutrality include, among others, "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id.* at 639.

That the Act is not religiously neutral is evident from its text, notwithstanding Defendants' assertions otherwise. The lack of neutrality is two-fold: (1) The Act mandates the display of explicitly religious doctrine, and (2) the particular text of the religious doctrine prescribed by the Act is Protestant. *Supra* pp. 33–34, 40–42. Many individuals, including some of the Plaintiffs, do not adhere to a faith that incorporates the commandments into their religious or non-religious observance. *See* Green Rep. ¶ 49; Compl ¶¶ 126–29, 140–145. Further, choosing one version of the Ten Commandments has "substantial theological implications" among those who follow the Jewish, Catholic, and Protestant traditions. Green Rep. ¶ 52. Due to these doctrinal differences, "the version of the Ten Commandments adopted under H.B. 71 is Protestant and *not* nondenominational" and is "religiously exclusive in that it fails to include religions that do not accept the Ten Commandments." *Id.* ¶ 56. On its face, the Act does not satisfy the Free Exercise Clause's neutrality mandate.

The legislative history also evinces legislators' deviation from neutrality. The Act's primary author and sponsor, Rep. Dodie Horton, proclaimed that she is only "concerned with our children looking and seeing what God's law is." La. House Reg. Sess. (Apr. 10, 2024), at 47:42, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/apr/0410_24_24RS_D

ay16. Another legislator and co-author, Rep. Sylvia Taylor, echoed similar intent and singled out constituents who do not attend church: "I believe that we are lacking in direction. A lot of people, their children, are not attending churches or whatever . . . So what I'm saying is, we need to do something in the schools to bring people back to where they need to be." *Id.* at 15:15.

Attempting to evade what is obvious from the text of the Act itself and its legislative history, Defendants point to the identical text of the monument in *Van Orden*. Def. Br. at 46. But, in addition to the wildly different setting at issue in *Van Orden*, the government there did not mandate the creation of the display or select and approve its denominationally preferential text. Pl. Br. at 15 & n.17. Here, the State went out of its way to require public-school displays of the commandments and to select, vote on, and officially approve the specific text to be used, and is, therefore, not shielded from strict scrutiny.

b.    <u>The Act fails strict scrutiny.</u>

The impositions on Plaintiffs' religious beliefs and practices cannot be sustained under the Free Exercise Clause's strict-scrutiny standard. It is the government's burden to demonstrate that its attacks on Plaintiffs' "protected rights serve a compelling interest and are narrowly tailored to that end." *See Kennedy*, 597 U.S. at 532. Defendants have not done so. Their brief fails to discuss, or identify at all, any compelling interest.

In fact, there is no compelling governmental interest in subjecting students—for nearly every minute of the school day, year after year—to religiously preferential displays of scripture in order to show children "what God's law is." *Supra* p. 41. And even if any supposed interest in educating students regarding the Ten Commandments' purported role in American history were accepted as bona fide, BESE could simply update its own curricular standards, which currently omit any mention of the commandments, Pl. Br. at 23 & n.22, and address the commandments objectively through "an appropriate study of history, civilization, ethics, comparative religion, or

42

the like." *See Stone*, 449 U.S. at 42. Blanket posting of the Ten Commandments in every classroom lacks any tailoring to such an interest. Pl. Br. at 22–24.

**III.    THIS COURT SHOULD GRANT A PRELIMINARY INJUNCTION.**

Each preliminary-injunction factor weighs in Plaintiffs' favor. *See* Pl. Br. at 6–25. First, because Defendants' 12(b)(1) and 12(b)(6) arguments fail for the reasons discussed above, Plaintiffs are likely to succeed on the merits of their claims. Second, Plaintiffs will suffer irreparable injuries without an injunction. The "[l]oss of First Amendment freedoms . . . constitutes irreparable injury." *Ingebretsen*, 88 F.3d at 280; *accord*, *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012); *see also* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2948.1 (3d ed. 2022) (updated June 2024) ("When an alleged deprivation of a constitutional right is involved, such as the right to free speech or freedom of religion, most courts hold that no further showing of irreparable injury is necessary."). Both the parent-Plaintiffs and the minor-child Plaintiffs are highly likely to suffer a concrete invasion of their First Amendment rights if the Act is not enjoined. *Supra* pp. 7–16.

Third, "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church*, 697 F.3d at 298; *accord Ingebretsen*, 88 F.3d at 280. Defendants argue that the public interest weighs in the government's favor because an injunction will cause it to '"suffer[] the irreparable harm of denying the public interest in the enforcement of its laws." Def. Br. at 46 (quoting *E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021)). But that harm, if it exists, does not compare to the harm Plaintiffs would suffer from the egregious violation of one of this nation's and (Plaintiffs') most treasured fundamental rights. As the Fifth Circuit held in rejecting an identical argument by the State of Texas, "neither the State nor the public has any interest in enforcing a regulation that violates federal law" and "because Plaintiffs are likely to succeed on

43

the merits of their First Amendment claim, the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment." *Book People*, 91 F.4th at 341 (alterations omitted).

