# EXHIBIT G-1

# Sunday Herald-Leader

# Context ■ Editorials ■ Business

## Section E

December 14, 1980

# Commandments ...
# Court ...
# Chaos

## The U.S. Supreme Court Has Ruled, But What Does That Ruling Mean?

By Andy Mead
Of The Herald Staff

Although he won't come right out and say it, the Rev. Tom Riner sounds much like someone who has just lost a battle and is about to win a war.

The battle, fought in the courts, was over posting copies of the Ten Commandments in Kentucky's public-school classrooms.

The war concerns the separation of church and state, an issue of growing significance throughout the country, and may be fought in the new, conservative-dominated Congress to be sworn in next month.

"There's going to be a showdown and it's going to be next year," said Riner, a Louisville minister and executive director of the Kentucky Heritage Foundation. "And it may be predicated on what's happening in Kentucky now."

What's happening now in Kentucky is that state officials have a U.S. Supreme Court decision and don't know what to do with it.

The decision, handed down last month by a court that split 5-4, said a 1978 state law requiring that copies of the Ten Commandments be posted in

every public-school classroom in the state is unconstitutional.

The legislation was introduced by Rep. Claudia Riner, a Louisville Democrat who is Riner's wife. It said the state must post copies of the commandments as private contributions to pay for them become available.

After the law passed, the Riners led a drive that has placed the commandments in 21,000 of the state's 30,-000 classrooms.

It's been a quarter-million-dollar venture, with most of the money coming from religious and civic groups and a fund-raising mail campaign that carried an endorsement from singer Pat Boone.

The Ten Commandments law was quickly challenged by five Louisville residents who claimed it violated constitutional guarantees of separation of church and state by favoring one religion over another.

Judge Squire Williams Jr. of Franklin Circuit Court was the first to hear the case. He said the law was constitutional.

The case moved to the Kentucky Supreme Court, which split 3-3 on the constitutionality question. That had

the effect of upholding Williams' decision.

The U.S. Supreme Court easily found a majority, deciding that the state law failed to pass even the first of three requirements it had established to test such church-state issues.

"It does not matter that the posted copies of the Ten Commandments are financed by voluntary private contributions, for the mere posting of the copies under the auspices of the legislature provides the 'official support of the State . . . Government that the Establishment Clause (of the Constitution) prohibits," the justices said.

News of the decision was spread across the country by newspapers and television networks and merited a page in Time magazine. It seemed like a pretty straightforward story: The court had said the commandments can't be placed in classrooms.

When the decision got back to Kentucky, however, it quickly became very muddy.

The Riners claimed the court had not banned copies of the commandments but rather had merely thrown out the Ten Commandments law.

They said they had been using another law — one that allows local school boards to accept gifts — to put the commandments in all but nine of the state's 120 counties. (Fayette is one of the counties that does not have the copies posted.) Since the court had not addressed that law, they said, the decision was meaningless.

"They struck down the law mandating that the commandments be put in, but they did not outlaw the Ten Commandments," Mrs. Riner said.

She admitted, however, that while the Ten Commandments law had not been used in the strict sense, having it on the books "helped open up some areas" and made school

boards more willing to accept the copies as gifts.

Louisville lawyer William Stone, who represented the people challenging the law, naturally saw things differently.

"There is no doubt in my mind that when the court declared the law unconstitutional, they declared the posting of the commandments unconstitutional," he said.

When it came down to officially deciding what to do with those 21,000 copies already posted, state Superintendent of Public Instruction Raymond Barber asked Attorney General Steve Beshear for advice.

While Beshear was considering

the question, the Riners swung into action with a mailing from the Kentucky Heritage Foundation, asking supporters to "pray that Attorney General Beshear will not issue an opinion to censor the Ten Commandments from our schools." They also asked that supporters write to Beshear or call the attorney general's toll-free Consumer Protection number.

The mailing noted that Beshear did not vote for the Ten Commandments bill when he was in the Legislature — he abstained — and said he might "misinterpret" the court's decision.

