## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

REVEREND DARCY ROAKE and ADRIAN
VAN YOUNG**,** on behalf of themselves and on
behalf of their minor children, A.V. and S.V.,
et al.,

      Plaintiffs,

      v.

CADE BRUMLEY, in his official capacity as
the Louisiana State Superintendent of
Education, et al.,

      Defendants.

CIVIL ACTION NO.
3:24-cv-00517-JWD-SDJ

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PUTATIVE EXPERT TESTIMONY

## Table of Contents

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD ......................................................................................................... 2

ARGUMENT ...................................................................................................................... 4

    I.    Historians Employing Traditional Methods of Historical Analysis Are
        Frequently Admitted as Experts in Constitutional Litigation. ........................................ 4

    II.   Dr. Green's Report Is Reliable. ................................................................................. 8

    III.  Dr. Green's Expert Opinions Are Relevant. ............................................................. 13

        A.    Defendant's misstate *Kennedy*'s "original meaning and history" test. ............... 14

        B.    Dr. Green's testimony is directly relevant to *Kennedy*'s historical analysis. ....... 16

CONCLUSION .................................................................................................................. 19

## Table of Authorities

**Cases**

*Am. Legion v. Am. Humanist Ass'n*,
    588 U.S. 29 (2019) ................................................................................. 10

*Ashburn v. Mapes*,
    No. 4:02-cv-90447 (S.D. Iowa Sept. 4, 2002) ....................................... 12

*Baird v. Bonta*,
    2023 WL 9050959 (E.D. Cal. Dec. 28, 2023) .......................................... 5

*Brown v. Ill. Cent. R.R. Co.*,
    705 F.3d 531 (5th Cir. 2013) ................................................................... 8

*Burleson v. Tex. Dep't of Crim. Just.*,
    393 F.3d 577 (5th Cir. 2004) ................................................................... 8

*Carlson v. Bioremedi Therapeutic Sys., Inc.*,
    822 F.3d 194 (5th Cir. 2016) ................................................................... 3

*Chane v. District of Columbia*,
    No. 1:08-cv-01604-RJL (D.D.C. Sept. 18, 2008) ................................. 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ...................................................................... passim

*Den Norske Bank AS v. First Nat. Bank of Bos.*,
    75 F.3d 49 (1st Cir. 1996) ................................................................ 12, 13

*Dyson v. United States*,
    No. CV 20-1975, 2021 WL 917336 (E.D. La. Mar. 10, 2021) ................. 3

*Erie v. Hunter*,
    675 F. Supp. 3d 647 (M.D. La. 2023) ................................................... 16

*Fair Fight Action, Inc. v. Raffensperger*,
    634 F. Supp. 3d 1128 (N.D. Ga. Sept. 30, 2022) .................................... 5

*Friedman v. Bd. of County Comm'rs*,
    781 F.2d 777 (10th Cir. 1985) ................................................................ 4

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997) ................................................................................ 8

*Gibbs v. Gibbs*,
    210 F.3d 491 (5th Cir. 2020) ................................................................... 3

*Glassroth v. Moore*,
No. 2:01-cv-01268 (M.D. Ala. Oct. 23, 2002) ............................................................. 3

*Half Price Books, Recs., Mags., Inc. v. Barnesandnoble.com, LLC*,
No. CIV.A. 302CV2518-G, 2003 WL 23175432 (N.D. Tex. Aug. 15, 2003) ............................ 3

*Hilsenrath on behalf of C.H. v. Sch. Dist. of the Chathams*,
698 F. Supp. 3d 752 (D.N.J. 2023) ............................................................. 16

*Holbrook v. Lykes Bros. S.S. Co., Inc.*,
80 F.3d 777 (3d Cir. 1996) ............................................................. 13

*Hollis v. Lynch*,
827 F.3d 436 (5th Cir. 2016) ............................................................. 11

*Huss v. Gayden*,
571 F.3d 442 (5th Cir. 2009) ............................................................. 4

*Jenson v. Eveleth Taconite Co.*,
130 F.3d 1287, 1289 (8th Cir. 1997) ............................................................. 6

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ............................................................. passim

*Kudabeck v. Kroger Co.*,
338 F.3d 856 (8th Cir. 2003) ............................................................. 17

*Lozano v. Collier*,
98 F.4th 614 (5th Cir. 2024) ............................................................. 16

*Maddonna v. U.S. Dep't of Health & Hum. Servs.*,
No. 6:19-cv-3551-TMC (D.S.C. Dec. 20, 2019) ............................................................. 12

*Marvel Characters, Inc. v. Kirby*,
726 F.3d 119 (2d Cir. 2013) ............................................................. 7, 17

*Marsh v. Chambers*,
462 U.S. 783 (1983) ............................................................. 15

*Mathis v. Exxon Corp.*,
302 F.3d 448 (5th Cir. 2002) ............................................................. 16

*McCreary County v. ACLU of Kentucky*,
545 U.S. 844 (2005) ............................................................. 9

*Miller v. Smith*,
No. 22-1482, 2023 WL 334788 (7th Cir. Jan. 20, 2023) ...................................................... 13

*Moore v. Ashland Chem., Inc.*,
151 F.3d 269 (5th Cir. 1998) ............................................................................................. 8

*Narcisse v. All Ways Transportation, LLC*,
No. CV 22-387-JWD-RLB, 2023 WL 6544930 (M.D. La. Sept. 22, 2023) .......................... 4, 6

*New York State Rifle & Pistol Association. v. Bruen*,
597 U.S. 1 (2022) .............................................................................................................. 13

*Nipper v. Smith*,
39 F.3d 1494 (11th Cir. 1994) .......................................................................................... 4

*North Carolina v. Alcoa Power Generating*,
853 F.3d 140 (4th Cir. 2017) ............................................................................................ 4

*Null v. Wainwright*,
508 F.3d 340 (5th Cir. 1975) ............................................................................................ 13

