# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

REVEREND DARCY ROAKE and ADRIAN VAN YOUNG, on behalf of themselves and on behalf of their minor children, A.V. and S.V., et al.,

      Plaintiffs,

      v.

CADE BRUMLEY, in his official capacity as the Louisiana State Superintendent of Education, et al.,

      Defendants.

CIVIL ACTION NO.
3:24-cv-00517-JWD-SDJ

## EXPERT REPORT OF STEVEN K. GREEN, J.D., Ph.D.

## I.    Qualifications of Expert

    1.    I am the Fred H. Paulus Professor of Law and Affiliated Professor of Religious Studies and History at Willamette University in Salem, Oregon.[1] In the College of Law (my primary appointment), I teach courses in Constitutional Law, First Amendment Law, Education Law, Legal History, and Jurisprudence (legal philosophy). In the College of Arts and Sciences, I occasionally teach courses in Constitutional History and American Religious History. In addition to holding a J.D. from the University of Texas, I have an M.A. in American Religious History and a Ph.D. in American Constitutional History from the University of North Carolina. I also spent a year of graduate study at Duke Divinity School and Duke Law School. A copy of my curriculum vitae ("CV") is attached to this report as **Exhibit A**.

---

[1] The opinions expressed in this report are my own and do not reflect the views of Willamette University or any other institution.

2.      My scholarship pertains almost exclusively to the intersection of law, religion, and history. I am the author of seven books and more than fifty scholarly articles and book chapters in the area. My chapters and articles have appeared in leading anthologies and law reviews, including the *Oxford Research Encyclopedia of American History*, *Oxford Handbook on Church and State in the United States*, *Yale Biographical Dictionary of American Law*, *Cornell Law Review*, *Notre Dame Law Review*, *Emory Law Journal*, *Boston College Law Review*, *Syracuse Law Review*, *William and Mary Bill of Rights Journal*, *Hastings Constitutional Law Quarterly*, *Journal of Church and State*, *Journal of Law and Religion*, *First Amendment Law Review*, and the *Oxford Journal of Law and Religion*. I am a member of the Constitutional Law Section of the Association of American Law Schools, and I serve on the editorial advisory board of the *Journal of Church and State*.

3.      I have examined the particular issue of the purported relationship between U.S. law and the Ten Commandments in four writings, including, "The Fount of Everything Just and Right? The Ten Commandments as a Source of American Law," 13 *Journal of Law and Religion* 101 (2000), as well as *The Second Disestablishment: Church and State in Nineteenth Century America* (Oxford University Press, 2010), 182-190; *Inventing a Christian America: The Myth of the Religious Founding* (Oxford University Press, 2015), 92-94; and "'Bad History:' The Lure of History in Establishment Clause Adjudication," 81 *Notre Dame Law Review* 101 (2006). Finally, in 2005, I authored an *amicus curiae* brief in *McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005), on behalf of approximately twenty leading legal historians and law scholars regarding the Ten Commandments' historical influence (or lack thereof) on the development of American law and government.

Exhibit H-1_Green Expert Report
DEFS_000126

4.　　Additionally, I have examined the role of religion in the development and operation of public schooling in the United States in four books, most comprehensively in *The Bible, the School, and the Constitution: The Clash that Shaped Modern Church-State Doctrine* (Oxford University Press, 2012).[2]

5.　　My CV, attached as **Exhibit A**, includes a list of the publications that I have authored in the last ten years.

6.　　I have not testified as an expert witness at trial or by deposition during the previous four years.

7.　　In preparing this report, I relied on standard and well-accepted methodologies used by historians. I reviewed both primary and secondary sources. Analysis of a primary source involves reviewing the source, determining how reliable the source is, and how consistent it is with other evidence. I considered the conditions under which each source originated. I considered where the source was produced, by whom it was produced, when it was produced, and the circumstances at the time it was produced. I considered the extent to which each source is consistent with other sources, and the extent to which sources complement each other. I also considered how the plain language of the source would have been interpreted at the time of its writing, and avoided applying modern interpretations to documents that were centuries old.

8.　　In preparing this report, I reviewed the sources that exist, selecting the most persuasive and appropriate sources. I considered the conditions under which each source was produced and the intentions of the author. I also considered the historical context in which each

---

[2] *See also* Steven K. Green, *Separating Church and State: A History* (Cornell Univ. Press, 2022), 124-136, 153-164, 168-173; Steven K. Green, *The Third Disestablishment: Church, State, and American Culture, 1940-1975* (Oxford Univ. Press, 2019), 133-146, 255-288; Steven K. Green, *The Second Disestablishment: Church and State in Nineteenth-Century America* (New York: Oxford Univ. Press, 2010), 251-325; Steven K. Green, "All Things Not Being Equal: Reconciling Student Religions Expression in the Public Schools," 42 U.C. Davis L. Rev. 843 (2009).

3

source was produced. I was careful not to select only those sources that supported my opinion, but I dealt with all sources on the basis of their reliability and validity.

9.      As to secondary sources, I relied on books and articles about the relevant topics and considered their analysis of the primary sources. I considered the perspective of the authors, the information available to them, and any motivations they may have had to distort their interpretations in any way.

10.     In reliance on all sources, I sought to provide a basis for a reliable narrative about the past. I applied the same degree of rigor to my work on this report as I apply in preparing my books and scholarly articles for publication. Proper historical analysis is necessarily analytical. As a historian, I seek to provide context to historical writings and events. The methodology I have described above is consistent with the methodology ordinarily expected of historians.

11.     This report is based on my knowledge, research, and study in this area, spanning the past 30 years. I am receiving $150 per hour for expert work related to this case up to $5,000 for preparing this report; up to 3,000 for any rebuttal/reply report preparation; up to $3,000 for any deposition preparation; and up to $3,000 for any hearing preparation.

## II.     <u>Summary of Conclusions</u>

12.     This report examines the history of the U.S. Constitution and First Amendment with respect to religious matters; the history of the Ten Commandments with respect to U.S. law and government; the history of displays of the Ten Commandments in public schools; and the denominational nature of the specific version of the Ten Commandments adopted in House Bill No. 71, Act No. 676 (hereinafter, "H.B. 71"). I reach four key conclusions:

- The Religion Clauses of the First Amendment were rooted in the Founders' profound concerns for protecting the conscience of individuals and religious communities; avoiding official denominational preferences, including the official promotion of religious doctrine; and preventing the religious

4

divisiveness that flows from government favoritism of some religions over others or non-religion.

- The historical record demonstrates that the Ten Commandments are not a foundation of the American government or legal system.

- There is no evidence of a longstanding historical acceptance and practice of widespread, permanent displays of the Ten Commandments in public-school classrooms.

- The version of the Ten Commandments adopted under H.B. 71 is Protestant and thus religiously exclusive.

III. **The Religion Clauses of the First Amendment Were Rooted in the Founders' Profound Concerns For Protecting the Conscience of Individuals and Religious Communities; Avoiding Official Denominational Preferences, Including the Official Promotion of Religious Doctrine; and Preventing the Religious Divisiveness that Flows From Government Favoritism of Some Religions Over Others or Non-Religion.**

13. On the cusp of the American Revolution, the British-American colonies represented the most religiously diverse place in the world. Congregationalists (formerly Puritans) dominated New England; Presbyterians, Quakers, Lutherans, and pietistic sects (Moravians, Mennonites) dominated the middle colonies; and Anglicans (Church of England) were entrenched in the southern colonies, where large swaths of evangelical New Light Presbyterian and Baptist groups also resided. Quakers, Mennonites, and Baptists constituted the majority in backcountry North Carolina, while Charleston and Savanah had large Jewish, Lutheran, and Huguenot communities. Many Catholics had settled in Maryland. And New York became home to myriad religious groups, including, among others, Dutch Reformed, Presbyterian, Anglican, Lutheran, and Jewish populations.[3]

14. Given this religious diversity, it is not surprising that religious persecution and significant religious discord arose when colonial governments gave official preference to some

---

[3] *See* Winthrop S. Hudson, *Religion in America*, 3rd ed. (New York: Charles Scribner's Sons, 1981), 23-58.