## IV. DEFENDANTS' STAY MOTION IS PREMATURE AND SHOULD BE DENIED.

In moving to stay, pending appeal, any future preliminary injunction issued by the Court, Defendants put the cart before the horse. There is nothing to stay pending appeal because this Court has not issued any ruling, and no appeal has been initiated. *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1241 (C.D. Cal. 2007) ("The Court agrees with Plaintiffs that [Defendant's] motion for a stay pending appeal pursuant to Rule 62(c) is premature. . . . Once the Court finalizes the terms of a permanent injunction, and an appeal is taken, [Defendant] can renew its request." (citing *Nikon, Inc. v. Ikon Corp.*, No. 89 Civ. 6044, 1992 WL 398440, at *3 (S.D.N.Y. Dec. 18, 1992))).[47] By filing their motion before any ruling has issued, Defendants improperly deny Plaintiffs the benefit of reviewing and relying on this Court's reasoning and ultimate decision in connection with any opposition that Plaintiffs may file to a stay motion, should they prevail on their preliminary-injunction motion.[48] The motion should be denied as premature, with leave to refile it, if appropriate and necessary, after the Court rules on the pending motion to dismiss and preliminary-injunction motion.

If this Court is inclined to consider Defendants' stay motion, Plaintiffs respectfully suggest that it must fail for the same reasons advanced in support of their preliminary-injunction motion. The standard for stay pending appeal overlaps substantially with the standard for a preliminary

---

[47] *See also, e.g.*, *Gregory v. Baucum*, No. 7:16-CV-00103-BP, 2018 WL 10096597, at *1 (N.D. Tex. Feb. 23, 2018) (denying motion to stay "[a]s there is no appeal currently pending"); *Electronic Frontier Found. v. Off. of Dir. of Nat'l Intel.*, No. C 08-01023 JSW, 2009 WL 3297195, at *1 (N.D. Cal. Oct. 13, 2009) ("As no appeal had yet been filed, the Court found that a motion to stay pending appeal pursuant to Federal Rule of Civil Procedure 62(c) would have been premature and was not properly before the Court.").

[48] The parties' agreement and this Court's Order as to scheduling and briefing did not contemplate that Defendants would file a preemptive motion to stay. *See* July 22, 2024, Order.

injunction.[49] If this Court grants Plaintiffs' preliminary-injunction motion, it will have found that Plaintiffs are likely to succeed on the merits and will suffer irreparable harm absent an injunction, and that an injunction is in the public interest. To obtain a stay, Defendants would need to show the opposite—a logical and legal impossibility. Where, as here, a preliminary injunction simply preserves the status quo pending a final determination on the merits, it would make little sense to *change* the status quo by staying the injunction and allowing the challenged law to take effect. "A stay is not a matter of right[.]" *Plaquemines Par. v. Chevron USA, Inc*., 84 F.4th 362, 373 (5th Cir. 2023). It is "extraordinary relief for which defendants bear a heavy burden." *Id.* (internal quotation marks omitted). Defendants have made no attempt to carry that burden here.

## CONCLUSION

For the reasons set forth above, this Court should issue the requested preliminary injunction, as outlined in Plaintiffs' Motion for Preliminary Injunction, and deny Defendants' Motion to Dismiss.

Date: August 26, 2024                    Respectfully submitted,

By: */s/  Charles Andrew Perry*
Charles Andrew Perry
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF LOUISIANA
Charles Andrew Perry
La. Bar No. 40906
PO Box 56157
New Orleans, LA 70156
(504) 522-0628
aperry@laaclu.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

---

[49] *See, e.g.*, *Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021) (per curiam) (noting that the analysis for a stay motion considers: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies").

Daniel Mach*
Heather L. Weaver*
915 15th Street, NW, Suite 600
Washington, DC 20005
(202) 675-2330
dmach@aclu.org
hweaver@aclu.org

AMERICANS UNITED FOR SEPARATION OF
CHURCH & STATE
Alex J. Luchenitser*
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
luchenitser@au.org

FREEDOM FROM RELIGION FOUNDATION
Patrick C. Elliott*
Samuel T. Grover*
PO Box 750
Madison, WI 53701
(608) 256-8900
Patrick@ffrf.org
sgrover@ffrf.org

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood*
Janet A. Gochman*
Nicholas J. Prendergast*
Jordan T. Krieger*
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
Nicholas.Prendergast@stblaw.com
Jordan.Krieger@stblaw.com

* Admitted *Pro Hac* Vice

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 26, 2024, I caused a true and correct copy of the foregoing Memorandum, the accompanying Declaration of Steven K. Green and the Exhibit thereto, and the accompany Declaration of Chloe L.M. Slater and the Exhibits thereto, to be served upon counsel of record as of this date by electronic filing.

*/s/ Charles Andrew Perry*
Charles Andrew Perry