A stack of mail soon piled up in

(Turn to U.S. RULING, E-2)



THE TEN COMMANDMENTS

I am the Lord thy God

Thou shalt have
no other gods before me

Thou shalt not
make unto thee
any graven image

Thou shalt not
take the name of the Lord thy
God in vain

Remember the Sabbath day
to keep it holy

Honor thy father
and thy mother

Thou shalt not
kill

Thou shalt not
commit adultery

Thou shalt not
steal

Thou shalt not
bear false witness

Thou shalt not
covet

# U.S. Ruling Doesn't End Commandments Battle

## From Page E-1

Beshear's office, but Deputy Attorney General Robert Chenoweth said the issue was "a legal question, which isn't influenced by the number of cards and letters."

Then, late last month, Barber and Beshear held a joint press conference to announce that they could not decide what the court meant when it struck down the Ten Commandments law and would ask the court to clarify the question of what to do with the copies already posted.

That brought sharp comments from both sides of the case, with both Riner and Stone insisting that Beshear should have been able to see quite easily that each one's side was correct.

Beshear said he wanted to try for a clarification from the court because "this is such an emotional issue and, with the attorney general's opinions having no force in law, whatever we said is not going to satisfy anybody's mind."

The Department of Education officially asked the court last week to say specifically whether the commandments must come down from the walls. The issue is temporarily in limbo while everyone waits to learn if the court will say more.

No one really expects it will.

Each year, the court receives hundreds of requests for rehearings and grants only a few.

That means the interpretation probably will have to be made in Kentucky. Beshear has said that if the court declines to rehear and explain the case, his office will either issue an opinion or ask the Franklin Circuit Court for one.

Two University of Kentucky constitutional-law professors said last week that they doubted the justices would consider the state's questions in this matter because it was very clear what they meant in the first place.

"It's totally unlikely that the court would explain one of it's decisions," said professor Paul Oberst. "I think it would be expected (by the court) that if something is unconstitutional, it's unconstitutional. It is the Ten Commandments being on the walls that is unconstitutional. They (the justices) are saying they can't be there."

Professor Alvin Goldman agreed.

"The court usually avoids spelling out obvious remedies," he said. "It said that it is unconstitutional for the Ten Commandments to be posted.

The clear implication is that where they are posted, they shall be removed."

Since the court decision came down, the Riners have been preparing for the worst by laying plans for the "showdown" Riner says will come next year.

They began by going to Washington and interviewing Supreme Court clerks about their chances for a rehearing, Riner said. He won't divulge all he learned in those "off-the-record" conversations, but he does not sound optimistic.

He said a clerk to one of the justices in the majority against the commandments told him they handed down the decision because "their feeling is the court is going to change soon and this is their way of leaving their mark."

Riner then went to the office of Sen. Jesse Helms, the conservative North Carolina Republican, and began laying the groundwork for legislation that will end court bans on school prayer, Bible readings and the Ten Commandments.

He hopes to have copies of the commandments in every public-school classroom in the country someday.

"I think America is just completely fed up with having the Constitution misread as a document to prohibit any reference to God in public places," Riner said last week. "In this next Congress, we're going to see legislation covering much more than just prayer in schools (which Helms already supports)."

The Senate already has passed a bill that would not allow the federal bench to rule on some "voluntary" school prayer cases. Supporters of the measure hope a more conservative House of Representatives will join the Senate next year.

And regardless of what happens in the Supreme Court, Congress or the Kentucky attorney general's office, Riner says he believes few of those 21,000 copies of the Ten Commandments already posted will ever come down.

"We've had state representatives and coaches call us and say the National Guard isn't big enough to take them down," he said. "There is a feeling in the Christian community in this country that this (Ten Commandments case) plus that attorney general in Tennessee saying athletic teams can't pray before games may be the straw that broke the camel's back.

"There is a second great American Revolution taking place. This is one nation under God."