*Palm Valley Health Care Inc. v. Azar*,
947 F.3d 321 (5th Cir. 2020) ............................................................................................ 3

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) ....................................................................................................... 14–16

*Sierra Club, Lone Star Chapter v. F.D.I.C.*,
992 F.2d 545 (5th Cir. 1993) ............................................................................................ 3

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
580 U.S. 405 (2017) .......................................................................................................... 9

*Stone v. Graham*,
449 U.S. 39 (1980) ........................................................................................................ 1, 18

*Town of Greece v. Galloway*,
572 U.S. 565 (2014) .......................................................................................................... 14

*Trunk v. City of San Diego*,
629 F.3d 1099 (9th Cir. 2011) .......................................................................................... 4

*Tuscaloosa v. Harcros Chemicals, Inc.*,
158 F.3d 548 (11th Cir. 1998) .......................................................................................... 17

iv

*United States v. Joseph*,
   542 F.3d 13 (2d Cir. 2008) ............................................................................... 6

*United States v. Kantengwa*,
   781 F.3d 545 (1st Cir. 2015) ............................................................................. 6

*United States v. Michigan*,
   471 F. Supp. 192 (W.D. Mich. May 7, 1979)................................................... 5

*United States v. Simmons*,
   470 F.3d 1115 (5th Cir. 2006) .......................................................................... 6

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981) .......................................................................................... 3

*Van Orden v. Perry*,
   No. A-01-CA-833-H, 2002 WL 32737462 (W.D. Tex. Oct. 2, 2002),
   *aff'd,* 351 F.3d 173 (5th Cir. 2003), *aff'd,* 545 U.S. 677 (2005) ............................ 10

*vonRosenberg v. Lawrence*,
   413 F. Supp. 3d 437 (D.S.C. 2019) ................................................................ 15

*Walz v. Tax Comm'n*,
   397 U.S. 664 (1970) ........................................................................................ 15

## Rules

Fed. R. Evid. 702 ...................................................................................... 2, 4, 6

## Statutes & Legislation

La. House Bill No. 71, Act 676 (2024) ................................................... passim

## Other Authorities

Jonathan D. Martin, *Historians At The Gate: Accommodating Expert
   Historical Testimony In Federal Court*, 78 N.Y.U. L. REV. 1518 (2003) ................................... 5

Oxford Univ. Press, https://www.ox.ac.uk/about/organisation/oxford-university-press
   .......................................................................................................................... 12

Steven K. Green, *The Fount of Everything Just and Right?
   The Ten Commandments As A Source of American Law*, 14 J.L. & Religion 525 (2000)........ 11

The Grand Collaboration: Thomas Jefferson, James Madison, and the Invention
   of American Religious Freedom, University of Virginia Press, Reviews,
   https://www.upress.virginia.edu/title/10018/ ............................................... 9

UVA Press, https://www.upress.virginia.edu/about/ .................................... 12

## INTRODUCTION

Dr. Steven K. Green is one the nation's foremost historians studying the intersection of law, religion, and history. He has specifically researched and written about the Ten Commandments in that context, and he has documented the role that religion has played in public schools. As Plaintiffs have explained in their briefing,[1] the outcome of this case is controlled by the Supreme Court's binding decision in *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam). The Court need look no further in its analysis. But should the Court go beyond *Stone* and assess Plaintiffs' claims under other First Amendment jurisprudence, few scholars are better-positioned or more qualified than Dr. Green to elucidate the pertinent historical facts and context that will help inform the Court's legal inquiry.[2]

Plaintiffs sought out Dr. Green to prepare an expert report because, as a historian with relevant expertise, he will aid the Court in sifting through the extensive relevant historical background. While Plaintiffs' briefs and evidence are sufficient on their own to substantiate their arguments under any applicable Establishment Clause or Free Exercise Clause standard, including the "original history and meaning" test discussed in *Kennedy v. Bremerton School District*, 597 U.S. 507, 535 (2022), the Court should admit Dr. Green's testimony because it clearly meets the threshold for admissibility under the governing evidentiary rules, which are relaxed for preliminary-injunction motions and proceedings in which a judge, rather than a jury, is the factfinder.

---

[1] *See* Mem. in Support of Plf. Mot. for Preliminary Injunction, ECF No. 20-1, at 1, 7-8; Plf. Combined Memo. of Law in Opp. to Def. Mot. to Dismiss & Mot. to Stay & Reply in Support of Plf. Mot. for Preliminary Injunction, ECF No. 47 (hereinafter, "Plf. MTD Opp., ECF No. 47"), at 1-2, 22-27.

[2] In accordance with Paragraph 4(a) of the Court's July 25, 2024, Order, ECF No. 37, Plaintiffs served Dr. Green's report on Defendants on August 13, 2024. Expert Rep. of Steven K. Green, J.D., Ph.D. (hereinafter, "Green Rep."), ECF No. 47-2. Defendants did not serve on Plaintiffs any opening expert report or rebuttal report.

Dr. Green's report is both reliable and relevant, and Defendants' arguments otherwise are unavailing. First, in characterizing Dr. Green's testimony as "unreliable," Defendants erroneously demand that he comply with the same methodologies as medical, scientific, and technical experts, rather than the prevailing practices of historians. They also misrepresent his scholarship in this area, and, despite having no evidence of actual bias, argue that his testimony should be excluded because of his employment over two decades ago by one of the organizations whose attorneys are representing Plaintiffs here.

Second, Defendants' claim that Dr. Green's report is irrelevant is premised on an incorrect interpretation of *Kennedy*'s historical-analysis requirement. It also runs counter to Defendants' frequent reliance on the history of the Ten Commandments, generally, and the commandments' alleged use in public schools, more specifically, to support their contention that the religious displays mandated by House Bill No. 71 ("H.B. 71"), Act No. 676 are constitutional.