Exhibit H-1_Green Expert Report
DEFS_000129

faiths or denominations over others, or when they acted to impede the religious exercise of some individuals. For example, despite the religious pluralism, nine of the thirteen colonies maintained religious establishments, which meant an officially sanctioned Protestant denomination that was financially supported through forced tax assessments on all freeholders, regardless of whether that person adhered to that faith. Dissenting churches, if allowed to operate at all, did so at the whim of colonial officials.[4] Following the Protestant revivals of the First Great Awakening of the 1730s and 1740s, evangelicals in New England and Virginia faced persecution as officials refused to grant licenses to their clergy, refused to allow the operation of their churches, and then taxed the dissenters to support the dominant religion (either Congregationalism or Anglicanism). Resistant dissenters faced fines or imprisonment.[5] In 1744, in a widely circulated pamphlet, Connecticut clergyman and judge Elisha Williams criticized his own Congregationalist religious order for using civil authority to harass and persecute evangelical ministers, asserting that "the civil authority hath no power to make or ordain articles of faith, creeds, forms of worship or church government."[6] Religious persecution was not unique to New England, however, as it took place in the Southern Anglican-controlled colonies as well, most notably in Virginia which fined and expelled Catholics and Quakers.[7]

---

[4] Frank Lambert, *The Founding Fathers and the Place of Religion in America* (Princeton: Princeton Univ. Press, 2003), 46-124; Thomas J. Curry, *The First Freedoms: Church and State in America to the Passage of the First Amendment* (New York: Oxford Univ. Press, 1986), 1-77.

[5] Hudson, *Religion in America*, *supra* n.3, at 23-58; Christopher Beneke, *Beyond Toleration: The Religious Origins of Religious Pluralism* (New York: Oxford Univ. Press, 2006), 17-40.

[6] Elisha Williams, "A Reasonable Plea for the Liberty of Conscience and the Right of Private Judgment in Matters of Religion," (1744), in *Political Sermons of the American Founding Era, 1730-1805*, ed., Ellis Sandoz (Indianapolis: Liberty Fund, 1991), 97.

[7] Frank Lambert, *The Founding Fathers and the Place of Religion in America*, *supra* n.4, at 46-72; Edward L. Bond, *Damned Souls in a Tobacco Colony: Religion in Seventeenth Century Virginia* (Macon, GA: Mercer Univ. Press, 2000), 145-152, 160-174.

Exhibit H-1_Green Expert Report
DEFS_000130

15.     Other examples of concerns raised by governmental religious favoritism included a decade-long controversy in the 1760s over a proposal to appoint an Anglican bishop in the American colonies, which would have brought the full apparatus of an exclusive religious establishment that included ecclesiastical courts. Colonialists almost universally viewed the proposal as inviting religious oppression. It led many to call for the complete disestablishment of religion by the government, and it strongly influenced the Founders' views on matters involving religion and the state.[8]

16.     Members of the Founding generation, when they began meeting in congresses in 1774 to discuss resistance to Britain and the formation of a new nation, were painfully aware of this recent historical context, as well as the legacy of religious persecution in Europe.[9] They recognized the need to prevent such persecution in the new nation, defuse any inter-religious conflict, and avoid the corrosive effect on civil society caused by the fusion of government and religion.[10] In 1774, for instance, James Madison bemoaned the jailing of five Baptist ministers who refused to obtain licenses from Virginia authorities in order to preach. "There are at this [time] in the adjacent County not less than 5 or 6 well[-]meaning men in close Goal for publishing their religious Sentiments which in the main are very orthodox," Madison wrote to his former Princeton classmate William Bradford.[11] "I have neither patience to hear talk or think of any thing relative to this matter, . . . So I beg you to pity me and pray for Liberty of Conscience for all."[12] Two years

---

[8] *See* Patricia U. Bonomi, *Under the Cope of Heaven: Religion, Society, and Politics in Colonial America* (New York: Oxford Univ. Press, 1986).

[9] For example, the Thirty Years War of the early-seventeenth century had pitted Protestants against Catholics, whereas the English Civil War (1643-1651) was waged between Presbyterians and Anglicans. *See* Geoffrey Parker, *The Thirty Years' War* (London: Routledge, 1997); Brian Manning, ed., *Politics, Religion, and the English Civil War* (New York: St. Martin's Press, 1974).

[10] Lambert, *The Founding Fathers and the Place of Religion in America, supra* n.4, at 137-158.

[11] Letter from James Madison to William Bradford, Jan. 24, 1774, FOUNDERS ONLINE, https://founders.archives.gov/documents/Madison/01-01-02-0029.

[12] *Ibid.*

Exhibit H-1_Green Expert Report
DEFS_000131

later, when the Continental Congress was drafting the Articles of Confederation, John Dickinson proposed a provision to address (and prevent) common religious preferences and persecutions. The provision provided that no person "shall be molested or prejudiced . . . for his or her religious persuasion, . . . nor be compelled to frequent or maintain or contribute to maintain any religious Worship, Place of Worship, or Ministry, . . . [nor] be disqualified . . . from holding any offices Civil or military" because of their religion.[13] As for the proposition that government had the authority to declare and promote articles of faith, Baptist minister John Leland spoke for many people, writing that, because "religion is a matter between God and individuals, the religious opinions of men [are] not being the objects of civil government, nor in any way under its control." Thus, "[t]he duty of magistrates is not to judge the divinity or tendency of doctrines."[14]

17.     In the years immediately preceding the 1787 Constitutional Convention, Madison further elaborated on his concerns regarding government involvement in matters of faith. Specifically, in his *Memorial and Remonstrance* of 1785, Madison vehemently opposed government support for religious instruction, urging the public and lawmakers to reject Patrick Henry's proposed Virginia measure, "A Bill Establishing a Provision for Teachers of the Christian Religion."[15] Several of his points are instructive here. Madison believed that religion, including the promotion of religious doctrine, was "exempt from the authority" of government.[16] Not only did such actions inevitably promote one religion over another and offend the notion of

---

[13] Derek Davis, *Religion and the Continental Congress, 1774-1789* (New York: Oxford Univ. Press, 2000), 160-161. According to Davis, the Continental Congress declined to include the article, not out of disagreement with its sentiments, but as inconsistent with the Articles' truncated states-rights approach.

[14] John Leland, "The Rights of Conscience Inalienable" in *The Sacred Rights of Conscience*, eds., Daniel L. Driesbach and Mark David Hall (Indianapolis: Liberty Fund, 2009), 337, 339.

[15] James Madison, *Memorial and Remonstrance against Religious Assessments*, in FOUNDERS' CONSTITUTION, vol. 5, doc. 43, https://press-pubs.uchicago.edu/founders/documents/amendI_religions43.html.

[16] *Ibid.*, ¶ 2.