Nothing in Defendants' motion justifies excluding Dr. Green's testimony. At most, even assuming Defendants' objections are valid, they would merely factor into the weight assigned to his expert opinions. Defendants' motion should be denied

## LEGAL STANDARD

Under the Federal Rules of Evidence, to submit expert testimony, a person must be qualified by their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The admission of expert testimony is governed by the criteria set forth in in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, which inquire whether (1) the testimony will help the finder of fact understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the principles and methods have been reliably applied to the facts of the case.

*See id.* at 591–94; *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016) (discussing the *Daubert* analysis).

However, at the preliminary-injunction phase, "the procedures in the district court are less formal" and a district court may even go so far as to "rely on otherwise inadmissible evidence[.]" *See Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993); *cf. Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (explaining that a "preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"). Accordingly, reliance on *Daubert* to exclude expert testimony tendered in connection with a preliminary-injunction motion "is misplaced." *See Half Price Books, Recs., Mags., Inc. v. Barnesandnoble.com, LLC*, No. CIV.A. 302CV2518-G, 2003 WL 23175432, at *1 (N.D. Tex. Aug. 15, 2003).

The Fifth Circuit has, moreover, recognized that "the procedural 'gatekeeping' aspects of *Daubert*, aimed as they are at preventing the jury from being tainted by unreliable evidence . . . do not fully translate to bench trials: in reaching a decision, a judge will only rely on evidence the judge deems reliable." *Palm Valley Health Care, Inc. v. Azar*, 947 F.3d 321, 329–30 (5th Cir. 2020). Because "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a judge sits as the trier of fact in place of a jury," *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000), "the safeguards of *Daubert* are relaxed" here with respect to Plaintiffs' expert report. *See Dyson v. United States*, No. CV 20-1975, 2021 WL 917336, at *2 (E.D. La. Mar. 10, 2021); *accord Null v. Wainwright*, 508 F.2d 340, 344 (5th Cir. 1975) ("Strict evidentiary rules of admissibility are generally relaxed in bench trials, as appellate courts assume that trial judges rely upon properly admitted and relevant evidence.").

**ARGUMENT**

Dr. Green's testimony is admissible under Federal Rule of Evidence 702, especially considering the relaxed evidentiary standards that apply to preliminary-injunctions motions and bench proceedings. As discussed below, Defendants' objections to Dr. Green's report are not valid, but even if any of their concerns were legitimate, they would merely affect the weight this Court should give the testimony in its analysis. *See, e.g.*, *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) ("'[M]ost arguments about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility" (quoting *Holbrook v. Lykes Bros. S.S. Co., Inc*., 80 F.3d 777, 782 (3d Cir.1996)); *Narcisse v. All Ways Transp., LLC*, No. CV 22-387-JWD-RLB, 2023 WL 6544930, at *2 (M.D. La. Sept. 22, 2023) ("Notwithstanding *Daubert*, the Court remains cognizant that the rejection of expert testimony is the exception and not the rule." (internal quotation marks omitted)).

I. **Historians Employing Traditional Methods of Historical Analysis Are Frequently Admitted as Experts in Constitutional Litigation.**

Courts have routinely admitted testimony by historians in litigation over constitutional issues, including Establishment Clause challenges, recognizing that the elucidation of complex social and historical issues by experts in the social sciences valuably informs the legal analysis. *See, e.g.*, *Trunk v. City of San Diego*, 629 F.3d 1099, 1119 (9th Cir. 2011) (noting expert testimony by historian in Establishment Clause case); *Friedman v. Bd. of County Comm'rs*, 781 F.2d 777, 779 (10th Cir. 1985) (discussing testimony by parties' expert historians in Establishment Clause challenge); *North Carolina v. Alcoa Power Generating*, 853 F.3d 140, 145 (4th Cir. 2017) (noting historians' testimony regarding North Carolina's navigable waterways at time of admission to the Union), *as amended* Apr. 18, 2017 & May 3, 2017; *Nipper v. Smith*, 39 F.3d 1494, 1500 n.8 (11th Cir. 1994) (pointing to expert report submitted by historian in voting-rights lawsuit); *see also, e.g.*,

4

Courtroom Deputy's Minutes of Proc. at 15, *Glassroth v. Moore*, No. 2:01-cv-01268 (M.D. Ala. Oct. 23, 2002), ECF No. 131 (admitting expert report in Establishment Clause challenge to Ten Commandments monument displayed in Alabama Supreme Court rotunda); *Baird v. Bonta*, No. 2:19-cv-00617-KJM-AC, 2023 WL 9050959, at *49–51 (E.D. Cal. Dec. 28, 2023) (Second Amendment); *United States v. Michigan*, 471 F. Supp. 192, 219 (W.D. Mich. May 7, 1979) (Supremacy Clause challenge to enforce Native American treaty rights); *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1174 (N.D. Ga. Sept. 30, 2022) (voter protections under the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution).

Indeed, "[h]istorians are increasingly being called to testify as expert witnesses" across a "vast array of matters." Jonathan D. Martin, Note, *Historians At The Gate: Accommodating Expert Historical Testimony In Federal Court*, 78 N.Y.U. L. Rev. 1518, 1519 (2003). "They appear in cases adjudicating . . . Native American rights, gay rights, voting rights, water rights, border disputes, trademark disputes, gender discrimination, employment discrimination, establishment clause violations, toxic tort and product liability, tobacco litigation, and the deportation of alleged Holocaust participants, among others." *Id.* at 1519–20 (citations and footnotes omitted). Admitting testimony by Dr. Green—an award-winning, tenured professor with a lengthy list of publications in this area—would fall squarely within this common judicial practice.