Exhibit H-1_Green Expert Report
DEFS_000132

denominational equality,[17] but they represented "an unhallowed perversion of the means of salvation."[18] They implied "either that the Civil Magistrate is a competent Judge of Religious Truth; or that he may employ Religion as an engine of Civil policy."[19] And to allow the government to promote religious doctrine would "destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion has produced among its several sects" and lead to "Religious discord."[20] The *Memorial and Remonstrance* was not only instrumental in defeating Henry's bill, but it laid the groundwork for passage of the Virginia Statute for Establishing Religious Freedom of 1786,[21] which Madison reintroduced to the House of Delegates a few months later. Drafted primarily by Thomas Jefferson, the Virginia statute disestablished the Church of England in Virginia and guaranteed religious equality for all sects.[22]

18.     The following year, Madison and others gathered to draft the Constitution, the primary foundational document that established the government and legal system for the United States. It did not invoke God or scripture. In fact, the delegates to the Constitutional Convention went a step further by expressly *prohibiting* any religious test for federal office holders. They recognized the exclusiveness and divisiveness of such practices and rejected the authority of government to determine or announce articles of faith.[23]

---

[17] *Ibid.*, ¶ 3 ("Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects?").
[18] *Ibid.*, ¶ 5.
[19] *Ibid.*
[20] *Ibid.*, ¶ 11.
[21] Thomas Jefferson, "Bill for Establishing Religious Freedom," *in* FOUNDERS' CONSTITUTION, vol. 5, doc. 37, https://press-pubs.uchicago.edu/founders/documents/amendI_religions37.html.
[22] Green, *Separating Church and State*, *supra* n.2, at 57-60. The statute notably did not refer to Jesus, reflecting the intent of Madison, Jefferson, and others that its protection should extend to "the Jew and the Gentile, the Christian and Mahometan, the Hindoo, and Infidel of every denomination." 1 Writings of Thomas Jefferson 62 (P. Ford ed. 1892).
[23] Green, *Separating Church and State*, *supra* n.2, at 65-75; *see also* U.S. Const. art. VI, cl. 3.

9

19.     Two years later, in 1789, as a member of the House of Representatives, Madison introduced several proposed amendments to the Constitution, including what would become the First Amendment of the Bill of Rights. Like the Constitution, the Bill of Rights mentioned neither God nor the Bible. Madison's Virginia experience and his strong opposition to both governmental promotion of religion and governmental interference with religious exercise were indubitably a strong factor in his resolve to see the Religion Clauses enacted. He ushered the amendment through the House debate, fending off proposals that would have lessened its scope and effect. He then served on the House-Senate conference committee where he again defeated efforts to weaken its language. Although Madison is not solely responsible for the First Amendment, no other person had a greater impact on its enactment,[24] a role that the members of the U.S. Supreme Court have recognized as far back as *Reynolds v. United States*,[25] through *Everson v. Board of Education*,[26] and beyond.

20.     These historical events and writings evince that the fundamental concerns and principles animating the Religion Clauses include that:

- Government should not coerce or promote religious fealty or any religious belief.[27]

- No person's standing in the political community should be contingent upon their religious beliefs, or lack thereof.

- No person's access to public benefits should be contingent upon affirming any article of faith.

---

[24] Richard Labunski, *James Madison and the Struggle for the Bill of Rights* (New York: Oxford Univ. Press, 2008), 179-240; Green, *The Second Disestablishment*, *supra* n.2, at 64-72.
[25] 98 U.S. 145, 163-64 (1878).
[26] 330 U.S. 1. 11-13, 33-41 (1947).
[27] Mark Storslee, "History and the School Prayer Cases," 110 U.Va. L. Rev. --- (2024) (forthcoming), at 8 ("Founding-era proponents of religious liberty condemned any governmental attempt to command formal acts of worship through law, no matter how permissively such laws functioned in practice.").

Exhibit H-1_Green Expert Report
DEFS_000134

- Government should not take a position on any religious doctrine or promote any denomination or denominational belief or practice as favored or preferred.[28]

21.     Madison, Jefferson, and other Founders repeatedly affirmed these core principles, and elaborated on them, even after the ratification of the First Amendment. For example, Jefferson explained that the Religion Clauses were concerned not only with coercion sanctioned by "fine & imprisonment" but also with governmental action that could result in "some degree of proscription perhaps in public opinion.[29] Thus, to him, a mere governmental "recommendation" of religious practice, even without the backing of legal force, was no "less a law of conduct for those to whom it is directed."[30] Madison likewise wrote in 1820 that even the government's "recommendation only" concerning religion "naturally terminates in a conformity to the creed of the major[ity] and of a single sect, if amounting to a majority."[31]

## IV.     **The Historical Record Demonstrates that the Ten Commandments Are Not a Foundation of the American Government or Legal System.**

22.     H.B. 71's claim that "the Ten Commandments 'have historical significance as one of the foundations of our legal system,'" H.B. 71 ¶ A(3) (quoting *American Legion v. American Humanist Association*, 588 U.S. 29, 53 (2019)), is contradicted by the historical record. There is simply no historical evidence for concluding that the Framers of the Constitution or their

---

[28] *See* Michael McConnell, "Establishment and Disestablishment at the Founding," 44 Wm. & Mary L. Rev. 2105, 2131 (2003).
[29] Letter from Thomas Jefferson to Samuel Miller, Jan. 23, 1808, FOUNDERS ONLINE, https://founders.archives.gov/documents/Jefferson/99-01-02-7257.
[30] *Ibid.*
[31] James Madison, Detached Memoranda, ca. Jan. 31, 1820, FOUNDERS ONLINE, https://founders.archives.gov/documents/Madison/04-01-02-0549; *see also* John Leland, The Rights of Conscience Inalienable, Jan. 1, 1791, in *Evans Early American Imprint Collection* at 10, U. MICH. LIBRARY DIGIT. COLLECTIONS, https://name.umdl.umich.edu/N18125.0001.001 ("[T]he minds of men are biassed[] to embrace that religion which is favored and pampered by law[] (and thereby hypocrisy is nourished) while those who cannot stretch their consciences to believe any thing and every thing in the established creed are treated with contempt and opprobrious names; and by such means some are pampered to death by largesses and others confined from doing what good, they otherwise could, by penury.").

Exhibit H-1_Green Expert Report
DEFS_000135

contemporary political and legal figures considered the Ten Commandments to be a basis for either American law or government. [32] On the contrary, as discussed above, the Framers of the Constitution were acutely aware of the need to accommodate the country's religious diversity, which was remarkable for the time, and to avoid the religious persecution and strife that has historically stemmed from government establishments of religion and encroachments on religious exercise, both in the colonies and in Europe.

23.     The significant sources of law for the American colonies were broad and varied. With the exception of a short-lived experiment in the New England Puritan colonies (Massachusetts Bay, New Haven, Connecticut, and Plymouth),[33] the colonies generally relied on secular sources for the law, not the Bible. Yet, even in the Puritan colonies, reliance on the Ten Commandments (as opposed to reliance on biblical law as a whole) was proportionately insignificant and largely limited to certain criminal and domestic laws, such as blasphemy and adultery. Indeed, as Calvinists, Puritans believed that they were bound by the New Testament, rather than by the Old Testament, in which the Ten Commandments are introduced. Thus, even though many early Puritan leaders believed in the supremacy of biblical law, they relied primarily on secular sources for the bulk of their laws, including those governing property ownership and inheritance. And the Glorious Revolution of 1688-89 in England, which led to a similar revolt in Boston to overthrow the Governor General of the Dominion of New England, quickly brought an end to this "religious experiment," resulting in a new charter in Massachusetts Bay that removed

---

[32] *See* Paul Finkelman, "The Ten Commandments on Courthouse Lawn and Everywhere," 73 Fordham L. Rev. 1477 (2005); Steven K. Green, "The Fount of Everything Just and Right? The Ten Commandments as a Source of American Law," 13 J.L. & Religion 101 (2000).

[33] For example, the *Lawes and Libertyes* of Massachusetts Bay (1641) cited to scriptural authority for several offenses and behavioral rules. Other New England colonies borrowed from the Massachusetts code.