Defendants assert that Dr. Green's testimony is "unreliable" because he "offers no independent validation of his methodology." Defs.' Suppl. Br. Regarding Expert Report & Mot. to Exclude Putative Expert Testimony, ECF No. 53-1 (hereinafter, "Def. Mot., ECF No. 53-1"), at 2. But they do not describe any "external standards" for historical analysis that Dr. Green should have supposedly employed; nor do they cite a single case excluding historical expert testimony on

the basis of inadequate methodology.  That is because the law is clear: There is no "one-size-fits-all" approach when it comes to evaluating methodology among different disciplines.[3]

In fact, just last year, this Court aptly noted that "[t]he Supreme Court has recognized that not all expert opinion testimony can be measured by the same exact standard." *Narcisse*, 2023 WL 6544930, at *2. "Because there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies, trial judges are given broad discretion to determine whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case." *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (internal quotation marks and citations omitted); *see also United States v. Joseph*, 542 F.3d 13, 21 (2d Cir. 2008) ("Social science 'research, theories and opinions cannot have the exactness of hard science methodologies[.]'") (quoting *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1289 (8th Cir. 1997)). Courts have thus found that acceptable historical methodology includes, for example, "gathering multiple sources . . . including original and secondary sources," to reach conclusions about historical facts. *See United States v. Kantengwa*, 781 F.3d 545, 562 (1st Cir. 2015) (internal citation and quotation marks omitted) (affirming district court's admission of historical expert's testimony relating to the use of roadblocks during the Rwandan genocide based on approximately two dozen interviews and the work of collaborators on a book project); *see also vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 451 (D.S.C. 2019) ("By reviewing historical documents and applying his experience, . . . [plaintiff's expert] used the common tools of a historian.").

---

[3] *See* Fed. R. Evid. 702, Advisory Comm. Notes to 1972 Proposed Rule 702 ("The rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the 'scientific' and 'technical' but extend to all 'specialized' knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by 'knowledge, skill, experience, training or education.' Thus within the scope of the rule are not only experts in the strictest sense of the word, *e.g.*, physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values.").

Far from "offer[ing] only his *ipse dixit* when it comes to historical method," Def. Mot., ECF No. 53-1, at 3, Dr. Green "relied on standard and well-accepted methodologies used by historians." Green Rep. ¶ 7. Specifically, he gathered and reviewed "both primary and secondary sources" and analyzed "how reliable the source is, and how consistent it is with other evidence" to inform his conclusions. *Id.* He "considered the conditions under which each source originated," including "where the source was produced, by whom it was produced, when it was produced, and the circumstances at the time it was produced." *Id.* Further, he "considered how the plain language of the source would have been interpreted at the time of its writing, and [he] avoided applying modern interpretations to documents that were centuries old." *Id.*

For secondary sources, Dr. Green examined "the perspective of the authors, the information available to them, and any motivations they may have had to distort their interpretations in any way." *Id.* ¶ 9. He was "careful not to select only those sources that supported [his] opinion" and "dealt with all sources on the basis of their reliability and validity." *Id.* ¶ 8. These methods are "consistent with the methodology ordinarily expected of historians" and "provide[d] a basis for a reliable narrative about the past." *Id.* ¶ 10. Defendants can offer no evidence that Dr. Green's described methodology departs from accepted standards among historians because his approach is entirely consistent with that of other historians whose expert testimony has been admitted based on specialized knowledge that enables them to "identify, gauge the reliability of, and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (noting that historians "might helpfully synthesize dense or voluminous historical texts" or "offer background knowledge or context that illuminates or places in perspective past events").

Defendants wrongly attempt to impose on Dr. Green's methodology a rigid standard that applies to cases involving highly technical or scientific issues. None of their citations are apposite here. *See* Def. Mot., ECF No. 53-1, at 2–3. *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 534 (5th Cir. 2013), dealt with expert testimony proffered by an engineer who opined on the specific technical question of whether a particular railroad crossing was "ultrahazardous" so as to trigger a duty to install signaling devices. *General Electric Co. v. Joiner*, 522 U.S. 136, 146, (1997), *Moore v. Ashland Chemical, Inc*., 151 F.3d 269, 273 (5th Cir. 1998), and *Burleson v. Texas Department of Criminal Justice*, 393 F.3d 577, 587 (5th Cir. 2004), evaluated the reliability of medical experts' testimony regarding the causal link between chemical exposure and illness. From these cases, Defendants improperly read into *Daubert* a requirement that *all* experts, regardless of discipline or factual scenario, must rely upon and detail "externally validated methods" specifically applicable in science and engineering. Def. Mot., ECF No. 53-1, at 2–3. But Defendants fail to explain how the rigorous application of the trial court's gatekeeping function to exclude unreliable technical expert opinion testimony in these jury-trial cases militates against Dr. Green offering his opinion as an expert on historical matters here.

## II. Dr. Green's Report Is Reliable.

Defendants do not seriously contend that Dr. Green lacks the qualifications necessary to credibly opine on the issues addressed in his expert report. Nor could they. Dr. Green is one of the nation's foremost historians studying "the intersection of law, religion, and history," as well as "the role of the development and operation of public schooling in the United States." *See* Green Rep. ¶¶ 2–4.[4] He has authored "seven books and more than fifty scholarly articles and book chapters in

---

[4] Jack N. Rakove, winner of the Pulitzer Prize in history and Coe Professor of History and American Studies and Professor of Political Science, Emeritus at Stanford University, has stated in response to Dr. Green's recently released book on Thomas Jefferson and James Madison: "Green is one of the leading historians of the development of the

the area." *Id.* ¶¶ 2–3 & Ex. A. And his numerous other educational and professional positions, associations, and work further demonstrate both the breadth and depth of his study and expertise. *Id.* ¶ 1 & Ex. A.

As Defendants note, Def. Mot., ECF No. 53-1, at 5, Dr. Green also has penned or collaborated on a number of Supreme Court amicus briefs in his capacity as a historian and legal scholar—the most relevant to this case being his authorship of an amicus brief in *McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005). Green Rep. ¶ 3. His involvement in these matters as amicus is yet another indicator of his deep knowledge in this area and the respect his work has commanded from his peers, notwithstanding Defendants' effort to mischaracterize his opinions as somehow unreliable because, purportedly, "the Supreme Court ruled against the understanding of the First Amendment and the related history Green advocated." Def. Mot., ECF No. 53-1, at 5.