Exhibit H-1_Green Expert Report
DEFS_000136

almost all references to biblical law and replaced them with common law practices and procedures.[34]

24.     Putting aside the Puritan colonies' abandoned early legal codes, the principal early sources of law were the common and statutory law of England, as well as the law of the non-common law courts of England, such as equity, chancery, admiralty, and ecclesiastical courts.[35]

25.     Many legal historians consider the Magna Carta of 1215 to be a seminal source of modern English and American law. It addressed various legal subjects, including inheritance, land ownership and sale, taxation, jury trials and trial procedure, proportionality in punishment, and the taking of property without compensation. In so doing, it set forth principles that are central to our legal rights and system today, including the understanding that no person can be "seized or imprisoned, or stripped of his rights or possessions … except by the lawful judgment of his equals or by the law of the land."[36]

26.     Colonialists were also highly influenced by the 1689 English Bill of Rights, which made the monarchy subject to the laws of Parliament and established legal rights and relationships for British citizens (*e.g.*, freedom of speech, no excessive bail and fines, no cruel and unusual punishment, and the right to a jury trial).[37]

27.     Many of the colonies incorporated liberties guaranteed by Magna Carta and the English Bill of Rights directly into their laws and governing documents. Neither Magna Carta nor the English Bill of Rights referred to either the Ten Commandments as a whole or to any specific

---

[34] George Lee Haskins, *Law and Authority in Early Massachusetts* (New York: Macmillan, 1960), 158-162.
[35] Finkelman, "The Ten Commandments on the Courthouse Lawn and Elsewhere," *supra* n.32, at 1500-1504.
[36] *See* Bernard Schwartz, *The Great Rights of Mankind: A History of the American Bill of Rights* (New York: Oxford Univ. Press, 1977), 2-8.
[37] *Ibid.*, 21-23; Finkelman, "The Ten Commandments on the Courthouse Lawn and Elsewhere," *supra* n.32, 1503-1504.

Exhibit H-1_Green Expert Report
DEFS_000137

commandment.[38] Another influential source on the development of early American law was William Blackstone's *Commentaries on the Law of England* (1765-69). Even though the *Commentaries* included a section on "Offenses Against God and Religion" – not surprising since Blackstone defended the established Church of England and prosecutions for blasphemy – and Blackstone asserted that the ultimate authority for the law was "divine law" as revealed in the scriptures, he recognized that a high proportion of legal matters were controlled by a secular body of "municipal or civil law." Despite his discussions about ecclesiastical and religious influences on the law, Blackstone did not claim that the Ten Commandments served as a basis for English law.[39]

28.     An analysis of the central Founding documents and political writings of the time demonstrates that the noninfluence of the Ten Commandments on colonial law continued into the Founding period. The Declaration of Independence does not cite the Ten Commandments, or even the Bible more generally, as the foundation of the American government and law; rather, the document proclaimed that "Governments are instituted among Men, deriving their just Powers from the Consent of the Governed." Indeed, although the Declaration includes allusions to God and natural law/rights, even these prefatory religious references are not acknowledgments of a law-giving biblical God. They must be understood in the context of Thomas Jefferson's embrace of Enlightenment thought: Jefferson, the primary author of the Declaration, and the Enlightenment writers on which he relied, distinguished natural law from Old Testament law, and these references

---

[38] *See* Bernard Bailyn, *The Ideological Origins of the American Revolution* (Cambridge, MA: Belknap Press of Harvard Univ. Press, 1967), 22-54; Neil H. Cogan ed., *Contexts of the Constitution* (New York: Foundation Press, 1999), 657-666; 686-692; Steven K. Green, "The Mixed Legacy of Magna Carta for American Religious Freedom," 32 J.L. & Religion 207 (2017). Although both made passing references to "God," these references were highly formalistic and bore no relationship to the substance of the documents.

[39] William Blackstone, *Commentaries on the Laws of England*, ed., Charles Harr (Boston: Beacon Press, 1962), 2:38-45; 4:41-61.

Exhibit H-1_Green Expert Report
DEFS_000138

to natural law suggest a *rejection* of the notion that the Declaration pertains to biblical law or the Ten Commandments.[40]

29.     The Constitution and the Bill of Rights, which set forth the framework for the U.S. legal system and government, do not include even these perfunctory or formalistic references to God. Rather, the Constitution is "ordained" by "the People of the United States." Nor does either document incorporate into its text any commandment or other provision tied to a biblical source.[41] This is not surprising given the experience of the colonialists and the Framers' resulting vision for a secular government.

30.     Consistent with the text of the Constitution and the Bill of Rights, neither the Ten Commandments nor the Bible more generally received any explicit mention in the debates and publications surrounding the Founding documents. In the wide-ranging debates—reprinted in Madison's *Notes of the Debates in the Federal Convention*, the *Annals of Congress*, Farrand's *Records of the Federal Convention*, Elliot's *Debates in the Several State Conventions*, and elsewhere—the Founders mentioned Roman law, European Continental law, British law, and various other legal systems. But as can best be determined, no delegate cited the Ten Commandments or the Bible as an authority or foundation for any provision included in the Constitution.[42] In fact, the debates confirmed the Framers' belief that minimizing any connection

---

[40] In fact, Jefferson, doubted the authenticity and authority of the Ten Commandments. In a letter to John Adams, Jefferson wrote that "the whole history of [the Ten Commandments] is so defective and doubtful that it seems vain to attempt minute enquiry into it; and such tricks have been plaid with their text … that we have a right, from that cause, to entertain much doubt what parts of them are genuine." Letter from Thomas Jefferson to John Adams, Jan. 24, 1814, *The Adams-Jefferson Letters*, ed., Lester J. Cappon (Chapel Hill: Univ. of North Carolina Press, 1987), 421.

[41] Green, *Inventing a Christian America*, *supra* ¶ 3, at 178-182.

[42] On August 10, 1787, during the Constitutional Convention, it appears that Benjamin Franklin made an oblique reference to one of the commandments during a debate over whether to include a wealth qualification for the President and members of Congress: "We should remember the character which the Scripture requires in rulers, that they should be men hating covetousness." Max Farrand, *Records of the Federal Convention* (New Haven: Yale Univ. Press, 1911), 2:249. Otherwise, there are no references to the Ten Commandments or to a commandment in the three volumes of Farrand's *Records*.

Exhibit H-1_Green Expert Report
DEFS_000139

between religious law and civil law was integral to American liberty. For example, James Madison noted in one debate that "Religion itself may become a motive to persecution & oppression. - These observations are verified by the Histories of every Country ancient & modern."[43] And George Reid of Delaware declared in a debate over the power of Congress that "the Legislature ought not to be too much shackled. It would make the Constitution like Religious Creeds, embarrassing to those bound to conform to them & more likely to produce dissatisfaction and Scism, than harmony and union."[44] Ultimately, the only significant discussion of religion during the debates led to the clause prohibiting religious tests for holding office—and, thereby, rejecting any endorsement of a preferred legal status for Christianity or any other faith.

31.     Similarly, neither the "Bible" nor "scripture" nor the "Ten Commandments" appears in the *Federalist Papers*, which are generally considered to set forth the most important discussions of the meaning of the Constitution at the time of ratification. The Federalist Papers included only a handful of passing references to "God" and "gods," the "Almighty," "Heaven," and to religion. In one place (*Federalist* 43), for example, Madison referred to "the transcendent law of nature and of nature's God." But, like the religious references in the Declaration, this language was an allusion to the Enlightenment concept of natural law rather than an Old Testament God. Instead of asserting a connection between biblical law and the new nation, most references to religion in the *Federalist Papers* denounced religious factions and intolerance and the mixing of church and state.[45] As Madison wrote in *Federalist* 10, "[a] zeal for different opinions concerning religion, concerning government, and many other points . . . have, in turn, divided

---

[43] *Ibid.*, 1:135.
[44] *Ibid.*, 1:582.
[45] *The Federalist Papers,* ed., Clinton Rossiter (New York: New American Library, 1961), nos. 10, 43, and 51.