Putting aside that the *McCreary* Court ruled in favor of the respondents, whom Dr. Green's amicus brief supported, Defendants completely misapprehend the role played by amici. Amici are not parties to a case. *See generally* 4 Am. Jur. 2d Amicus Curiae § 1. A variety of factors may affect the consideration and weight accorded by the Supreme Court to particular amicus briefs. *See, e.g.*, *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 408 (2017) (rejecting amicus argument because "[w]e generally do not entertain arguments that were not raised below and that are not advanced in this Court by any party"). The Court's rulings in these cases, therefore, say nothing about the reliability of Dr. Green's historical opinions, and they certainly are not a basis for excluding Dr. Green's testimony here. Tellingly, Defendants do not cite a single case to support this tortured argument.

---

ideas, doctrines, and practices of American religious freedom. I cannot think of another scholar who has contributed as much to the subject[.]" The Grand Collaboration: Thomas Jefferson, James Madison, and the Invention of American Religious Freedom, UVA Press, Reviews, https://www.upress.virginia.edu/title/10018/ (last visited Sept. 5, 2024).

Defendants further assert that Dr. Green's *entire* report is "*ipso facto* unreliable" based on one section that analyzes the role of the Ten Commandments at the Founding. Def. Mot., ECF No. 53-1, at 4. But Dr. Green's analysis and recounting of history on this point have substantial probative value, setting forth persuasive evidence that "[t]here is no historical basis for singling out the Ten Commandments as *seminal* in the foundation of American law and government." Green Rep. ¶ 33 (emphasis added). H.B. 71's focus on the Ten Commandments is plainly premised on the State's historically inaccurate stance that the commandments played an outsized role in the formation of American government and law, with the State even going so far as to use a fake quote from James Madison. *See id.* ¶ 32 (explaining that the Act's Madison "quotation is a hoax," that "[t]here is no evidence in the historical record that Madison ever uttered or wrote those words," and that the fictious statement would have "directly conflicted with Madison's other writings and actions, which vigorously advocated for the separation of church and state"). Thus, even if this Court credits the Supreme Court's assertion in *American Legion* that the commandments "have historical significance as one of the foundations of our legal system[,]"[5] the thrust of Dr. Green's point still stands.

---

[5] *See Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 53 (2019). The Supreme Court's remark in *American Legion* was not a "holding," as Defendants state. Def. Mot., ECF No. 53-1, at 4. At best, it is dicta and was not based on any evidentiary record because *American Legion* involved a challenge to the government's display of a nearly century-old Latin Cross war memorial, *not the Ten Commandments*. *American Legion* cites to the plurality opinion in *Van Orden*, where the Court notes the commandments' role in America's "heritage," but the plurality does not assert that the Ten Commandments are a foundation of the U.S. legal system. *See, e.g.*, *Van Orden v. Perry*, 545 U.S. 677, 712 (2005) (Stevens, J., dissenting) ("Though this Court has subscribed to the view that the Ten Commandments influenced the development of Western legal thought, it has not officially endorsed the far more specific claim that the Ten Commandments played a significant role in the development of our Nation's foundational documents . . . Although it is perhaps an overstatement to characterize this latter proposition as 'idiotic' as one Member of the *plurality* has done, at the very least the question is a matter of intense scholarly debate.") (internal citation omitted). The Fifth Circuit's assessment in *Van Orden*, Def. Mot., ECF No. 53-1, at 4, was likewise dicta. As the district court explained, it "found no reference to the influence of the Ten Commandments on secular law" in the state proceedings relating to the challenged monument. *Van Orden v. Perry*, No. A-01-CA-833-H, 2002 WL 32737462, at *4 (W.D. Tex. Oct. 2, 2002), *aff'd*, 351 F.3d 173 (5th Cir. 2003), *aff'd*, 545 U.S. 677 (2005). Accordingly, this Court need not defer to either statement. *See Hollis v. Lynch*, 827 F.3d 436, 448 (5th Cir. 2016) (although the court is "generally bound by Supreme Court dicta . . . it is appropriate to undertake an independent inquiry" in response to such dicta).

Dr. Green's conclusion that "[t]here is no historical basis for singling out the Ten Commandments as seminal in the foundation of American law and government," Green Rep. ¶ 33, tracks with his prior writings. Defendants' attempt to manufacture a supposed contradiction is based on cherry-picked, incomplete quotations of his work. *See* Def. Mot., ECF No. 53-1, at 5–6. Dr. Green has acknowledged that "the Ten Commandments—*and its parallels from other ancient cultures—as well as other directives contained in the Pentateuch of the Hebrew and Christian Scriptures*, inform our notions of right and wrong and, as such, have influenced the development of Western law of which the American legal system is part." Steven K. Green, *The Fount of Everything Just and Right? The Ten Commandments As A Source of American Law*, 14 J.L. & Religion 525 (2000) (emphasis added). Defendants misleadingly omit the italicized text in their motion.