Exhibit H-1_Green Expert Report
DEFS_000140

mankind into parties, inflamed them with mutual animosity, and rendered them much more disposed to vex and oppress each other than to co-operate for their common good."[46]

32.     According to the preamble of H.B. 71, James Madison stated that "'(w)e have staked the whole future of our new nation . . . upon the capacity of each of ourselves to govern ourselves according to the moral principles of the Ten Commandments.'" H.B. 71 ¶ A(4). This quotation is a hoax. There is no evidence in the historical record that Madison ever uttered or wrote those words. I have extensively examined Madison's available public and private writings and speeches and have not located any such statement.[47] Such a statement would have directly conflicted with Madison's other writings and actions, which vigorously advocated for the separation of church and state. *See supra* ¶¶ 16-19.[48]

33.     In sum, it is my expert opinion that the American government and legal system are not premised on, or rooted in, the Ten Commandments. There is no historical basis for singling out the Ten Commandments as seminal in the foundation of American law and government. On

---

[46] *Ibid.*, nn.9-24.

[47] For my recently published dual biography of Thomas Jefferson and James Madison on religious freedom, *The Grand Collaboration: Thomas Jefferson, James Madison, and the Invention of American Religious Freedom* (Charlottesville, Univ. of Virginia Press, 2024), I attempted to examine every letter, speech, and writing of Jefferson and Madison regarding religion. To accomplish this, I relied on the U.S. Archives data base, Founders Online, https://founders.archives.gov/, which is derived from the available compilations and series of writings of various Founders. A digital word search of Madison's writings fails to produce this statement. In preparing this report, I also conducted an additional search for this statement using George Thomas Webb's four-volume *The James Madison Letters* (New York: Townsend MacCoun, 1865, 1884) and Galliard Hunt's nine-volume *The Writings of James Madison* (New York: G.P. Putnam's Soms, 1900-1910), which again produced no such statement. The editors of *The Papers of James Madison* also have confirmed that there is no evidence that Madison ever wrote or said this and that "the idea is inconsistent with everything we know about Madison's views on religion and government, views which he expressed time and time again in public and private." *See* Robert S. Alley, "Public Education and the Public Good," 4 Wm & Mary Bill of Rights J. 277, 316-318 (1995) (noting that, after a search of Madison's known public and private writings, the editors "did not find anything in [their] files remotely like the sentiment expressed in the extract [allegedly made by Madison]").

[48] As best can be determined, the origin of this false quotation is David Barton's *The Myth of Separation* (Aledo, TX: WallBuilder Press, 1992), 120, which fails to cite to an original document or source.

Exhibit H-1_Green Expert Report
DEFS_000141

the contrary, the historical record reveals that the Ten Commandments had minimal impact on the development of American law.

## V.   There is No Evidence of a Longstanding Historical Acceptance and Practice of Widespread, Permanent Displays of the Ten Commandments in Public-School Classrooms.

34.     When the U.S. Constitution and First Amendment were drafted, *public* schooling was essentially nonexistent. Education at the time of the Founding occurred in *private* academies or through tutors and generally had a strong religious component due to the dominance of clergy as teachers.[49] Only in New England were there town "district" schools for children to attend, but these quasi-public prototypes required parents to pay a "rate," and, again, the teachers were largely local clergy. "Almost everywhere and in every case, the avowed purpose of founding schools was religious: the schools were there to make Christians."[50] As a result, early textbooks, such as the popular *New England Primer*, included religious references, using scripture to teach spelling or reading, and were designed chiefly to inculcate religious fealty.[51] Practices in these handful of prototype schools thus offer little insight into the history of *public* education and the Ten Commandments, but even so, there is a lack of evidence that these schools permanently displayed the Ten Commandments on classroom walls.

35.     Believing that an educated citizenry was essential for the survival of the new republic, education reformers pushed for the establishment of publicly operated and funded

---

[49] Carl Kastle, *Pillars of the Republic: Common Schools and American Society* (New York: Hill & Wang, 1983), 13-29.

[50] Warren A. Nord, *Religion and American Education* (Chapel Hill: University of North Carolina Press, 1995), 64-65.

[51] *Ibid.*; Edward P. Cubberley, *Readings in the History of Education* (Boston: Hughton Mifflin Co., 1911), 311-315; Richard L. Venezky, "A History of the Reading Textbook," 87 *Elementary Sch. J.* 246 (1987) ("Calvinism, with its stress on innate evil and the omnipotence of a wrathful God, had no room for readiness or multistage development. The child's interests were irrelevant to the need to inculcate the religious beliefs of the adult society.").

Exhibit H-1_Green Expert Report
DEFS_000142

"common schools" in the early 1800s.[52] To that end, in 1826, Massachusetts created the first state board of education, which was mandated to provide universal, "non-sectarian," public education. Under the leadership of Horace Mann, the board eliminated doctrinal religious instruction but retained use of the Bible to inculcate "universal" Christian morals; Mann believed that the Bible was to be read without "note or comment"—to "let the Bible speak for itself."[53] Other states eventually followed suit, likewise authorizing free, common schools that offered a liberal education, with some permitting limited "nonsectarian" religious activities such as prayers and Bible reading.[54]

36.     However, even these scaled-back religious practices in common schools were deeply controversial and not universally accepted, in part, because they required students of some faiths and denominations to receive official government indoctrination in the religious doctrine of another faith or denomination. Bible readings, for example, used the Protestant King James version of the text, and its use quickly drew the opposition of Catholics and Jews.[55] Indeed, the history of religious exercises in America's public schools, to the extent they occurred, is one of dissension, exclusion, conflict, and litigation, beginning in the 1840s with the first organized Catholic opposition to religious instruction. In 1840, the nation's Catholic bishops issued a pastoral letter denouncing the use of the King James Bible and Protestant-biased textbooks, such as the McGuffey *Reader*: "We can scarcely point out a book in general use in the ordinary

---

[52] Green, *The Bible, the School, and the Constitution, supra* ¶ 4, at 13-16. Thomas Jefferson recommended the creation of grammar schools "for teaching reading, writing, and arithmetic" but was against "putting the Bible and Testament into the hands of the children, at an age when their judgments are not sufficiently matured for religious enquiries." *See* Thomas Jefferson, *Notes on the State of Virginia* (1787), ed. William Penden (Chapel Hill: Univ. of North Carolina Press, 1982), 146-147.
[53] Horace Mann, *The Twelfth Annual Report of the Board of Education* (Boston: Dutton & Wentworth, 1849), 116-117 (maintaining that "all dogmatical theology and sectarianism [have been] sacredly excluded").
[54] Green, *The Bible, the School, and the Constitution, supra* ¶ 4, at 20-24.
[55] *Ibid.*, 16-36.

Exhibit H-1_Green Expert Report
DEFS_000143

schools . . . wherein covert and insidious efforts are not made to misrepresent our principles, to distort our tenets, to vilify our practices, and to bring contempt upon our Church."[56] Notably, in 1844, the Philadelphia "Bible riots" led to three days of clashes between Nativist Protestants rallying in support of the use of the Protestant Bible in Philadelphia's public schools and Irish Catholics protesting it. During the riots, buildings were set on fire, hundreds of thousands of dollars in property damage occurred, thousands of people were displaced from their homes, and at least twenty people died.[57]

37.     Conflicts over religious exercise in public schools continued throughout the nineteenth century and beyond.[58] My research, and that of other scholars, has documented approximately thirty reported court cases between 1850 and 1960 involving challenges to public-school religious exercises,[59] demonstrating that these practices were not universally permitted or accepted.[60]

---

[56] Peter Guilday, *The National Pastorals of the American Hierarchy (1792-1919)* (Washington, DC: National Catholic Welfare Council, 1923), 132-134.

[57] Green, *The Bible, the School, and the Constitution*, *supra* ¶ 4, at 80-84.

[58] *See generally ibid.*; *see also, e.g.*, *Engel v. Vitale*, 370 U.S. 421 (1962); *Abington Township Sch. Dist. v. Schempp*, 374 U.S. 203 (1963).