Defendants also ignore his analysis that follows, which specifically refutes any claims of "a much closer relationship between the Ten Commandments and American law." *Id.* at 526. Noting that the commandments' role "as a central source of law is generally assumed," Dr. Green explains that "[t]he historical record fails to support claims of a direct relationship." *Id.* at 529, 558. Rather, "[a]bsent the failed experiment in seventeenth century Massachusetts and the other Puritan colonies, American law has generally been viewed as having a secular origin and function." *Id.* at 558. In sum, he writes, "the most that could be said about the relationship of the Ten Commandments to the law is that the former has influenced legal notions of right and wrong . . . [b]ut to insist on a closer relationship or to hold the Ten Commandments up as having a special place in the development of American law lacks historical support." *Id.*

Finally, Defendants argue that Dr. Green's opinions are unreliable because his employment—more than two decades ago—with Americans United for Separation of Church

State, whose attorneys are among those representing Plaintiffs in this case, indicates "potential bias." Def. Mot., ECF No. 53-1, at 6.[6] Defendants do not, however, point to any evidence of actual bias in Dr. Green's report. Indeed, Dr. Green's opinions are based on over twenty years of academic and historical research, study, and writing—the results of which have been published by various renowned academic journals and publishers, including the Oxford University Press and the University of Virginia Press, which presumably seek to avoid placing their stamp of approval on one-sided or misrepresentative work.[7] Moreover, as Defendants concede, Def. Mot., ECF No. 53-1, at 6, courts have not only permitted *former employees of a party* to testify as experts, but they have permitted *current employees of a party* to do so as well. *See, e.g.*, *Den Norske Bank AS v. First Nat. Bank of Bos.*, 75 F.3d 49, 58 (1st Cir. 1996) (admitting expert affidavits of plaintiff company's current and former vice presidents).

In any event, Defendants' allegation of "potential" bias would go, at most, to the weight of the evidence; it does not justify the wholesale exclusion of Dr. Green's opinions from this case. *See id.* ("[W]e are not persuaded that First National has demonstrated that the expert qualifications of these affiants are undermined by their present and former association with Den norske so as to

---

[6] Plaintiffs are unclear to what end Defendants accuse Americans United of being an anti-Catholic organization. Def. Mot., ECF No. 53-1, at 6 n.2. To the extent that Defendants intend to tarnish the reputation of Plaintiffs' counsel, they are unsuccessful. Americans United represents clients of all faiths and has represented Catholics on many occasions. *See, e.g.*, Compl. at 3, *Maddonna v. U.S. Dep't of Health & Hum. Servs.*, No. 6:19-cv-3551-TMC (D.S.C. Dec. 20, 2019), ECF No. 1; Compl. at 3, *Chane v. District of Columbia*, No. 1:08-cv-01604-RJL, (D.D.C. Sept. 18, 2008), ECF No. 1; Second Amended Compl. ¶ 12c, *Ashburn v. Mapes*, No. 4:02-cv-90447 (S.D. Iowa Sept. 4, 2002), ECF No. 1. Further, as Defendants are well-aware, Plaintiffs here argue that the State's adoption of a Protestant version of the Ten Commandments discriminates against Catholics, Jews, and many others. Compl., ECF No. 1, ¶¶ 56–67. To the extent that Defendants' accusation is intended to discredit Dr. Green by falsely implying that he is anti-Catholic because of his prior association with Americans United, the suggestion is nothing more than a baseless ad hominem attack that is beneath the dignity of Defendants and this Court, and thus requires no response from Plaintiffs.

[7] *See* Oxford Univ. Press, https://www.ox.ac.uk/about/organisation/oxford-university-press (last visited Sept. 5, 2024) ("The main criteria when evaluating a new title for publication are its quality and whether it supports the aims of furthering education and disseminating knowledge."); About UVA Press, https://www.upress.virginia.edu/about/ (last visited Sept. 5, 2024) (noting its mission to publish scholarship "that contributes to the progress of research and learning" and is "aimed at bringing the findings of a discipline to the well-educated reading public").

render their testimony *inadmissible*. Of course, such matters may bear heavily on witness credibility, bias, and the weight of the evidence. But these are matters for the factfinder.").

## III.    <u>Dr. Green's Expert Opinions Are Relevant.</u>

Defendants argue (incorrectly) that the historical standard identified in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), is a narrow inquiry confined to six hallmarks of establishment discussed in a concurring opinion in an entirely different case. Def. Mot., ECF No. 53-1, at 7–8. They have further contended (also incorrectly) that Plaintiffs bear the evidentiary burden under *Kennedy*'s historical test.[8] Finally, despite repeatedly relying on the purported history of the Ten Commandments in public schools to support their arguments that the Act is constitutional, *infra* p. 18, they move to exclude Dr. Green's testimony as irrelevant, proclaiming that "historical experts are simply beside the point under modern Establishment Clause analysis." Def. Mot., ECF No. 53-1, at 8.[9]  Defendants cannot have their cake and eat it too. Dr. Green's testimony is plainly relevant to Plaintiffs' claims and will be helpful to this Court in adjudicating them.

### A.    <u>Defendants misstate *Kennedy*'s "original meaning and history" test.</u>

Defendants' relevance arguments are premised on their erroneous interpretation of *Kennedy*. Def. Mot., ECF No. 53-1, at 6–7.[10] Their attempt to reduce the Court's "original meaning and history" standard to the six hallmarks of establishment discussed by Justice Gorsuch's

---

[8] Def. Mem. of Law in Support of Defs. Consolidated Mot. to Dismiss, Opp. to Plf. Mot. for Preliminary Injunction, and Alternative Mot. for Stay Pending Appeal, ECF No.39-1 (hereinafter, "Def. MTD, ECF No. 39-1"), at 23 n.3.

[9] *New York State Rifle & Pistol Association. v. Bruen*, 597 U.S. 1 (2022), Def. Mot., ECF No. 53-1, at 7, does not preclude or discourage expert testimony to aid in a court's historical analysis. *See generally id.*; *see also, e.g.*, *Miller v. Smith*, No. 22-1482, 2023 WL 334788, at *1 (7th Cir. Jan. 20, 2023) (remanding case and instructing the district court to "allow the parties to engage in further discovery, including seeking additional expert reports" and "then evaluate any subsequent motions under *Bruen*'s text, history, and tradition framework"). To the extent Defendants suggest otherwise, they are wrong.