[59] Decisions upholding prayer and/or Bible reading in public schools, prior to the Supreme Court's decisions in *Engel* and *Schempp*, included: *Donahoe v. Richards*, 38 Me. 379 (1854); *Commonwealth v. Cooke*, 7 Am. L. Reg. 417 (Mass. 1859); *McCormick v. Burt*, 95 Ill. 263 (1880); *Moore v. Monroe*, 20 N.W. 475 (Iowa 1884); *Hart v. Sch. Dist. of Sharpsville*, 2 Lanc. 346 (Pa. Comm. 1885); *Nessle v. Hum*, 1 Oh. N.P. Rpts 140 (1894); *Pfeiffer v. Bd. of Educ.*, 77 N.W. 250 (Mich. 1898); *Curran v. White*, 22 Pa. Cty Rpts 201 (1898); *Stevenson v. Hanyon*, 7 Pa. Dist. 585 (1898); *Billard v. Bd. of Educ.*, 76 P. 422 (Kan. 1904); *Hackett v. Brooksville Graded Sch. Dist.*, 87 S.W. 792 (Ky. 1905); *Church v. Bullock*, 109 S.W. 115 (Tex. 1908); *Wilkerson v. City of Rome*, 110 S.E. 895 (Ga., 1922); *Kaplan v. Independent Sch. Dist.*, 214 N.W. 18 (Minn. 1927); *People ex rel. Vollmar v. Stanley*, 255 P. 610 (Col. 1927); *Doremus v. Bd. of Educ.*, 75 A.2d 880 (N.J. 1950). Cases barring prayer and/or Bible reading in public schools included: *Bd. of Educ. v. Minor*, 23 Ohio St. 211 (Ohio 1873); *Weiss v. Dist. Bd. of Sch. Dist. No. 8*, 44 N.W. 967 (Wis. 1890); *Freeman v. Scheve*, 91 N.W. 846, 847 (Neb. 1902); *State ex rel. Freeman v. Scheve*, 93 N.W. 169 (Neb. 1903); *People ex rel. Ring v. Bd. of Educ.*, 92 N.E. 251, 254-256 (Ill. 1910); *Herold v. Parish Bd. of Sch. Dirs.*, 68 So. 116 (La. 1915); *State ex rel. Dearle v. Frazier*, 173 P. 35 (Wash. 1918); *State ex rel. Finger v. Weedman*, 226 N.W. 348 (S.D. 1929); *Zellers v. Huff*, 236 P.2d 949 (N.M. 1951).

[60] Green, *The Bible, the School, and the Constitution*, *supra* ¶ 4, at 93-136, 236-243; Albert Levitt, "Compulsory Bible Reading in Public Schools," 99 Central L.J. 77-83, 93-103 (1925); Bruce J. Dierenfield, *The Battle Over School Prayer* (Lawerence, KS: University Press of Kansas, 2007), 23-66.

Exhibit H-1_Green Expert Report
DEFS_000144

38.     Other data supports this conclusion: As the nineteenth century drew to a close, many public schools no longer engaged in religious practices. In the mid-1880s and 1890s, the U.S. Commissioner of Education, William T. Harris, issued a series of reports on curriculum and educational practices in the nation's public schools, based on surveys sent to local school districts. The surveys collected information regarding, among other topics, the prevalence of religious exercises in schools, showing that they had significantly declined in the closing decades of the century, particularly in urban areas and in the West.[61]

39.     Looking more specifically at the Ten Commandments, the evidence for a longstanding historical practice and acceptance of widespread and permanent displays of the Ten Commandments in public-school classrooms does not exist.

40.     The "context statement" set forth in H.B. 71 asserts that the "Ten Commandments were a prominent part of American public education for almost three centuries." H.B. 71 ¶ B(3). The only historical support offered for this assertion is the claim that the Ten Commandments were used in several early textbooks: the *New England Primer*, William McGuffey's *Readers*, and Noah Webster's *American Spelling Book*. However, examining these sources and their use in more detail, it is my conclusion that the evidence cited in H.B. 71 does not support the broad assertion that "the Ten Commandments were a prominent part of American public education for almost three centuries."

41.     As noted above, *supra* ¶ 34, the *New England Primer*, which first appeared around 1690 and was republished into the early nineteenth century, had the central purpose of inculcating religious fealty along sectarian, Calvinist lines – "the primer was a codification of primary religious creed." But the *Primer* was used chiefly, if not exclusively, in *religiously* run schools,

---

[61] *See, e.g.*, William T. Harris, *Report of the Commissioner of Education for the Year 1888-1889* (Washington, DC: Government Printing Office, 1890), 622-634.

Exhibit H-1_Green Expert Report
DEFS_000145

and, importantly, it fell into disuse during the early decades of the nineteenth century, before the rise of public education. Thus, as a matter of historical methodology and analysis, it does not represent a precedent for, or provide evidence of, later practices in *public* schooling.[62]

42.     H.B. 71 also misrepresents or overstates matters considerably with respect to the other texts it cites. Noah Webster's *American Spelling Book*, first published in 1783, was the most popular speller into the mid-nineteenth century.[63] However, as an early leader in the nonsectarian reform movement, Webster was opposed to a religiously infused curriculum, and his spellers made only occasional references to "commandments." For example, the 1839 edition of his speller includes only one mention of the commandments: "Fear God, and keep his commandments, for this is the whole duty of man." Similarly, the 1863 *Speller* states in a single entry: "God is the divine legislator. He proclaimed his ten commandments from Mt. Sinai." Significantly, the words "commandment" or "commandments" do not appear in the book's 1795, 1808, 1822, 1843, 1848, 1857, 1866, 1880, and 1908 editions.[64]

43.     The McGuffey *Readers*, written and compiled by Presbyterian minister William McGuffey, were also used in many common schools throughout much of the nineteenth century. McGuffey wrote various *Readers* for grades one through six, with numerous editions that were published into the early twentieth century.[65] While some early editions and versions of the *Readers*

---

[62] Venezky, "A History of the Reading Textbook," *supra* n.51, at 248; Cubberley, *Readings in the History of Education*, *supra* n.51, at 311-315.

[63] The original title of the 1783 edition was the "Grammatical Institute of the English Language, Part One." The speller was followed by a grammar book and a reader. By 1786, the title had been changed to the "American Spelling Book," and, in the 1820s, it was published as "The Elementary Spelling Book."

[64] Venezky, "A History of the Reading Textbook," *supra* n.51, at 250; Noah Webster, *The Elementary Spelling Book, being an Improvement on the American Spelling Book* (Portland, ME: O.L. Sanborn, 1829, 1839), 168. I conducted word searches using digitized editions of the book available through the online resources Early American Imprints-Evans Digital Collection, HathiTrust digital service, and the Internet Archive. Some editions are not available in digitized formats and were thus not searched.

[65] Gerry Bohning, "The McGuffey Eclectic Readers," 40 *Reading Teacher* 263 (1986).

Exhibit H-1_Green Expert Report
DEFS_000146

set out some version of the Ten Commandments as part of a reading lesson, it was just one of dozens of lessons available to students and teachers. For example, the 1853 edition of McGuffey's *Eclectic Second Reader* included 105 separate lessons, with only one lesson focusing on the "The Ten Commandments," listed last, starting at page 216.[66] Many other editions and versions did not reproduce the Ten Commandments verbatim, making only sporadic reference to a specific commandment, such as the prohibition on bearing false witness, as part of a lesson or story. And references to the Ten Commandments in other editions and versions were even more attenuated. The 1853 edition of the *Third Reader*, for instance, included an extract from the Sermon on the Mount: "Whosoever, therefore, shall break one of these least commandments . . . shall be least in the kingdom of heaven."[67] The 1857 edition of the *Fifth Reader* stated that "the commandment of the Lord is pure, enlightening the eyes."[68] Even then, references to a "commandment" were minimal when compared to the numerous lessons (up to 200, depending on the edition) included in each book. Still other editions and versions of McGuffey's *Readers*, especially later ones, did not include any reference to a "commandment."[69]

44.     In sum, the Ten Commandments, even when used or referred to in McGuffey's *Readers*, were not a significant aspect of the texts, and the extent to which common-school teachers

---

[66] William H. McGuffey, *McGuffey's Eclectic Second Reader* (Cincinnati: Sargent, Wilson & Hinkle, 1853), at 216-217, https://archive.org/details/mcguf2ndread002mcguffey/page/216/mode/2up.