[10] *See also* Def. MTD, ECF No. 39-1, at 22–23; Def. Reply in Support of Mot. to Dismiss and Alternative Mot. to Stay Pending Appeal, ECF No. 54 (hereinafter, "Def. Reply, ECF No. 54"), at 13–14.

concurring opinion in *Shurtleff v. City of Boston*, 596 U.S. 243, 285 (2022), is not supported by *Kennedy* or the *Shurtleff* concurrence itself.

While Justice Gorusch's *Shurtleff* opinion may be useful with respect to assessing the validity of certain challenged practices under the Establishment Clause, it does not purport to set forth the entire universe of permitted or prohibited practices. Rather, the opinion identifies "*some* helpful hallmarks [of establishment] that localities and lower courts can rely on." *Id.* at 285 (Gorsuch, J., concurring in the judgment) (emphasis added). Justice Gorsuch notes that, "[b]eyond a formal declaration that a religious denomination was in fact the established church, founding-era religious establishments *often* bore certain other telling traits" that "explain *many* of th[e] Court's Establishment Clause cases. *Id.* at 286 (emphasis added). He does not contend, however, that the six "hallmarks" discussed in his opinion are an exhaustive or definitive list.

Nor does *Kennedy*'s majority opinion, even though it was penned by Justice Gorsuch, mandate Defendants' reductive reading of the "original meaning and history" inquiry.  Reaffirming the standard previously set out in *Town of Greece*, the *Kennedy* Court explained that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" 507 U.S. at 535 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014). The Court further instructed that "'[t]he line' that courts and governments 'must draw between the permissible and the impermissible' has to 'accor[d] with history and faithfully reflec[t] the understanding of the Founding Fathers.'" *Id.* at 535–36 (quoting *Town of Greece*, 572 U.S. at 577 (alterations in original)).[11]

*Town of Greece* illustrates how this "historical practices and understandings" standard operates. There, the Court looked to whether the "specific practice" at issue accorded with history

---

[11] *See also* Plf. MTD Opp., ECF No. 47, at 28–29.

and reflected the Founders' understanding. 572 U.S. at 577. The Court held that the challenged legislative invocations were constitutional because there was an '"unambiguous and unbroken history of more than 200 years . . . of opening legislative sessions with a prayer[,]"' which dates back to the First Congress and '"has become part of the fabric of our society."' *Id.* at 576 (quoting *Marsh v. Chambers*, 462 U.S. 783, 792 (1983)). In other words, the practice "was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Id.*; *see also Walz v. Tax Comm'n*, 397 U.S. 664, 677 (1970) (recognizing that "Congress, from its earliest days, has viewed the Religion Clauses of the Constitution as authorizing statutory real estate tax exemption to religious bodies" and holding that "[n]othing in this national attitude toward religious tolerance and two centuries of uninterrupted freedom from taxation has given the remotest sign of leading to an established church or religion and on the contrary it has operated affirmatively to help guarantee the free exercise of all forms of religious belief") (cited in *Kennedy*, 597 U.S. at 536); *Shurtleff*, 596 U.S. at 281 (Gorusch, J., concurring in the judgment ) ("Often, we have looked to early and long-continued historical practices as evidence of the Constitution's meaning at the time of its adoption."). As the Court recognized in *Town of Greece*, "sweep[ing] away what has so long been settled would create new controversy and begin anew the very divisions along religious lines that the Establishment Clause seeks to prevent." 572 U.S. at 577.

Defendants' insistence that the *Kennedy* Court's footnoted citation to Justice Gorsuch's *Shurtleff* concurrence somehow transforms and elevates his "hallmarks" passage—itself a non-exclusive treatment of *some* traits of religious establishment—into a binding, hard-and-fast checklist would effectively negate the Court's discussion of the "historical practices and understandings" analysis in *Kennedy* and *Town of Greece*. *See* Plf. MTD Opp., ECF No. 47, at 28–29. Instead, the citations in the footnote at the center of Defendants' extraordinary reimagining of

*Kennedy*'s historical test merely support the majority's unremarkable observation that some forms of coercion were "*among* the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." 597 U.S. at 537 & n.5 (emphasis added).[12] Even the Court's short parenthetical explaining Justice Gorsuch's *Shurtleff* opinion makes clear that his treatment of this issue is not exhaustive, noting that he discusses "coercion and *certain other* historical hallmarks of an established religion." *See Kennedy*, 597 U.S. at 537 n.5 (emphasis added).

**B.    Dr. Green's testimony is directly relevant to *Kennedy*'s historical analysis.**

Expert evidence is relevant and properly admitted if it has "'any tendency to make any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Mathis v. Exxon Corp*., 302 F.3d 448, 460 (5th Cir. 2002) (quoting Fed. R. Evid. 401). Dr. Green's testimony meets this standard and is unquestionably "pertinent" to the analysis under *Kennedy*. *See* Def. Mot., ECF No. 7. It will help the Court draw the line "between the permissible and the impermissible" by elucidating historical facts that illuminate whether the challenged practice "accor[ds] with history and faithfully reflec[ts] the understanding of the Founding Fathers."  *See Kennedy*, 507 U.S. at 535–36 (internal quotation marks omitted).[13]

---

[12] The same is true for the Fifth Circuit's ruling in *Lozano v. Collier*, 98 F.4th 614, 628 (5th Cir. 2024) (per curiam), and this Court's decision in *Erie v. Hunter*, 675 F. Supp. 3d 647, 657–58 (M.D. La. 2023). Defendants have misleadingly suggested that these cases were decided "with reference to" the *Shurtleff* hallmarks. Def. Reply, ECF No. 54, at 14. *Lozano* does not even cite Justice Gorsuch's *Shurtleff* discussion or *Kennedy*'s footnote reference to it. And, like *Kennedy*, *Erie* merely recognizes that religious coercion is a "historical hallmark" of unconstitutional establishment. 675 F. Supp. 3d at 657. *Hilsenrath on behalf of C.H. v. Sch. Dist. of the Chathams*, 698 F. Supp. 3d 752 (D.N.J. 2023), Def. Reply, ECF No. 54, at 13-14, is in error, and is on appeal (No. 23-3030, 3d Cir., Nov. 13, 2023).