[67] William H. McGuffey, *McGuffey's Eclectic Third Reader* (Cincinnati: Winthrop R. Smith, 1853), at 134-135, http s://ar chive.org/details/mcguffeysnewlyre01mcgu/page/134/mode/2up.

[68] William H. McGuffey, *McGuffey's Eclectic Fifth Reader* (Cincinnati: Winthrop R. Smith, 1857), at 111, https://ar chive.org/details/mcguffeysnewfour05mcgu/page/110/mode/2up.

[69] I conducted word searches though digitized editions of the books available through online resources, including Early American Imprints, Evans Digital Collection, the HathiTrust digital service, the Internet Archive, and Project Gutenberg. The editions and versions I reviewed included all six levels of the *Readers* with edition dates ranging from 1844 to 1920 (a total of 36 books). The word "commandment" or "commandments" occurred primarily in the Third and Fourth *Readers* and varied between one to three references per book out of 100-200 lessons per book. As noted above, some editions, such as the 1853 edition of the *Second Reader*, included a lesson on the Ten Commandments or other references to the commandments, but many later editions did not. For example, a search of the 1866 and 1880 Second *Reader*, as well as a sampling of the First, Fifth, and Sixth Readers between 1865 to 1901, uncovered no references to a "commandment" or "commandments."

Exhibit H-1_Green Expert Report
DEFS_000147

may have relied on those particular readings and spelling lessons, as opposed to the dozens of others available in the same book, cannot be verified. Moreover, references to the commandments were largely eliminated in later versions of the *Readers*; and, while the *Readers* were used in many common schools from their initial publication through the early twentieth century, reliance on them tapered as public schools turned to myriad other available options.[70] It follows that, as a matter of historical methodology and analysis, the common schools' use of these *Readers* or Webster's *Spelling Book*, standing alone, does not prove H.B. 71's broad assertion that the "Ten Commandments were a *prominent* part of American public education for almost *three* centuries." Nor does it demonstrate a longstanding historical acceptance of an entirely *distinct* practice— permanently displaying the Ten Commandments in public-school classrooms.

45.     The available data and research further support my conclusion that there is no longstanding, widespread history of permanently displaying the Ten Commandments in public-school classrooms. First, as a historian, considering the substantial religious turmoil and conflict that arose from the incorporation of prayer and Bible reading into some common schools, *supra* ¶¶ 36-37, I would expect to see similar responses if teachers in the common-school era were placing substantial or undue emphasis on *Readers*' lessons involving particular versions of the Ten Commandments or frequently putting up permanent displays of the commandments in classrooms, especially in light of the denominational differences among various versions. *See infra* ¶¶ 52-55.

---

[70] To be sure, despite the minimal role of the Ten Commandments in the *Readers*, they nevertheless included significant religious content aimed at inculcating Protestant religious beliefs. *See* Henry Steele Commager, *Forward* to *McGuffey's Sixth Eclectic Reader* (New York: New American Library, 1962), ix; John H. Westerhoff, *McGuffey and His Readers: Peity, Morality, and Education in Nineteenth-Century America* (Nashville: Abington Press, 1978). Indeed, for that reason, many viewed the *Readers* as anti-Catholic. Ruth Miller Elson, *Guardians of Tradition: American Schoolbooks of the Nineteenth Century* (Lincoln: University of Nebraska Press, 1964), 47-54. But, just as the frequency of lessons referencing one or more commandments declined over time, so too did the overall religious content of the McGuffey *Readers*. According to one study, approximately 30% of the selections were religious in the 1844 *Fourth Reader*. By the 1903 edition, the religious content of the *Reader* amounted to only 3%. John A. Nietz, "Why the Longevity of the McGuffey Readers?" 4 *Hist. Educ. Q.* 119 (1964).

Exhibit H-1_Green Expert Report
DEFS_000148

This was not the case, however. For example, out of the thirty reported legal challenges to religious instruction listed above, *supra* n.59, only two involved an issue about the Ten Commandments, and neither case involved the posting of the commandments on classroom walls.[71]

46. Second, the surveys conducted by the U.S. Commissioner of Education in the mid-1880s and 1890s, *supra* ¶ 38, did not reflect any specific, routine practice of displaying the Ten Commandments in classrooms or otherwise using them in classroom instruction.[72] Third, I also examined various editions of Thomas Cooley's popular nineteenth-century legal treatise, *Constitutional Limitations*, for any discussion regarding the use of the Ten Commandments in the public schools (all editions of Cooley's treatises include information pertaining to religious liberty and religious exercises in public schools). The treatises' treatment of religious-liberty issues generally, and religious exercises in the public schools more specifically, do not refer to the posting of the Ten Commandments or its use in public schools' curricula.[73]

47. Finally, as far as I am aware, no state law specifically permitted or mandated the posting of the Ten Commandments in public schools prior to 1927. Although a 1912 Columbia Teachers' College study of state regulations of religious activities in public schools over the

---

[71] *See Commonwealth v. Cooke*, 7 Am. L. Reg. 417-326 (Mass. 1859); *Pfeiffer v. Bd. of Educ.*, 77 N.W. 250 (Mich. 1898).

[72] *See, e.g.*, Harris, *Report of the Commissioner*, *supra* n.61, at 622-634; *ibid.* (1893-1895), at 2:1656; *ibid.* (1896-1897), at 2189-2191; *ibid.* (1897-1898), at 1539-1563. Using the digital search resource HathiTrust, I searched fourteen years of Commission Reports, from 1884 to 1898, during Harris's tenure as commissioner. Aside from a handful of references to using the Ten Commandments in British, Canadian, and parochial schools, I found only two entries that might indicate limited references to them in a few American public schools. The 1886-1887 *Report* includes a quotation from a school superintendent in North Carolina who stated that "the Ten Commandments embody great principles" that represented "*eternal* truth, binding upon men before they were commanded by God on Mount Sinai." Harris, *Report of the Commissioner, 1886-1887*, at 201. The 1897-1898 *Report* relates a "sentiment" prepared for use in Wisconsin schools in patriotic exercises that states: "The best citizen, the best patriot, and the best son of his country, is he who gives the best manhood to his country. He is the man who writes upon his nature the Ten Commandments and the Nine Beatitudes." Harris, *Report of the Commissioner, 1897-1898*, at 2:1555. Yet, in neither entry is there any indication that the commandments were used in classrooms or posted on classroom walls.

[73] *See, e.g.*, Thomas Cooley, *A Treatise on the Constitutional Limitations*, 2nd ed. (Boston: Little, Brown & Co., 1871), 516-527; *ibid.*, 3rd ed. (1874), at 467-481; *ibid.*, 4th ed. (1878), at 584-589; *ibid.*, 6th ed. (1890), at 577, 583-586; *ibid.*, 7th ed. (1903), at 659-688.