[13] Dr. Green's opinions are also relevant to Plaintiffs' claims that the Act adopts and prescribes a religiously preferential version of the Ten Commandments, Green Rep. ¶¶ 49–56, and that displays posted in accordance with the Act will result in unconstitutional coercion of the minor-Plaintiffs, *id.* ¶¶ 20–21.

In so doing, Dr. Green provides significant assistance to this Court. As discussed above, a historian's expert testimony aids a court where, among other uses, it "help[s] to identify, gauge the reliability of, and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson[,] . . . synthesize[s] dense or voluminous historical texts[,] . . . [or] offer[s] background knowledge or context that illuminates or places in perspective past events." *Marvel Characters*, 726 F.3d at 135–36 (internal citations omitted); *see also Kudabeck v. Kroger Co.*, 338 F.3d 856, 860 (8th Cir. 2003) ("Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact."). By bringing to bear his extensive expertise in this area, Dr. Green's report fulfills this role.

For example, Dr. Green's report discusses key historical events and writings that shed light on the purposes of core principles animating the Founders' understanding of the First Amendment. Green Rep. ¶¶ 12–21. It clarifies the role played by the Ten Commandments in foundational documents and analyzes and synthesizes these voluminous historical texts in a helpful manner. *Id.* ¶¶ 22–33. Dr. Green identifies inaccurate information propagated by the Act, including its false Madison quotation, that could otherwise mislead the Court. *Id.* ¶ 32. And he provides background knowledge and context regarding the textbooks on which the Act and Defendants heavily rely, in addition to exploring the historical record relating to the use of the Ten Commandments in public education and the specific practice at issue here—displays of the Ten Commandments in public schools. *Id.* ¶¶ 34–38.[14]

---

[14] Defendants' claim that Dr. Green improperly characterizes the historical evidence is without merit, and their reliance on *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548 (11th Cir. 1998), is misplaced. Def. Mot., ECF No. 53-1, at 12. There, the proffered testimony was "outside" the expert's "competence as a statistician" and offered legal conclusions regarding collusion and the "existence of a conspiracy." *Id.* at 565. Even recognizing that such testimony was properly excluded, the court of appeals held that the district court had erred in excluding the expert's testimony in its entirety. *Id.* at 567. By contrast, Dr. Green's testimony here is well within his expertise and does not opine on ultimate legal conclusions.

Confronted with Dr. Green's well-supported expert opinions on each of these issues, which they did not even attempt to rebut through their own expert, Defendants now assert that the "longstanding prominent role of the Ten Commandments in American classrooms is of great educational relevance . . . but here what is educationally relevant is not legally relevant." Def. Mot., ECF No. 53-1, at 7; *see also id.* (contending that "[w]hether Ten Commandments displays existed in public or private schools in prior centuries, or whether the Ten Commandments were taught in public or private schools," are not "facts at issue" under the historical analysis). Their briefing in this case tells another story.

Defendants repeatedly rely on the historical significance of the Ten Commandments, especially their purported use in public schools:

- "H.B. 71 is independently constitutional given the history of Ten Commandments in public education." Def. MTD, ECF No. 39-1 at 36.

- "[I]t bears noting that H.B 71 is especially constitutional given the historical role of the Ten Commandments not only in America, but also in American public education." *Id.*

- "This historical backdrop alone justifies H.B. 71 displays; however, there is even more historical justification here. As H.B. 71 explains, the Ten Commandments were featured in textbooks widely used before and after the advent of public schools." *Id.*

- "[S]chools today act comfortably within historical norms when they take one aspect of the religious material long presented in schools . . . and display it passively and with context . . . as an aspect of legal, civic, and educational history." *Id.* at 38.

- "Whereas the *Stone* display contained a single-sentence notation untethered to the public-school context, *id.*, H.B 71 requires that each "display include a three-paragraph context statement regarding 'The History of the Ten Commandments in American Public Education' to explain Louisiana's historical and educational purposes for enacting the law." Def. Reply, ECF No. 54, at 12.

- "[T]here is a tradition long followed of religious content in public schools, stretching back to their advent. That history includes—specifically—the Ten Commandments, which 'were a prominent part of American public education for almost three centuries.' *Id.* at 15 (quoting H.B. 71 (B)(3); internal citation omitted).

Given Defendants' own arguments, they cannot credibly maintain now that Dr. Green's report addressing these topics is irrelevant or unhelpful.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that this Court deny Defendants' motion to exclude Dr. Green's testimony.

Date: September 6, 2024

Respectfully submitted,

By: */s/ Charles Andrew Perry*
Charles Andrew Perry
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF LOUISIANA
Charles Andrew Perry
La. Bar No. 40906
PO Box 56157
New Orleans, LA 70156
(504) 522-0628
aperry@laaclu.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Daniel Mach*
Heather L. Weaver*
915 15th Street, NW, Suite 600
Washington, DC 20005
(202) 675-2330
dmach@aclu.org
hweaver@aclu.org

AMERICANS UNITED FOR SEPARATION OF
CHURCH & STATE
Alex J. Luchenitser*
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
luchenitser@au.org

FREEDOM FROM RELIGION FOUNDATION
Patrick C. Elliott*
Samuel T. Grover*
PO Box 750
Madison, WI 53701
(608) 256-8900

Patrick@ffrf.org
sgrover@ffrf.org

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood*
Janet A. Gochman*
Nicholas J. Prendergast*
Jordan T. Krieger*
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
Nicholas.Prendergast@stblaw.com
Jordan.Krieger@stblaw.com

* Admitted *Pro Hac* Vice

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2024, I caused a true and correct copy of the foregoing

Memorandum to be served upon counsel of record on this date by electronic filing.


*/s/ Charles Andrew Perry*
Charles Andrew Perry