25

previous century listed various laws authorizing the use of the Bible in public schools, none referenced the Ten Commandments. A later study by two professors at Gettysburg College likewise did not indicate any laws or regulations specifically pertaining to the use of the Ten Commandments in the schools.[74] The first state law specifically permitting the display of the Ten Commandments was not enacted until 1927, when the North Dakota legislature approved a measure providing that "[t]he board of a school district may . . . [a]uthorize schools within the district to display the ten commandments with a display of other historical documents in the school and in a classroom."[75] The statute was later struck down by a federal court.[76]

48.     Based on all the factors discussed above, *supra* ¶¶ 34-47, and the lack of compelling counterevidence, it is my expert judgment that the Ten Commandments were *not* "a prominent part of American public education for almost three centuries," as H.B. 71 claims. Nor more specifically, in my expert opinion, is there evidence of a longstanding, let alone unbroken, historical acceptance and practice of widespread, permanent displays of the Ten Commandments in public schools.

## VI.     The Version of the Ten Commandments Adopted Under H.B. 71 is Protestant and Thus Religiously Exclusive.

49.     The Ten Commandments are set forth in Chapter 20 of the Book of Exodus and repeated (although not word-for-word) in Chapter 5 of the Book of Deuteronomy. Many religions do not generally consider the Ten Commandments to be a part of their religious doctrine, including but not limited to Eastern religions, such as Hinduism, Buddhism, Taoism, Jainism, and Sikhism,

---

[74] Jarome K, Jackson and Constanine F. Malmberg, *Religious Education and the State* (Garden City, NY: Doubleday, Doren & Co., 1928), 1-14.

[75] N.D. Cent. Code § 15.1-09-33; S.L. 1927, c. 247, ss 1, 2. A search of the digital service, Hein Online State Statutes: A Historical Archive, which covers the late colonial period through the mid-twentieth century, produced only one other early twentieth-century state law authorizing the use of the Ten Commandments in the public schools, Maine Rev. Statutes, ch. 19, sec. 125, 1930.

[76] *See Ring v. Grand Forks Pub. Sch. Dist.*, 483 F. Supp. 272 (N.D. 1980) (holding that the statute violated the Establishment Clause of the First Amendment).

and earth-based and humanistic religions. Some denominations, such as Jehovah's Witnesses, regard the Ten Commandments as having theological significance but believe that the Commandments are not binding on them. Other faith traditions that typically consider the Ten Commandments to be authoritative as a religious matter, including Protestants, Catholics, and Jews, have substantial differences among them with respect to religious teachings that pertain to the structure, content, and meaning of the commandments.[77]

50.     H.B. 71 asserts that the version of the Ten Commandments adopted under the statute is "identical" to the text of the Ten Commandments monument at issue in *Van Orden v. Perry*, 545 U.S. 677 (2005). H.B. 71 ¶ A(6). I have compared both, and they appear to be nearly identical.

51.     The *Van Orden* version of the Ten Commandments, and thus the official version adopted under H.B. 71, is Protestant in its structure: The ordering system is associated with, and derives from, the Protestant King James version.[78]

52.     Further, the *Van Orden* version of the Ten Commandments, and thus the official version adopted under H.B. 71, is Protestant in its content, which also is drawn from the Protestant King James translation of the Bible.[79] The decision to use a Protestant translation of the Ten Commandments has substantial theological implications; there are significant differences and religious disputes between the Jewish, Catholic, and Protestant traditions when it comes to the content and meaning of the Commandments.[80]

---

[77] "Ten Commandments," *The Oxford Companion to the Bible*, 737 ("The enumeration of the commandments varies among the religious communities."); Finkelman, "The Ten Commandments on the Courthouse Lawn and Elsewhere," *supra* n.32, at 1498-1499.
[78] Finkelman, "The Ten Commandments on the Courthouse Lawn and Elsewhere," *supra* n.32, at 1492.
[79] *Ibid.*
[80] *Ibid.*, 1495.

Exhibit H-1_Green Expert Report
DEFS_000151

53. As one example, the Hebrew Ten Commandments, and English translations followed by most Jews, explicitly exalt God's delivery of the Israelites from slavery: "I the LORD am your God who brought you out of the land of Egypt, the house of bondage." This is "a statement of faith that in itself is a Commandment."[81] For many Jews, this language is a critical recognition of their special relationship and covenant with God, and erasing this text may be considered deeply offensive to them as a spiritual matter. The version of the Ten Commandments adopted by Louisiana lawmakers states only, "I AM the LORD thy God;" it omits any reference to God's role in bringing the Jewish people out of Egypt and slavery.[82] According to one commentary, for Jews, this prologue is "intimately connected to the first commandment ('You shall have no other gods before me'). . . . And the first commandment, together with the prologue, serves as the foundation upon which all the others stand . . . Given the importance of the prologue to a correct understanding of the rest of the commandments [for Jews], excising it (for purposes of 'posting' the Decalogue in public places, for example) violates the intent of the commandments."[83]

54. Further illustrating the conflict between the Protestant text of H.B. 71's official version of the Ten Commandments and Jewish beliefs about the commandments, H.B. 71's directs "Thou shalt not kill." The Jewish version, however, admonishes, "You shall not murder."[84] This "difference in translation is significant."[85] As a colleague in this area of study has explained, "There is a clear legal difference between to kill and to murder, and this difference has had, and continues to have, important theological implications."[86] Indeed, the state's decision to warn not

---

[81] *Ibid.*, 1486. *See generally* Ben-Tsiyon Segal and Gershon Levy, *The Ten Commandments in History and Tradition* (Jerusalem: Magnes Press, 1990) (discussing the uniqueness of the decalogue and its place in the Jewish tradition).
[82] "Ten Commandments," *Oxford Companion*, *supra* n.77, at 737.
[83] "Ten Commandments," *in The Cambridge Dictionary of Christian Theology*, ed., Ian A. McFarland, et. al (Cambridge: Cambridge University Press, 2011), 106-107.
[84] "Murder," *Oxford Companion*, *supra* n.77, at 532.
[85] Finkelman, *supra* n.32, at 1495.
[86] *Ibid.*

Exhibit H-1_Green Expert Report
DEFS_000152

to "kill" instead of not to "murder" touches on a longstanding doctrinal controversy between religions that persists today.

55. H.B. 71's Protestant version of the Ten Commandments is also at odds with views held by many Catholics. One notable example: Drawing from the King James Bible, H.B. 71 warns, "Thou shalt not make thyself any graven images." However, some Catholic translations instead prohibit "carv[ing] idols for yourselves in the shape of anything in the sky above or on the earth below or in the waters beneath the earth."[87] These differences in translation are "substantive" and "theological."[88] A broad prohibition on "graven images" could, for some Catholics, call into question the faith's reliance on and adoration of various religious statues.[89]

56. Despite any assertions to the contrary, because of the substantial doctrinal differences among those religions that consider the Ten Commandments to be part of their theology, it is my expert opinion that the version of Ten Commandments adopted under H.B. 71 is Protestant and *not* nondenominational. Moreover, even if there were a way to somehow reconcile the differences among faith systems that teach the Ten Commandments, H.B 71's approved version is religiously exclusive in that it fails to include those religions that do not accept the Ten Commandments.

Respectfully submitted,

Steven K. Green, J.D., Ph.D.
August 13, 2024

---

[87] *Ibid.*, 1493-94 (internal quotation marks omitted).
[88] *Ibid.*, 1494; "Idolatry," *Cambridge Dictionary of Christian Theology*, 234 (comparing the different Jewish and Christian understandings of the use of idols).
[89] *See* "Graven Image" and "Idols," *Oxford Companion*, *supra* n.77, at 261-262, 297-298 (describing the interchangeability of the terms "graven image" and "idol" in Hebrew and noting that "[s]trict prohibition of idolatry is one of the most distinctive features of Israelite religion," *ibid.*, 297, whereas many Christian denominations interpret the commandment quite permissively to allow idols and icons: "there are significant differences in practice between Roman Catholic and Orthodox churches, on the one hand, and some Protestant churches, on the other," *ibid.*, 298.

Exhibit H-1_Green Expert Report
DEFS_000153